

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAY 1 7 1995

Michael N. Milby
Clerk of Court

ASCENCIO, et al )
)
v. )        C.A. No.  B-94-215
)
TROMINSKI, et al. )
_____)

PETITIONERS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS
NO SUBSTANTIAL CONTROVERSY

Come Petitioners, and in anticipation of filing a motion for
Summary Judgment, pursuant to Rule 56, Federal Rules of Civil
Procedure, and this Court's Order of April 26, 1995, and in the
interest of giving Respondents ample time to verify that no
substantial controversy exists with respect to any of the material
facts upon which Petitioners intend to rely in support of said
motion, present herewith their Statement of Material Facts As To
Which There Exists No Substantial Controversy. [1]

I.  SOURCES OF MATERIAL FACTS
AS TO WHICH THERE EXISTS NO SUBSTANTIAL CONTROVERSY

At the status conference conducted on April 26, 1995, both Parties
represented to the Court that the facts which are material to the
instant action are not in dispute.  These representations are fully
supported by the record herein.  Respondents have not contested,
much less provided any <u>evidence</u> tending to disprove, any of the
material facts established through Petitioners' verified Petitions,
declarations under penalty of perjury, and other evidentiary
materials submitted as Exhibits.  Nor did Respondents make timely
denials of any of the facts set forth in Petitioners' First and
Second Sets of Requests for Admission.  All of the factual material

_____

[1]  Petitioners reserve the right to supplement this Statement
with additional facts, if required.

1179

contained in the record was provided by Petitioners, although much of it originally came from Respondents. And according to Respondents' own admission, none of it is in dispute.

Petitioners' Original, First, and Second, Amended Petitions, [2] were all verified. No answer was ever filed to either the original, or the First Amended Petitions, and "Defendants' Answer to Plaintiffs' Second Amended Petition For Writ of Habeas Corpus and Class Action Complaint for Declaratory Judgment and Injunction Relief," [3] was not verified. [4]

Petitioners also filed two sets of requests for admission. No timely response was received to either set, and Respondents have neither sought, nor obtained, an Order under Rule 36(b), F.R.Civ.P., permitting the withdrawal or amendment of any of these admissions. Consequently, all matters set forth in Petitioners' First and Second Sets of Requests for Admission [5] are taken as

---

[2] The Original, First, and Second Amended Petitions are hereinafter cited as (PET:___) (PET1:___) and (PET2:___), respectively, where (PET2:10), for example, would refer to page 10 of Petitioners' Second Amended Petition.

[3] Hereinafter referred to as Respondents' "Answer," and cited as (ANS:___), where, for example, (ANS:3) would refer to page 3 of Respondents' Answer.

[4] In its Answer, Respondents deny, or refuse to admit, some of the facts alleged, generally on the grounds that they claim that they do not have sufficient information to admit or deny same. Most of these facts are not "material," and are therefore not included herein. Any such facts which were not admitted, but which Petitioners consider to be material, and for which the record contains other evidence demonstrating the truth of the matters which Respondents deny, refuse to admit, will be so identified, for the Court's convenience.

[5] Facts established by the requests for admission, which are found in the record as Petitioners' Exhibits G and O, will be cited as (AD1:___) and (AD2:___), respectively, where (AD2:10), for example, would be found as Exhibit O, and would refer to admission #10, of Petitioners' Second Set of Requests for Admission.

2

1180

conclusively established.

Finally, with the exception of <u>Petitioners' Exhibit Q</u>, all of the
Exhibits which Petitioners have filed herein, (<u>Petitioners'
Exhibits A</u> through <u>P</u> and <u>R</u> through <u>T</u>), were served on Respondents
well before the Status Conference of April 26, 1995.  <u>Petitioners'
Exhibit Q</u> is a copy of a document provided by Respondents after
that date.  These Exhibits are therefore within the scope of
Respondents' admission, in open Court, on April 26, 1995, that the
facts are not in dispute, and, to the extent that the Exhibits
embody factual matters, are also taken as established.

II.  STATEMENT OF UNDISPUTED FACTS<br>A.  THE PARTIES

1. Petitioners Juana Ascencio-Guzman, Efrain Merino, Arturo Lopez-
Lozano, Alejandra Gutierrez, Juan Sanchez-Salinas, Adelita Cantu de
Cabrera, and Ramiro Gracia-Cantu are all lawful permanent residents
of the United States.  Petitioners Ascencio, Merino, Gutierrez, and
Sanchez, were stopped by Respondents at Ports of Entry within the
jurisdiction of this Court, and placed in exclusion proceedings,
which proceedings are still pending, either before an Immigration
Judge, or before the Board of Immigration Appeals.  Petitioner
Cabrera was stopped at a Port of Entry, and was under exclusion
proceedings at the time the instant Petition was filed, but has
since been granted relief by an Immigration Judge, and said
proceedings have been terminated.  Petitioner Gracia is currently
under deportation proceedings.  Petitioner Lopez was under
deportation proceedings at the time the instant Petition was filed,
but has since been granted relief by an Immigration Judge, and
deportation proceedings against him have been terminated, (PET2:2,
3,5,7,8) (ANS:2-6).

2. Respondent Immigration and Nationality Service is an executive
agency of the United States, with offices in Harlingen, Texas,

3

1181

within the jurisdiction of this Court, (PET2:2-3) (ANS:3).

3.   Respondent E.M. Trominski is the District Director of the Harlingen, Texas, District of Respondent Immigration and Nationality Service, with offices in Harlingen, Texas, within the jurisdiction of this Court, (PET2:3) (ANS:3).

4.   Respondent Hon. Janet Reno is the duly appointed Attorney General of the United States, (PET2:3) (ANS:3).

5.   Petitioner Ramiro Gracia-Cantu, (A26 948 199), is a native and citizen of Mexico, who has resided in the United States as a lawful permanent resident since June 25, 1984, (PET2:3) (ANS:3).

6.   On or about December 11, 1992, Mr. Gracia was convicted in State Court in Illinois of an offense allegedly relating to the distribution of a controlled substance, for which offense he was fined and sentenced to four years' probation, (PET2:3) (ANS:3).

7.   In approximately June, 1994, Respondents contacted Mr. Gracia, and asked him to present himself to the Investigations branch of the INS office in Harlingen, Texas.  Mr. Gracia obtained counsel, who was informed by the INS agent in charge of the case that he was to be served with an Order to Show Cause, (an "OSC"), initiating deportation proceedings, and a warrant of arrest.  It was agreed that Mr. Gracia would surrender on June 22, 1994, for service of the OSC, and to post bond, (PET2:3) (ANS:3).

8.   On June 22, 1994, Mr. Gracia appeared at the INS office in Harlingen, Texas, with counsel.  The OSC was served, and bond was posted.  During the processing the INS agent asked whether Mr. Gracia had his resident alien card with him. [6]   Counsel inquired

---

[6]   Hereinafter, resident alien cards, issued on forms I-551 and I-151, will be referred to as "green cards."

4

1182

whether it was the agent's intention to confiscate Mr. Gracia's green card, and was told that it was. The agent informed counsel that it was the practice of the Investigations branch of the Harlingen INS Office to confiscate green cards in such cases, for fear that, if the individual were ultimately deported, he or she might not surrender the green card, but might continue to use it illegally, (PET2:3-4) (ANS:3) (AD1:16). See also, (AD1:17)

9.   Under protest, Mr. Gracia surrendered his green card, and was given an I-94, valid only until December 21, 1994, with his photo, and a small stamp, stating that it is a "Temporary Form I-551," and indicating that he was admitted for permanent residence at "HLG/IR6/06-2584," and that he is under bond. The I-94 contained no "employment authorization" stamp. Rather, in large, fully legible letters, it bore the following notation:

> "DEPORTATION PROCEEDINGS INITIATED
> 241(a)(2)(B)(i) & 241(a)(2)(A)(iii)."

(PET2:4) (Petitioners' Exhibit A) (ANS:3).

10.   Subsequently, at the insistence of counsel, Mr. Gracia was issued a new replacement card, which does not bear the offending notation, (PET2:4) (ANS:4).

11.   Petitioner Arturo Lopez-Lozano, (A37 522 584), has been a lawful permanent resident of the United States since June 16, 1981. On May 2, 1988, Mr. Lopez was convicted of an offense involving a controlled substance. The following day, Respondents initiated deportation proceedings against him. Mr. Lopez conceded deportability, and applied for relief under Section 212(c) of the Act, (8 USC Sec. 1182(c)). Following a hearing, an Immigration Judge in Harlingen, Texas, denied said application in the exercise of discretion. Mr. Lopez appealed to the Board of Immigration Appeals, ("BIA"), who, on August 25, 1994, granted his appeal, and

5

1183

remanded the case to the Immigration Judge for further proceedings, and entry of a new decision.  On remand, and subsequent to the filing of the instant Petition, the Immigration Judge granted his application for Section 212(c) relief, and terminated deportation proceedings, (PET2:4-5) (ANS:2,4) (AD2:2).

12.  In the early morning hours of Friday, December 23, 1994, Mr. Lopez sought admission to the United States as a returning lawful permanent resident, presenting himself for inspection at the Port of Entry in Brownsville, Texas, and tendering his green card to the official, (PET2:5) (ANS:4) (AD2:4) (<u>Petitioners' Exhibit H</u>).

13.  At that time, his resident alien card, and his Texas driver's license, were confiscated by Respondents, and he was returned to Mexico, (PET2:5-6) (ANS:4) (AD2:4) (<u>Petitioners' Exhibit H</u>).

14.  Later that day, his wife contacted the undersigned, who contacted counsel for Respondents.  It was ascertained that Mr. Lopez had been denied admission because the remand from the BIA had not been entered in INS' computer, which error was corrected. Respondents' counsel advised Mr. Lopez' counsel that he should return to the Port of Entry, and that he would be admitted, (PET2:6) (ANS:4) (AD2:5) (<u>Petitioners' Exhibit H</u>).

15.  At approximately 3:30 p.m., on Friday, December 23, 1994, Mr. Lopez returned to the Brownsville Port of Entry, and again requested admission as a returning resident.  He informed the official on duty that the computer now would reflect the fact that he was entitled to readmission.  However, the official refused to re-admit Mr. Lopez, or even check the computer, and instructed Mr. Lopez' wife that she would have to go to the INS Office in Harlingen, Texas, on Tuesday, December 27, to get some "paper" stating that INS had agreed to let him return to the United States. By this time, it was late in the afternoon, on the Friday before Christmas, so there was nothing to do but wait until the following

1184

Tuesday, (PET2:6) (AD2:5) (<u>Petitioners' Exhibit H</u>).  [7]

16.  On Tuesday, December 27, 1994, Mrs. Lopez returned with counsel to the INS Office in Harlingen, and reiterated her request that her husband be re-admitted to the United States.  Eventually, that request was granted, and on the afternoon of December 27, 1994, Mr. Lopez was finally re-admitted, (PET2:6) (ANS:4) (AD2:6) (<u>Petitioners' Exhibit H</u>).

17.  Petitioners Juana Ascencio-Guzman, (A90 775 805), and Efrain Merino, (A91 495 976), are both lawful permanent residents of the United States.  On or about July 3, 1994, they were stopped at the Brownsville, Texas, Port of Entry, following a brief departure to Mexico, and placed in exclusion proceedings, for allegedly attempting to illegally bring Mr. Merino's nephew, who was ill, into the United States for medical treatment.  Their resident alien cards, and Ms. Ascencio's Texas Identification card, were all confiscated by Respondents.  They were placed in exclusion proceedings, and forced to return to Mexico.  They finally secured counsel, who, on October 31, 1994, was able to obtain permission for them to be paroled into the United States pending completion of their exclusion proceedings, (PET2:2,6-7) (AD2:7) (ANS:3-4).  [8]

---

[7]  This is one of the areas where Respondents have refused to admit some of the allegations of the Petition, specifically, that Mr. Lopez went to the Port of Entry late in the afternoon of December 23, 1994, and was refused readmission.  Respondents base their refusal on the claim that they are "without sufficient knowledge to admit or deny" same, (ANS:4).  However, Mr. Lopez' version of events is not only supported by his unrebutted Declaration, (<u>Petitioners' Exhibit H</u>), which was served on Respondents virtually immediately after the events in question, but by other facts which were admitted by Respondents, to the effect that his wife and counsel were obliged to return to INS on Tuesday, December 27, 1994, before he was finally re-admitted, (ANS:4).

[8]  This is another instance where Respondents have refused to admit an allegation of the Petition, to wit, that Petitioners Ascencio and Merino were "forced" to return to Mexico, on the grounds that Respondents are allegedly "without sufficient

7

18. The parole documents given to Petitioners Ascencio and Merino carry a notation that they have been paroled into the United States pending determination of their right to re-enter, (PET2:7) (ANS:5) (AD2:8) (Petitioners' Exhibit I).

19. The notation on the parole documents that Petitioners Ascencio and Merino have been paroled into the United States pending determination of their right to re-enter interferes with the exercise of certain rights [9] which attend their status as lawful permanent residents, including the right to make innocent, brief, and casual border crossings. [10]      On or before March 2, 1995,

———————————

knowledge to admit or deny" same, (ANS:4). However, the fact that Petitioners were, indeed, "forced" to return to Mexico is shown by Respondents' admission that, on October 31, 1994, they granted their request for parole, and ultimately allowed Ms. Ascencio and Mr. Merino to return to the United States pending the completion of exclusion proceedings, (ANS:4) (Petitioners' Exhibit I).

[9]   At the April 26, 1995 hearing, Respondents asserted that these notations do not interfere, even as a practical matter, with the ability of a lawful permanent resident to obtain employment. Given that this assertion was made at the hearing, the fact that the notations also frequently cause potential employers to find excuses for not granting employment to holders or such cards will be taken as disputed. However, it is not "material" for purposes of summary judgment, insofar as it is indisputable that the notations interfere with the exercise of other rights which pertain to the status of lawful permanent residence, including the right to make casual border crossings, c.f., Rosenberg v. Fleuti, 374 U.S. 449 (1963); Molina v. Sewell, 983 F.2d 676 (5th Cir. 1993).

[10]   This is an area where Respondents actually denied the allegation that such a notation "interfer[es] with the exercise of the attendant rights [of lawful permanent resident status], including the right to make innocent, brief, and casual border crossings," (ANS:5). That this denial is wholly frivolous is shown by other facts of record, including the protracted battle to obtain assurances that Mr. Merino and Ms. Ascencio could visit her ailing mother in Mexico, and, in the absence of conduct which would justify a refusal, be re-paroled into the U.S. on their return.

This battle was won only after the Court suggested, at the Pretrial Conference of April 26, 1995, that Petitioners submit a proposed Order to that effect, following which, Respondents finally relented, and granted the requested guarantee, (Petitioners'

8

1186

Petitioner Ascencio received word that her mother was ill in Mexico, and on or about that date, her counsel requested Respondents permit her to visit her mother, and be re-paroled on her return. Said request was not granted until May 2, 1995, (PET2:7) (AD2:8) (<u>Petitioners' Exhibits Q and S</u>).

20. Petitioner Alejandra Gutierrez, (A41 858 559), is a lawful permanent resident of the United States. On or about August 4, 1994, she was stopped at the Brownsville, Texas, Port of Entry, and placed in exclusion proceedings, for allegedly attempting to illegally cross her sister and nieces into the United States. Respondents confiscated her green card, and forced her to return to Mexico. On or about January 6, 1995, Ms. Gutierrez' counsel filed a request with Respondents that she be paroled into the United States, without bond. On January 27, 1995, her request for parole was granted, (PET2:7) (AD2:9) (ANS:5) (<u>Petitioners' Exhibit J</u>).

21. Juan Sanchez-Salinas (A13 102 286) obtained lawful permanent residency in 1964. Following a conviction for an offense involving a controlled substance, Mr. Sanchez was placed in exclusion proceedings, paroled into the U.S., and, ultimately, held in detention at the Port Isabel Service Processing Center. Through counsel, Mr. Sanchez sought permission to be released from detention, upon payment of a bond. Said request was granted, and on or about August 17, 1994, Mr. Sanchez posted bond, and was

---

Exhibit Q). Moreover, the letter affirmatively states that Respondents do not ordinarily allow such border crossings in the cases of people like Ms. Ascencio and Mr. Merino, notwithstanding that they continue to enjoy lawful permanent resident status. Respondents have also imposed unreasonable restrictions, including a requirement that Petitioners must advise Respondents, prior to their departure, of their "return date, and at which port of entry they will apply for parole upon their return," (Id.). The stated purpose of this requirement is allow Respondents to "notify the supervisor at that location of the arrival of [Petitioners] to prevent delays on their return from Mexico," (Id.). This further demonstrates that such trips are not ordinarily permitted.

9

CVisPDF - www.texisi.com

released.  He was given an I-94, with his photo and fingerprint. However, the document given Mr. Sanchez specified that it was "Not Valid For Employment," which defect was cured only through the intervention of the SAUSA handling the instant action at that time, (PET2:8) (ANS:5) (AD2:10) (<u>Petitioners' Exhibit K</u>).

22. Adelita Cantu de Cabrera, (A38 102 369), was paroled into the United States on November 9, 1993, pending exclusion proceedings, but was initially denied employment authorization, unless and until she paid a fee, which error Respondents agreed to cure only after being told that she was being added as a Petitioner herein, (PET2:8) (AD2:12) (ANS:6) (<u>Petitioners' Exhibit M</u>).

23.  When a lawful permanent resident applies for admission as a returning resident at a port of entry under the jurisdiction of the Harlingen, Texas, INS Office, and Respondents have reason to believe that said person has committed an act which would subject him or her to exclusion proceedings, if criminal prosecution is also contemplated, it is the practice [11] of Respondents to parole the individual into the United States for prosecution, and place him or her under exclusion proceedings.  If the prosecution results in a conviction, it is the practice of Respondents to detain said individual at the Service Processing Center at Los Fresnos, Texas, pending exclusion proceedings.  Upon request of counsel, and in some cases upon payment of a bond, such persons are frequently paroled into the United States, (PET2:9) (ANS:6) (AD2:14,17) (<u>Petitioners' Exhibit K</u>). [12]

---

[11] As used herein, the term "practice" means an act performed or procedure followed in more than half of the instances described.

[12] Interestingly, Respondents appear to assert in their Answer that the procedures for obtaining the release of lawful permanent residents in exclusion proceedings who are detained by Respondents are even more restrictive than those alleged by Petitioners, in that Respondents appear to deny that they grant more than half of the requests made by attorneys that their lawful permanent resident clients detained at PISPC for exclusion proceedings be paroled into

10

CutePDF - www.texla.com

24. When a lawful permanent resident applies for admission as a returning resident at a port of entry under the jurisdiction of the Harlingen, Texas, INS Office, and Respondents have reason to believe that said person has committed an act which would subject him or her to exclusion proceedings, if criminal prosecution is <u>not</u> contemplated, it is the practice of Respondents to initiate exclusion proceedings, and, in most instances, force said person to return to Mexico, without even advising him or her of the possibility of being paroled into the United States.  In such cases, unless the individual obtains counsel, it is very difficult to ascertain, and follow, the procedures necessary to request that he or she be paroled into the U.S. during the exclusion proceedings, (PET2:9) (AD2:15,16,18) (ANS:6).

25. In the Harlingen, Texas INS District, when Respondents place lawful permanent residents under exclusion proceedings, it is Respondents' practice to confiscate their green cards, and not to return these cards unless and until exclusion proceedings are terminated in favor of the resident.  In such cases, Respondents often also confiscate other documents, such as (valid) U.S. drivers' licenses, state issued identification cards, and Mexican passports, and have in some cases refused to return such documents unless and until exclusion proceedings are terminated, in favor of the permanent resident, (PET2:7,9-10) (AD2:20) (ANS:4,7) (<u>Petitioners' Exhibit L</u>).

26. INS has previously asserted to this Court that when a lawful permanent resident who has posted bond in connection with deportation proceedings, departs the United States, the bond is subject to either forfeiture or cancellation, in INS' discretion, and has never retracted said assertion.  INS has also asserted that the fact that a lawful permanent resident departed the United

---

the United States upon payment of a bond, (ANS:6), although they admit that they did so in the case of Mr. Sanchez.

States while under deportation proceedings is a fact to be taken into consideration in determining whether exclusion proceedings are appropriate, (PET2:10) (<u>Petitioners' Exhibit C</u>).   [13]

27. Many lawful permanent residents whose green cards have been confiscated by Respondents because they have been placed in exclusion or deportation proceedings have legitimate business and personal needs which require them to make "casual, brief, and innocent" trips into Mexico, and back, but are deterred from making such trips by the actions of Respondents in, <u>inter alia</u>, confiscating their green cards, and providing them either with no substitute documentation, or with substitute documentation which greatly increases the possibility that they would not be allowed to re-enter, or be re-paroled, into the U.S. on their return, (PET:6) (PET1:5-6) (PET2:7,10-11) (AD1:9,10,11,12,13,24,25) (AD2:8,11,13)

---

[13]   Petitioners requested that the Court take judicial notice of Respondent's <u>Answer to Petition for Writ of Habeas Corpus and Request for Dismissal of Action</u>, filed May 30, 1986, in the case of <u>Lozano-Molina v. Sewell</u>, C.A. B-86-101, at paragraph 13, where Defendants claimed that a departure to Mexico by a lawful permanent resident who was on bond while under deportation proceedings was a violation of the terms of the bond "because a demand upon the obligor to present the [alien] would have been impossible."

Petitioners also submitted <u>Exhibit C</u>, documenting the fact that, notwithstanding the decision in <u>Molina v. Sewell</u>, 983 F.2d 676 (5th Cir. 1993), reaffirming the principle that a lawful permanent resident in deportation proceedings does not lose his status as a lawful permanent resident, INS has asserted that the departure to Mexico of a lawful permanent resident, while under deportation proceedings, is a factor "to be given some weight in determining whether [his] departure was a meaningful one," (<u>Exhibit C</u>).

Respondents now deny that they made either of these assertions, (ANS:7), although both are matters of record, and relate to the same individual involved in <u>Molina v. Sewell</u>, <u>supra</u>, to wit, Israel Lozano-Molina, A36 599 698.  This denial is particularly puzzling, given that the pleading submitted as <u>Petitioners' Exhibit C</u> was signed by the INS General Attorney who is now Of Counsel for the Respondents herein.

12

1190

(ANS:7) (<u>Petitioners' Exhibits A, B, C, D, I, K, L, M, and Q</u>). [14]

28. When Respondents provide replacement documentation to lawful permanent residents whose green cards were confiscated because they were placed in deportation proceedings, Respondents usually limit the validity of those documents to a period of six (6) months, and require that the residents renew them periodically, for the duration of the proceedings, (PET2:33) (ANS:7) (<u>Petitioners' Exhibits A, B, and D</u>).

29. When Respondents provide replacement documentation to lawful permanent residents whose green cards were confiscated because they were placed in exclusion proceedings, Respondents usually do not limit the validity of such documents to any particular period of time. Instead, they usually place a notation on the document that specifies that the holder is in exclusion proceedings, and ties its validity to the conclusion of those proceedings, (<u>Petitioners' Exhibits I, K, L, and M</u>).

30. The confiscation of the green cards of lawful permanent residents placed in deportation or exclusion proceedings in the Harlingen INS District, without provision of substitute documents which place no cloud over their status as lawful permanent residents, and the resultant curtailment of their rights and privileges, has been a source of controversy within the Harlingen District Office of INS for at least a dozen years, (PET:7) (PET1:8)

---

[14] This factual statement, found at Paragraph 31 of Petitioners' Second Amended Petition, (PET2:10-11), is one about which Respondents disclaim sufficient knowledge to admit or deny, (ANS:7). However, the record is replete with information which demonstrates its truth, not the least of which is <u>Petitioners' Exhibit Q</u>, in which Respondents affirmatively state that it is their practice to <u>not</u> allow certain lawful permanent residents to come and go freely from the United States.

1191

CVAPDF - www.texriu.com

(PET2:11-12) (<u>Petitioners' Exhibit T</u>). [15]

31.  From the date of the issuance of the decision of the Fifth
Circuit Court of Appeals in the case of <u>Molina v. Sewell</u>, 983 F.2d
676 (5th Cir. 1993), to wit, February 22, 1993, until the date of
the filing of the instant action, on July 15, 1994, Respondents
made no changes in their practices, procedures, or policies
regarding the confiscation of green cards of lawful permanent
residents who are placed under deportation proceedings, as a result
of, or based on, the Court's ruling in said case, (AD1:1,2).

32.  Between February 22, 1993 and July 15, 1994, it was the
practice of the Investigations branch of the Harlingen INS office
to confiscate the green cards of lawful permanent resident aliens
on whom they served Orders to Show Cause and Warrants of Arrest,
regardless of whether the individual simultaneously posted bond or
was released on recognizance, (AD1:4).

33.  Between February 22, 1993 and July 15, 1994, it was

_____

[15]  In their Answer, (ANS:8), Respondents address Paragraph 35,
consisting of this very allegation, as follows:

   Paragraph  thirty-five  is  a  characterization  of
   plaintiffs' lawsuit and does not contain allegations of
   fact requiring an answer, but insofar as an answer may be
   deemed required, the allegations are denied.

The  fact  that  the  problem  at  bar  has  long  been  a  source  of
controversy in the Harlingen District is indeed an "allegation[] of
fact."  It is one with respect to which Respondents' first managing
attorney requested further information, during the conversation
which brought about the original settlement agreement herein.  The
information requested was provided by letter dated July 29, 1994,
with copies to Ms. Masso, Mr. Guerra, and Mr. Carte, (<u>Petitioners'
Exhibit T</u>).  No further information was requested, either by Mr.
Rose, or by any of his successors, on this point.

It is therefore difficult to imagine that Respondents' denial of
Paragraph 35 of Petitioners' Second Amended Petition is meant to be
taken seriously, and this allegation is consequently included as an
undisputed fact.

Respondents' practice to provide I-94s, with a stamp indicating that the individual had been admitted as a lawful permanent resident, to lawful permanent residents who were processed for deportation proceedings by the Investigations branch of the Harlingen INS Office, and who, at the time of processing, either posted bond or were released on recognizance, although the I-94's provided did not always include the notation: "EMPLOYMENT AUTHORIZED." (AD1:5,6).

34.  In situations such as described in No. 33 above, it was Respondents' practice to put a notation on the I-94, indicating that the individual was under deportation proceedings, (AD1:7).

35.  In situations such as described in No. 33, above, where bond was posted, it was the practice of the Investigations branch of the Harlingen INS office to put a notation on the I-94, indicating that the individual had been released on bond, (AD1:8).

36.  In situations such as described in No. 33, above, notations were sometimes placed on the I-94, indicating that it was not valid for re-entry to the United States, (AD1:9).

37.  On July 22, 1994, in the offices of the Investigations branch of the Harlingen INS office, an agent of Respondents told Julio Herrera-Loa [16] in the presence of his counsel, after Mr. Herrera had been served with a (superseding) Order to Show Cause charging deportability only under Section 241(a)(2)(C) of the Act, and a new I-94, that since he is under deportation proceedings, if he were to cross into Mexico without first obtaining an advance parole, he would automatically be deported, (AD1:10).

38.  Between February 22, 1993 and July 15, 1994, when class members who were issued an I-94 by the Investigations branch of the

---

[16]  A former Petitioner, now deceased.

15

Harlingen INS office inquired whether they could use that document to go to Mexico and back, they were sometimes informed that the document was not valid for that purpose, (AD1:10,11).

39.  Between February 22, 1993 and July 15, 1994, when a class member who had been detained at the Port Isabel Service Processing Center posted bond or was released on recognizance, it was not Respondents' practice to provide any evidence of his status as a lawful permanent resident other than the bond or release papers, and the Order to Show Cause, unless the individual or his representative specifically requested such a document, (AD1:12).

40.  As of July 15, 1994, it was not the practice of the Deportations branch of the Harlingen INS office to confiscate the green cards of lawful permanent resident aliens on whom they served Orders to Show Cause and Warrants of Arrest, in situations where the individual simultaneously posted bond or was released on recognizance, (AD1:14).

41.  As of July 15, 1994, it was not the practice of the McAllen Sector of the U.S. Border Patrol to confiscate the green cards of lawful permanent residents on whom they served Orders to Show Cause and Warrants of Arrest, in situations where the person simultan-eously posted bond, or was released on recognizance, (AD1:15).

42.  On June 22, 1994, an agent of Respondents told Petitioner Gracia in the presence of his counsel that the primary reason that it was the practice of his office to confiscate the individual's green card in cases such as his was a concern that, if and when the person were deported from the United States, he might not surrender the card, but might continue to use it illegally, (AD1:16).

43. On July 22, 1994, an agent of Respondents told Julio Herrera-Loa in the presence of his counsel that the primary reason that it was the practice of his office to confiscate the green cards in

16

1194

cases such as his was a concern that, if and when the person was deported from the U.S., he might not surrender the card, but might continue to use it illegally, (AD1:17).

44. A lawful permanent resident who has made a "brief, casual, and innocent" departure from the U.S. and seeks readmission as a returning resident, who presents an I-94 indicating that he is a lawful permanent resident under deportation proceedings, is more likely to be denied readmission and placed in exclusion proceedings, than would have been the case if he had presented his green card, (PET1:21-23) (AD1:24,25) (Petitioners' Exhibit C).

Respectfully Submitted,

Lisa S. Brodyaga                    Thelma O. Garcia
402 E. Harrison, 2nd Floor          301 E. Madison
Harlingen, Texas 78550              Harlingen, Texas 78550
(210) 421-3226                      (210) 425-3701

CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing, with attachment, were mailed to Regina Byrd, Attorney, OIL, U.S. Department of Justice, Civil Division, Box 878, Ben Franklin Station, Washington, D.C. 20044, David Guerra, AUSA, 1701 W. Highway 83, #305, McAllen, Texas 78501, and Ken Muir, General Attorney, INS, 2102 Teege, Harlingen, Texas 78550, this    th day of May, 1995.


_____
Lisa S. Brodyaga
Attorney at Law

17

1195

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO, et al                    )
                                   )
v.                                 )        C.A. No.  B-94-215
                                   )
TROMINSKI, et al.                  )
_____)


PETITIONERS' EXHIBIT "S"
IN SUPPORT OF STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE EXISTS NO SUBSTANTIAL CONTROVERSY

1196

**LAW OFFICES OF REFUGIO DEL RIO GRANDE**
402 E. Harrison, 2nd Floor
Harlingen, Texas 78550
(210) 421-3226
March 2, 1995

Immigration and Naturalization Service
2102 Teege
Harlingen, Texas 78550

Re:   Juana Ascencio Guzman
      A90 775 805
Attn:  Larry Doyle, ADDE

Dear Mr. Doyle:

The above-captioned lawful permanent resident was paroled into the
U.S., pending final resolution of exclusion proceedings.

However, she now finds herself in a dilemma, in that her mother, in
Mexico, is gravely ill, suffering from cardiac problems.  She would
therefore request that she be permitted to make a "brief, casual,
and innocent" trip to Mexico, and that she be re-paroled into the
United States upon her return.   Documentation of the medical
emergency is on the way.

The issue of the right of a lawful permanent resident to freely
make  cross-border,  <u>Flueti</u>  type,  departures  during  exclusion
proceedings has been raised in the pending class action, <u>Herrera et
al v. Trominski, et al</u>, CA B-94-215, of which Ms. Ascencio is a
named plaintiff in the Second Amended Complaint.  Even though her
case is currently on appeal to the Board of Immigration Appeals,
there is no conceptual bar to her being re-paroled, since she is
not considered to be "inside" the United States in any event.

It is expected that the documentation will be available by the
middle of next week.  Hopefully, a decision can have been made by
that time.  It is hoped that this matter can be promptly, and
fairly, resolved, with due consideration for her status as a lawful
permanent resident of the United States.

Sincerely,

Lisa S. Brodyaga
Attorney at Law

cc:  John Carte, SAUSA

1197

**LAW OFFICES OF REFUGIO DEL RIO GRANDE**
402 E. Harrison, 2nd Floor
Harlingen, Texas 78550
(210) 421-3226
March 10, 1995

Immigration and Naturalization Service
2102 Teege
Harlingen, Texas 78550

Re:   Juana Ascencio Guzman
      A90 775 805
Attn:  Larry Doyle, ADDE

Dear Mr. Doyle:

With respect to my letter of March 2, 1995, enclosed please find
the supporting medical evidence, demonstrating that Donata Guzman
Cedillo, mother of Juana Ascencio Guzman, is currently hospitalized
in Mexico.   We thank you for your prompt consideration.

Sincerely,

/s/

Lisa S. Brodyaga
Attorney at Law

cc:  John Carte, SAUSA

1159

ZARAGOZA DE LA LUZ MUNICIPIO DE TULCINGO DE VALLE PUE A 25 DE
FEBRERO DE 1995.

que suscribe DR. SALVADOR

sugestiva por lo que suscribo integralmente.

legales que contengan

Case 1:94-cv-00215   Document 33   Filed in TXSD on 05/17/1995   Page 22 of 23

COPIA PARA EL ENFERMO



IMSS

COORDINACION GENERAL DEL PROGRAMA IMSS-SOLIDARIDAD

RECETA INDIVIDUAL

CEDULA PROFESIONAL

REGISTRO SECRETARIA DE SALUD

FECHA

CANT.    CLAVE    T.D.

FIRMA DEL MEDICO

AUTORIZACION

CLAVE

1200

CutePDF - www.tasso.com

**LAW OFFICES OF REFUGIO DEL RIO GRANDE**
402 E. Harrison, 2nd Floor
Harlingen, Texas 78550
(210) 421-3226
March 28, 1995

Immigration and Naturalization Service
2102 Teege
Harlingen, Texas 78550

Re:   Juana Ascencio Guzman
      A90 775 805, and
      Efrain Merino
      A91 495 976

Attn:  Larry Doyle, ADDE

Dear Mr. Doyle:

To date I have received no reply to my correspondence of March 2,
1995, and March 10, 1995, requesting assurances that if Juana
Ascencio Guzman visits her mother, who is currently hospitalized in
Mexico, (and in the absence of any changed circumstances), she will
be re-paroled into the United States upon her return.   By this
letter, I would include her husband, Efrain Merino, in the request,
so that he may accompany his wife on her visit.

We thank you for your attention to this matter.

Sincerely,

Lisa S. Brodyaga
Attorney at Law

cc:  Office of the United States Attorney

1201