4 0

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 2 1995

Michael N. Milby, Clerk

ASCENCIO, et al ) 
 )
v. ) C.A. No. B-94-215
 )
TROMINSKI, et al. )
_____)

## PETITIONERS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## WITH INCORPORATED POINTS AND AUTHORITIES

TABLE OF CONTENTS

I.     HISTORY OF THE CONTROVERSY .......................... 1

II.    RELIEF REQUESTED, AND POINTS AND AUTHORITIES
       IN SUPPORT THEREOF ................................. 10

       A.  POINTS AND AUTHORITIES DEMONSTRATING ENTITLEMENT
           TO RELIEF ...................................... 11

1. This Court has jurisdiction over the instant action under 28 USC Section 1346(a)(2) (action against an agency and/or officers of the United States); 8 USC Section 1329 (action arising under the Immigration and Nationality Act); 28 USC Section 2201 et seq, (declaratory Judgment action); and 5 USC Section 702 et seq, (action by one adversely affected by final agency action), coupled with 28 USC Section 1331 (federal question).......... 11

2. A person duly admitted to the United States for lawful permanent residence retains that status, with all the attendant rights and privileges, unless and until an administratively final order of deportation, (or exclusion and deportation), has been issued. Where an administratively final order is overturned following review by the U.S. Courts of Appeal, or U.S. District Courts, status as a lawful permanent resident is

retroactively restored, 8 USC Section 1101(a)(20).  Any
deprivation of the liberty of Petitioners, regardless of
whether they are physically present within the United
States, or are at the border, seeking readmission as
lawful permanent residents, must be accomplished in
accordance with procedures which comport with Due
Process....................................    11

3.  Lawful permanent residents must register with INS,
and provide certain personal information, and their
fingerprints, 8 USC Section 1302.  They are thereafter
entitled, in accordance with the regulations prescribed
by the Attorney General, to documents which unambiguously
evidence their status as lawful permanent residents of
the United States, and which do not place a cloud over,
or interfere with their ability to exercise, the rights
and privileges which attend that status..........    12

4.  Among the rights and privileges which attend lawful
permanent resident status, are the right to reside and
work in the United States, and to make casual, brief, and
innocent border crossings, (<u>Fleuti</u> excursions), without
being subsequently denied readmission as returning
residents, (or re-parole, if in parole status), and
having their documents, including, but not limited to,
their green cards, confiscated.....................    14

5.  It constitutes a violation of the liberty rights of
a lawful permanent resident to curtail the rights and
privileges which attend lawful permanent resident status,
including the right to reside and work in the United
States, and to make casual, brief, and innocent border
crossings, on the grounds that the resident is under
deportation or exclusion proceedings; <u>Rosenberg  v.</u>
<u>Fleuti</u>, 374 U.S. 449 (1963)......................    18

6.  When a lawful permanent resident is placed under
deportation proceedings, INS issues an Order to Show
Cause, and may also issue a warrant of arrest, 8 USC
Section 1252(a)(1).  When a warrant of arrest is issued,
the resident may seek redetermination of the conditions
of custody in the first instance from certain INS
officers, or from an Immigration Judge...........    21

7.  When a lawful permanent resident is placed under
exclusion proceedings, INS issues a document captioned
"Notice to Applicant For Admission Detained For Hearing
Before Immigration Judge," on Form I-122..........    21

8.  When an LPR applies for admission to the United
States as a returning resident, and presents appropriate
documentation of his or her status, but where it appears

i2

*1064*

to the examining officer that he or she is making an "entry," and is not admissible to the United States, under existing regulations, INS has three choices: they may detain the person, parole him or her into the U.S., or parole him or her for deferred inspection. In determining whether the person should be detained, the inspecting officer must consider the likelihood that he or she will abscond, or pose a security risk.....   22

9.   When a lawful permanent resident applies for admission to the United States as a returning resident, and presents appropriate documentation of his or her status, but where the examining officer does not have reasonable cause to believe that he or she is making an "entry," as defined by <u>Rosenberg v. Fleuti</u>, <u>supra</u>, and its progeny, it constitutes a violation of that person's liberty interests to refuse admission as a returning resident, even if the person is already under deportation proceedings, and/or is in an excludable class.....   24

10.   Apart from 8 USC Section 1225(c), the Immigration and Nationality Act does not authorize the summary exclusion of an applicant for admission to the United States.   Under 8 USC Section 1225(c), aliens who appear to the examining officer to be excludable for certain reasons relating to the national security, (to wit, subparagraph (A) (other than clause (ii)), and (B) or (C) of 8 USC Section 1182(a)(3)), are subject to specified summary exclusion proceedings.   However, even where INS has reason to believe that the security of the United States might be at stake, lawful permanent residents may not be summarily excluded from the United States....   24

11.   When the admissibility of a lawful permanent resident seeking readmission is challenged, INS may not accept a waiver of the person's right of to a hearing before an Immigration Judge.......................   25

12.   There is no authority under the Immigration and Naturalization Act, or under the governing regulations, for INS to force lawful permanent residents applying admission as returning residents to return to Mexico, or other country of embarkation, to await exclusion proceedings........................................   26

13.   The confiscation by Respondents of the green cards, and other documents, such as the drivers' licenses, social security cards, and state issued identification cards, of lawful permanent residents placed under exclusion proceedings, where the residents are neither detained, nor paroled into the United States, results in the residents being forced to return to Mexico (or other

i3

country of embarkation) while they await exclusion
hearings, and is tantamount to summary exclusion, which
constitutes a deprivation, without Due Process, of their
liberty interests................................... 27

14.  The practice of the Investigations Branch of the
Harlingen INS Office, of confiscating, and refusing to
return, the green cards of lawful permanent residents
whom they place under deportation proceedings, but who
are not being held in detention, and in whose cases no
administratively final order of deportation has been
entered, interferes with the LPRs' ability to exercise
the rights and privileges which pertain to their status,
and constitutes a denial of Equal Protection, and a
deprivation of their liberty, without Due Process.. 29

15.  A cloud is placed over an individual's status as a
lawful permanent resident, which interferes with the
exercise of the rights and privileges which attend that
status, including the right to engage in international
travel by making casual, innocent, and brief border
crossings, and constitutes a deprivation of liberty
without Due Process, when INS confiscates a lawful
permanent resident's green card, and either provides no
substitute documentation, or provides only a temporary I-
551, consisting of an I-94, with a stamp stating that the
individual has been admitted for lawful permanent
residence, but which suffers from one or more of a series
of common defects................................... 31

16.  Lawful permanent residents who have been ordered
deported, or excluded and deported, by an Immigration
Judge, but whose cases are under review by the Board of
Immigration Appeals, remain lawful permanent residents,
and are entitled to enjoy the rights and privileges which
attend that status, including the right to engage in
international travel, by making innocent, brief, and
casual border crossings, and to be readmitted to the
United States thereafter as returning residents.  Any
construction of 8 CFR Section 3.4 which includes such
departures, including the denial of admission or re-
parole as returning residents to lawful permanent
residents in whose cases orders of deportation or
exclusion and deportation are, (or are believed by
Respondents to be), on review before the BIA, constitutes
a deprivation of their liberty interests, without Due
Process........................................... 33

17.  When a lawful permanent resident applies for
admission to the United States as a returning resident,
the fact that he or she is under deportation proceedings
is not, in and of itself, a relevant fact to be

i4

*1066*

considered in determining whether the absence was brief, casual, and innocent, for the purpose of deciding whether exclusion proceedings are appropriate............... 37

18.  The cases of Petitioners Lopez and Cabrera are not rendered moot by the fact that relief from deportation has been granted, and proceedings against them have been terminated.  Both persons remain lawful permanent resident aliens, and the problems which they experienced could recur, and could otherwise escape review.  In addition, the case has been brought as a class action, and relief is sought is not solely on behalf of the named Petitioners, but is likewise on behalf of all others similarly situated, and the named Petitioners are not only entitled, but _obligated_, to continue as representatives of the class........................ 38

B.  RELIEF REQUESTED ................................... 41

CERTIFICATE OF SERVICE ....................................... 44

TABLE OF AUTHORITIES

I.  CASES

Aleman-Fiero v. INS,
     481 F.2d 601 (1973) . . . . . . . . . . . . . . . 36, 37

Aptheker v. Secretary of State,
     84 S.Ct. 1659 (1964) . . . . . . . . . . . . . . . 2, 14

Califano v. Aznavorian,
     99 S.Ct. 471 (1978) . . . . . . . . . . . . . . 2, 15, 18

Califano v. Torres,
     435 U.S. 1 (19  ) . . . . . . . . . . . . . . . . . 15

County of Los Angeles v. Davis,
     440 U.S. 625 (1979) . . . . . . . . . . . . . . . . 39

Etuk v. Blackman,
     748 F.Supp. 990 (E.D.N.Y. 1990) ("Etuk I") . . . . 3, PASSIM

i5

1067

Etuk v. Slattery,
     936 F.2d 1433 (2nd Cir. 1991) ("Etuk II")  . . . . 3, PASSIM

Etuk v. Slattery,
     973 F.2d 60 (2nd Cir. 1992) ("Etuk III") . . . . . 3, PASSIM

Francis v. INS,
     532 F.2d 268 (2nd Cir. 1976) . . . . . . . . . . . . . 34

Gannett Co. v. DePasquale,
     443 U.S. 368, 99 S.Ct. 2898,
     61 L.Ed.2d 668 (1978)  . . . . . . . . . . . . . . . . 39

Hernandez v. Casillas,
     520 F.Supp. 389 (S.D.TX 1981) . . . . . . . . . 25, 26, 28

Kwong Hai Chew v. Colding,
     344 U.S. 590, 73 S.Ct. 472 (1953) . . . . . . . 2, PASSIM

Landon v. Plasencia,
     459 U.S. 21, 103 S.Ct. 321,
     74 L.Ed. 2d 21 (1982) . . . . . . . . . . . . . . . . 17

Matter of A-A-,
     Interim Decision 3176 (BIA 1992) . . . . . . . . . . . 29

Matter of Becerra-Miranda,
     12 I&N Dec. 358 (BIA 1967) . . . . . . . . . . . . 16, 37

Matter of G- y B-,
     6 I&N Dec. 159 (BIA 1954) . . . . . . . . . . . . . . 15

Matter of Hernandez-Casillas,
     Interim Decision 3147 (BIA 1990) (A.G. 1991) . . . . . . . 8

Matter of Kazemi,
     19 I&N Dec. 49 (BIA 1984) . . . . . . . . . . . . . . 29

Matter of Keyte,
     Interim Decision 3128 (BIA 1990) . . . . . . . . . . . 34

Matter of Malone,
     11 I&N Dec. 730 (BIA 1966) . . . . . . . . . . . . . . 36

Matter of Nafi,
     19 I&N Dec. 430 (BIA 1987) . . . . . . . . . . . . 26, 28

Matter of Patel,
     15 I&N Dec. 666 (BIA 1976) . . . . . . . . . . . . . . 23

Matter of Rangel,
     15 I&N Dec. 789 (BIA 1976) . . . . . . . . . . . . . . 12

*1068*

CutePDF - www.twolw.com

Matter of Roman,
   19 I&N Dec. 855 (BIA 1988) . . . . . . . . . . . . . . . 36

Matter of U-M-,
   Interim Decision 3152 (BIA 1991) . . . . . . . . . . . 29

Mejia-Ruiz v. INS,
   51 F.3d 358 (2nd Cir. 1995) . . . . . . . . . 16, 18, 35

Molina v. Sewell,
   983 F.2d 676 (5th Cir. 1992) . . . . . . . . . . 2, PASSIM

NLRB v. Riley,
   681 F.2d 1083 (5th Cir. 1982) . . . . . . . . . . . . 39

Osman v. Ribicoff,
   195 F.Supp. 699 (E.D. Mich. 1961) . . . . . . . . . . 35

Pearson v. Ecological Science Corp,
   522 F.2d 171, reh. den. 525 F.2d 1407,
   cert. den. 425 U.S. 912 (5th Cir. 1975) . . . . . . . 39

Phil Elect. Co. v. Anaconda American Brass,
   42 F.R.D. 324 (E.D. Pa. 1967) . . . . . . . . . . . . 40

Rafeedie v. INS,
   880 F.2d 506 (D.C.Cir. 1989) . . . . . . 22, 23, 25, 27, 29

Research Corp v. Asgrow Seed Co.,
   425 F.2d 1059 (7th Cir. 1970) . . . . . . . . . . . . 40

Rivera v. INS,
   810 F.2d 540 (5th Cir. 1987) . . . . . . . . . 12, 26, 34

Roper v. Consurve,
   578 F.2d 1106 (5th Cir. 1978) . . . . . . . . . . 39, 40

Rosenberg v. Fleuti,
   374 U.S. 449, 83 S.Ct. 1804,
   10 L.Ed.2d 1000 (1963) . . . . . . . . . . . . . . 2, PASSIM

U.S. v. Campos-Asencio,
   822 F.2d 506 (5th Cir. 1987) . . . . . . . . . . . . . 36

U.S. v. Guest,
   383 U.S. 745 (1966) . . . . . . . . . . . . . . . . . 14

U.S. v. Mendoza-Lopez,
   95 L.Ed.2d 772, 107 S.Ct. 2148 (1987) . . . . . . . . 35

U.S. v. Palacios-Martinez,
   845 F.2d 89 (5th Cir. 1988) . . . . . . . . . . . . . 36

1069

CutePDF - www.foxita.com

Vargas-Banuelos v. INS,
    466 F.2d 1371 (5th Cir. 1972) . . . 14, 17, 18, 28, 34, 37

Vitek v. Jones,
    445 U.S. 480 (1980) . . . . . . . . . . . . . . . . . . 39

Yanez-Jacquez v. INS,
    440 F.2d 701 (5th Cir. 1971) . . . . . . . . . . . 14, 28

Young v. Higbee Corp,
    324 U.S. 204, 65 S.Ct. 594,
    89 L.Ed. 890 (1945) . . . . . . . . . . . . . . . . . 40

## II.   STATUTES

5 USC Section 702 et seq . . . . . . . . . . . . . . . . 11

8 USC Section 1101,
    Immigration and Nationality Act
    Section 101 . . . . . . . . . . . . . . . . . . . . . 20

8 USC Section 1101(a)(20)
    Immigration and Nationality Act
    Section 101(a)(20) . . . . . . . . . . . . . . . 11, 34

8 USC Section 1101(a)(13)
    Immigration and Nationality Act
    Section 101(a)(13) . . . . . . . . . . . . . . . 7, 20, 34

8 USC Section 1101(g)
    Immigration and Nationality Act
    Section 101(g) . . . . . . . . . . . . . . . . . 35, 36

8 USC Section 1105a(c)
    Immigration and Nationality Act
    Section 106(c) . . . . . . . . . . . . . . . . . 16, 35

8 USC Section 1182(a)(3)
    Immigration and Nationality Act
    Section 212(a)(3) . . . . . . . . . . . . . . . . . 24

8 USC Section 1182(a)
    Immigration and Nationality Act
    Section 212(a) . . . . . . . . . . . . . . . . . . . 22

8 USC Section 1182(c)
    Immigration and Nationality Act
    Section 212(c) . . . . . . . . . . . . . . . . . . . 33

1070

8 USC Section 1182(d)(5)(A)
    Immigration and Nationality Act
    Section 212(d)(5)(A) . . . . . . . . . . . . . . . . . 20

8 USC Section 1221
    Immigration and Nationality Act
    Section 231 . . . . . . . . . . . . . . . . . . . . . 20

8 USC Section 1225(b)
    Immigration and Nationality Act
    Section 235(b) . . . . . . . . . . . . . . . . 22, 26

8 USC Section 1225(c)
    Immigration and Nationality Act
    Section 235(c) . . . . . . . . . . . . . . . 23, 24, 28

8 USC Section 1225
    Immigration and Nationality Act
    Section 235 . . . . . . . . . . . . . . . . . . . . . 25

8 USC Section 1252(a)(1)
    Immigration and Nationality Act
    Section 242(a)(1) . . . . . . . . . . . . . . . . . . 21

8 USC Section 1302
    Immigration and Nationality Act
    Section 262 . . . . . . . . . . . . . . . . . 12, 13

8 USC Section 1304
    Immigration and Nationality Act
    Section 264 . . . . . . . . . . . . . . . . . . . 4, 13

8 USC Section 1324a(h)(3)
    Immigration and Nationality Act
    Section 274A . . . . . . . . . . . . . . . . . . . . . 4

8 USC Section 1326
    Immigration and Nationality Act
    Section 276 . . . . . . . . . . . . . . . . . . . . . 36

8 USC Section 1329
    Immigration and Nationality Act
    Section 279 . . . . . . . . . . . . . . . . . . . . . 11

28 USC Section 1331 . . . . . . . . . . . . . . . . . . . 11

28 USC Section 1346(a)(2) . . . . . . . . . . . . . . . . 11

28 USC Section 2201 et seq . . . . . . . . . . . . . . . . 11

i9

1071

## III.  REGULATIONS

8 CFR Section 3.4 . . . . . . . . . . . . . . . .  9, 15, 16, 34-37

8 CFR Section 100.4(b)  . . . . . . . . . . . . . . . . . .  4, 7

8 CFR Section 212.5 . . . . . . . . . . . . . . . . . . . .  20

8 CFR Section 215.1(h)  . . . . . . . . . . . . . . . . . .  20

8 CFR Section 235.3(c)  . . . . . . . . . . . . .  22, 23, 26, 27

8 CFR Section 235.4 . . . . . . . . . . . . . . . . . . . .  21

8 CFR Section 235.6 . . . . . . . . . . . . . . . . . . . .  21

8 CFR Section 242.2 . . . . . . . . . . . . . . . . . . . .  21

8 CFR Section 264.1 . . . . . . . . . . . . . . . . . . . .  13

## IV.  OTHER AUTHORITIES

Black's Law Dictionary, Fifth Edition (1979)  . . . . . . . .  37

Federal Rules of Civil Procedure,
    Rule 56  . . . . . . . . . . . . . . . . . . . . . . . . 1

Federal Rules of Civil Procedure,
    Rule 23(e) . . . . . . . . . . . . . . . . . . . .  39, 40

1072

.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO, et al                    )
                                   )
v.                                 )       C.A. No.   B-94-215
                                   )
TROMINSKI, et al.                  )
_____)

**PETITIONERS' MOTION FOR PARTIAL SUMMARY JUDGMENT
WITH INCORPORATED POINTS AND AUTHORITIES**

Come Petitioners, and, pursuant to Rule 56, Federal Rules of Civil
Procedure, and this Court's Order of April 26, 1995, file herewith
their Motion for Partial Summary Judgment, addressing the basic
legal issues presented herein, but leaving for later resolution,
following a determination of Petitioners' pending motion for class
certification, some of the questions regarding appropriate remedies
for individual class members who are not named herein.

I.   HISTORY OF THE CONTROVERSY

The instant action represents another step in a protracted battle,
dating back at least as far as 1981, [1]   which has been waged with

_____

     [1]   Petitioners' Exhibit T consists of a letter dated July 29,
1994, from Petitioners' counsel, to the first managing attorney for
Respondents, responding to his inquiry regarding the history of the
controversy.   The letter has been redacted, per agreement with
Respondents' current managing attorney, to delete references to
settlement negotiations.   Attached were copies of correspondence
with two prior INS District Directors, on this issue, beginning
with a letter to Hal Bolden, dated February 5, 1981, on behalf of
an LPR whose I-151 had been lifted when he was placed under
deportation proceedings, requesting that he be given some form of
evidence of his status as an LPR, sufficient to:

     enable him to claim and enjoy the benefits of his status
     as lawful permanent resident alien, specifically the
     ability to travel outside the United States and seek
     readmission as a returning resident.

CVAPDF - www.lexisi.com

three successive District Directors of the Harlingen Office of the Immigration and Naturalization Service. At the heart of the controversy is the right of lawful permanent residents of the United States, ("LPRs"), starting with the right to be provided with documents which unequivocally demonstrate their status as LPRs, unencumbered with notations clouding that status.

The primary terrain over which this struggle has been waged has been INS' practice of confiscating the documents evidencing their status as LPRs, [2] when deportation proceedings are initiated, and when exclusion proceedings are initiated, of confiscating not only the LPRs' green cards, but other documents as well, including drivers' licenses, social security cards, and state issued identification cards. As a result, the LPRs are disabled from exercising many of the rights and privileges which attend that status, "Petitioners' Statement of Material Facts With Respect to Which There Exists No Genuine Issue of Fact," hereinafter cited as (FACTS:__), at Fact Number 33; Petitioners' Exhibit T.

In the Rio Grande Valley, this struggle has focused on the manner in which Respondents' arbitrary denial of appropriate documentation to lawful permanent residents results in the deprivation, without Due Process, of their liberty interest in engaging in international travel, i.e., their right to make casual, cross-border excursions; Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); Califano v. Aznavorian, 99 S.Ct. 471 (1978); Aptheker v. Secretary of State, 84 S.Ct. 1659 (1964); Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472 (1953); Molina v. Sewell, 983 F.2d 676 (5th Cir. 1992); (FACTS:33); Petitioners' Exhibit T. [3]

---

[2] Such documents, issued on Forms I-151 and I-551, will hereinafter be referred to as "green cards."

[3] The fact that it also makes it more difficult for the LPRs to obtain, and maintain, employment is one which INS disputed at the April 26, 1995 hearing, and is therefore not addressed in this motion, although it was found to have this effect in the Etuk

2

CUbPDF - www.texbu.com

Historically, when the local INS office has confiscated the green cards [4] of LPRs under proceedings, the LPRs have been given either no identification as lawful permanent residents, or documents which are not the functional equivalent of green cards.

When anything is provided at all, the substitute documentation has generally consisted of Orders to Show Cause, bond papers, or "temporary" green cards which contain significant limitations, such as notations to the effect that the holder, although still a lawful permanent resident, is not entitled to be employed in the United States, that the document is not valid for re-entry, that the holder is under deportation or exclusion proceedings, or is on bond, (FACTS:6,7,11-13,16,19-24,25-27,30-42).

The U.S. District Court for the Eastern District of New York, and the Second Circuit, have addressed a similar controversy, resulting in a published decision by the District Court, Etuk v. Blackman, 748 F.Supp. 990 (E.D.N.Y. 1990) ("Etuk I"), and two decisions by the United States Court of Appeals for the Second Circuit, Etuk v. Slattery, 936 F.2d 1433 (2nd Cir. 1991) ("Etuk II"), and Etuk v. Slattery, 973 F.2d 60 (2nd Cir. 1992) ("Etuk III").

Although the New York City INS Office never routinely confiscated the green cards of LPRs under deportation proceedings, if the LPR lost the green card, INS in New York would not, at that time, replace it until deportation proceedings were completed, Etuk I at 994. In addition, INS was extremely slow in providing substitute documentation to LPRs whose green cards had been lost or stolen.

The Etuk suit also complained that INS confiscated the cards of residents paroled into the U.S. for exclusion proceedings, without

---

cases, infra, and was the principle disability addressed therein.

[4] As used herein, "green card" means the laminated document issued by INS to lawful permanent residents, forms I-151 and I-551.

3

providing adequate substitute documentation, but this aspect was not addressed in any of the opinions resulting from the action. [5]

The Etuk action focused on the curtailment of the LPR's right to be employed in the United States which results from inadequate documentation of lawful permanent resident status, and the decisions were based on INS' legal obligation to provide documents adequate for this purpose, c.f., 8 USC Section 1324a(h)(3). [6]

In March, 1990, during the pendency of, and in response to, the suit before the District Court, then INS Commissioner Gene McNary issued a memorandum that permitted, on a case by case basis, INS to confiscate the green cards of LPRs under deportation proceedings, for the purpose of ensuring that they appeared at their hearings, and other "justifiable" circumstances, but required the issuance of adequate substitute documentation in such instances. [7]    The

---

[5]    The local INS practice of seizing the green cards, and other documentation of LPRs, (drivers licenses, social security, and state issued identification cards, etc.), and not paroling them into the country, but requiring them to return to the country of embarkation, (usually Mexico), to await their exclusion hearings apparently did not exist in New York, as it was never mentioned in any of the decisions.  Most likely, this is because there is no land border in the N.Y.C. INS district, see, 8 CFR Sec. 100.4(b).

[6]  This is only one of several legal bases for LPRs' assertion of the right to be provided with unambiguous documentation of their status.  See also, 8 USC Section 1304 (INS must issue, and aliens must carry, alien registration receipt forms).

[7]    As quoted in Etuk II, 936 F.2d at 1442, the McNary memorandum provided, in relevant part, as follows:

> ... If the district director, chief patrol agent or officer in charge determines that a temporary document is needed to assure the alien's appearance at hearings, or for other justifiable reasons, the [green card] will be lifted, and temporary I-551 will be issued.  In these cases, temporary Forms I-551 will be prepared in accordance with the guidance of O.I. 264.1, and will be issued for a period sufficient to allow completion of the depor-

4

CRANPDF - www.fexivo.com

District Court accepted this rationale, <u>Etuk I</u>, at 1000, but nonetheless entered an injunction, over the objection of INS that the McNary memorandum rendered the case moot, <u>Etuk I</u> at 994.

The Second Circuit rejected the proposition that ensuring an LPR's appearance at hearings was a valid basis for confiscating his or her green card. The Court observed that other procedures are built into the process, such as detention, bond, and release on conditional parole, which can be utilized to protect against flight in an individual case, <u>Etuk II</u> at 1447. The Second Circuit left open the question of what circumstances, if any, would render "justifiable" the confiscation of the green cards of LPRs in deportation proceedings. Rather, the bulk of both appeals turned on the adequacy of the temporary documentation issued.

Following the issuance of the McNary memorandum, and the <u>Etuk</u> decisions, most branches of INS modified their practices. However, neither the memorandum, nor the injunction, have been consistently followed in this INS District. Both the McAllen Division of the U.S. Border Patrol, and the Deportations Branch of the Harlingen, INS Office, ceased confiscating the green cards of LPRs placed under deportation proceedings, and even returned the cards of a number of LPRs from whom they had been previously confiscated.

However, the Investigation Branch of the Harlingen INS Office has continued, as a matter of course, to confiscate the green cards of LPRs whom they process for deportation proceedings. They claim that since this practice is not clearly prohibited by the <u>Etuk</u> trilogy, it is still permitted under the McNary memorandum, for "justifiable" reasons, although the only "justification" given to date has been a generalized concern that, if and when proceedings are concluded adversely to the LPRs, they may refuse to relinquish

---

tation proceedings, but in no case less than six months.

5

*1077*

their cards when deported, and may continue to use them illegally.

Even assuming that such a blanket rationale constitutes a "justifiable" reason for one branch of INS to maintain a practice long discontinued elsewhere, several sub-issues would remain. A number of LPRs, primarily those whose cards had been lifted when they were placed under deportation proceedings by Investigations, and who had been held in detention for some period of time, have not been provided with <u>any</u> substitute documentation as LPRs, even after their release from custody, (FACTS:42).

Similarly, whatever substitute documentation <u>is</u> provided often violates the McNary memorandum, and would also violate the <u>Etuk</u> injunction, if it applied in this INS district. Such documentation often contains notations which all but nullify the LPRs' ability to exercise many of the rights and privileges pertaining to their status, such as, <u>inter alia</u>, that the document was not valid for employment, or for re-entry to the United States, or that its holder is under deportation or exclusion proceedings, or had been released on bond, (FACTS:36-39).

In addition, the Investigations Branch routinely issues replacement documentation which is valid for only six months, (FACTS:6,7,12,13) (Petitioners' Exhibits A, B, D, V, and W), regardless of whether this period could reasonably be considered "sufficient to allow completion of the deportation proceedings," <u>Etuk II</u> at 1442. [8]

The instant action also presents issues not resolved either by the McNary Memorandum, or by the <u>Etuk</u> injunction, (assuming that it

---

[8]   Lawful permanent residents who have been lawfully domiciled in the United States for seven or more years may apply for relief from most grounds of deportation, pursuant to 8 USC Section 1182(c), (Section 212(c) of the Immigration and Nationality Act). Such proceedings usually last well over six months, as shown by the case of Petitioner Arturo Lopez-Lozano, which had been pending for over six <u>years</u> when the instant Petition was filed.

6

CutePDF - www.fsxxia.com

applied in this INS District), deriving primarily from the fact
that the Harlingen INS District includes a long stretch of land
border with Mexico, and many LPRs who reside in this district have
strong familial and/or business ties to that country, which lead to
frequent brief, casual, and innocent border crossings, ("Fleuti
excursions"). [9]  By contrast, the New York City District, on which
the Etuk class was based, has no land borders, 8 CFR Sec. 100.4(b).

The complications that such crossings can engender are multiple,
and the rights of LPRs under such circumstances beg for
clarification.  For example, Molina v. Sewell, 983 F.2d 676 (5th
Cir. 1993), involved an LPR who made a Fleuti excursion while under
deportation proceedings, and was detained, and placed in exclusion
proceedings on his return.  In that case, the Fifth Circuit held
that the fact that he was under deportation proceedings did not
convert a Fleuti excursion into an attempted "entry," such that
exclusion proceedings would have been appropriate. [10]

The local INS office has been slow to recognize, and implement, the
principles underlying the Molina decision.  On remand, INS even
argued that the fact that Mr. Lozano-Molina had been under
deportation proceedings at the time of his departure was, although
not sufficient in and of itself, at least a legitimate element to
be considered in deciding whether he was attempting an "entry," or
whether a Fleuti excursion was involved, (Petitioners' Exhibit C).

---

[9]   Rosenberg v. Fleuti, 374 U.S. 449, 462, 83 S.Ct. 1804,
1812, 10 L.Ed.2d 1000 (1963), held that an LPR does not effect an
"entry," and is therefore not subject to exclusion proceedings,
when he returns from an "innocent, casual, and brief excursion"
outside the United States.

[10]   Under Rosenberg v. Fleuti, the return from an innocent,
brief and casual excursion does not constitute an "entry," as that
term is used in 8 USC 1101(a)(13), so that exclusion proceedings
are not appropriate following such an excursion, even if the
resident is in a status which would otherwise cause him or her to
be excludable, such as, for example, having been previously
convicted of an offense relating to a controlled substance.

1079

Similarly, the rights of lawful permanent residents under exclusion proceedings remain to be resolved.   The Harlingen INS Office continues to confiscate the green cards of LPRs who are denied admission as returning residents, and frequently seizes other documents as well, such as drivers licenses, social security cards, and state issued identification cards.   On occasion, INS even confiscates documents from an LPR who neither withdraws his application for admission, nor is placed under exclusion proceedings, (FACTS:16,19,27) (<u>Petitioners' Exhibit H</u>).

Unless LPRs denied admission as returning residents are paroled into the U.S. for prosecution on some criminal offense, INS generally confiscates their documents, (green cards, drivers' licenses, social security cards, etc.), and returns them to Mexico. Under such circumstances, Respondents admit that INS does not even advise LPRs of the possibility of being paroled into the United States while proceedings are being conducted, and further admits that, unless they obtain counsel, it is very difficult for them to ascertain, and follow, the procedures necessary to request parole into the United States.   Because they lack <u>any</u> documentation, this group of LPRs must generally remain in Mexico for the duration of their exclusion proceedings, (PET2:9) (ANS:6).

Under such circumstances, some LPRs become desperate, and enter the U.S. by unlawful means.  Under current law, Section 212(c) does <u>not</u> waive the offense of entry without inspection, <u>Matter of Hernandez-Casillas</u>, Interim Decision 3147 (BIA 1990) (A.G. 1991), but only the more serious charges, such as conviction of an offense involving controlled substances, crimes of violence, aggravated felonies, etc., <u>Id</u>..  As a result, such an act of desperation may cause the LPR to lose eligibility for any form of relief.

Petitioners herein challenge, on both procedural and substantive grounds, the practice of lifting the documents of LPRs, and requiring that they return to Mexico, with or without the

8

<u>1080</u>

institution of exclusion proceedings.  Petitioners allege that it is not authorized by the Immigration and Nationality Act, and that it constitutes a form of summary exclusion, resulting in the denial, without Due Process, of the liberty interests of a lawful permanent resident of the United States in being allowed to live and work in this country, and to engage in international travel.

Petitioners also challenge the substitute documentation provided to LPRs who are lucky enough to be paroled into the United States for exclusion proceedings, in that it invariably contains a notation to the effect that the resident's status as an LPR is in doubt.

In addition, Petitioners challenge the practice of the Investigations branch of the Harlingen INS office of confiscating the green cards of LPRs whom they place under deportation proceedings.  The rationale provided is that of ensuring that the cards are not used illegally at some point in the future, if and when deportation is effectuated.  But once a final order of deportation is entered, (and keyed into INS' computer), such cards are no more useful than "good" fakes, which are readily available both in the United States, and in Mexico.

Assuming, _arguendo_, that Investigations is justified in this practice, Petitioners further challenge the adequacy of the substitute documentation provided, which, as mentioned, is generally valid for far less time than the proceedings can reasonably be expected to last, and which frequently contains notations which cloud their status as LPRs.

And finally, Petitioners challenge the applicability to lawful permanent residents making _Fleuti_ excursions, of 8 CFR Section 3.4, mandating that an appeal of a deportation order is deemed withdrawn, if the alien departs the U.S. during the appeal.

Shortly after the instant action was filed, Respondents agreed to

9

CSoPDF - www.faxio.com

settle a number of the issues presented herein.  However, as time
passed,  and  Respondents'  legal  team  underwent  various
metamorphoses, their willingness to settle the case evaporated, to
the point where it became clear that settlement was impossible. [11]

A number of Petitioners, both named and unnamed herein, have
suffered serious prejudice by the extended delays, to which delays
Petitioners originally agreed, believing that Respondents actually
intended to settle most, if not all, of the action.

Consequently, at a status conference conducted on April 26, 1995,
after determining that there were no genuine issues of material
fact relevant to the case at this point in the proceedings, [12]
the Court suggested that Petitioners file a motion for summary
judgment, and set a timetable for receipt of pleadings.

## II.  RELIEF REQUESTED, AND POINTS AND AUTHORITIES
## IN SUPPORT THEREOF

Petitioners seek summary judgment with respect to what could be
called the "liability" portion of the action, defining the various
rights and responsibilities of the parties, and entering orders
granting both declaratory, and injunctive relief, of a general
nature. [13]    If and when the class is certified, there may be

---

[11]  Respondents have recently announced that they will not
honor any agreements made between Petitioners and Respondents'
prior counsel, including matters relating to discovery.  See,
"Defendants' Opposition to Plaintiffs' (Opposed) Motion to
Compel Production of Documents and Motion to Hold Discovery in
Abeyance," at pages 3-4.

[12]  No determination has yet been made on the issue of class
certification.  Once this question has been settled, there may well
be unresolved questions of fact regarding the situations of
individual class members, and appropriateness of proposed remedies.

[13]  If Respondents object to the entry of such general orders,
on the grounds that the class has not yet been certified, and
relief is only appropriate for the named Petitioners, it will be

10

lingering questions to be resolved involving the status of persons
claiming to be members of the class, and/or of the appropriateness
of specific remedies requested.

A.  POINTS AND AUTHORITIES DEMONSTRATING ENTITLEMENT TO RELIEF

The following are the points of law, which Petitioners consider
controlling, and sufficient to dispose of the instant controversy,
most of which are followed by a brief commentary.

1.  This Court has jurisdiction over the instant action under 28
USC Section 1346(a)(2) (action against an agency and/or officers of
the United States); 8 USC Section 1329 (action arising under the
Immigration and Nationality Act); 28 USC Section 2201 et seq,
(declaratory Judgment action); and 5 USC Section 702 et seq,
(action by one adversely affected by final agency action), coupled
with 28 USC Section 1331 (federal question).

Discussion:  This Court's jurisdiction over the instant action is
obvious, and, as the Court noted at the Status Conference on April
26, 1995, Respondents' claim to the contrary is frivolous.

2.  A person duly admitted to the United States for lawful
permanent residence retains that status, with all the attendant
rights and privileges, unless and until an administratively final
order of deportation, (or exclusion and deportation), has been
issued.  Where an administratively final order is overturned
following review by the U.S. Courts of Appeal, or U.S. District
Courts, status as a lawful permanent resident is retroactively
restored, 8 USC Section 1101(a)(20).  Any deprivation of the
liberty of Petitioners, regardless of whether they are physically
present within the United States, or are at the border, seeking

---

necessary to resolve both the issues presented herein, and those
relating to class status, simultaneously.

11

CAMPDF - www.foxitis.com

readmission as lawful permanent residents, must be accomplished in accordance with procedures which comport with Due Process; <u>Kwong Hai Chew v. Colding</u>, 344 U.S. 590; 73 C.Ct. 472 (1953); <u>Molina v. Sewell</u>, <u>supra</u>; <u>Rivera v. INS</u>, 810 F.2d 540 (5th Cir. 1987); <u>Etuk v. Blackman</u>, 748 F.Supp. 990 (E.D.N.Y. 1990) ("Etuk I"); <u>Etuk v. Slattery</u>, 936 F.2d 1433 (2nd Cir. 1991) ("Etuk II"); <u>Etuk v. Slattery</u>, 973 F.2d 60 (2nd Cir. 1992) ("Etuk III"); and <u>Matter of Rangel</u>, 15 I&N Dec. 789 (BIA 1976).

Discussion:  As long ago as 1953, in <u>Kwong Hai Chew v. Colding</u>, <u>supra</u>, the Supreme Court recognized the Due Process rights of lawful permanent residents, even where the resident was returning from a four month voyage abroad, and INS asserted, on security grounds, that his readmission was contrary to the public interest.

In that decision, the Court distinguished between "excludable" aliens, which term the Court used to relate to "entrant aliens and to those assimilated to their status," 73 S.Ct at 478, and a lawful permanent resident, detained on board ship by INS.  Under these circumstances, the Court held that the resident's status was assimilated, "for constitutional purposes, to the status of a continuous resident physically present in the United States," <u>Id</u>. at 479, and that he was entitled to full Due Process rights.

Once acquired, lawful permanent residents do not lose that status unless and until an administratively final order of deportation, (or exclusion and deportation), has been entered against them. This principle was first established in this Circuit by <u>Rivera v. INS</u>, <u>supra</u>, and was recently reaffirmed in <u>Molina v. Sewell</u>, <u>supra</u>.

3.  Lawful permanent residents must register with INS, and provide certain personal information, and their fingerprints, 8 USC Section 1302.  They are thereafter entitled, in accordance with the regulations prescribed by the Attorney General, to documents which unambiguously evidence their status as lawful permanent residents

12

of the United States, and which do not place a cloud over, or
interfere with their ability to exercise, the rights and privileges
which attend that status, 8 USC Sections 1302 and 1304; 8 CFR Sec.
264.1 et seq.; Etuk I, II, and III.

Discussion:  By law, all non-citizens, including lawful permanent
residents, who remain in the U.S. for thirty days or more, must
register, and provide their fingerprints and certain personal
information, 8 USC Section 1302(a).  Once registered, they must be
issued alien registration cards, "in such form and manner and at
such time as shall be prescribed under regulations issued by the
Attorney General," 8 USC Section 1304(d).  Once a card is issued,
they are required to carry at all times, 8 USC Section 1304(e).

8 CFR Section 264.1(b) specifies the forms which shall be utilized
as evidence of alien registration.  Under that Section, forms I-151
and I-551 are the appropriate alien registration receipt forms for
lawful permanent residents of the United States.  The regulations
do not specify any particular form to be used for "temporary" green
cards, to be provided, for example, to LPRs who have just acquired
that status, or to those who have lost their cards, and have
applied for new ones.  Consequently, INS has devised the practice
of using I-94's to generate such documents.

However, those local INS office attempts to use such I-94s not only
as "temporary" green cards, but also as purveyors of certain
information, primarily intended for the use of Immigration Officers
who may have occasion to check the cards.  Presumably, this is
intended for the convenience of the officers, so that they have
access to this information without having to check the (notoriously
unreliable) INS computer data base, (Petitioners' Exhibit H).

This additional information, for example, to the effect that the
resident is under deportation or exclusion proceedings, may carry
unintended consequences for the LPR, such as interfering with his

13

or her ability to find employment, Etuk I, II and III, supra. Or, in some cases, the consequences are intended, but are based on a faulty interpretation of the law, such as notations to the effect that the LPR is not authorized to be employed, or that the document cannot be used to re-enter the U.S. after a Fleuti excursion.

4.  Among the rights and privileges which attend lawful permanent resident status, are the right to reside and work in the United States, and to make casual, brief, and innocent border crossings, (Fleuti excursions), without being subsequently denied readmission as returning residents, (or re-parole, if in parole status), and having their documents, including, but not limited to, their green cards, confiscated, Rosenberg v. Fleuti, 374 U.S. 449 (1963); Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra; Vargas-Banuelos v. INS, 466 F.2d 1371 (5th Cir. 1972); Yanez-Jacquez v. INS, 440 F.2d 701 (5th Cir. 1971); Ettuck I, II and III, supra.

Discussion:  This is the heart of the case at bar.  The principle question before the Court in the case at bar is:  At what point, if ever, and by virtue of what Due Process procedures, if any, may a lawful permanent resident be deprived of the right to engage in international travel, particularly, to make Fleuti excursions, and to return to the United States in the same status as before?

The right of international travel, although not always as absolute as the "virtually unqualified" right of interstate travel, [14] may still be, under some circumstances, a "constitutional liberty closely related to rights of free speech and association," Aptheker v. Secretary of State, 84 S.Ct. at 1669.

Where the rights of free speech and association are not implicated, and where any abridgment of the right of international travel is only an indirect result of policies devised to further other

-------

[14]    U.S. v. Guest, 383 U.S. 745, 757-758 (1966).

14

legitimate governmental interests, such abridgment is permissible, c.f., <u>Califano v. Aznavorian</u>, 99 S.Ct. at 475:

> The statutory provision in issue here does not have nearly so direct an impact on the freedom to travel internationally as occurred in the <u>Kent</u>, <u>Aptheker</u>, or <u>Zemel</u> cases. ... It does not limit the right to travel on grounds that may be in tension with the First Amendment. It merely withdraws a governmental benefit during or shortly after an extended absence from this country.

Even where First Amendment rights are not implicated, the right of international travel is nonetheless a valuable liberty interest, and as such, is protected by the Fifth Amendment, applicable to citizens and resident aliens alike. Under such circumstances, the right of international travel is subject to regulation, but only "within the bounds of due process," <u>Id.</u>, quoting <u>Califano v. Torres</u>, 435 U.S. 1, 4 n.6, (19  ).

Historically, INS has curtailed the right of LPRs to engage in international travel as of the time deportation or exclusion proceedings were initiated, and has made that abridgement absolute as of the time a deportation order was entered.

Long before the Supreme Court's decision in <u>Rosenberg v. Fleuti</u>, a regulation was promulgated, [15] relating to the effect of a "departure" on a pending appeal to the BIA. Said regulation, now found at 8 CFR Section 3.4, provides, in relevant part, as follows:

> Departure from the United States of a person who is the subject [of] deportation proceedings subsequent to the

---

[15] <u>See</u>, <u>Matter of G- y B-</u>, 6 I&N Dec. 159, 159-160 (BIA 1954) ("This conclusion is required by 8 C.F.R. 6.12 which in pertinent part provides: 'Departure from the United States of a person who is the subject of deportation proceedings subsequent to the taking of an appeal but prior to a decision thereon shall constitute a withdrawal of the appeal...'").

15

taking of an appeal but prior to a decision thereon shall
constitute a withdrawal of the appeal, and the initial
decision in the case shall be final to the same extent as
though no appeal had been taken.

8 CFR Section 3.4 was published without notice or comment, and
purportedly "interprets" 8 USC Section 1105a(c), [16] removing the
right to judicial review of a final order of deportation where the
alien has "departed" the U.S. after the issuance of the order.

Shortly after the decision of the Supreme Court in <u>Fleuti</u>, the BIA
issued <u>Matter of Becerra-Miranda</u>, 12 I&N Dec. 358, 363 (BIA 1967), [17]
asserting that <u>any</u> excursion by a lawful permanent resident under
deportation proceedings, "for no matter what purpose," fell outside
the purview of <u>Rosenberg v. Fleuti,</u> and that on return, the LPR was
properly subject to exclusion proceedings.

It was on this basis that INS developed, (and, before the advent of
<u>Molina v. Sewell</u>, justified), the practice of confiscating the
green  cards  of  lawful  resident  aliens  under  deportation
proceedings, and placing such notations as "not valid for re-entry"
on any substitute documentation provided.

In <u>Molina v. Sewell</u>, <u>supra</u>, the Fifth Circuit declined to follow
<u>Becerra-Miranda</u>, finding "such a purely objective standard as the
<u>Becerra</u> court applied contrary to the subjective <u>Fleuti</u> inquiry,"
<u>Id</u>. at 679-680. <u>Molina</u> also reaffirmed the principle that a lawful
permanent resident retains that status unless and until a final
order of deportation is entered, <u>Id</u>. at 680:

---

[16]    According to <u>Mejia-Ruiz v. INS</u>, 51 F.3d 358, 363 (2nd Cir.
1995), 8 CFR Section 3.4 is not invalid for having been promulgated
without notice and comment, because it "clarifies existing law, and
therefore ... is interpretive."

[17]    <u>Matter of Becerra-Miranda</u> was disapproved by the Fifth
Circuit in <u>Molina v. Sewell</u>, <u>supra</u>.

16

CAMPDF - www.faxiia.com

Lozano [-Molina] was indisputably a permanent resident when he departed to Mexico. Although he was subject to deportation proceedings, no final order had issued. To conclude that upon his return to the United States Lozano effected an "entry" as a matter of law is inconsistent with the due process requirements of <u>Landon</u> [18] and contrary to the subjective inquiry mandated by <u>Fleuti</u>.

The <u>Molina</u> Court elaborated as follows, <u>Id</u>. at 680 (emphasis in first paragraph in original; emphasis in second paragraph added):

<u>Fleuti</u> held that whether a permanent resident effects an "entry" depends on whether <u>he intended</u> to depart in a manner meaningfully interruptive of his permanent residence. ... The <u>Fleuti</u> Court identified three factors relevant to the intent inquiry: 1) the length of time the alien is absent, 2) the purpose of the visit, and 3) whether travel documents were required. ...

<u>Landon v. Plasencia</u> also dissuades us from adopting the <u>Becerra</u> rule. <u>Landon</u> recognized that, unlike an alien seeking to enter the United States for the first time, a returning resident alien retains a constitutional right to due process. 459 U.S. at 32-33. <u>The fact that an alien is subject to deportation proceedings does not affect his status as a permanent resident alien. A permanent resident alien's status terminates only when the order of deportation is affirmed by the BIA or otherwise becomes administratively final</u>.

This holding is consistent with the compassionate approach, evidencing great sensitivity to the realities of life along the U.S. Mexican border, which the Fifth Circuit has historically taken to issues arising from the cross border excursions of LPRs. For example, in <u>Vargas-Banuelos v. INS</u>, 466 F.2d at 1374 (emphasis in original), the Court commented as follows:

---

[18] <u>Landon v. Plasencia</u>, 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed. 2d 21 (1982).

17

CAMPDF - www.texiix.com

The lesson of <u>Fleuti</u> is that a brief departure from this country should not give rise to grounds for deportation when the alien returns unless some element of the alien's state of mind <u>at the time of the departure</u> subjected him to the charge that he left the country with the intention to interrupt his residential status.  Any other holding would make a mockery of <u>Fleuti's</u> humanities.  Unless our immigration laws receive a compassionate interpretation and concomitant administration, our country will no longer be the haven inscribed upon the Statute of Liberty for the huddled masses, tired and poor, yearning to breathe free.

These words, and the principles they embody, were never more important than at this historical juncture.  And the fact that the Fifth Circuit maintains its position on this point is seen by its citation to <u>Vargas-Banuelos</u> in <u>Molina v. Sewell</u>, <u>supra</u> at 680, n.4.

These principles illuminate the flaws in Respondents' attempts to justify the curtailment of such border crossings for lawful permanent residents under deportation or exclusion proceedings, at any time prior to the entry of a final order.  They also demonstrate that the reasoning of the Second Circuit in <u>Mejia-Ruiz</u>, <u>supra</u>, (adopting a purely "objective" test for a <u>Fleuti</u> departure), is inconsistent with the subjective analysis required by the Fifth Circuit in <u>Molina v. Sewell</u>, <u>supra</u>.  <u>See also</u>, point No. 16, <u>infra</u>.

5.  It constitutes a violation of the liberty rights of a lawful permanent resident to curtail the rights and privileges which attend lawful permanent resident status, including the right to reside and work in the United States, and to make casual, brief, and innocent border crossings, on the grounds that the resident is under deportation or exclusion proceedings; <u>Rosenberg v. Fleuti</u>, 374 U.S. 449 (1963); <u>Califano v. Aznavorian</u>, <u>supra</u>; <u>Kwong Hai Chew v. Colding</u>, <u>supra</u>; <u>Molina v. Sewell</u>, <u>supra</u>; <u>Vargas-Banuelos v. INS</u>, <u>supra</u>; <u>Ettuck I, II and III</u>, <u>supra</u>.

18



Discussion:  In essence, this is an amplification of point 4, supra.  Molina v. Sewell, supra at 680, held that the mere fact that the LPR was under deportation proceedings did not mean that he (subjectively) intended to interrupt his status as an LPR, thereby justifying a refusal to readmit him on his return.  In principle, Respondents have accepted this holding, although they have been reluctant to put it into practice, (Petitioners' Exhibit C).

However, they do not appear to have accepted the underlying premise of that case, that an LPR is an LPR is an LPR, and must be treated as such, unless and until that status is changed.  Rather, Respondents continue to urge that some lawful permanent residents may be treated as though their status had already been lost, and that they may be arbitrarily "detained" either in the U.S., or in Mexico, while they await the outcome of the administrative proceedings.  This turns Molina v. Sewell on its head.

Like LPRs under deportation proceedings, LPRs under exclusion proceedings remain LPRs.  As such, even when seeking readmission to the U.S. following an extended journey abroad, their status is "assimilate[d] ... to that of an alien continuously residing and physically present in the United States," and they retain their full rights to due process; Kwong Hai Chew v. Colding, supra at 477.  This includes the right to be free of restrictions imposed, without due process, on their right to international travel.

INS has justified the restrictions imposed on the right of an LPR under exclusion proceedings to engage in international travel [19] solely on the basis that, for those lucky enough to be paroled into the U.S. during proceedings, their parole status "terminates automatically by operation of law" when they depart the country,

---

[19]    To date, Respondents have offered no justification for their practice of confiscating the green card and other documents of LPRs placed in exclusion proceedings, and then returning them to Mexico to await a hearing.

19

(ANS:10). [20]    This assertion suffers from the same flaw as all other arguments based on a literal application of the terms "entry" and "departure" to LPRs, where <u>Fleuti</u> excursions are involved.

<u>Fleuti</u> was based on an interpretation of the statutory term "entry." The crucial factor was the intent of the LPR at the time of his or her "departure" from the United States. While there is no equivalent statutory definition of "departure," under <u>Fleuti</u>, it is clear that, except where it is otherwise specifically defined, "departure" is the converse of "entry," in the sense that, if and only there was a "departure," can there be an "entry" on return. [21]

The provisions governing the parole of non-citizens into the United States are 8 CFR Section 212.5, and 8 USC Section 1182(d)(5)(A), whence it derives. Neither 8 USC Section 1101, nor 8 CFR Part 212, contains a definition of "departure." It is therefore reasonable to interpret the term "departure" as utilized in 8 CFR Section 212.5(d)(1), in a manner consistent with <u>Fleuti</u>.

Logic, fairness, and the First Amendment implications of the right of international travel mandate a conclusion that a lawful permanent resident who has been granted parole during the pendency of exclusion proceedings does not make a "departure" from the United States when he or she leaves on a <u>Fleuti</u> excursion, any more than an LPR under deportation proceedings makes an "entry" when he

_____

[20]    8 CFR Section 212.5(d) provides that parole terminates automatically upon the person's "departure from the United States."

[21]    Where another definition is intended, it is specifically provided. <u>See</u>, for example, 8 CFR Section 215.1(h), defining the phrase "depart from the United States," in a very broad manner. By its terms, however, said definition applies only to that Part, which implements 8 USC Section 1221, "Lists of alien and citizen passengers arriving and departing." From this, it is clear that the term "departure" as used in Part 215 is not the opposite of "entry," as defined in 8 USC Section 1101(a)(13), and interpreted by <u>Fleuti</u>, but of "arrival," which is a much broader term.

20

CUdPDF - www.tesoo.com

or she returns to the U.S. following such an excursion. [22]

Furthermore, even if, as Respondents urge, it were construed that parole terminated automatically upon the LPR's <u>Fleuti</u> type "departure" from the United States, there are no conceptual barriers, nor valid policy objections, to a procedure whereby the LPR would be automatically re-paroled, on return. Once the initial decision to grant parole has been made, it should include multiple border crossings, so long as the excursions remain within the <u>Fleuti</u> guidelines. There is no more reason to force the LPR to remain "detained" in the U.S., than to require that he or she be "detained" in Mexico, during the pendency of exclusion proceedings.

6. When a lawful permanent resident is placed under deportation proceedings, INS issues an Order to Show Cause, and may also issue a warrant of arrest, 8 USC Section 1252(a)(1). When a warrant of arrest is issued, the resident may seek redetermination of the conditions of custody in the first instance from certain INS officers, or from an Immigration Judge, 8 CFR Sec. 242.2, <u>Petitioners' Exhibit U</u>.

7. When a lawful permanent resident is placed under exclusion proceedings, INS issues a document captioned "Notice to Applicant For Admission Detained For Hearing Before Immigration Judge," on Form I-122, 8 CFR Section 235.6, <u>Petitioners' Exhibit U</u>.

_____

[22] That INS does not construe <u>Fleuti</u> excursions to constitute "departures" and "entries" in most contexts can also be seen by the manner in which non-immigrants, such as students, and visitors, are treated. Such persons are required to have I-94s, which they must surrender "to a representative of the carrier transporting" them at the "time of departure from the United States," 8 CFR Section 235.4. This requirement does not even make sense in the context of a casual border crossing, as there is generally no "carrier transporting the alien." Far from applying Section 235.4 literally in such situations, Respondents treat unexpired I-94s as valid re-entry documents for foreign visitors and students, who have, for example, made brief excursions across the border to shop in Mexico.

CUMPDF - www.fastio.com

1093

8.  When a lawful permanent resident applies for admission to the
United States as a returning resident, and presents appropriate
documentation of his or her status, but where it appears to the
examining officer that he or she is making an "entry," and is not
admissible to the United States, under existing regulations, INS
has three choiced:  they may detain the person, parole him or her
into the U.S., or parole him or her for deferred inspection.   In
determining whether the person should be detained, the inspecting
officer must consider the likelihood that he or she will abscond,
or pose a security risk, <u>Rosenberg v. Fleuti</u>, <u>supra</u>; <u>Kwong Hai Chew
v. Colding</u>, <u>supra</u>; <u>Molina v. Sewell</u>, <u>supra</u>; <u>Rafeedie v. INS</u>, 880
F.2d 506 (D.C.Cir. 1989); 8 USC 1225(b); 8 CFR Sec. 235.3(c).

Discussion:  In theory, when a lawful permanent resident applies
for admission as a returning resident, the inquiry should first be
directed to determining whether or not the person is making an
"entry," within the meaning of <u>Rosenberg v. Fleuti</u> and its progeny,
including <u>Molina v. Sewell</u>.  If, and only if, there is something
about the excursion which takes it outside of the parameters of
those cases, is the second stage reached, of determining whether
the person is "excludable," i.e., whether any grounds of exclusion,
as set forth in 8 USC Section 1182(a), are applicable.

If both of the above questions are answered in the affirmative, the
LPR is generally placed in exclusion proceedings, pursuant to 8 USC
Section 1225(b).  At that point, 8 CFR Section 235.3(c) comes into
play.  That section provides as follows, (emphasis added):

>    Any alien who appears to the inspecting officer to be
>    inadmissible, but who does not fall within paragraph
>    (b) of this section, [23]  <u>may be detained</u>, <u>paroled</u>, <u>or
>    paroled for deferred inspection</u> by the inspecting
>    officer.  In determining whether or not an alien shall be

---

[23]  Paragraph (b) relates to aliens with no documentation, or
with false documentation.

22

detained, paroled, or paroled for deferred inspection,
the inspecting officer shall consider the likelihood that
the alien will abscond or pose a security risk.

Said section does not contain an option of confiscating the LPRs'
green cards, driver's licenses, social security cards, etc.,
processing them for exclusion proceedings, and showing them the
door to return to Mexico.

Such a procedure is not only unauthorized, but, it is submitted, it
constitutes a form of summary, or "temporary" exclusion, similar to
that provided for by 8 USC Section 1225(c). However, Section
1225(c) can only be invoked where the alien appears to be
excludable on grounds relating to national security, and is wholly
inapplicable to lawful permanent residents, <u>Rafeedie v. INS</u>, <u>supra</u>.

In determining whether the person should be detained, or paroled
into the U.S., 8 CFR 235.3(c) requires that the inspecting officer
consider the likelihood that he or she will abscond, or pose a
security risk. These are the same criteria for determining whether
an alien under deportation proceedings should be detained and/or
required to post bond, <u>Matter of Patel</u>, 15 I&N Dec. 666 (BIA 1976)
("An alien generally is not and should not be detained or required
to post bond except on a finding that he is a threat to the
national security ... or that he is a poor bail risk").

It is therefore submitted that, under 8 CFR 235.3(c), an LPR placed
under exclusion proceedings should be paroled into the U.S., if
conditions are such that, if under deportation proceedings, he or
she would not be detained or required to post bond. Alternatively,
under conditions where an LPR in deportation proceedings would be
detained, and required to post bond, an LPR placed under exclusion
proceedings should also be detained, and paroled into the U.S.,
upon payment of a bond equivalent to that which would be required
in deportation proceedings.

23

1095

Although it may at first blush seem more "humane" to allow the LPR to remain in Mexico, this is illusory.  The LPRs from whom INS lifts their documents, and forces them to await exclusion proceedings in Mexico, are those whose offenses were not sufficiently serious to warrant criminal prosecution.  They are people who, if in deportation proceedings, would in most cases be released on recognizance, if not by INS, then by an Immigration Judge.  Giving INS the option to summarily exclude such persons places their residency at far greater risk than would be the case if they were paroled into the U.S., with, or without bond.  See, points 12 and 13, infra, for an elaboration of these risks.

9.  When a lawful permanent resident applies for admission to the United States as a returning resident, and presents appropriate documentation of his or her status, but where the examining officer does not have reasonable cause to believe that he or she is making an "entry," as defined by Rosenberg v. Fleuti, supra, and its progeny, it constitutes a violation of that person's liberty interests to refuse admission as a returning resident, even if the person is already under deportation proceedings, and/or is in an excludable class, Rosenberg v. Fleuti, supra; Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra.

Discussion:  This is precisely the holding of Molina v. Sewell, supra.  See also, points 2, 4 and 5, supra.

10.  Apart from 8 USC Section 1225(c), the Immigration and Nationality Act does not authorize the summary exclusion of an applicant for admission to the United States.  Under 8 USC Section 1225(c), aliens who appear to the examining officer to be excludable for certain reasons relating to the national security, (to wit, subparagraph (A) (other than clause (ii)), and (B) or (C) of 8 USC Section 1182(a)(3)), are subject to specified summary exclusion proceedings.  However, even where INS has reason to believe that the security of the United States might be at stake,

24

lawful permanent residents may not be summarily excluded from the United States; <u>Kwong Hai Chew v. Colding</u>, <u>supra</u>; <u>Rafeedie v. INS</u>, 880 F.2d 506 (D.C.Cir. 1989).

Discussion:  <u>See</u> point number 8, <u>supra</u>.

11.  When the admissibility of a lawful permanent resident seeking readmission is challenged, INS may not accept a waiver of the person's right of to a hearing before an Immigration Judge, <u>Hernandez v. Casillas</u>, 520 F.Supp. 389 (S.D.TX 1981).

Discussion:   In <u>Hernandez v. Casillas</u>, <u>supra</u>, lawful permanent residents successfully challenged certain INS' practices which are very similar to those at bar.  At that time, when INS considered that certain lawful permanent residents were excludable, they frequently would obtain "waivers" of their right to a hearing before an Immigration Judge, confiscate their green cards, and then allow them to enter for a temporary visit.  If the LPRs insisted on their right to a hearing, INS would confiscate their green cards, and return them to Mexico, much as is still being done today.

In <u>Hernandez</u>, the LPRs challenged, and Judge Kazen struck down, this waiver procedure, on the twin grounds that there was no means of knowing whether the waivers were executed voluntarily, and the procedure utilized was neither authorized by the statute, nor by the governing regulations.  INS apparently admitted that it was not in conformity with the literal terms of 8 USC Section 1225, and attempted to defend it on the grounds that there were insufficient Immigration Judges to hear all of the cases, <u>Id</u>. at 391.

The second option given to LPRs at that time, to wit, of having their green cards confiscated, and being returned to Mexico to await a hearing, was not challenged in <u>Hernandez</u>, which was decided well before any of the authorities came into being upon which Petitioners place primary reliance.

25

The decisions in <u>Molina v. Sewell</u>, <u>Rivera v. INS</u>, <u>supra</u>, and the <u>Etuk</u> trilogy, on which Petitioners' place primary reliance in their attack on this procedure, were all rendered many years after <u>Hernandez</u>. Even 8 CFR 235.3(c) was not promulgated until 1982, a year after the <u>Hernandez</u> decision.

12. There is no authority under the Immigration and Naturalization Act, or under the governing regulations, for INS to force lawful permanent residents applying for admission as returning residents to return to Mexico, or other country of embarkation, to await exclusion proceedings, 8 USC 1225(b); 8 CFR Section 235.3(c).

Discussion: As discussed above, (points 8 and 11, <u>supra</u>), 8 CFR section 235.3(c), which was promulgated in 1982, provides three options when Respondents are not convinced that an LPR seeking admission as a returning resident is entitled to such admission. They may detain, parole, or parole the individual for further (deferred) inspection. There is no fourth option, of lifting the person's documents; green card, driver's license, social security card, etc., and returning him or her to Mexico.

Apart from the deprivation of the right of a lawful permanent resident to live and work in the United States, this procedure suffers from several additional, very serious, disabilities.

At the time of <u>Hernandez</u>, <u>supra</u> at 391, Immigration Judges generally did not enter <u>in absentia</u> orders against LPRs who did not appear for their exclusion hearings. But under procedures currently in effect in this District, if a lawful permanent resident does not appear for an exclusion hearing, the Immigration Judges are empowered to, and frequently do, proceed <u>in absentia</u>, and order the person excluded and deported, c.f., <u>Matter of Nafi</u>, 19 I&N Dec. 430 (BIA 1987).

Sending a notice of a hearing to an address in Mexico, particularly

to a remote location, creates a far greater chance that it will not
be received by the LPR in a timely fashion, if at all, than would
be the case if it were mailed to a U.S. address, (c.f. <u>Petitioners'
Exhibit X</u>).  Although there exists a theoretical right to reopen
the proceedings under such circumstances, (<u>Id</u>.), that right is
virtually impossible to assert effectively without counsel, and it
is extremely difficult, while in Mexico, to obtain the assistance
of an attorney competent to bring such a motion.

Even where notice is received, being in Mexico also makes it far
more difficult, if not impossible, for the resident to obtain
counsel to represent him or her at the exclusion hearing.  Without
an attorney, there are a number of potent legal arguments,
particularly those which are not yet recognized by the Immigration
Judges, or the BIA, that cannot be effectively raised.  Being
forced to remain in Mexico for months, or years, is also very
disruptive of the lives of the residents, and frequently, as in the
case of Petitioners Ascencio and Merino, of their U.S. citizen
children as well, <u>Petitioners' Exhibit X</u>.

13.  The confiscation by Respondents of the green cards, and other
documents, such as the drivers' licenses, social security cards,
and state issued identification cards, of lawful permanent
residents placed under exclusion proceedings, where the residents
are neither detained, nor paroled into the United States, results
in the residents being forced to return to Mexico (or other country
of embarkation) while they await exclusion hearings, and is
tantamount to summary exclusion, which constitutes a deprivation,
without Due Process, of their liberty interests, <u>Rosenberg v.
Fleuti</u>, <u>supra</u>; <u>Kwong Hai Chew v. Colding</u>, <u>supra</u>; <u>Molina v. Sewell</u>,
<u>supra</u>; <u>Etuk I, II and III</u>, <u>supra</u>; <u>Rafeedie v. INS</u>, <u>supra</u>; 8 CFR
Section 235.3(c).

Discussion:  It should be remembered that not all lawful permanent
residents placed in exclusion proceedings are attempting to make an

27

*1099*

"entry," such that exclusion proceedings are appropriate;  c.f.,
Molina v. Sewell, supra, Vargas-Banuelos v. INS, supra; Yanez-
Jacquez v. INS, supra; Petitioners' Exhibits L and Y.

The procedure currently in effect, of confiscating the green cards
and other documents of LPRs placed in exclusion proceedings, and
forcing them to return to Mexico, without even advising them of the
possibility of seeking parole, is the functional equivalent of the
summary exclusion procedures of 8 USC Section 1225(c).   An LPR
treated in this manner may not have a hearing scheduled for months,
and even then, as a practical matter, may never receive notice of
the hearing, Petitioners' Exhibits L, X and Y.

The same concerns addressed by Judge Kazen in Hernandez v. Casillas
are inherent in this procedure.  If anything, the situation is even
more fraught with pitfalls, as Immigration Judges are now entering
in absentia orders of exclusion against LPRs.  If the LPR did not
receive notice of the hearing, it is equally likely that he or she
will not receive any order of exclusion and deportation entered in
absentia, or otherwise become aware of what has transpired.  While
in Mexico, or even at the Port of Entry, it is extremely difficult
to make inquiries regarding the status of one's case. [24]

Even assuming that the LPR learns that an in absentia order has
been entered, without counsel, it is difficult, if not impossible,
to bring a motion to reopen proceedings on the basis of lack of
notice, c.f., Matter of Nafi, supra.  And the law is now clear
that, as Judge Kazen predicted, Hernandez v. Casillas, supra at
394, eligibility for admission will be judged as of the time that

---

[24]   The INS computer at the Port of Entry may, or may not,
correctly reflect this information, as new developments are often
slow to be entered in the data base.  But even if the data base has
been updated, there is no assurance that the officials will check
the computer, simply because they are asked to do so by the
affected party, c.f., Petitioners' Exhibit H.

28

the case is finally decided, and <u>not</u> as of the date when the application for entry was first made; <u>Matter of A-A-</u>, Interim Decision 3176 (BIA 1992); <u>Matter of U-M-</u>, Interim Decision 3152 (BIA 1991); <u>Matter of Kazemi</u>, 19 I&N Dec. 49 (BIA 1984).

If the initial basis for exclusion proceedings was INS' belief that the LPR had abandoned his or her residency, the case may be seriously prejudiced by the additional time that the LPR spent in Mexico, particularly if there are any complications, such as failure to appear at the hearing because of lack of notice, and further delays caused by the LPR's inability to obtain counsel to bring a motion to reopen.

14.  The practice of the Investigations Branch of the Harlingen INS Office, of confiscating, and refusing to return, the green cards of lawful permanent residents whom they place under deportation proceedings, but who are not being held in detention, and in whose cases no administratively final order of deportation has been entered, interferes with the LPRs' ability to exercise the rights and privileges which pertain to their status, and constitutes a denial of Equal Protection, and a deprivation of their liberty, without Due Process, <u>Rosenberg v. Fleuti</u>, <u>supra</u>; <u>Kwong Hai Chew v. Colding</u>, <u>supra</u>; <u>Molina v. Sewell</u>, <u>supra</u>; <u>Rafeedie v. INS</u>, <u>supra</u>; <u>Etuk I, II, and III</u>, <u>supra</u>.

Discussion:  INS can argue that it was not obliged to comply with the mandates of the <u>Etuk</u> injunction in this district, because it did not, by its terms, reach this far.  The same claim cannot be made, however, with reference to the McNary memorandum, which, in theory, applied on a nationwide basis.  Even assuming that it would have been legally sufficient for INS to follow the mandates of the McNary memorandum, as modified by <u>Etuk II</u>, the Harlingen Office has

29

demonstrated that it is incapable of doing so. [25]

The McNary memorandum, issued in 1990, requires that the decision to lift the green card of an LPR placed in deportation proceedings be made on a case by case basis. While it permits the decision to lift a card to be made by the District Director, Chief Patrol Agent, or officer in charge, Etuk I at 993, it (presumably) did not intend this flexibility to result in a situation where one branch lifts the cards as a matter of course, and others do not.

And once the decision is made to lift the card in a given case, if the person is not detained, the memorandum instructs INS to provide a substitute green card, valid for the expected duration of the proceedings, which casts no doubt on the bearer's status as an LPR.

Under practices in effect at the time the instant litigation was filed, four years after the issuance of the McNary memorandum, LPRs whose cards had been lifted and who posted bond and were released from the Port Isabel Service Processing Center were given no evidence of their status. When substitute cards were provided, they often bore notations that they were not valid for re-entry, or for employment, or that the holder was under deportation proceedings for such and such an offense. The cards issued by the Investigations branch are routinely valid for only six months, even in cases where proceedings can be reasonably expected to last for two or three years, or more. And the question of whether or not a given card will be lifted is determined not by the facts of the

---

[25] The memorandum permitted the lifting of green cards for LPRs placed in deportation proceedings when "needed to assure that alien's appearance at hearings, or for other justifiable reasons," Etuk I at 993. The Second Circuit correctly concluded that confiscating a green card was not an appropriate means of ensuring that LPRs appeared for their hearings, Etuk II at 1447. This leaves only the "justifiable reason" portion of the memorandum as grounds for confiscating an LPR's green card, with no circumstances identified which would constitute such a "justifiable reason."

30

case, but by the happenstance of which branch of the local office processes the LPR for deportation proceedings.

Since the institution of the instant case, some persons within INS have made a good faith effort to rectify some, (but not all), of these problems. But the will, and/or the ability, to do so is not universal. And the fact that problems continue to persist is, if anything, simply an indication that, as a practical matter, the McNary memorandum cannot be effectively implemented on a voluntary basis. This was the conclusion of the District Court in Etuk I, supra at 994, and there is no less reason to believe that it would be the case in this INS District.

Under such circumstances, an injunction is more than warranted. Petitioners recognize, as the McNary memorandum indicates, that there may be individual circumstances under which the lifting of an LPRs green card is warranted, although no specific examples come to mind, and Respondents have, to date, suggested none. Even the example cited in the McNary memorandum, of ensuring that the LPR appears when and as directed, is inappropriate, Etuk II.

The only justification tendered by INS to date is a concern that the LPR may, if and when deported, refuse to relinquish the card, and continue to use it illegally. It is submitted that this is an insufficient, for a variety of reasons. It is based on pure speculation, and would, in essence, allow the exception to swallow the rule, as has been the case with the Investigations Branch. Moreover, assuming that the computer data base is adequately maintained, such a card would be of no more value than a good forgery, which are readily available. And the LPR should not be made to suffer for INS' inability to adequately maintain its computer data base. See, Petitioners' Exhibit H.

15. A cloud is placed over an individual's status as a lawful permanent resident, which interferes with the exercise of the

31

//03

rights and privileges which attend that status, including the right
to engage in international travel by making casual, innocent, and
brief border crossings, and constitutes a deprivation of liberty
without Due Process, when INS confiscates a lawful permanent
resident's green card, and either provides no substitute
documentation, or provides only a temporary I-551, consisting of an
I-94, with a stamp stating that the individual has been admitted
for lawful permanent residence, but which suffers from one or more
of the following defects:   (a) the card does not include an
"employment authorized" stamp;   (b) the card is valid only for a
period of time significantly shorter than the deportation
proceedings can reasonably expected to last;   (c) the card contains
one or more notations indicating that the person's status as a
lawful permanent resident is in doubt, including any one or more of
the following notations:   (i) that he or she is under deportation
proceedings; (ii) that he or she has been paroled into the United
States, including parole for the purpose of determining his or her
right to re-enter, or for conducting exclusion proceedings; (iii)
that he or she is on bond; (iv) that he or she is not authorized to
be employed in the United States, or (v) that the document is not
valid for re-entry; Rosenberg v. Fleuti, supra; Kwong Hai Chew v.
Colding, supra; Molina v. Sewell, supra; Etuk I, II and III, supra.

Discussion:   Old habits die hard, and, as noted above, even the
McNary memorandum was insufficient, in this INS district, to bring
about significant changes in the way some branches operate.   One
branch of the local INS office continues, and Respondents herein
defend, the practice of routinely confiscating the green cards of
LPRs placed under deportation proceedings, and providing grossly
insufficient replacement documentation, or none at all.

Respondents have accepted, in theory, their responsibility to
provide "adequate" substitute documentation when cards are lifted
from LPRs in deportation proceedings.   But no progress has been
made either in the area of ensuring that cards are only lifted, on

32

1104

a case by case basis, when there is a "justifiable" reason, or that replacement documentation is valid for a period of time reasonably calculated to coincide with the anticipated length of the deportation proceedings. All the Petitioners herein were given I-94s which were initially valid only six months, although they were eligible for Section 212(c), or other forms of relief, and their cases could reasonably have been expected to last for years.

Even less progress has been made in the areas of persuading Respondents not to confiscate such documents as drivers' licenses and social security cards from LPRs placed in exclusion proceedings, or of convincing them to provide adequate replacement documentation to LPRs under exclusion proceedings.  Taking as "contested" Petitioners' assertion that the notations "paroled for exclusion proceedings," or "paroled pending determination of right to reenter" often interfere with the LPR's ability to find suitable employment, [26]    there is no dispute but that they completely eliminate the LPR's right to engage in international travel, by making Fleuti excursions.

As discussed above, (number 4), the right of international travel, including border crossings, carries, under some circumstances, First Amendment implications.  And even when it does not, it is still a protected liberty, which cannot be curtailed without Due Process.  A practice which eliminates this right for a whole class of arbitrarily selected LPRs, is, by definition, overbroad, and violates Due Process.

16.  Lawful permanent residents who have been ordered deported, or excluded and deported, by an Immigration Judge, but whose cases are under review by the Board of Immigration Appeals, remain lawful

---

[26]    But see, Etuk I, at 998, where the Court expresses a concern that while temporary cards with dates of expiration "might not deter every employer from hiring the bearer.  But in all likelihood they limit the bearer to short-term job opportunities."

1105

the order is used as an element of 8 USC Section 1326, unlawful re-entry following deportation). See also, U.S. v. Palacios-Martinez, 845 F.2d 89, 91 (5th Cir. 1988); U.S. v. Campos-Asencio, 822 F.2d 506, 509 (5th Cir. 1987); Matter of Roman, 19 I&N Dec. 855, 856-857 (BIA 1988) (prior order of deportation or exclusion, even if fully executed, can be collaterally attacked in subsequent proceeding if the prior order resulted in a gross miscarriage of justice); Matter of Malone, 11 I&N Dec. 730, 731 (BIA 1966) ("if there was a miscarriage of justice, the error should not be perpetuated").

The Second Circuit implicitly recognized this weakness, in that Section 1101(g) was cited only as evidence that 8 CFR 3.4 was "interpretive," and therefore valid even though published without notice or comment. It was not mentioned in the context of analyzing the Fleuti claim.

Rather, the Second Circuit dismissed the argument that the term "departure" as used in 8 CFR Section 3.4 did not include a Fleuti type departure, Id. at 365, by citing to its previous decision in Aleman-Fiero v. INS, 481 F.2d 601 (1973). However, Aleman-Fiero is itself grounded on a clearly erroneous interpretation of 8 USC Sec. 1105a(a)(13), on which Fleuti is based, and which provides that:

> ... no person whose departure from the United States was occasioned by deportation proceedings ... shall be held to be entitled to such exception [i.e. Fleuti exception].

Aleman-Fiero held 8 USC Sec. 1101(g) rendered Fleuti unavailable to a person whose deportation order was pending at the BIA because the departure was "occasioned" by deportation proceedings, Id. at 602:

> [U]nlike Fleuti who left the country free of any sanctions imposed by the immigration laws, appellant departed while the subject of a deportation order which was then pending before the Board of Immigration Appeals.

36

permanent residents, and are entitled to enjoy the rights and
privileges which attend that status, including the right to engage
in international travel, by making innocent, brief, and casual
border crossings, and to be readmitted to the United States
thereafter as returning residents.   Any construction of 8 CFR
Section 3.4 which includes such departures, including the denial of
admission or re-parole as returning residents to lawful permanent
residents in whose cases orders of deportation or exclusion and
deportation are, (or are believed by Respondents to be), on review
before the BIA, constitutes a deprivation of their liberty
interests, without Due Process; Rosenberg v. Fleuti, supra; Kwong
Hai Chew v. Colding, supra; Molina v. Sewell, supra; Rivera v. INS,
supra; Vargas-Banuelos v. INS, supra; 8 USC Section 1101(a)(13); 8
USC Section 1101(a)(20).

Discussion:  This will doubtless be the most hotly contested legal
point asserted herein.  Ironically, it is an area where LPRs under
exclusion proceedings are afforded greater rights than those under
deportation proceedings.  Notwithstanding INS' reluctance to allow
LPRs whose exclusion cases are on appeal to the BIA to make Fleuti
excursions, (see, Petitioners' Exhibit Q), the law is clear that
they may do so, without having their appeals construed as
withdrawn, as it would be for an LPR under deportation proceedings,
c.f., Matter of Keyte, Interim Decision 3128 (BIA 1990).

LPRs under deportation proceedings should have the same rights.  It
is violative of Equal Protection, as applied through the Due
Process clause, to condition the rights of an individual on the
happenstance of whether or not they have made a departure from the
United States, Francis v. INS, 532 F.2d 268 (2nd Cir. 1976).

LPRs under both exclusion and deportation proceedings retain their
status as LPRs throughout the process of appeal to the BIA, which

34

//06

may last for several years. [27]   8 CFR Section 3.4, which provides
that "departure" from the United States during such an appeal
"shall constitute a withdrawal of the appeal" was not only
promulgated without notice or comment, but was adopted long before
the issuance of <u>Rosenberg v. Fleuti</u>, <u>supra</u>.

In <u>Mejia-Ruiz v. INS</u>, <u>supra</u>, the Second Circuit sustained 8 CFR
Section 3.4 against an attack based on the fact that it had been
promulgated without notice or comment.  The Court reasoned, <u>Id</u>. at
363, that the regulation "interpreted" 8 USC Section 1105a(c),
withdrawing the right of review of an otherwise reviewable final
order of deportation, where the alien has "departed from the United
States after the issuance of the order."  The Court also cited 8
USC 1101(g), purporting to give the stamp of legality to all
deportations, once they have been effectuated, as evidence that 8
CFR Section 3.4 is "interpretive." [28]

8 USC Section 1101(g) is of dubious applicability, [29] and even more
dubious validity, following the decision of the Supreme Court in
<u>U.S. v. Mendoza-Lopez</u>, 95 L.Ed.2d 772, 107 S.Ct. 2148 (1987) (a
collateral challenge to a deportation order must be permitted when

---

[27]   For example, in the case of Petitioner Lopez, the decision
of the Immigration Judge was dated May 17, 1990, and his appeal was
not decided until August 25, 1994.

[28]   8 USC Section 1101(g) provides as follows:

For the purposes of this Act any alien ordered deported
(whether before or after the enactment of this Act) who
has left the United States, shall be considered to have
been deported in pursuance of law, irrespective of the
source from which the expenses of his transportation were
defrayed or of the place to which he departed.

[29]   <u>See</u>, for example, <u>Osman v. Ribicoff</u>, 195 F.Supp. 699 (E.D.
Mich. 1961) (Qualifying language of Section 1101(g) operates so as
to not make this section binding on determination of Social
Security Administrator regarding alien's deported status under 42
USC Section 402(n)(1)).

35

the order is used as an element of 8 USC Section 1326, unlawful re-entry following deportation). See also, U.S. v. Palacios-Martinez, 845 F.2d 89, 91 (5th Cir. 1988); U.S. v. Campos-Asencio, 822 F.2d 506, 509 (5th Cir. 1987); Matter of Roman, 19 I&N Dec. 855, 856-857 (BIA 1988) (prior order of deportation or exclusion, even if fully executed, can be collaterally attacked in subsequent proceeding if the prior order resulted in a gross miscarriage of justice); Matter of Malone, 11 I&N Dec. 730, 731 (BIA 1966) ("if there was a miscarriage of justice, the error should not be perpetuated").

The Second Circuit implicitly recognized this weakness, in that Section 1101(g) was cited only as evidence that 8 CFR 3.4 was "interpretive," and therefore valid even though published without notice or comment.  It was not mentioned in the context of analyzing the Fleuti claim.

Rather, the Second Circuit dismissed the argument that the term "departure" as used in 8 CFR Section 3.4 did not include a Fleuti type departure, Id. at 365, by citing to its previous decision in Aleman-Fiero v. INS, 481 F.2d 601 (1973).  However, Aleman-Fiero is itself grounded on a clearly erroneous interpretation of 8 USC Sec. 1105a(a)(13), on which Fleuti is based, and which provides that:

> ... no person whose departure from the United States was occasioned by deportation proceedings ... shall be held to be entitled to such exception [i.e. Fleuti exception].

Aleman-Fiero held 8 USC Sec. 1101(g) rendered Fleuti unavailable to a person whose deportation order was pending at the BIA because the departure was "occasioned" by deportation proceedings, Id. at 602:

> [U]nlike Fleuti who left the country free of any sanctions imposed by the immigration laws, appellant departed while the subject of a deportation order which was then pending before the Board of Immigration Appeals.

36

CVAPDF - www.fastio.com

However, the verb "to occasion" is defined by Black's Law Dictionary, Fifth Edition (1979) as follows:

> To cause or bring about ... To give occasion to, to produce; to cause incidentally or indirectly; to bring about or be the means of bringing about or producing.

This clearly implies some form of causal relationship. In other words, if the deportation order did not somehow <u>cause</u> the departure, then the departure cannot be said to have been "occasioned by deportation proceedings."

The Second Circuit continued in <u>Aleman-Fiero</u> as follows, <u>Id</u>.:

> The effect of the regulation was automatically to impute an intent to withdraw the appeal to one who has left the country under such a burden.

This objective standard would not be permissible in the Fifth Circuit, under <u>Molina v. Sewell</u>, <u>supra</u> at 679-680 ("We consider such a purely objective standard as the <u>Becerra</u> court applied contrary to the subjective <u>Fleuti</u> inquiry").

As the Fifth Circuit held in <u>Vargas-Banuelos v. INS</u>, <u>supra</u> at 1374, "[t]he lesson of <u>Fleuti</u> is that a brief departure from this country should not give rise to grounds for deportation when the alien returns..." Any interpretation of 8 CFR 3.4 which includes <u>Fleuti</u> departures by lawful permanent residents violates not only the spirit, but the letter, of this mandate.

17. When a lawful permanent resident applies for admission to the United States as a returning resident, the fact that he or she is under deportation proceedings is not, in and of itself, a relevant fact to be considered in determining whether the absence was brief, casual, and innocent, for the purpose of deciding whether exclusion proceedings are appropriate, <u>Molina v. Sewell</u>, <u>supra</u>.

37

1109

Discussion: As demonstrated by <u>Petitioners' Exhibit C</u>, Respondents still give the narrowest possible interpretation to <u>Molina v. Sewell</u>, <u>supra</u>. As a result, lawful permanent residents continue to be placed in exclusion proceedings following a <u>Fleuti</u> type departure, on the grounds that they may (or may not) be excludable, but with no meaningful consideration of whether or not they are attempting an "entry," as defined by <u>Fleuti</u>. While this is often rectified if, and when, the LPR has a hearing before an Immigration Judge, sometimes even with INS' concurrence, <u>Petitioners' Exhibit Y</u>, this is an insufficient remedy, particularly given the protracted period that many such persons must wait, outside the U.S., for a hearing, and the dangers that they will not receive notice when the hearings are finally scheduled.

This is one of the reasons that Petitioners have been insistent that the green cards of LPRs should not be lifted <u>as a matter of course</u> when they are placed in deportation proceedings, regardless of which arm of INS does the processing, (<u>Petitioners' Exhibit T</u>), and regardless of the "adequacy" of any substitute documentation provided. An LPR who presents his or her green card at the border will, in most cases, be waived through, with few questions beyond the standard inquiries as to where one has been, and what one is bringing back. If only because the fact that deportation proceedings are pending rarely comes to the attention of the inspecting officer, in the case of a legitimate <u>Fleuti</u> type departure by an LPR in possession of his or her green card, it is relatively rare for such a person to be stopped at the border, and placed in exclusion proceedings for this reason.

18. The cases of Petitioners Lopez and Cabrera are not rendered moot by the fact that relief from deportation has been granted, and proceedings against them have been terminated. Both persons remain lawful permanent resident aliens, and the problems which they experienced could recur, and could otherwise escape review. In addition, the case was brought as a class action, and relief is

38

sought not solely on behalf of the named Petitioners, but likewise on behalf of all others similarly situated. The named Petitioners are not only entitled, but <u>obligated</u>, to continue as representatives of the class; <u>Vitek v. Jones</u>, 445 U.S. 480, 487 (1980); <u>Gannett Co. v. DePasquale</u>, 443 U.S. 368, 377, 99 S.Ct. 2898, 61 L.Ed.2d 668 (1978); <u>NLRB v. Riley</u>, 681 F.2d 1083 (5th Cir. 1982); <u>Roper v. Consurve</u>, 578 F.2d 1106 (5th Cir. 1978); <u>Etuk II</u>, <u>supra</u>.

Discussion: A case is not rendered "moot" simply because the complainant has received the relief sought, where the wrong suffered may recur, <u>Vitek v. Jones</u>, <u>supra</u>. It is also clear that, as noted in <u>Etuk II</u>, <u>supra</u> at 1441, quoting <u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979), the party seeking to have a case dismissed on the grounds of mootness bears the burden of demonstrating mootness, and "that burden 'is a heavy one.'"

Petitioners Lopez and Cabrera remain lawful permanent residents, notwithstanding that proceedings against them have been terminated, and both have had their green cards returned. So long as the Investigations branch of the Harlingen INS office continues its current practice of confiscating the green cards of virtually all lawful permanent residents processed by them for deportation proceedings, it is not, as required by <u>Vitek v. Jones</u>, <u>supra</u>, "absolutely clear" that they could not have their green cards confiscated again in the future.

Moreover, Petitioners Lopez and Cabrera are functioning herein not only as individual Petitioners, but as class representatives. Rule 23(e), F.R.Civ. Proc., states that no class action shall be "dismissed or compromised" without the approval of the Court, and notice to all members of the class. The purpose of this rule is to ensure that the self-appointed class representatives do not settle their individuals claims in a manner which adversely affects the rights of the class as a whole, <u>Pearson v. Ecological Science Corp</u>, 522 F.2d 171, reh. den. 525 F.2d 1407, cert. den. 425 U.S. 912 (5th

Cir. 1975); <u>Research Corp v. Asgrow Seed Co.</u>, 425 F.2d 1059 (7th Cir. 1970); <u>see also</u>, <u>Young v. Higbee Corp</u>, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890, 896-898 (1945).

The protection of Rule 23(e) commences with the filing of the action, even prior to class certification, <u>Pearson</u>, <u>supra</u> at 178; <u>Phil Elect. Co. v. Anaconda American Brass</u>, 42 F.R.D. 324, 326 (E.D. Pa. 1967), and survives the denial of class certification, to the extent that dismissal or settlement would adversely affect the rights of individuals not before the Court, <u>Pearson</u>, <u>supra</u>.

As explained in <u>Roper v. Consurve</u>, <u>supra</u>, at 1110:

> The notion that a defendant may short-circuit a class action by paying off the class representatives either with their acquiescence, or, as here, against their will, deserves short shrift. Indeed, if it were so easy to end class actions, few would survive. ... By the very act of filing a class action, the class representatives assume responsibilities to members of the class. They may not terminate their duties by taking satisfaction; a cease-fire may not be pressed upon them by paying their claims. The court itself has special responsibilities to ensure that the dismissal does not prejudice putative members.

<u>See also</u>, <u>Etuk II</u>, at 1441-1442.

### B.  RELIEF REQUESTED

On the basis of the foregoing, and the entire record to date, Petitioners urge that partial summary judgment is warranted, and that both declaratory and permanent injunctive relief are appropriate, and therefore request that the Court enter the following Declarations and Orders:

1.  Petitioners seek a declaration that it is a violation of Due Process for Respondents to confiscate, without justifiable cause,

CVAPDF - www.fastio.com

based on articulable facts demonstrating that such an action is required to further a legitimate interest of Respondents, the green cards of lawful permanent residents placed under deportation proceedings, but who are not being held in actual detention, and to not return the green cards of such lawful permanent residents from whom they have previously been confiscated.

2.   It is also urged that Respondents be enjoined and restrained from confiscating, without justifiable cause, based on articulable facts demonstrating that such an action is required to further a legitimate interest of Respondents, the green cards of lawful permanent residents placed under deportation proceedings, but who are not held in actual detention, and from not returning the green cards of such lawful permanent residents from whom they have previously been confiscated.

3.   Petitioners also seek a declaration that confiscation by Respondents of the green cards, and other documents, such as the drivers' licenses, social security cards, and state issued identification cards, of lawful permanent residents placed under exclusion proceedings, where the residents are neither detained, nor paroled into the United States constitutes a deprivation, without Due Process, of their liberty interests.

4.   Petitioners therefore urge that Respondents be enjoined and restrained from confiscating the green cards and other documents, such as the drivers' licenses, social security cards, and state issued identification cards, of lawful permanent residents placed under exclusion proceedings, where the residents are neither detained, nor paroled into the United States.

5.   Petitioners seek a declaration that the confiscation by Respondents of documents such as the drivers' licenses, social security cards, and state issued identification cards, belonging to lawful permanent residents placed under exclusion proceedings, who

41

1113

are paroled into the United States, regardless of whether, and by whom, they are detained, constitutes a deprivation, without Due Process, of their liberty interests.

6.   Petitioners therefore urge that Respondents be enjoined and restrained from confiscating documents such as the drivers' licenses, social security cards, and state issued identification cards, belonging to lawful permanent residents placed under exclusion proceedings, who are paroled into the United States, regardless of whether, and by whom, they may be detained.

7.   Petitioners further seek a declaration that the confiscation by Respondents of the green cards of lawful permanent residents placed under exclusion proceedings, who are paroled into the United States, without providing a substitute document evidencing their status as lawful permanent residents which contains no markings or restrictions which could interfere with the exercise of the rights and privileges of a lawful permanent resident, including the right to make brief, casual, and innocent border crossings, constitutes a deprivation, without Due Process, of their liberty interests.

8.   Petitioners seek a further order that Respondents be enjoined and restrained from confiscating the green cards of lawful permanent residents placed under exclusion proceedings, who are paroled into the United States, without providing a substitute document evidencing their status as lawful permanent residents which contains no markings or restrictions which could interfere with the exercise of their rights and privileges as lawful permanent residents, including the right to make brief, casual, and innocent border crossings.

9.   Petitioners seek a declaration that any construction of 8 CFR Section 3.4 which includes innocent, brief, and casual departures by lawful permanent residents, (i.e., <u>Fleuti</u> excursions), constitutes a deprivation, without Due Process, of their liberty

42

114

interest in being able to engage in international travel.

10.   Petitioners also urge that Respondents be enjoined and restrained from refusing to readmit, or re-parole, lawful permanent residents who have been ordered deported, or excluded and deported, by an Immigration Judge, but whose cases are under review by the Board of Immigration Appeals, who are seeking readmission or re-parole to the United States following innocent, brief, and casual border crossings, (i.e., _Fleuti_ excursions).

Respectfully Submitted,

Lisa S. Brodyaga
402 E. Harrison, 2nd Floor
Harlingen, Texas 78550
(210) 421-3226

Thelma O. Garcia
301 E. Madison
Harlingen, Texas 78550
(210) 425-3701

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing, with proposed Order, and Petitioners' Exhibits U, V, W, X and Y were mailed, first class postage prepaid, this 12th day of June, 1995, to:

1.   Regina Byrd, Attorney
     U.S. Dept. of Justice, Civ. Division
     Box 878, Ben Franklin Station
     Washington, D.C. 20044

2.   David Guerra, AUSA
     1701 W. Highway 83, #305
     McAllen, Texas 78501, and

3.   Ken Muir, General Attorney
     2102 Teege
     Harlingen, Texas 68550

Lisa S. Brodyaga

43

1115