41

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 2 1995

Michael N. Milby, Clerk

| | | |
|---|---|---|
| ASCENCIO, et al | ) | |
| | ) | |
| v. | ) | C.A. No.   B-94-215 |
| | ) | |
| TROMINSKI, et al. | ) | |
| | ) | |

**PETITIONERS' AMENDED STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE EXISTS NO GENUINE CONTROVERSY**

Come Petitioners, and file this, their Amended Statement of
Material Facts As To Which There Exists No Genuine Dispute, in
support of the motion for partial summary judgment, including
declaratory, and injunctive, relief.

I.  SOURCES OF MATERIAL FACTS
AS TO WHICH THERE EXISTS NO GENUINE ISSUE OF FACT

At the status conference conducted on April 26, 1995, both Parties
represented to the Court that the facts which are material at this
stage of the instant action are not in dispute.   These
representations are fully supported by the record herein.

As of April 26, 1995, Respondents had neither contested, nor
provided any evidence tending to disprove, the material facts set
forth by Petitioners.   All the factual material contained in the
record was submitted by Petitioners, although much of it originated
with Respondents.   The only issues presented for determination by
the Court at this point in time are questions of law.

Petitioners' Original, First, and Second, Amended Petitions, [1]

---

[1]   The Original, First, and Second Amended Petitions are
hereinafter cited as (PET:____) (PET1:____) and (PET2:____),
respectively, where (PET2:10), for example, would refer to page 10
of Petitioners' Second Amended Petition.

CNsPDF - www.fasio.com

were all verified. No answer was filed to either the original, or the First Amended Petitions, and "Defendants' Answer to Plaintiffs' Second Amended Petition For Writ of Habeas Corpus and Class Action Complaint for Declaratory Judgment and Injunction Relief," [2] was not verified. [3] Petitioners also filed two sets of requests for admission. No timely response was received to either set, and Respondents have neither sought, nor obtained, an Order under Rule 36(b), Fed. Rules of Civ. Procedure, permitting the withdrawal or amendment of any of these admissions. Consequently, all matters set forth in Petitioners' First and Second Sets of Requests for Admission [4] are taken as conclusively established.

Finally, all of the Exhibits on file herein, (Petitioners' Exhibits A through Y), are either copies of documents provided by Respondents, or were served on Respondents well before the Status Conference of April 26, 1995. Petitioners' Exhibits are therefore within the scope of Respondents' admission, in open Court, on April 26, 1995, that the facts pertinent to a motion for summary judgment are not in dispute, and, to the extent that the Exhibits embody factual matters, they are also taken as established.

---

[2] Hereinafter referred to as Respondents' "Answer," and cited as (ANS:___), where, for example, (ANS:3) would refer to page 3 of Respondents' Answer.

[3] In its Answer, Respondents deny, or refuse to admit, some of the facts alleged, generally on the grounds that they claim that they do not have sufficient information to admit or deny same. Most of these facts are not "material," and are therefore not included herein. Those facts are included, however, which were not admitted by Respondents, but which could be construed as material, and for which the record contains sufficient independent evidence demonstrating the truth thereof that it cannot reasonably be said that there exists a genuine issue of fact with respect thereto.

[4] Facts established by the requests for admission, which are found in the record as Petitioners' Exhibits G and O, will be cited as (AD1:___) and (AD2:___), respectively, where (AD2:10), for example, would be found as Exhibit O, and would refer to admission #10, of Petitioners' Second Set of Requests for Admission.

2

1043

## II.  MATERIAL FACTS WITH RESPECT TO WHICH THERE EXISTS NO GENUINE ISSUE OF FACT

### A.  THE PARTIES

1.  Petitioners Juana Ascencio-Guzman, Efrain Merino, Arturo Lopez-Lozano, Alejandra Gutierrez, Juan Sanchez-Salinas, Adelita Cantu de Cabrera, and Ramiro Gracia-Cantu are all lawful permanent residents of the United States.  Petitioners Ascencio, Merino, Gutierrez, and Sanchez, were stopped by Respondents at Ports of Entry within the jurisdiction of this Court, and placed in exclusion proceedings, which proceedings are still pending, either before an Immigration Judge, or before the Board of Immigration Appeals.  Petitioner Gracia is currently under deportation proceedings.

Petitioner Cabrera was stopped at a Port of Entry, and was under exclusion proceedings at the time the instant action was filed, but has since been granted relief by an Immigration Judge, and proceedings against her have been terminated.  Petitioner Lopez was under deportation proceedings at the time the instant action was filed, but has since been granted relief by an Immigration Judge, and deportation proceedings against him have been terminated, (PET2:2, 3,5,7,8) (ANS:2-6).

2.  Respondent Immigration and Nationality Service is an executive agency of the United States, with offices in Harlingen, Texas, within the jurisdiction of this Court, (PET2:2-3) (ANS:3).

3.  Respondent E.M. Trominski is the District Director of the Harlingen, Texas, District of Respondent Immigration and Nationality Service, with offices in Harlingen, Texas, within the jurisdiction of this Court, (PET2:3) (ANS:3).

4.  Respondent Hon. Janet Reno is the duly appointed Attorney General of the United States, (PET2:3) (ANS:3).

3

*1044*

## B.   THE FACTS

5.   The instant action was initially filed by two lawful permanent residents, Julio Herrera-Loa, and Ramiro Gracia-Cantu, on their own behalf, and as a class action.   Mr. Herrera was subsequently killed, and an amended Petition was filed, deleting his name, and adding several other named Petitioners, primarily LPRs in exclusion proceedings, whose green cards had been lifted, and who had been forced to return to Mexico to await their hearings.

6.   Mr. Herrera, who was domiciled in Florida, was arrested and placed under deportation proceedings by Respondents on or about July 7, 1994, while he was in the Rio Grande Valley on a combined business and pleasure trip.   At the time of his arrest, his green card was confiscated by Respondents, and he was detained at the Port Isabel Service Processing Center, ("PISPC"), at Bayview, Texas.   After he posted bond, an I-94 temporary card, with the notation "UNDER DEPORTATION PROCEEDINGS 241(a)(2)(c) & 241(a)(2)(A)(i) OUT ON BOND" was issued by the Investigations Branch of the Harlingen INS Office.   (PET:4-5)   (PET1:4-5) (Petitioners' Exhibit B).

7.   On July 22, 1994, Respondents, while still refusing to return his green card, issued Mr. Herrera a new I-94, which noted that he was under deportation proceedings, but no longer specified under which section of law, (PET1:5) (Petitioners' Exhibit D).

8.   Petitioner Ramiro Gracia-Cantu, (A26 948 199), is a native and citizen of Mexico, who has resided in the United States as a lawful permanent resident since June 25, 1984, (PET2:3) (ANS:3).

9.   On or about December 11, 1992, Mr. Gracia was convicted in State Court in Illinois of an offense allegedly relating to the distribution of a controlled substance, for which offense he was fined and sentenced to four years' probation, (PET2:3) (ANS:3).

4

*1045*

10.  In approximately June, 1994, Respondents contacted Mr. Gracia, and asked him to present himself to the Investigations branch of the INS office in Harlingen, Texas.  Mr. Gracia obtained counsel, who was informed by the INS agent in charge of the case that he was to be served with an Order to Show Cause, (an "OSC"), initiating deportation proceedings against him, and a warrant of arrest.  It was agreed that Mr. Gracia would surrender on June 22, 1994, for service of the OSC, and to post bond, (PET2:3) (ANS:3).

11.  On June 22, 1994, Mr. Gracia appeared at the INS office in Harlingen, Texas, with counsel.  The OSC was served, and bond was posted.  During the processing the INS agent asked whether Mr. Gracia had his resident alien card with him.  Counsel inquired whether it was the agent's intention to confiscate Mr. Gracia's green card, [5]  and was told that it was.  The agent informed counsel that it was the practice of the Investigations branch of the Harlingen INS Office to confiscate green cards in such cases, for fear that, if the individual were ultimately deported, he or she might not surrender the green card, but might continue to use it illegally, (PET2:3-4) (ANS:3) (AD1:16).

12.  Under protest, Mr. Gracia surrendered his green card, and was given an I-94, valid only until December 21, 1994, with his photo, and a rather small stamp, "Temporary Form I-551," with a notation that he was admitted for permanent residence at "HLG/IR6/06-2584," and that he was under bond.  The I-94 contained no "employment authorization" stamp, and bore the following notation:

> "DEPORTATION PROCEEDINGS INITIATED
> 241(a)(2)(B)(i) & 241(a)(2)(A)(iii)."

(PET2:4) (Petitioners' Exhibit A) (ANS:3).

----

[5]  Hereinafter, resident alien cards, issued on forms I-551 and I-151, will be referred to as "green cards."

13.  At the request of counsel, on or about September 15, 1994, Mr. Gracia was issued a new I-94, valid only until March 15, 1995, but which bore a larger, more legible, stamp demonstrating his status as a lawful permanent resident, and a employment authorized stamp. The notation:  "DEPORTATION PROCEEDINGS INITIATED
                       241(a)(2)(B)(i) & 241(a)(2)(A)(iii)."

was deleted, but the card still contained an abbreviated version, "Under Dep. Proc" (<u>Petitioners' Exhibit V</u>).  Finally, on or about September 25, 1994, at the insistence of counsel, INS issued a which did not bear any notations concerning the existence of deportation proceedings, (<u>Petitioners' Exhibit W</u>) (PET2:4) (ANS:4).

14.  Petitioner Arturo Lopez-Lozano, (A37 522 584), has been a lawful permanent resident of the United States since June 16, 1981. On May 2, 1988, Mr. Lopez was convicted of an offense involving a controlled substance.   The following day, Respondents initiated deportation proceedings against him.    Mr. Lopez conceded deportability, and applied for relief under Section 212(c) of the Act, (8 USC Sec. 1182(c)).  Following a hearing, an Immigration Judge in Harlingen, Texas, denied said application in the exercise of discretion.   Mr. Lopez appealed to the Board of Immigration Appeals, ("BIA"), who, on August 25, 1994, granted his appeal, and remanded the case to the Immigration Judge for further proceedings, and entry of a new decision.  On remand, and subsequent to January 17, 1995, the date Petitioners' Second Amended Petition was filed, the Immigration Judge granted Mr. Lopez' application for Section 212(c) relief, and terminated deportation proceedings, (PET2:4-5) (ANS:2,4) (AD2:2).

15.  In the early morning hours of Friday, December 23, 1994, while the case was still before the Immigration Judge, Mr. Lopez sought admission to the United States as a returning lawful permanent resident, presenting himself for inspection at the Port of Entry in Brownsville, Texas, and tendering his green card to the official,

1047

(PET2:5) (ANS:4) (AD2:4) (<u>Petitioners' Exhibit H</u>).

16. At that time, his resident alien card, and his Texas driver's license, were confiscated by Respondents, and he was returned to Mexico.  Later that day, Mr. Lopez' wife contacted counsel for Petitioners, who contacted counsel for Respondents.  It was ascertained that Mr. Lopez had been denied admission because the remand from the BIA had not been entered in INS' computer. [6] Respondents' counsel caused the error to be corrected, and advised Mr. Lopez' counsel that Mr. Lopez should return to the Port of Entry, and that he would be admitted, (PET2:5-6) (ANS:4) (AD2:4,5) (<u>Petitioners' Exhibit H</u>).

17. At approximately 3:30 p.m., on Friday, December 23, 1994, Mr. Lopez returned, with his wife, to the Brownsville Port of Entry, and again requested admission as a returning resident. He informed the official on duty that the computer now would reflect the fact that he was entitled to readmission. However, the official refused to re-admit Mr. Lopez, or even check the computer, and instructed Mr. Lopez' wife that she would have to go to the INS Office in Harlingen, Texas, on Tuesday, December 27, 1994, to get some "paper" stating that INS had agreed to let him return to the United States. By this time, it was late in the afternoon, on the Friday before Christmas, so there was nothing to do but wait until the

---

[6] The failure to enter the remand in the computer apparently caused the official at the port of entry to think that the case was still on appeal, and that, pursuant to 8 CFR Section 3.4, Mr. Lopez' "departure" constituted a withdrawal of the appeal, which, by implication, would have resulted in the finalization of the initial deportation Order.  As is discussed below, however, any interpretation of said section which includes lawful permanent residents who have made casual, brief, and innocent departures constitutes a deprivation of their liberty, without Due Process, and a violation of their rights as lawful permanent residents.

*1048*

following Tuesday, (PET2:6) (AD2:5) (<u>Petitioners' Exhibit H</u>). [7]

18.  On Tuesday, December 27, 1994, Mrs. Lopez returned with counsel to the INS Office in Harlingen, and reiterated her request that her husband be re-admitted to the United States.  Eventually, that request was granted, and on the afternoon of December 27, 1994, Mr. Lopez was finally re-admitted, (PET2:6) (ANS:4) (AD2:6) (<u>Petitioners' Exhibit H</u>).

19.  Petitioners Juana Ascencio-Guzman, (A90 775 805), and Efrain Merino, (A91 495 976), are both lawful permanent residents of the United States.  On or about July 3, 1994, they were stopped at the Brownsville, Texas, Port of Entry, following a brief departure to Mexico, and placed in exclusion proceedings, for allegedly attempting to illegally bring Mr. Merino's nephew, who was ill, into the United States for medical treatment.  Their resident alien cards, and Ms. Ascencio's Texas Identification card, were all confiscated by Respondents.  They were placed in exclusion proceedings, and forced to return to Mexico.  They finally secured counsel, who, on October 31, 1994, was able to obtain permission for them to be paroled into the United States pending completion of their exclusion proceedings, (PET2:2,6-7) (AD2:7) (ANS:3-4).

20.  The parole documents given to Petitioners Ascencio and Merino carry a notation that they have been paroled into the United States

---

[7]   This is one of the areas where Respondents have refused to admit some of the allegations of the Petition, specifically, that Mr. Lopez went to the Port of Entry late in the afternoon of December 23, 1994, and was refused readmission.  Respondents base their refusal on the claim that they are "without sufficient knowledge to admit or deny" same, (ANS:4).  However, Mr. Lopez' version of events is not only supported by his unrebutted Declaration, (<u>Petitioners' Exhibit H</u>), which was served on Respondents virtually immediately after the events in question, but by other facts which were admitted by Respondents, to the effect that his wife and counsel were obliged to return to INS on Tuesday, December 27, 1994, before he was finally re-admitted, (ANS:4).

1049

pending determination of their right to re-enter, (PET2:7) (ANS:5) (AD2:8) (Petitioners' Exhibit I).

21. The notation on the parole documents that Petitioners Ascencio and Merino have been paroled into the United States pending determination of their right to re-enter interferes with the exercise of certain rights [8] which attend their status as lawful permanent residents, including the right to make innocent, brief, and casual border crossings. [9]   On or before March 2, 1995,

---

[8]   At the April 26, 1995 hearing, Respondents asserted that these notations do not interfere, even as a practical matter, with the ability of a lawful permanent resident to obtain employment. Given that this assertion was made at the hearing, the fact that the notations also frequently cause potential employers to find excuses for not granting employment to holders or such cards will be taken as disputed.  However, it is not "material" for purposes of summary judgment, insofar as it is indisputable that the notations interfere with the exercise of other rights which pertain to the status of lawful permanent residence, including the right to make casual border crossings, c.f., Rosenberg v. Fleuti, 374 U.S. 449 (1963); Molina v. Sewell, 983 F.2d 676 (5th Cir. 1993) (Petitioners' Exhibit Q) (ANS:10).

[9]   Respondents denied the allegation that such a notation "interfer[es] with the exercise of the attendant rights [of lawful permanent resident status], including the right to make innocent, brief, and casual border crossings," (ANS:5).  That the notation does interfere with such rights is shown by other facts of record, including the difficulty experienced by Petitioners in obtaining assurances that Mr. Merino and Ms. Ascencio could visit her ailing mother in Mexico, and, in the absence of conduct which would justify a refusal, be re-paroled into the U.S. on their return.

These assurances were gained only after the Court suggested, at the Pretrial Conference of April 26, 1995, that Petitioners submit a proposed Order to that effect, following which, Respondents granted the requested guarantee, (Petitioners' Exhibit Q).  Moreover, Exhibit Q affirmatively states that Respondents do not ordinarily allow such border crossings in the cases of people like Ms. Ascencio and Mr. Merino, notwithstanding that they continue to enjoy lawful permanent resident status, Molina v. Sewell, supra. Respondents have also imposed certain restrictions on Petitioners' right to travel, including a requirement that Petitioners must advise Respondents, prior to their departure, of their "return date, and at which port of entry they will apply for parole upon their return," allegedly to allow Respondents to "notify the

*1050*

CUMPDF - www.texis.com

Petitioner Ascencio received word that her mother was ill in Mexico, and on or about that date, her counsel requested Respondents permit her to visit her mother, and be re-paroled on her return.  Said request was not granted until May 2, 1995, (PET2:7) (AD2:8) (<u>Petitioners' Exhibits Q and S</u>).

22.  Petitioner Alejandra Gutierrez, (A41 858 559), is a lawful permanent resident of the United States.  On or about August 4, 1994, she was stopped at the Brownsville, Texas, Port of Entry, and placed in exclusion proceedings, for allegedly attempting to illegally cross her sister and nieces into the United States. Respondents confiscated her green card, and forced her to return to Mexico.  On or about January 6, 1995, Ms. Gutierrez' counsel filed a request with Respondents that she be paroled into the United States, without bond.  On January 27, 1995, her request for parole was granted, (PET2:7) (AD2:9) (ANS:5) (<u>Petitioners' Exhibit J</u>).

23.  Juan Sanchez-Salinas (A13 102 286) obtained lawful permanent residency in 1964.  Following a conviction for an offense involving a controlled substance, Mr. Sanchez was placed in exclusion proceedings, paroled into the U.S., and, ultimately, held in detention at the Port Isabel Service Processing Center.  Through counsel, Mr. Sanchez sought permission to be released from detention, upon payment of a bond.  Said request was granted, and on or about August 17, 1994, Mr. Sanchez posted bond, and was released.  He was given an I-94, with his photo and fingerprint. However, the document given Mr. Sanchez specified that it was "Not Valid For Employment," which defect was cured only through the intervention of the SAUSA handling the instant action at that time. (PET2:8) (ANS:5) (AD2:10) (<u>Petitioners' Exhibit K</u>).

24. Adelita Cantu de Cabrera, (A38 102 369), was paroled into the

---

supervisor at that location of the arrival of [Petitioners] to prevent delays on their return from Mexico," (<u>Id</u>.).

United States on November 9, 1993, pending exclusion proceedings, but was initially denied employment authorization, unless and until she paid a fee, which error Respondents agreed to cure only after being told that she was being added as a Petitioner herein, (PET2:8) (AD2:12) (ANS:6) (<u>Petitioners' Exhibit M</u>).

25.  When a lawful permanent resident applies for admission as a returning resident at a port of entry under the jurisdiction of the Harlingen, Texas, INS Office, and Respondents have reason to believe that said person has committed an act which would subject him or her to exclusion proceedings, if criminal prosecution is also contemplated, it is Respondents' practice [10] to parole the individual into the United States for prosecution, place him or her under exclusion proceedings, and confiscate his or her green card. If the prosecution results in a conviction, it is the practice of Respondents to detain said individual at the Service Processing Center at Bayview, Texas, ("PISPC"), pending exclusion proceedings. Upon request of counsel, and in some cases upon payment of a bond, such persons are frequently paroled into the United States, (PET2:9) (ANS:6) (AD2:14,17) (<u>Petitioners' Exhibit K</u>). [11]

26.  When a lawful permanent resident applies for admission as a returning resident at a port of entry under the jurisdiction of the Harlingen, Texas, INS Office, and Respondents have reason to believe that said person has committed an act which would subject him or her to exclusion proceedings, if criminal prosecution is <u>not</u>

---

[10]  As used herein, the term "practice" means an act performed or procedure followed in more than half of the instances described.

[11]  Respondents appear to assert that the procedures for obtaining the release of lawful permanent residents detained for exclusion proceedings are even more restrictive than those alleged by Petitioners, in that Respondents appear to deny that they grant more than half of the requests made by attorneys that their lawful permanent resident clients detained at PISPC for exclusion proceedings be paroled, upon payment of a bond, (ANS:6), although they admit that they did so in the case of Mr. Sanchez.

1052

contemplated, it is Respondents' practice to initiate exclusion proceedings, confiscate his or her green card, and, in most instances, force said person to return to Mexico, without advising him or her of the possibility of being paroled into the United States.  In such cases, unless the individual obtains counsel, it is very difficult to ascertain, and follow, the procedures necessary to request that he or she be paroled into the U.S. during the exclusion proceedings, (PET2:9) (AD2:15,16,18) (ANS:6).

27.  In the Harlingen, Texas INS District, when Respondents place lawful permanent residents under exclusion proceedings, it is Respondents' practice to confiscate their green cards, and to not to return these cards unless and until exclusion proceedings are terminated in favor of the resident.  In such cases, Respondents frequently confiscate other documents belong to the resident as well, such as (valid) U.S. drivers' licenses, state issued identification cards, and Mexican passports, and have in some cases refused to return such documents unless and until exclusion proceedings are terminated, in favor of the permanent resident, (PET2:7,9-10) (AD2:20) (ANS:4,7) (Petitioners' Exhibit L).

28.  INS has previously asserted to this Court that when a lawful permanent resident who has posted bond in connection with deportation proceedings, departs the United States, the bond is subject to either forfeiture or cancellation, in INS' discretion, and has never retracted said assertion.  Even after the decision of the Fifth Circuit in Molina v. Sewell, supra, INS has asserted that the mere fact that a lawful permanent resident departed the United States while under deportation proceedings may be taken into consideration in determining whether exclusion proceedings are appropriate, (PET2:10) (Petitioners' Exhibit C).  [12]

---

[12]   In their Answer to Petition for Writ of Habeas Corpus and Request for Dismissal of Action, in Lozano-Molina v. Sewell, C.A. B-86-101, at paragraph 13, Respondents represented to this Court that a departure to Mexico by a lawful permanent resident who was

12

29. Many lawful permanent residents whose green cards have been confiscated by Respondents because they have been placed in exclusion or deportation proceedings have legitimate business and personal needs which require them to make "casual, brief, and innocent" trips into Mexico, and back, but are deterred from making such trips by the actions of Respondents in, _inter alia_, confiscating their green cards, and providing them either with no substitute documentation, or with substitute documentation which greatly increases the possibility that they would not be allowed to re-enter, or be re-paroled, into the U.S. on their return, (PET:6) (PET1:5-6) (PET2:7,10-11) (AD1:9,10,11,12,13,24,25) (AD2:8,11,13) (ANS:7) (Petitioners' Exhibits A, B, C, D, I, K, L, M, and Q).  [13]

---

on bond while under deportation proceedings was a violation of the conditions of the bond "because a demand upon the obligor to present the [alien] would have been impossible." To date, Respondents have tendered no documentation demonstrating that this claim has been retracted.

Petitioners' Exhibit C, documents the fact that, notwithstanding the decision in Molina v. Sewell, 983 F.2d 676 (5th Cir. 1993), reaffirming the principle that a lawful permanent resident in deportation proceedings does not lose his status as a lawful permanent resident, INS has asserted that the departure to Mexico of a lawful permanent resident, while under deportation proceedings, is a factor "to be given some weight in determining whether [his] departure was a meaningful one."

Respondents' denial that they made these assertions, (ANS:7), will not be construed as creating a genuine issue of material fact, given that both are matters of record, and relate to the same individual involved in Molina v. Sewell, supra, to wit, Israel Lozano-Molina, A36 599 698, particularly since the pleading submitted as Petitioners' Exhibit C was signed by the INS General Attorney who is now Of Counsel for the Respondents herein.

[13]    This statement of fact, found at Paragraph 31 of Petitioners' Second Amended Petition, (PET2:10-11), is one about which Respondents disclaim sufficient knowledge to admit or deny, (ANS:7). However, the record is replete with documentation which demonstrates that there exists no genuine issue as to its truth, including Petitioners' Exhibit Q, in which Respondents state that it is their practice to not allow certain lawful permanent residents to come and go freely from the United States.

13

1054

30.  When Respondents provide replacement documentation to lawful permanent residents whose green cards were confiscated because they were placed in deportation proceedings, Respondents usually limit the validity of those documents to a period of six (6) months, even in cases where it is clear that the resident is eligible to apply for some for of relief, such as adjustment of status, or a waiver of deportability under 8 USC Section 1182(c), and require that the card be renewed periodically, for the duration of the proceedings, (PET2:33) (ANS:7) (<u>Petitioners' Exhibits A, B, D, V and W</u>).

31.  When Respondents provide replacement documentation to lawful permanent residents whose green cards were confiscated because they were placed in exclusion proceedings, Respondents usually do not limit the validity of such documents to any particular period of time.  Instead, they usually place a notation on the document that specifies that the holder is in exclusion proceedings, and ties its validity to the conclusion of those proceedings, (<u>Petitioners' Exhibits I, K, L, and M</u>).

32.  The replacement documentation generally provided by Respondents to lawful permanent residents whose green cards were confiscated because they were placed in exclusion proceedings is not considered by Respondents to be valid for the purpose of departing from, and returning to, the United States.  Respondents consider that the validity of such documents "terminates automatically by operation of law," (ANS:10), even when the holder is a lawful permanent resident who has made a casual, brief, and innocent departure, and under such circumstances, do not generally allow the resident to return to the U.S., unless and until he or she has made application for, and been granted, a new document, which request is not usually granted if the resident's case is on appeal to the Board of Immigration Appeals, (PET2:14-15) (ANS:10) (<u>Petitioners' Exhibit Q</u>).

33.  The confiscation of the green cards of lawful permanent

14

CVdPDF - www.faxixa.com

residents placed in deportation or exclusion proceedings in the
Harlingen INS District, without provision of substitute documents
which place no cloud over their status as lawful permanent
residents, and the resultant curtailment of their rights and
privileges, has been a source of controversy within the Harlingen
District Office of INS for at least a dozen years, (PET:7) (PET1:8)
(PET2:11-12) (<u>Petitioners' Exhibit T</u>).    [14]

34.   From the date of the issuance of the decision of the Fifth
Circuit Court of Appeals in the case of <u>Molina v. Sewell</u>, 983 F.2d
676 (5th Cir. 1993), to wit, February 22, 1993, until the date of
the filing of the instant action, on July 15, 1994, Respondents
made no changes in their practices, procedures, or policies
regarding the confiscation of green cards of lawful permanent
residents who are placed under deportation proceedings, as a result
of, or based on, the Court's ruling in said case, (AD1:1,2).

35.   Between February 22, 1993 and July 15, 1994, it was the
practice of the Investigations branch of the Harlingen INS office
to confiscate the green cards of lawful permanent resident aliens
on whom they served Orders to Show Cause and Warrants of Arrest,
regardless of whether the individual simultaneously posted bond or

---

[14]   In their Answer, (ANS:8), Respondents address this
allegation, as follows:

> Paragraph   thirty-five   is   a   characterization   of
> plaintiffs' lawsuit and does not contain allegations of
> fact requiring an answer, but insofar as an answer may be
> deemed required, the allegations are denied.

That the problem at bar has long been a source of controversy in
the Harlingen INS District is indeed an "allegation[] of fact."
Petitioners provided proof of this fact to Respondents by letter
dated July 29, 1994, (<u>Petitioners' Exhibit T</u>).   The longstanding
nature of the problem is also demonstrated by the case of Israel
Lozano-Molina, which was before this Court in 1986, and of which
this Court hereby takes judicial notice.   Respondents' denial of
Paragraph 35 of Petitioners' Second Amended Petition is therefore
not taken as creating a genuine issue of fact.

15

was released on recognizance, (AD1:4).

36.   Between February 22, 1993 and July 15, 1994, it was Respondents' practice to provide I-94s, with a stamp indicating that the individual had been admitted as a lawful permanent resident, to lawful permanent residents who were processed for deportation proceedings by the Investigations branch of the Harlingen INS Office, and who, at the time of processing, either posted bond or were released on recognizance, although the I-94's provided did not always include the notation: "EMPLOYMENT AUTHORIZED." (AD1:5,6).

37.   In situations such as described in No. 35 above, it was Respondents' practice to put a notation on the I-94, indicating that the individual was under deportation proceedings, (AD1:7).

38.   In situations such as described in No. 35, above, where bond was posted, it was the practice of the Investigations branch of the Harlingen INS office to put a notation on the I-94, indicating that the individual had been released on bond, (AD1:8).

39.   In situations such as described in No. 35, above, notations were sometimes placed on the I-94, indicating that it was not valid for re-entry to the United States, (AD1:9).

40.   On July 22, 1994, in the offices of the Investigations branch of the Harlingen INS office, an agent of Respondents told Julio Herrera-Loa [15]   in the presence of his counsel, after Mr. Herrera had been served with a (superseding) Order to Show Cause charging deportability only under Section 241(a)(2)(C) of the Act, and a new I-94, that since he is under deportation proceedings, if he were to cross into Mexico without first obtaining an advance parole, he would automatically be deported, (AD1:10).

_____

[15]   A former Petitioner, now deceased.

16

*1057*

41.   Between February 22, 1993 and July 15, 1994, when class members who were issued an I-94 by Respondents inquired whether they could use that document to go to Mexico and back, they were sometimes informed that the document was not valid for that purpose, (AD1:10,11).

42.   Between February 22, 1993 and July 15, 1994, when a class member who had been detained at the Port Isabel Service Processing Center posted bond or was released on recognizance, it was not Respondents' practice to provide any evidence of his status as a lawful permanent resident other than the bond or release papers, and the Order to Show Cause, unless the individual or his representative specifically requested such a document, (AD1:12).

43.   As of July 15, 1994, it was not the practice of the Deportations branch of the Harlingen INS office to confiscate the green cards of lawful permanent resident aliens on whom they served Orders to Show Cause and Warrants of Arrest, in situations where the individual simultaneously posted bond or was released on recognizance, (AD1:14).

44.   As of July 15, 1994, it was not the practice of the McAllen Sector of the U.S. Border Patrol to confiscate the green cards of lawful permanent residents on whom they served Orders to Show Cause and Warrants of Arrest, in situations where the person simultaneously posted bond, or was released on recognizance, (AD1:15).

45.   On June 22, 1994, an agent of Respondents told Petitioner Gracia in the presence of his counsel that the primary reason that it was the practice of his office to confiscate the individual's green card in cases such as his was a concern that, if and when the person were deported from the United States, he might not surrender the card, but might continue to use it illegally, (AD1:16).

46.   On July 22, 1994, an agent of Respondents told Julio Herrera-

17

1058

Loa, in the presence of his counsel that the primary reason that it was the practice of his office to confiscate the green cards in cases such as his was a concern that, if and when the person was deported from the U.S., he might not surrender the card, but might continue to use it illegally, (AD1:17).

47. A lawful permanent resident who has made a "brief, casual, and innocent" departure from the U.S. and seeks readmission as a returning resident, who presents an I-94 indicating that he is a lawful permanent resident under deportation proceedings, is more likely to be denied readmission and placed in exclusion proceedings, than would have been the case if he had presented his green card, (PET1:6) (AD1:24,25) (Petitioners' Exhibit C).

48. Counsel for Petitioners, Thelma O. Garcia and Lisa S. Brodyaga, are well known to this Court, and have a long history, both individually, and as a team, of vigorously defending the rights of immigrants, both documented, and undocumented.  Although Respondents claim that they are without sufficient knowledge to admit or deny that Ms. Garcia and Ms. Brodyaga "have the necessary resources, and commitment, to adequately represent the interests of the instant class," (ANS:9), based on their record before this Court, and their reputation in the community, the Court finds that they do have such resources, and commitment.

49. The class which Petitioners seek to represent is that of all lawful permanent resident aliens who are under deportation or exclusion proceedings, in whose cases no final order of deportation or exclusion has been entered, who are not presently held in detention, whose lawful permanent resident alien cards (Forms I-151 or I-551), [16] have been confiscated by Respondents, and are being retained by or under the authority of the Harlingen Office of the Immigration and Naturalization Service.  Respondents deny, (ANS:9),

---

[16]   Hereinafter called "green cards."

that said class is "so numerous that joinder of all members is impracticable, and that there are questions of law and fact which are common to the class," (PET2:13). However, when Respondents attempted to send notices to members of the putative class, advising them of appointments with INS for the purpose of being provided with substitute documentation, Respondents were unable to identify the members of the putative class, (Petitioners' Exhibit E). As of the status conference on April 26, 1995, Respondents asserted that they had still been unable to identify the class. Therefore, Respondents' denials of numerosity, and commonality of issues of law and fact, will not be taken as creating a genuine issue of material fact, and the Court hereby finds that the class as defined is sufficiently numerous that joinder of all members is impracticable, and that there are questions of law and fact which are common to the class. [17]

50. Respondents also deny that they have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the whole class, (ANS:9). However, Respondents have admitted a number of facts which belie this denial.

Respondents admit, inter alia: (a) that it is their practice to confiscate the green cards, and sometimes other documents, such as drivers' licenses, and State identification cards, of class members placed in exclusion proceedings, (ANS:4,6-7); (b) that it is the practice of at least one subdivision of Respondents, (INS Investigations, in Harlingen, Texas), to confiscate the green cards of class members placed in deportation proceedings, regardless of whether the individuals were detained, or released on bond or recognizance, and to either provide no substitute documentation, or documentation which is valid only for a limited period of time, and which includes various types of restrictions, such as that the

---

[17] See also, (AD1:19-22).

19

CSUPDF - www.fastio.com

document was not valid for re-entry, or for employment, (AD1:4,6-13); (c) that Respondents frequently do not give class members in exclusion proceedings any documents demonstrating their status as lawful permanent residents, without which, they are unable to reside and work in the United States while their status is being determined, (ANS:4-7), or to freely make cross-border visits to Mexico and back, (Petitioners' Exhibit Q).

51. Respondents disclaim sufficient knowledge to admit or deny the allegations that the claims of the named Petitioners herein are typical of the claims of the putative class, and that they will fairly and adequately protect the interests of the class, (ANS:8). Based on the nature of the action, and its history to date, the Court finds that the claims are indeed typical, and that the named Petitioners have to date fairly and adequately protected the interests of the class, and that there is no reason to believe that they will not continue to do so in the future.

52. The controversy in the Harlingen, Texas, INS District, with respect to the confiscation of the green cards of lawful permanent residents who have been placed in exclusion or deportation proceedings, and the resultant infringement upon their ability to exercise the rights and privileges which attend that status, dates back at least to 1981, and attempts to resolve the issue were made, without success, with three consecutive INS District Directors, and the Office of the United States Attorney in Brownsville, Texas, prior to filing the instant action, (Petitioners' Exhibit T).

53. As noted above, at the time of filing the instant action, neither the Deportations Branch of the Harlingen INS Office, nor the McAllen Sector of the U.S. Border Patrol, routinely confiscated the green cards of lawful permanent residents processed by them deportation proceedings, but the Investigations Branch of the Harlingen INS Office did at that time, and continues at the present, routinely confiscating the green cards of lawful permanent

20

residents processed by them for deportation proceedings. Respondents have offered no explanation or justification for treating people differently, solely on the basis of which of their various branches processes the case. The only justification offered to Petitioners, or to the Court, for the practice of the Investigations Branch, is their concern that if and when a final order of deportation is issued, the resident may keep the card, and continue to use it illegally. (PET:3-4,7-8) (PET1:3-4) (PET2:4) (ANS:3) (AD1:4,14-17).

Respectfully Submitted,

Lisa S. Brodyaga
402 E. Harrison, 2nd Floor
Harlingen, Texas 78550
(210) 421-3226

Thelma O. Garcia
301 E. Madison
Harlingen, Texas 78550
(210) 425-3701

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing were mailed to Regina Byrd, Attorney, OIL, U.S. Department of Justice, Civil Division, Box 878, Ben Franklin Station, Washington, D.C. 20044, David Guerra, AUSA, 1701 W. Highway 83, #305, McAllen, Texas 78501, and Ken Muir, General Attorney, INS, 2102 Teege, Harlingen, Texas 78550, this 12th day of June, 1995.

Lisa S. Brodyaga
Attorney at Law

21

1068