UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 2 1995

Michael N. Milby, Clerk

ASCENCIO, et al )
)
v. )        C.A. No.  B-94-215
)
TROMINSKI, et al. )
_____ )

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER GRANTING PARTIAL SUMMARY JUDGMENT,
INCLUDING DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

Upon consideration of Petitioners' Motion for Summary Judgment, the
Points and Authorities in support thereof, and Amended Statement of
Material Facts As To Which There Exists No Genuine Dispute, the
response of the Government thereto, and the entire record herein,
the Court makes the following Findings of Fact, Conclusions of Law,
and enters the following Order, granting partial summary judgment,
including declaratory, and injunctive, relief.

I.   BACKGROUND OF THE CONTROVERSY

The instant action represents another step in a longstanding
controversy, dating back at least as far as 1981, [1] between

---

[1]  Petitioners' Exhibit T consists of a letter dated July 29,
1994, from Petitioners' counsel, to the first managing attorney for
Respondents, responding to his inquiry regarding the history of the
instant controversy.  Included as attachments to the letter were
copies of correspondence on this issue, including a letter to Hal
Bolden, then INS District Director, dated February 5, 1981, on
behalf of an LPR whose I-151 had been lifted when he was placed
under deportation proceedings.  The letter requested that he be
given some form of evidence of his status as an LPR, sufficient to:

> enable him to claim and enjoy the benefits of his status
> as lawful permanent resident alien, specifically the
> ability to travel outside the United States and seek
> readmission as a returning resident.

1005

attorneys for lawful permanent residents, and three successive
District Directors of the Harlingen Office of the Immigration and
Naturalization Service, regarding the right of lawful permanent
residents of the United States, ("LPRs"), to documents which
unequivocally demonstrate their status as LPRs.

The primary terrain over which this struggle has been waged locally
has been INS' practice of confiscating LPRs documents evidencing
their status, [2] when deportation or exclusion proceedings are
initiated. As a result, the LPRs claim that they are disabled from
exercising many of the rights and privileges pertaining to that
status, c.f., "Petitioners' Statement of Material Facts With
Respect to Which There Exists No Genuine Issue of Fact," herein-
after cited as (FACTS:__), at Number 33; Petitioners' Exhibit T.

In the Rio Grande Valley, this struggle has focused on the claim
that Respondents' arbitrary denial of appropriate documentation to
lawful permanent residents results in the deprivation, without Due
Process, of their liberty interest in being able to make casual,
cross-border excursions; Rosenberg v. Fleuti, 374 U.S. 449, 83
S.Ct. 1804, 10 L.Ed.2d 1000 (1963); Kwong Hai Chew v. Colding, 344
U.S. 590, 73 S.Ct. 472 (1953); Molina v. Sewell, 983 F.2d 676 (5th
Cir. 1992); (FACTS:33); Petitioners' Exhibit T. [3]

Historically, when agents of the Harlingen District Office of INS
have placed lawful permanent residents in exclusion or deportation

---

[2]  Such documents, issued on Forms I-151 and I-551, will
hereinafter be referred to as "green cards."

[3]  The fact that it also makes it more difficult for the LPRs
to obtain, and maintain, employment is one which INS disputed at
the April 26, 1995 hearing, and is therefore not addressed in this
motion, although it was found to have this effect in the Etuk
cases, infra, and was the principle disability addressed therein.

2

CMsPDF - www.texisy.com

proceedings, they have confiscated their green cards, [4] and given them either no identification as lawful permanent residents, or documents which are not the functional equivalent of green cards.

When anything has been provided at all, the substitute documentation has sometimes consisted of nothing other than the Orders to Show Cause, or bond papers, or "temporary" green cards, which contain significant limitations, such as notations to the effect that the holder, although still a lawful permanent resident, is not entitled to be employed in the United States, that the document is not valid for re-entry, that the holder is under deportation or exclusion proceedings, or is on bond, (FACTS:6,7,11-13,16,19-24,25-27,30-42).

The U.S. District Court for the Eastern District of New York, and the Second Circuit, have addressed a similar controversy, resulting in a published decision by the District Court, Etuk v. Blackman, 748 F.Supp. 990 (E.D.N.Y. 1990) ("Etuk I"), and two decisions by the United States Court of Appeals for the Second Circuit, Etuk v. Slattery, 936 F.2d 1433 (2nd Cir. 1991) ("Etuk II"), and Etuk v. Slattery, 973 F.2d 60 (2nd Cir. 1992) ("Etuk III").

Although INS in New York never routinely confiscated the green cards of LPRs placed under deportation proceedings, if the resident lost his or her green card, INS would not, at that time, replace it until deportation proceedings were completed, Etuk I at 994. In addition, INS in N.Y. was extremely slow in providing substitute documentation for residents whose cards had been lost or stolen. The suit also complained that INS confiscated the cards of residents placed under exclusion proceedings, without providing adequate substitute documentation, but this aspect was not

---

[4] As used herein, "green card" means the laminated document issued by INS to lawful permanent residents, forms I-151 and I-551.

3

*1007*

addressed in any of the opinions resulting from the action. [5]

The Etuk action focused on the curtailment of the right to be employed in the United States which results from inadequate documentation of lawful permanent resident status, and the decisions were based on INS' legal obligation to provide documents adequate for this purpose, c.f., 8 USC Section 1324a(h)(3). During the pendency of, and in response to, the action before the District Court, in March, 1990, then INS Commissioner Gene McNary issued a policy memorandum that permitted, under certain limited and "justifiable" circumstances, the confiscation of the green cards of LPRs placed in deportation proceedings, but required that they be issued adequate substitute documentation in such instances. [6]

The bulk of both the first, and second, appeals to the Second Circuit turned on the adequacy of the temporary documentation

---

[5]     The practice of seizing the green cards of LPRs, and not paroling them into the country, but requiring them to return to the country of embarkation to await their exclusion hearings, which practice forms the basis of a large portion of the instant controversy, apparently did not exist in New York City.   That Immigration Office does not have jurisdiction over any land borders, where such a procedure would be feasible, 8 CFR Section 100.4(b).  The Etuk cases also dealt with issues arising from the fact that INS in N.Y.C. was slow to provide replacement documentation to LPRs whose green cards had been lost or stolen, issues which are not involved herein.

[6]     As quoted in Etuk II, 936 F.2d at 1442, the memorandum provided, in relevant part, as follows:

> ... If the district director, chief patrol agent or officer in charge determines that a temporary document is needed to assure the alien's appearance at hearings, or for other justifiable reasons, the [green card] will be lifted, and temporary I-551 will be issued.   In these cases, temporary Forms I-551 will be prepared in accordance with the guidance of O.I. 264.1, and will be issued for a period sufficient to allow completion of the deportation proceedings, but in no case less than six months.

4

*1008*

issued, and neither decision clearly delineated the circumstances, if any, under which INS could confiscate the green cards of residents placed in either deportation or exclusion proceedings.

In <u>Etuk II</u>, at 1447, however, the Second Circuit did reject the suggestion of the McNary memorandum, approved by the District Court in <u>Etuk I</u>, at 1000, that the confiscation of resident's green cards is an appropriate means of ensuring that they comply with future mandates such as appearing for deportation hearings, or for deportation. As the Court observed, other procedures are built into the process, such as detention, bond, and release on conditional parole, which can be utilized to protect against flight in an individual case.

Following the issuance of the McNary memorandum, and the <u>Etuk</u> injunction, most branches of INS modified their practices accordingly. However, neither the memorandum, nor the injunction, have been consistently followed in this INS District.

Both the McAllen Division of the U.S. Border Patrol, and the Deportations Branch of the Harlingen, INS Office, ceased confiscating, as a matter of course, the green cards of LPRs placed under deportation proceedings, and even returned the green cards of many residents from whom they had been previously confiscated.

However, the Investigation Branch of the Harlingen INS Office has continues, as a matter of course, to confiscate the green cards of most LPRs whom they process for deportation proceedings. They have claimed that this practice is justified by a concern that, in the event the proceedings are ultimately concluded adversely to an LPR, he or she may refuse to relinquish the card, and continue to use it illegally, notwithstanding that the card loses its validity once deportation has been accomplished, and becomes no more valuable than a "good" fake card.

5

At the time the instant action was filed, it is undisputed that a number of LPRs, primarily those whose cards had been lifted when they were placed under deportation proceedings, and who had been held in detention for some period of time, had not been provided with <u>any</u> substitute documentation as LPRs, even after their release from custody, (FACTS:42). Given INS' apparent difficulty in identifying the members of the putative class herein, there are in all likelihood lawful permanent residents in this INS district who still have no documentation of their status.

Similarly, in many instances, whatever substitute documentation <u>is</u> provided fails to comply with the McNary memorandum, in that it frequently contains notations which all but nullified the ability to exercise the rights and privileges pertaining to their status as LPRs, notations such as, <u>inter alia</u>, that the document is not valid for employment, or for re-entry to the United States, or that its holder is under deportation or exclusion proceedings, or has been released on bond, (FACTS:36-39). [7]

In addition, the replacement documentation issued is generally valid for only six months, (FACTS:6,7,12,13) (Petitioners' Exhibits A, B, D, V, and W), regardless of whether this period could reasonably be considered "sufficient to allow completion of the deportation proceedings," <u>Etuk II</u> at 1442. [8]

The instant action also presents issues not resolved either by the McNary Memorandum, or by the <u>Etuk</u> injunction, (assuming that it

---

[7]  The only reason that the substitute documentation provided in the Harlingen District did not also violate the <u>Etuk</u> injunction was that the injunction did not apply in this district.

[8]  Lawful permanent residents who have been lawfully domiciled in the United States for seven or more years may apply for relief from most grounds of deportation, pursuant to 8 USC Section 1182(c). Such proceedings usually last well over six months, as shown by the case of Petitioner Arturo Lopez-Lozano, which had been pending for over six <u>years</u> when the instant Petition was filed.

6

CVldPDF - www.fsxls.com

10/0

applied in this INS District), deriving primarily from the fact that, unlike N.Y.C., the Harlingen INS District includes a long stretch of land border with Mexico, and many LPRs who reside in this district have strong familial and/or business ties to that country, which lead to frequent brief, casual, and innocent border crossings, (hereinafter called "_Fleuti_ excursions"). [9]

The complications that such crossings can engender are multiple, and the rights of LPRs under such circumstances beg for clarification. For example, _Molina v. Sewell_, 983 F.2d 676 (5th Cir. 1993), involved an LPR who made a _Fleuti_ excursion while under deportation proceedings, and was detained, and placed in exclusion proceedings on his return. In that case, the Fifth Circuit held that the fact that he was under deportation proceedings did not convert a _Fleuti_ excursion into an attempted "entry," such that exclusion proceedings would have been appropriate. [10]

On remand, INS argued that the fact that he had been under deportation proceedings was, if not sufficient in and of itself, at least a legitimate element to take into consideration in deciding whether a _Fleuti_ excursion had occurred, (_Petitioners' Exhibit C_).

Similarly, the rights of lawful permanent residents under exclusion proceedings remain to be resolved. The Harlingen INS District continues to confiscate the green cards of LPRs, who are denied

---

[9]   _Rosenberg v. Fleuti_, 374 U.S. 449, 462, 83 S.Ct. 1804, 1812, 10 L.Ed.2d 1000 (1963), held that an LPR does not effect an "entry," and is therefore not subject to exclusion proceedings, when he returns from an "innocent, casual, and brief excursion" outside the United States.

[10]   Under _Rosenberg v. Fleuti_, the return from an innocent, brief and casual excursion does not constitute an "entry," as that term is used in 8 USC 1101(a)(13), so that exclusion proceedings are not appropriate following such an excursion, even if the resident is in a status which would otherwise cause him or her to be excludable, such as, for example, having been previously convicted of an offense relating to a controlled substance.

7

_10_ _11_

CitePDF - www.tessa.com

admission as returning residents, and, regardless of whether they are placed under exclusion proceedings, frequently seizes other documents as well, such as drivers licenses, social security cards, and state issued identification cards, (FACTS:16,19,27).

Unless LPRs denied admission as returning residents are paroled into the U.S. for prosecution of some criminal offense, they are generally returned to Mexico.  Because they lack documentation of their status as LPRs, they generally must remain in Mexico for the duration of their exclusion proceedings.  Under such circumstances, Respondents admit that INS does not even advise the resident of the possibility of being paroled into the United States, and further admits that, unless the person obtains counsel, it is very difficult to ascertain, and follow, the procedures necessary to request parole into the United States, (PET2:9) (ANS:6).

Petitioners challenge this practice on both procedural and substantive grounds, alleging that it constitutes a form of summary exclusion, resulting in the denial, without Due Process, of the liberty interests of a lawful permanent resident of the United States in being allowed to live and work in this country.

Shortly after the instant action was filed, Respondents agreed to settle most of the issues presented herein.  However, as time passed, and Respondents' legal team underwent various metamorphoses, their willingness to settle the case evaporated, to the point where it became clear that settlement was impossible.

Consequently, at a status conference conducted on April 26, 1995, after determining that there were no genuine issues of material fact relevant to the case at this point in the proceedings, [11]

---

[11]    No determination has yet been made on the issue of class certification.  Once this question has been settled, there may well be unresolved questions of fact regarding the situations of individual class members, and appropriateness of proposed remedies.

the Court suggested that Petitioners file a motion for summary judgment, and set a timetable for receipt of pleadings.

## II.  SOURCES OF MATERIAL FACTS
### AS TO WHICH THERE EXISTS NO GENUINE ISSUE OF FACT

At the status conference conducted on April 26, 1995, both Parties represented to the Court that the facts which are material at this stage of the instant action are not in dispute.   These representations are fully supported by the record herein.

As of April 26, 1995, Respondents had neither contested, nor provided any evidence tending to disprove, the material facts set forth by Petitioners.   All the factual material contained in the record was submitted by Petitioners, although much of it originated with Respondents.   The only issues presented for determination by the Court at this point in time are questions of law.

Petitioners' Original, First, and Second, Amended Petitions, [12] were all verified.   No answer was filed to either the original, or the First Amended Petitions, and "Defendants' Answer to Plaintiffs' Second Amended Petition For Writ of Habeas Corpus and Class Action Complaint for Declaratory Judgment and Injunction Relief," [13]  was not verified. [14]   Petitioners also filed two sets of requests for

---

[12]   The Original, First, and Second Amended Petitions are hereinafter cited as (PET:____) (PET1:____) and (PET2:____), respectively, where (PET2:10), for example, would refer to page 10 of Petitioners' Second Amended Petition.

[13]   Hereinafter referred to as Respondents' "Answer," and cited as (ANS:___), where, for example, (ANS:3) would refer to page 3 of Respondents' Answer.

[14]   In its Answer, Respondents deny, or refuse to admit, some of the facts alleged, generally on the grounds that they claim that they do not have sufficient information to admit or deny same. Most of these facts are not "material," and are therefore not included herein.   Those facts are included, however, which were not admitted by Respondents, but which could be construed as material,

9

admission.  No timely response was received to either set, and Respondents have neither sought, nor obtained, an Order under Rule 36(b), Fed. Rules of Civ. Procedure, permitting the withdrawal or amendment of any of these admissions.  Consequently, all matters set forth in Petitioners' First and Second Sets of Requests for Admission [15] are taken as conclusively established.

Finally, all of the Exhibits on file herein, (<u>Petitioners' Exhibits</u> <u>A</u> through <u>Y</u>), are either copies of documents provided by Respondents, or were served on Respondents well before the Status Conference of April 26, 1995.  Petitioners' Exhibits are therefore within the scope of Respondents' admission, in open Court, on April 26, 1995, that the facts pertinent to a motion for summary judgment are not in dispute, and, to the extent that the Exhibits embody factual matters, they are also taken as established.

III.  MATERIAL FACTS WITH RESPECT TO WHICH THERE EXISTS
NO GENUINE ISSUE OF FACT

A.  THE PARTIES

1. Petitioners Juana Ascencio-Guzman, Efrain Merino, Arturo Lopez-Lozano, Alejandra Gutierrez, Juan Sanchez-Salinas, Adelita Cantu de Cabrera, and Ramiro Gracia-Cantu are all lawful permanent residents of the United States.  Petitioners Ascencio, Merino, Gutierrez, and Sanchez, were stopped by Respondents at Ports of Entry within the jurisdiction of this Court, and placed in exclusion proceedings, which proceedings are still pending, either before an Immigration

---

and for which the record contains sufficient independent evidence demonstrating the truth thereof that it cannot reasonably be said that there exists a genuine issue of fact with respect thereto.

[15]  Facts established by the requests for admission, which are found in the record as <u>Petitioners' Exhibits G</u> and <u>O</u>, will be cited as (AD1:___) and (AD2:___), respectively, where (AD2:10), for example, would be found as <u>Exhibit O</u>, and would refer to admission #10, of Petitioners' Second Set of Requests for Admission.

10

1014

Judge, or before the Board of Immigration Appeals. Petitioner Gracia is currently under deportation proceedings.

Petitioner Cabrera was stopped at a Port of Entry, and was under exclusion proceedings at the time the instant action was filed, but has since been granted relief by an Immigration Judge, and proceedings against her have been terminated. Petitioner Lopez was under deportation proceedings at the time the instant action was filed, but has since been granted relief by an Immigration Judge, and deportation proceedings against him have been terminated, (PET2:2, 3,5,7,8) (ANS:2-6).

2. Respondent Immigration and Nationality Service is an executive agency of the United States, with offices in Harlingen, Texas, within the jurisdiction of this Court, (PET2:2-3) (ANS:3).

3. Respondent E.M. Trominski is the District Director of the Harlingen, Texas, District of Respondent Immigration and Nationality Service, with offices in Harlingen, Texas, within the jurisdiction of this Court, (PET2:3) (ANS:3).

4. Respondent Hon. Janet Reno is the duly appointed Attorney General of the United States, (PET2:3) (ANS:3).

B.   THE FACTS

5. The instant action was initially filed by two lawful permanent residents, Julio Herrera-Loa, and Ramiro Gracia-Cantu, on their own behalf, and as a class action. Mr. Herrera was subsequently killed, and an amended Petition was filed, deleting his name, and adding several other named Petitioners, primarily LPRs in exclusion proceedings, whose green cards had been lifted, and who had been forced to return to Mexico to await their hearings.

6. Mr. Herrera, who was domiciled in Florida, was arrested and

11

placed under deportation proceedings by Respondents on or about July 7, 1994, while he was in the Rio Grande Valley on a combined business and pleasure trip.  At the time of his arrest, his green card was confiscated by Respondents, and he was detained at the Port Isabel Service Processing Center, ("PISPC"), at Bayview, Texas.  After he posted bond, an I-94 temporary card, with the notation "UNDER DEPORTATION PROCEEDINGS 241(a)(2)(c) & 241(a)(2)(A)(i) OUT ON BOND" was issued by the Investigations Branch of the Harlingen INS Office. (PET:4-5) (PET1:4-5) (Petitioners' Exhibit B).

7.  On July 22, 1994, Respondents, while still refusing to return his green card, issued Mr. Herrera a new I-94, which noted that he was under deportation proceedings, but no longer specified under which section of law, (PET1:5) (Petitioners' Exhibit D).

8.  Petitioner Ramiro Gracia-Cantu, (A26 948 199), is a native and citizen of Mexico, who has resided in the United States as a lawful permanent resident since June 25, 1984, (PET2:3) (ANS:3).

9.  On or about December 11, 1992, Mr. Gracia was convicted in State Court in Illinois of an offense allegedly relating to the distribution of a controlled substance, for which offense he was fined and sentenced to four years' probation, (PET2:3) (ANS:3).

10.  In approximately June, 1994, Respondents contacted Mr. Gracia, and asked him to present himself to the Investigations branch of the INS office in Harlingen, Texas.  Mr. Gracia obtained counsel, who was informed by the INS agent in charge of the case that he was to be served with an Order to Show Cause, (an "OSC"), initiating deportation proceedings against him, and a warrant of arrest.  It was agreed that Mr. Gracia would surrender on June 22, 1994, for service of the OSC, and to post bond, (PET2:3) (ANS:3).

11.  On June 22, 1994, Mr. Gracia appeared at the INS office in

12

CutePDF - www.tesisa.com

Harlingen, Texas, with counsel. The OSC was served, and bond was posted. During the processing the INS agent asked whether Mr. Gracia had his resident alien card with him. Counsel inquired whether it was the agent's intention to confiscate Mr. Gracia's green card, [16] and was told that it was. The agent informed counsel that it was the practice of the Investigations branch of the Harlingen INS Office to confiscate green cards in such cases, for fear that, if the individual were ultimately deported, he or she might not surrender the green card, but might continue to use it illegally, (PET2:3-4) (ANS:3) (AD1:16).

12. Under protest, Mr. Gracia surrendered his green card, and was given an I-94, valid only until December 21, 1994, with his photo, and a rather small stamp, "Temporary Form I-551," with a notation that he was admitted for permanent residence at "HLG/IR6/06-2584," and that he was under bond. The I-94 contained no "employment authorization" stamp, and bore the following notation:

> "DEPORTATION PROCEEDINGS INITIATED
> 241(a)(2)(B)(i) & 241(a)(2)(A)(iii)."

(PET2:4) (Petitioners' Exhibit A) (ANS:3).

13. At the request of counsel, on or about September 15, 1994, Mr. Gracia was issued a new I-94, valid only until March 15, 1995, but which bore a larger, more legible, stamp demonstrating his status as a lawful permanent resident, and a employment authorized stamp. The notation: "DEPORTATION PROCEEDINGS INITIATED
241(a)(2)(B)(i) & 241(a)(2)(A)(iii)."

was deleted, but the card still contained an abbreviated version, "Under Dep. Proc" (Petitioners' Exhibit V). Finally, on or about

---

[16] Hereinafter, resident alien cards, issued on forms I-551 and I-151, will be referred to as "green cards."

CutePDF - www.fasisa.com

September 25, 1994, at the insistence of counsel, INS issued a
which did not bear any notations concerning the existence of
deportation proceedings, (Petitioners' Exhibit W) (PET2:4) (ANS:4).

14.   Petitioner Arturo Lopez-Lozano, (A37 522 584), has been a
lawful permanent resident of the United States since June 16, 1981.
On May 2, 1988, Mr. Lopez was convicted of an offense involving a
controlled substance.   The following day, Respondents initiated
deportation proceedings against him.   Mr. Lopez conceded
deportability, and applied for relief under Section 212(c) of the
Act, (8 USC Sec. 1182(c)).   Following a hearing, an Immigration
Judge in Harlingen, Texas, denied said application in the exercise
of discretion.   Mr. Lopez appealed to the Board of Immigration
Appeals, ("BIA"), who, on August 25, 1994, granted his appeal, and
remanded the case to the Immigration Judge for further proceedings,
and entry of a new decision.   On remand, and subsequent to January
17, 1995, the date Petitioners' Second Amended Petition was filed,
the Immigration Judge granted Mr. Lopez' application for Section
212(c) relief, and terminated deportation proceedings, (PET2:4-5)
(ANS:2,4) (AD2:2).

15.   In the early morning hours of Friday, December 23, 1994, while
the case was still before the Immigration Judge, Mr. Lopez sought
admission to the United States as a returning lawful permanent
resident, presenting himself for inspection at the Port of Entry in
Brownsville, Texas, and tendering his green card to the official,
(PET2:5) (ANS:4) (AD2:4) (Petitioners' Exhibit H).

16.   At that time, his resident alien card, and his Texas driver's
license, were confiscated by Respondents, and he was returned to
Mexico.   Later that day, Mr. Lopez' wife contacted counsel for
Petitioners, who contacted counsel for Respondents.   It was
ascertained that Mr. Lopez had been denied admission because the

14

remand from the BIA had not been entered in INS' computer. [17]
Respondents' counsel caused the error to be corrected, and advised
Mr. Lopez' counsel that Mr. Lopez should return to the Port of
Entry, and that he would be admitted, (PET2:5-6) (ANS:4) (AD2:4,5)
(Petitioners' Exhibit H).

17.  At approximately 3:30 p.m., on Friday, December 23, 1994, Mr.
Lopez returned, with his wife, to the Brownsville Port of Entry,
and again requested admission as a returning resident.  He informed
the official on duty that the computer now would reflect the fact
that he was entitled to readmission.  However, the official refused
to re-admit Mr. Lopez, or even check the computer, and instructed
Mr. Lopez' wife that she would have to go to the INS Office in
Harlingen, Texas, on Tuesday, December 27, 1994, to get some
"paper" stating that INS had agreed to let him return to the United
States.  By this time, it was late in the afternoon, on the Friday
before Christmas, so there was nothing to do but wait until the
following Tuesday, (PET2:6) (AD2:5) (Petitioners' Exhibit H). [18]

---

[17]  The failure to enter the remand in the computer apparently
caused the official at the port of entry to think that the case was
still on appeal, and that, pursuant to 8 CFR Section 3.4, Mr.
Lopez' "departure" constituted a withdrawal of the appeal, which,
by implication, would have resulted in the finalization of the
initial deportation Order.  As is discussed below, however, any
interpretation of said section which includes lawful permanent
residents who have made casual, brief, and innocent departures
constitutes a deprivation of their liberty, without Due Process,
and a violation of their rights as lawful permanent residents.

[18]  This is one of the areas where Respondents have refused
to admit some of the allegations of the Petition, specifically,
that Mr. Lopez went to the Port of Entry late in the afternoon of
December 23, 1994, and was refused readmission.  Respondents base
their refusal on the claim that they are "without sufficient
knowledge to admit or deny" same, (ANS:4).  However, Mr. Lopez'
version of events is not only supported by his unrebutted
Declaration, (Petitioners' Exhibit H), which was served on
Respondents virtually immediately after the events in question, but
by other facts which were admitted by Respondents, to the effect
that his wife and counsel were obliged to return to INS on Tuesday,
December 27, 1994, before he was finally re-admitted, (ANS:4).

15

18.   On Tuesday, December 27, 1994, Mrs. Lopez returned with counsel to the INS Office in Harlingen, and reiterated her request that her husband be re-admitted to the United States.   Eventually, that request was granted, and on the afternoon of December 27, 1994, Mr. Lopez was finally re-admitted, (PET2:6) (ANS:4) (AD2:6) (<u>Petitioners' Exhibit H</u>).

19.   Petitioners Juana Ascencio-Guzman, (A90 775 805), and Efrain Merino, (A91 495 976), are both lawful permanent residents of the United States.   On or about July 3, 1994, they were stopped at the Brownsville, Texas, Port of Entry, following a brief departure to Mexico, and placed in exclusion proceedings, for allegedly attempting to illegally bring Mr. Merino's nephew, who was ill, into the United States for medical treatment.   Their resident alien cards, and Ms. Ascencio's Texas Identification card, were all confiscated by Respondents.   They were placed in exclusion proceedings, and forced to return to Mexico.   They finally secured counsel, who, on October 31, 1994, was able to obtain permission for them to be paroled into the United States pending completion of their exclusion proceedings, (PET2:2,6-7) (AD2:7) (ANS:3-4).

20.   The parole documents given to Petitioners Ascencio and Merino carry a notation that they have been paroled into the United States pending determination of their right to re-enter, (PET2:7) (ANS:5) (AD2:8) (<u>Petitioners' Exhibit I</u>).

21.   The notation on the parole documents that Petitioners Ascencio and Merino have been paroled into the United States pending determination of their right to re-enter interferes with the exercise of certain rights [19] which attend their status as

---

[19]   At the April 26, 1995 hearing, Respondents asserted that these notations do not interfere, even as a practical matter, with the ability of a lawful permanent resident to obtain employment. Given that this assertion was made at the hearing, the fact that the notations also frequently cause potential employers to find

1020

lawful permanent residents, including the right to make innocent, brief, and casual border crossings. [20]    On or before March 2, 1995, Petitioner Ascencio received word that her mother was ill in Mexico, and on or about that date, her counsel requested Respondents permit her to visit her mother, and be re-paroled on her return.   Said request was not granted until May 2, 1995, (PET2:7) (AD2:8) (<u>Petitioners' Exhibits Q and S</u>).

22.   Petitioner Alejandra Gutierrez, (A41 858 559), is a lawful permanent resident of the United States.   On or about August 4, 1994, she was stopped at the Brownsville, Texas, Port of Entry, and

---

excuses for not granting employment to holders or such cards will be taken as disputed.   However, it is not "material" for purposes of summary judgment, insofar as it is indisputable that the notations interfere with the exercise of other rights which pertain to the status of lawful permanent residence, including the right to make casual border crossings, c.f., <u>Rosenberg v. Fleuti</u>, 374 U.S. 449 (1963); <u>Molina v. Sewell</u>, 983 F.2d 676 (5th Cir. 1993) (<u>Petitioners' Exhibit Q</u>) (ANS:10).

[20]    Respondents denied the allegation that such a notation "interfer[es] with the exercise of the attendant rights [of lawful permanent resident status], including the right to make innocent, brief, and casual border crossings," (ANS:5).   That the notation does interfere with such rights is shown by other facts of record, including the difficulty experienced by Petitioners in obtaining assurances that Mr. Merino and Ms. Ascencio could visit her ailing mother in Mexico, and, in the absence of conduct which would justify a refusal, be re-paroled into the U.S. on their return.

These assurances were gained only after the Court suggested, at the Pretrial Conference of April 26, 1995, that Petitioners submit a proposed Order to that effect, following which, Respondents granted the requested guarantee, (<u>Petitioners' Exhibit Q</u>).   Moreover, <u>Exhibit Q</u> affirmatively states that Respondents do not ordinarily allow such border crossings in the cases of people like Ms. Ascencio and Mr. Merino, notwithstanding that they continue to enjoy lawful permanent resident status, <u>Molina v. Sewell</u>, <u>supra</u>. Respondents have also imposed certain restrictions on Petitioners' right to travel, including a requirement that Petitioners must advise Respondents, <u>prior</u> to their departure, of their "return date, and at which port of entry they will apply for parole upon their return," allegedly to allow Respondents to "notify the supervisor at that location of the arrival of [Petitioners] to prevent delays on their return from Mexico," (<u>Id</u>.).

17

placed in exclusion proceedings, for allegedly attempting to illegally cross her sister and nieces into the United States. Respondents confiscated her green card, and forced her to return to Mexico. On or about January 6, 1995, Ms. Gutierrez' counsel filed a request with Respondents that she be paroled into the United States, without bond. On January 27, 1995, her request for parole was granted, (PET2:7) (AD2:9) (ANS:5) (<u>Petitioners' Exhibit J</u>).

23. Juan Sanchez-Salinas (A13 102 286) obtained lawful permanent residency in 1964. Following a conviction for an offense involving a controlled substance, Mr. Sanchez was placed in exclusion proceedings, paroled into the U.S., and, ultimately, held in detention at the Port Isabel Service Processing Center. Through counsel, Mr. Sanchez sought permission to be released from detention, upon payment of a bond. Said request was granted, and on or about August 17, 1994, Mr. Sanchez posted bond, and was released. He was given an I-94, with his photo and fingerprint. However, the document given Mr. Sanchez specified that it was "Not Valid For Employment," which defect was cured only through the intervention of the SAUSA handling the instant action at that time. (PET2:8) (ANS:5) (AD2:10) (<u>Petitioners' Exhibit K</u>).

24. Adelita Cantu de Cabrera, (A38 102 369), was paroled into the United States on November 9, 1993, pending exclusion proceedings, but was initially denied employment authorization, unless and until she paid a fee, which error Respondents agreed to cure only after being told that she was being added as a Petitioner herein, (PET2:8) (AD2:12) (ANS:6) (<u>Petitioners' Exhibit M</u>).

25. When a lawful permanent resident applies for admission as a returning resident at a port of entry under the jurisdiction of the Harlingen, Texas, INS Office, and Respondents have reason to believe that said person has committed an act which would subject him or her to exclusion proceedings, if criminal prosecution is

18

also contemplated, it is Respondents' practice [21] to parole the individual into the United States for prosecution, place him or her under exclusion proceedings, and confiscate his or her green card. If the prosecution results in a conviction, it is the practice of Respondents to detain said individual at the Service Processing Center at Bayview, Texas, ("PISPC"), pending exclusion proceedings. Upon request of counsel, and in some cases upon payment of a bond, such persons are frequently paroled into the United States, (PET2:9) (ANS:6) (AD2:14,17) (<u>Petitioners' Exhibit K</u>). [22]

26.  When a lawful permanent resident applies for admission as a returning resident at a port of entry under the jurisdiction of the Harlingen, Texas, INS Office, and Respondents have reason to believe that said person has committed an act which would subject him or her to exclusion proceedings, if criminal prosecution is <u>not</u> contemplated, it is Respondents' practice to initiate exclusion proceedings, confiscate his or her green card, and, in most instances, force said person to return to Mexico, without advising him or her of the possibility of being paroled into the United States.  In such cases, unless the individual obtains counsel, it is very difficult to ascertain, and follow, the procedures necessary to request that he or she be paroled into the U.S. during the exclusion proceedings, (PET2:9) (AD2:15,16,18) (ANS:6).

27.  In the Harlingen, Texas INS District, when Respondents place lawful permanent residents under exclusion proceedings, it is

---

[21]  As used herein, the term "practice" means an act performed or procedure followed in more than half of the instances described.

[22]  Respondents appear to assert that the procedures for obtaining the release of lawful permanent residents detained for exclusion proceedings are even more restrictive than those alleged by Petitioners, in that Respondents appear to deny that they grant more than half of the requests made by attorneys that their lawful permanent resident clients detained at PISPC for exclusion proceedings be paroled, upon payment of a bond, (ANS:6), although they admit that they did so in the case of Mr. Sanchez.

19

Respondents' practice to confiscate their green cards, and to not to return these cards unless and until exclusion proceedings are terminated in favor of the resident.  In such cases, Respondents frequently confiscate other documents belong to the resident as well, such as (valid) U.S. drivers' licenses, state issued identification cards, and Mexican passports, and have in some cases refused to return such documents unless and until exclusion proceedings are terminated, in favor of the permanent resident, (PET2:7,9-10) (AD2:20) (ANS:4,7) (Petitioners' Exhibit L).

28.  INS has previously asserted to this Court that when a lawful permanent resident who has posted bond in connection with deportation proceedings, departs the United States, the bond is subject to either forfeiture or cancellation, in INS' discretion, and has never retracted said assertion.  Even after the decision of the Fifth Circuit in Molina v. Sewell, supra, INS has asserted that the mere fact that a lawful permanent resident departed the United States while under deportation proceedings may be taken into consideration in determining whether exclusion proceedings are appropriate, (PET2:10) (Petitioners' Exhibit C). [23]

_____

[23]  In their Answer to Petition for Writ of Habeas Corpus and Request for Dismissal of Action, in Lozano-Molina v. Sewell, C.A. B-86-101, at paragraph 13, Respondents represented to this Court that a departure to Mexico by a lawful permanent resident who was on bond while under deportation proceedings was a violation of the conditions of the bond "because a demand upon the obligor to present the [alien] would have been impossible."  To date, Respondents have tendered no documentation demonstrating that this claim has been retracted.

Petitioners' Exhibit C, documents the fact that, notwithstanding the decision in Molina v. Sewell, 983 F.2d 676 (5th Cir. 1993), reaffirming the principle that a lawful permanent resident in deportation proceedings does not lose his status as a lawful permanent resident, INS has asserted that the departure to Mexico of a lawful permanent resident, while under deportation proceedings, is a factor "to be given some weight in determining whether [his] departure was a meaningful one."

Respondents' denial that they made these assertions, (ANS:7), will

20

1024

29.  Many lawful permanent residents whose green cards have been confiscated by Respondents because they have been placed in exclusion or deportation proceedings have legitimate business and personal needs which require them to make "casual, brief, and innocent" trips into Mexico, and back, but are deterred from making such trips by the actions of Respondents in, <u>inter alia</u>, confiscating their green cards, and providing them either with no substitute documentation, or with substitute documentation which greatly increases the possibility that they would not be allowed to re-enter, or be re-paroled, into the U.S. on their return, (PET:6) (PET1:5-6) (PET2:7,10-11) (AD1:9,10,11,12,13,24,25) (AD2:8,11,13) (ANS:7) (<u>Petitioners' Exhibits A, B, C, D, I, K, L, M, and Q</u>).  [24]

30.  When Respondents provide replacement documentation to lawful permanent residents whose green cards were confiscated because they were placed in deportation proceedings, Respondents usually limit the validity of those documents to a period of six (6) months, even in cases where it is clear that the resident is eligible to apply for some for of relief, such as adjustment of status, or a waiver of deportability under 8 USC Section 1182(c), and require that the card be renewed periodically, for the duration of the proceedings, (PET2:33) (ANS:7) (<u>Petitioners' Exhibits A, B, D, V and W</u>).

---

not be construed as creating a genuine issue of material fact, given that both are matters of record, and relate to the same individual involved in <u>Molina v. Sewell</u>, <u>supra</u>, to wit, Israel Lozano-Molina, A36 599 698, particularly since the pleading submitted as <u>Petitioners' Exhibit C</u> was signed by the INS General Attorney who is now Of Counsel for the Respondents herein.

[24]  This statement of fact, found at Paragraph 31 of Petitioners' Second Amended Petition, (PET2:10-11), is one about which Respondents disclaim sufficient knowledge to admit or deny, (ANS:7).  However, the record is replete with documentation which demonstrates that there exists no genuine issue as to its truth, including <u>Petitioners' Exhibit Q</u>, in which Respondents state that it is their practice to <u>not</u> allow certain lawful permanent residents to come and go freely from the United States.

21

31.  When Respondents provide replacement documentation to lawful permanent residents whose green cards were confiscated because they were placed in exclusion proceedings, Respondents usually do not limit the validity of such documents to any particular period of time.  Instead, they usually place a notation on the document that specifies that the holder is in exclusion proceedings, and ties its validity to the conclusion of those proceedings, (<u>Petitioners' Exhibits I, K, L, and M</u>).

32.  The replacement documentation generally provided by Respondents to lawful permanent residents whose green cards were confiscated because they were placed in exclusion proceedings is not considered by Respondents to be valid for the purpose of departing from, and returning to, the United States.  Respondents consider that the validity of such documents "terminates automatically by operation of law," (ANS:10), even when the holder is a lawful permanent resident who has made a casual, brief, and innocent departure, and under such circumstances, do not generally allow the resident to return to the U.S., unless and until he or she has made application for, and been granted, a new document, which request is not usually granted if the resident's case is on appeal to the Board of Immigration Appeals, (PET2:14-15) (ANS:10) (<u>Petitioners' Exhibit Q</u>).

33.  The confiscation of the green cards of lawful permanent residents placed in deportation or exclusion proceedings in the Harlingen INS District, without provision of substitute documents which place no cloud over their status as lawful permanent residents, and the resultant curtailment of their rights and privileges, has been a source of controversy within the Harlingen District Office of INS for at least a dozen years, (PET:7) (PET1:8)

22

1026

(PET2:11-12) (<u>Petitioners' Exhibit T</u>). [25]

34. From the date of the issuance of the decision of the Fifth Circuit Court of Appeals in the case of <u>Molina v. Sewell</u>, 983 F.2d 676 (5th Cir. 1993), to wit, February 22, 1993, until the date of the filing of the instant action, on July 15, 1994, Respondents made no changes in their practices, procedures, or policies regarding the confiscation of green cards of lawful permanent residents who are placed under deportation proceedings, as a result of, or based on, the Court's ruling in said case, (AD1:1,2).

35. Between February 22, 1993 and July 15, 1994, it was the practice of the Investigations branch of the Harlingen INS office to confiscate the green cards of lawful permanent resident aliens on whom they served Orders to Show Cause and Warrants of Arrest, regardless of whether the individual simultaneously posted bond or was released on recognizance, (AD1:4).

36. Between February 22, 1993 and July 15, 1994, it was Respondents' practice to provide I-94s, with a stamp indicating that the individual had been admitted as a lawful permanent resident, to lawful permanent residents who were processed for

_____

[25]   In their Answer, (ANS:8), Respondents address this allegation, as follows:

> Paragraph thirty-five is a characterization of plaintiffs' lawsuit and does not contain allegations of fact requiring an answer, but insofar as an answer may be deemed required, the allegations are denied.

That the problem at bar has long been a source of controversy in the Harlingen INS District is indeed an "allegation[] of fact." Petitioners provided proof of this fact to Respondents by letter dated July 29, 1994, (<u>Petitioners' Exhibit T</u>). The longstanding nature of the problem is also demonstrated by the case of Israel Lozano-Molina, which was before this Court in 1986, and of which this Court hereby takes judicial notice. Respondents' denial of Paragraph 35 of Petitioners' Second Amended Petition is therefore not taken as creating a genuine issue of fact.

*1027*

deportation proceedings by the Investigations branch of the Harlingen INS Office, and who, at the time of processing, either posted bond or were released on recognizance, although the I-94's provided did not always include the notation: "EMPLOYMENT AUTHORIZED." (AD1:5,6).

37.   In situations such as described in No. 35 above, it was Respondents' practice to put a notation on the I-94, indicating that the individual was under deportation proceedings, (AD1:7).

38.   In situations such as described in No. 35, above, where bond was posted, it was the practice of the Investigations branch of the Harlingen INS office to put a notation on the I-94, indicating that the individual had been released on bond, (AD1:8).

39.   In situations such as described in No. 35, above, notations were sometimes placed on the I-94, indicating that it was not valid for re-entry to the United States, (AD1:9).

40.   On July 22, 1994, in the offices of the Investigations branch of the Harlingen INS office, an agent of Respondents told Julio Herrera-Loa [26] in the presence of his counsel, after Mr. Herrera had been served with a (superseding) Order to Show Cause charging deportability only under Section 241(a)(2)(C) of the Act, and a new I-94, that since he is under deportation proceedings, if he were to cross into Mexico without first obtaining an advance parole, he would automatically be deported, (AD1:10).

41.   Between February 22, 1993 and July 15, 1994, when class members who were issued an I-94 by Respondents inquired whether they could use that document to go to Mexico and back, they were sometimes informed that the document was not valid for that purpose, (AD1:10,11).

---

[26]   A former Petitioner, now deceased.

24

42.   Between February 22, 1993 and July 15, 1994, when a class member who had been detained at the Port Isabel Service Processing Center posted bond or was released on recognizance, it was <u>not</u> Respondents' practice to provide any evidence of his status as a lawful permanent resident other than the bond or release papers, and the Order to Show Cause, unless the individual or his representative specifically requested such a document, (AD1:12).

43.   As of July 15, 1994, it was <u>not</u> the practice of the Deportations branch of the Harlingen INS office to confiscate the green cards of lawful permanent resident aliens on whom they served Orders to Show Cause and Warrants of Arrest, in situations where the individual simultaneously posted bond or was released on recognizance, (AD1:14).

44.   As of July 15, 1994, it was <u>not</u> the practice of the McAllen Sector of the U.S. Border Patrol to confiscate the green cards of lawful permanent residents on whom they served Orders to Show Cause and Warrants of Arrest, in situations where the person simultaneously posted bond, or was released on recognizance, (AD1:15).

45.   On June 22, 1994, an agent of Respondents told Petitioner Gracia in the presence of his counsel that the primary reason that it was the practice of his office to confiscate the individual's green card in cases such as his was a concern that, if and when the person were deported from the United States, he might not surrender the card, but might continue to use it illegally, (AD1:16).

46.   On July 22, 1994, an agent of Respondents told Julio Herrera-Loa, in the presence of his counsel that the primary reason that it was the practice of his office to confiscate the green cards in cases such as his was a concern that, if and when the person was deported from the U.S., he might not surrender the card, but might continue to use it illegally, (AD1:17).

1029

47. A lawful permanent resident who has made a "brief, casual, and innocent" departure from the U.S. and seeks readmission as a returning resident, who presents an I-94 indicating that he is a lawful permanent resident under deportation proceedings, is more likely to be denied readmission and placed in exclusion proceedings, than would have been the case if he had presented his green card, (PET1:6) (AD1:24,25) (<u>Petitioners' Exhibit C</u>).

48. Counsel for Petitioners, Thelma O. Garcia and Lisa S. Brodyaga, are well known to this Court, and have a long history, both individually, and as a team, of vigorously defending the rights of immigrants, both documented, and undocumented. Although Respondents claim that they are without sufficient knowledge to admit or deny that Ms. Garcia and Ms. Brodyaga "have the necessary resources, and commitment, to adequately represent the interests of the instant class," (ANS:9), based on their record before this Court, and their reputation in the community, the Court finds that they do have such resources, and commitment.

49. The class which Petitioners seek to represent is that of all lawful permanent resident aliens who are under deportation or exclusion proceedings, in whose cases no final order of deportation or exclusion has been entered, who are not presently held in detention, whose lawful permanent resident alien cards (Forms I-151 or I-551), [27] have been confiscated by Respondents, and are being retained by or under the authority of the Harlingen Office of the Immigration and Naturalization Service. Respondents deny, (ANS:9), that said class is "so numerous that joinder of all members is impracticable, and that there are questions of law and fact which are common to the class," (PET2:13). However, when Respondents attempted to send notices to members of the putative class, advising them of appointments with INS for the purpose of being provided with substitute documentation, Respondents were unable to

---

[27] Hereinafter called "green cards."

1030

identify the members of the putative class, (<u>Petitioners' Exhibit E</u>).  As of the status conference on April 26, 1995, Respondents asserted that they had still been unable to identify the class. Therefore, Respondents' denials of numerosity, and commonality of issues of law and fact, will not be taken as creating a genuine issue of material fact, and the Court hereby finds that the class as defined is sufficiently numerous that joinder of all members is impracticable, and that there are questions of law and fact which are common to the class.  [28]

50.  Respondents also deny that they have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the whole class, (ANS:9).  However, Respondents have admitted a number of facts which belie this denial.

Respondents admit, <u>inter alia</u>:  (a) that it is their practice to confiscate the green cards, and sometimes other documents, such as drivers' licenses, and State identification cards, of class members placed in exclusion proceedings, (ANS:4,6-7);  (b) that it is the practice of at least one subdivision of Respondents, (INS Investigations, in Harlingen, Texas), to confiscate the green cards of class members placed in deportation proceedings, regardless of whether the individuals were detained, or released on bond or recognizance, and to either provide no substitute documentation, or documentation which is valid only for a limited period of time, and which includes various types of restrictions, such as that the document was not valid for re-entry, or for employment, (AD1:4,6-13);  (c) that Respondents frequently do not give class members in exclusion proceedings any documents demonstrating their status as lawful permanent residents, without which, they are unable to reside and work in the United States while their status is being determined, (ANS:4-7), or to freely make cross-border visits to

---

[28]  <u>See also</u>, (AD1:19-22).

1031

Mexico and back, (<u>Petitioners' Exhibit Q</u>).

51. Respondents disclaim sufficient knowledge to admit or deny the allegations that the claims of the named Petitioners herein are typical of the claims of the putative class, and that they will fairly and adequately protect the interests of the class, (ANS:8). Based on the nature of the action, and its history to date, the Court finds that the claims are indeed typical, and that the named Petitioners have to date fairly and adequately protected the interests of the class, and that there is no reason to believe that they will not continue to do so in the future.

52. The controversy in the Harlingen, Texas, INS District, with respect to the confiscation of the green cards of lawful permanent residents who have been placed in exclusion or deportation proceedings, and the resultant infringement upon their ability to exercise the rights and privileges which attend that status, dates back at least to 1981, and attempts to resolve the issue were made, without success, with three consecutive INS District Directors, and the Office of the United States Attorney in Brownsville, Texas, prior to filing the instant action, (<u>Petitioners' Exhibit T</u>).

53. As noted above, at the time of filing the instant action, neither the Deportations Branch of the Harlingen INS Office, nor the McAllen Sector of the U.S. Border Patrol, routinely confiscated the green cards of lawful permanent residents processed by them deportation proceedings, but the Investigations Branch of the Harlingen INS Office did at that time, and continues at the present, routinely confiscating the green cards of lawful permanent residents processed by them for deportation proceedings. Respondents have offered no explanation or justification for treating people differently, solely on the basis of which of their various branches processes the case. The only justification offered to Petitioners, or to the Court, for the practice of the Investigations Branch, is their concern that if and when a final

1032

order of deportation is issued, the resident may keep the card, and
continue to use it illegally.  (PET:3-4,7-8) (PET1:3-4) (PET2:4)
(ANS:3) (AD1:4,14-17).

### III.  CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the instant action under 28
USC Section 1346(a)(2) (action against an agency and/or officers of
the United States); 8 USC Section 1329 (action arising under the
Immigration and Nationality Act); 28 USC Section 2201 et seq,
(declaratory Judgment action); and 5 USC Section 702 et seq,
(action by one adversely affected by final agency action), coupled
with 28 USC Section 1331 (federal question).

2.  A person duly admitted to the United States for lawful
permanent residence retains that status, with all the attendant
rights and privileges, unless and until an administratively final
order of deportation, (or exclusion and deportation), has been
issued.  Where an administratively final order is overturned
following review by the U.S. Courts of Appeal, or U.S. District
Courts, status as a lawful permanent resident is retroactively
restored, 8 USC Section 1101(a)(20).  Any deprivation of the
liberty of Petitioners, regardless of whether they are physically
present within the United States, or are at the border, seeking
readmission as lawful permanent residents, must be accomplished in
accordance with procedures which comport with Due Process; Kwong
Hai Chew v. Colding, 344 U.S. 590; 73 C.Ct. 472 (1953); Molina v.
Sewell, supra; Rivera v. INS, 810 F.2d 540 (5th Cir. 1987); Etuk v.
Blackman, 748 F.Supp. 990 (E.D.N.Y. 1990) ("Etuk I"); Etuk v.
Slattery, 936 F.2d 1433 (2nd Cir. 1991) ("Etuk II"); Etuk v.
Slattery, 973 F.2d 60 (2nd Cir. 1992) ("Etuk III"); and Matter of
Rangel, 15 I&N Dec. 789 (BIA 1976).

3.  Lawful permanent residents must register with INS, and provide
certain personal information, and their fingerprints, 8 USC Section

1033

1302. They are thereafter entitled, in accordance with the regulations prescribed by the Attorney General, to documents which unambiguously evidence their status as lawful permanent residents of the United States, and which do not place a cloud over, or interfere with their ability to exercise, the rights and privileges which attend that status, 8 USC Sections 1302 and 1304; 8 CFR Sec. 264.1 et seq.; Etuk I, II, and III.

4. Among the rights and privileges which attend lawful permanent resident status, are the right to reside and work in the United States, and to make casual, brief, and innocent border crossings, (Fleuti excursions), without being subsequently denied readmission as returning residents, (or re-parole, if in parole status), and having their documents, including, but not limited to, their green cards, confiscated, Rosenberg v. Fleuti, 374 U.S. 449 (1963); Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra; Vargas-Banuelos v. INS, 466 F.2d 1371 (5th Cir. 1972); Yanez-Jacquez v. INS, 440 F.2d 701 (5th Cir. 1971); Ettuck I, II and III, supra.

5. It constitutes a violation of the liberty rights of a lawful permanent resident to curtail the rights and privileges which attend lawful permanent resident status, including the right to reside and work in the United States, and to make casual, brief, and innocent border crossings, on the grounds that the resident is under deportation or exclusion proceedings; Rosenberg v. Fleuti, 374 U.S. 449 (1963); Califano v. Aznavorian, supra; Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra; Vargas-Banuelos v. INS, supra; Ettuck I, II and III, supra.

6. When a lawful permanent resident is placed under deportation proceedings, INS issues an Order to Show Cause, and may also issue a warrant of arrest, 8 USC Section 1252(a)(1). When a warrant of arrest is issued, the resident may seek redetermination of the conditions of custody in the first instance from certain INS officers, or from an Immigration Judge, 8 CFR Sec. 242.2,

CutePDF - www.texiss.com

Petitioners' Exhibit U.

7.   When a lawful permanent resident is placed under exclusion proceedings, INS issues a document captioned "Notice to Applicant For Admission Detained For Hearing Before Immigration Judge," on Form I-122, 8 CFR Section 235.6, Petitioners' Exhibit U.

8.   When a lawful permanent resident applies for admission to the United States as a returning resident, and presents appropriate documentation of his or her status, but where it appears to the examining officer that he or she is making an "entry," and is not admissible to the United States, under existing regulations, INS has three choices:  they may detain the person, parole him or her into the U.S., or parole him or her for deferred inspection.  In determining whether the person should be detained, the inspecting officer must consider the likelihood that he or she will abscond, or pose a security risk, Rosenberg v. Fleuti, supra; Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra; Rafeedie v. INS, 880 F.2d 506 (D.C.Cir. 1989); 8 USC 1225(b); 8 CFR Sec. 235.3(c).

9.   When a lawful permanent resident applies for admission to the United States as a returning resident, and presents appropriate documentation of his or her status, but where the examining officer does not have reasonable cause to believe that he or she is making an "entry," as defined by Rosenberg v. Fleuti, supra, and its progeny, it constitutes a violation of that person's liberty interests to refuse admission as a returning resident, even if the person is already under deportation proceedings, and/or is in an excludable class, Rosenberg v. Fleuti, supra; Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra.

10.   Apart from 8 USC Section 1225(c), the Immigration and Nationality Act does not authorize the summary exclusion of an applicant for admission to the United States.  Under 8 USC Section 1225(c), aliens who appear to the examining officer to be

31

1035

excludable for certain reasons relating to the national security, (to wit, subparagraph (A) (other than clause (ii)), and (B) or (C) of 8 USC Section 1182(a)(3)), are subject to specified summary exclusion proceedings.   However, even where INS has reason to believe that the security of the United States might be at stake, lawful permanent residents may not be summarily excluded from the United States; Kwong Hai Chew v. Colding, supra; Rafeedie v. INS, 880 F.2d 506 (D.C.Cir. 1989).

11.  When the admissibility of a lawful permanent resident seeking readmission is challenged, INS may not accept a waiver of the person's right of to a hearing before an Immigration Judge, Hernandez v. Casillas, 520 F.Supp. 389 (S.D.TX 1981).

12.  There is no authority under the Immigration and Naturalization Act, or under the governing regulations, for INS to force lawful permanent residents applying for admission as returning residents to return to Mexico, or other country of embarkation, to await exclusion proceedings, 8 USC 1225(b); 8 CFR Section 235.3(c).

13.  The confiscation by Respondents of the green cards, and other documents, such as the drivers' licenses, social security cards, and state issued identification cards, of lawful permanent residents placed under exclusion proceedings, where the residents are neither detained, nor paroled into the United States, results in the residents being forced to return to Mexico (or other country of embarkation) while they await exclusion hearings, and is tantamount to summary exclusion, which constitutes a deprivation, without Due Process, of their liberty interests, Rosenberg v. Fleuti, supra; Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra; Etuk I, II and III, supra; Rafeedie v. INS, supra; 8 CFR Section 235.3(c).

14.  The practice of the Investigations Branch of the Harlingen INS Office, of confiscating, and refusing to return, the green cards of

*L03b*

lawful permanent residents whom they place under deportation proceedings, but who are not being held in detention, and in whose cases no administratively final order of deportation has been entered, interferes with the LPRs' ability to exercise the rights and privileges which pertain to their status, and constitutes a denial of Equal Protection, and a deprivation of their liberty, without Due Process, <u>Rosenberg v. Fleuti</u>, <u>supra</u>; <u>Kwong Hai Chew v. Colding</u>, <u>supra</u>; <u>Molina v. Sewell</u>, <u>supra</u>; <u>Rafeedie v. INS</u>, <u>supra</u>; <u>Etuk I, II, and III</u>, <u>supra</u>.

15.  A cloud is placed over an individual's status as a lawful permanent resident, which interferes with the exercise of the rights and privileges which attend that status, including the right to engage in international travel by making casual, innocent, and brief border crossings, and constitutes a deprivation of liberty without Due Process, when INS confiscates a lawful permanent resident's green card, and either provides no substitute documentation, or provides only a temporary I-551, consisting of an I-94, with a stamp stating that the individual has been admitted for lawful permanent residence, but which suffers from one or more of the following defects:  (a) the card does not include an "employment authorized" stamp;  (b) the card is valid only for a period of time significantly shorter than the deportation proceedings can reasonably expected to last;  (c) the card contains one or more notations indicating that the person's status as a lawful permanent resident is in doubt, including any one or more of the following notations:  (i) that he or she is under deportation proceedings; (ii) that he or she has been paroled into the United States, including parole for the purpose of determining his or her right to re-enter, or for conducting exclusion proceedings; (iii) that he or she is on bond; (iv) that he or she is not authorized to be employed in the United States, or (v) that the document is not valid for re-entry; <u>Rosenberg v. Fleuti</u>, <u>supra</u>; <u>Kwong Hai Chew v. Colding</u>, <u>supra</u>; <u>Molina v. Sewell</u>, <u>supra</u>; <u>Etuk I, II and III</u>, <u>supra</u>.

1037

16. Lawful permanent residents who have been ordered deported, or excluded and deported, by an Immigration Judge, but whose cases are under review by the Board of Immigration Appeals, remain lawful permanent residents, and are entitled to enjoy the rights and privileges which attend that status, including the right to engage in international travel, by making innocent, brief, and casual border crossings, and to be readmitted to the United States thereafter as returning residents. Any construction of 8 CFR Section 3.4 which includes such departures, including the denial of admission or re-parole as returning residents to lawful permanent residents in whose cases orders of deportation or exclusion and deportation are, (or are believed by Respondents to be), on review before the BIA, constitutes a deprivation of their liberty interests, without Due Process; Rosenberg v. Fleuti, supra; Kwong Hai Chew v. Colding, supra; Molina v. Sewell, supra; Rivera v. INS, supra; Vargas-Banuelos v. INS, supra; 8 USC Section 1101(a)(13); 8 USC Section 1101(a)(20).

17. When a lawful permanent resident applies for admission to the United States as a returning resident, the fact that he or she is under deportation proceedings is not, in and of itself, a relevant fact to be considered in determining whether the absence was brief, casual, and innocent, for the purpose of deciding whether exclusion proceedings are appropriate, Molina v. Sewell, supra.

18. The cases of Petitioners Lopez and Cabrera are not rendered moot by the fact that relief from deportation has been granted, and proceedings against them have been terminated. Both persons remain lawful permanent resident aliens, and the problems which they experienced could recur, and could otherwise escape review. In addition, the case was brought as a class action, and relief is sought not solely on behalf of the named Petitioners, but likewise on behalf of all others similarly situated. The named Petitioners are not only entitled, but obligated, to continue as representatives of the class; Vitek v. Jones, 445 U.S. 480, 487 (1980);

34

1038

<u>Gannett Co. v. DePasquale</u>, 443 U.S. 368, 377, 99 S.Ct. 2898, 61
L.Ed.2d 668 (1978); <u>NLRB v. Riley</u>, 681 F.2d 1083 (5th Cir. 1982);
<u>Roper v. Consurve</u>, 578 F.2d 1106 (5th Cir. 1978); <u>Etuk II</u>, <u>supra</u>.

### III.   ORDERS

On the basis of the foregoing findings of fact, conclusions of law,
and the entire record herein, the Court hereby enters the following
Orders, granting injunctive, and declaratory, relief.

1.  IT IS HEREBY DECLARED that it is a violation of Due Process for
Respondents to confiscate, without justifiable cause, based on
articulable facts demonstrating that such an action is required to
further a legitimate interest of Respondents, the green cards of
lawful permanent residents placed under deportation proceedings,
but who are not being held in actual detention, and to not return
the green cards of such lawful permanent residents from whom they
have previously been confiscated.

2.   IT  IS  ORDERED  that  Respondents  be,  and  they  hereby  are,
enjoined  and  restrained  from  confiscating,  without  justifiable
cause, based on articulable facts demonstrating that such an action
is required to further a legitimate interest of Respondents, the
green cards of lawful permanent residents placed under deportation
proceedings, but who are not held in actual detention, and from not
returning the green cards of such lawful permanent residents from
whom they have previously been confiscated.

3.  IT IS HEREBY DECLARED that confiscation by Respondents of the
green cards, and other documents, such as the drivers' licenses,
social security cards, and state issued identification cards, of
lawful  permanent  residents  placed  under  exclusion  proceedings,
where the residents are neither detained, nor paroled into the
United States constitutes a deprivation, without Due Process, of
their liberty interests.

*1039*

4.   IT IS ORDERED that Respondents be, and they hereby are, enjoined and restrained from confiscating the green cards and other documents, such as the drivers' licenses, social security cards, and state issued identification cards, of lawful permanent residents placed under exclusion proceedings, where the residents are neither detained, nor paroled into the United States.

5.  IT IS HEREBY DECLARED that the confiscation by Respondents of documents such as the drivers' licenses, social security cards, and state issued identification cards, belonging to lawful permanent residents placed under exclusion proceedings, who are paroled into the United States, regardless of whether, and by whom, they are detained, constitutes a deprivation, without Due Process, of their liberty interests.

6.   IT IS ORDERED that Respondents be, and they hereby are, enjoined and restrained from confiscating documents such as the drivers' licenses, social security cards, and state issued identification cards, belonging to lawful permanent residents placed under exclusion proceedings, who are paroled into the United States, regardless of whether, and by whom, they may be detained.

7.   IT IS DECLARED that the confiscation by Respondents of the green cards of lawful permanent residents placed under exclusion proceedings, who are paroled into the United States, without providing a substitute document evidencing their status as lawful permanent residents which contains no markings or restrictions which could interfere with the exercise of the rights and privileges of a lawful permanent resident, including the right to make brief, casual, and innocent border crossings, constitutes a deprivation, without Due Process, of their liberty interests.

8.   IT IS ORDERED that Respondents be, and they hereby are, enjoined and restrained from confiscating the green cards of lawful permanent residents placed under exclusion proceedings, who are

36



paroled into the United States, without providing a substitute
document evidencing their status as lawful permanent residents
which contains no markings or restrictions which could interfere
with the exercise of their rights and privileges as lawful
permanent residents, including the right to make brief, casual, and
innocent border crossings.

9.  IT IS DECLARED that any construction of 8 CFR Section 3.4 which
includes innocent, brief, and casual departures by lawful permanent
residents, (i.e., _Fleuti_ excursions), constitutes a deprivation,
without Due Process, of their liberty interest in being able to
engage in international travel.

10.  IT IS ORDERED that Respondents be, and they hereby are,
enjoined and restrained from refusing to readmit, or re-parole,
lawful permanent residents who have been ordered deported, or
excluded and deported, by an Immigration Judge, but whose cases are
under review by the Board of Immigration Appeals, who are seeking
readmission or re-parole to the United States following innocent,
brief, and casual border crossings, (i.e., _Fleuti_ excursions); and

11.  IT IS FURTHER ORDERED that the Clerk of Court cause certified
copies of the foregoing to be served on all counsel of record.

DONE at Brownsville, Texas,
this _____ day of _____, 1995.


_____
                    JUDGE PRESIDING

1041