Case 1:94-cv-00215   Document 55   Filed in TXSD on 08/28/1995   Page 1 of 174

5

1

No. B-94-215

United States District Court
Southern District of Texas
FILED

AUG 28 1995

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO-GUZMAN, et. al.,
(A39-74-1172)

Plaintiffs,

v.

E.M. TROMINSKI, District Director, Immigration
and Naturalization Service, HON. JANET RENO,
United States Attorney General, and
IMMIGRATION AND NATURALIZATION SERVICE,

Defendants.

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' COUNTER MOTION FOR SUMMARY JUDGMENT

FRANK W. HUNGER
Assistant Attorney General
Civil Division

MARK C. WALTERS
Assistant Director

REGINA BYRD
NELDA C. REYNA
Attorneys
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044
Attorneys for Defendants        (202) 616-4860

Of Counsel:        KENNETH M. MUIR
General Attorney
Immigration and Naturalization
Service
U.S. Department of Justice
P.O. Box 1711
Harlingen, TX  78551

Dated: August 28, 1995.

657

CMPDF - www.fsnio.com

# TABLE OF CONTENTS

TABLE OF AUTHORTIES . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS'
COUNTER MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . 4

BURDEN OF PROOF . . . . . . . . . . . . . . . . . . . . . . . 9

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . 9

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    THE COURT SHOULD UPHOLD THE ATTORNEY
        GENERAL'S DECISION TO ISSUE DOCUMENTS
        OTHER THAN THE FORM I-551 (GREEN CARD)
        AS EVIDENCE OF IDENTITY AND EMPLOYMENT
        AUTHORIZATION . . . . . . . . . . . . . . . . . . . 10

    II.  ALIENS IN DEPORTATION PROCEEDINGS . . . . . . . . . 14

        A.    An alien lawfully admitted for
            permanent residence has no property
            interest in the green card, and
            thus it may be lifted, as long
            as adequate replacement documentation
            is provided . . . . . . . . . . . . . . . . . . 14

        B.    The I-94 with the legend indicated
            in the McNary memorandum, along with
            any other notations which are factually
            correct, constitutes adequate replacement
            documentation for green cards lifted
            from LPR's in deportation proceedings . . . . . 24

    III. EXCLUSION ISSUES . . . . . . . . . . . . . . . . . . 31

        A.    Putting LPR's in Exclusion Proceedings . . . . 31

            1.    Returning LPRs are always subject to
                inspection by United States Immigration
                Officers when arriving at a United
                States' Port of Entry . . . . . . . . . 31

CM/PDF – www.fdsinc.com

        2.    Returning LPR's bear the burden of
proof in exclusion proceedings to
demonstrate that they fall within
the <u>Fleuti</u> doctrine . . . . . . . . . . . 35

    B.    Lifting cards when exclusion proceedings
are initiated . . . . . . . . . . . . . . . 37

    C.    Returning LPR's to Mexico . . . . . . . . . 39

    D.    Parole rights . . . . . . . . . . . . . . . 49

        1.    There is no right to a bond hearing
or parole hearing in exclusion
proceedings for returning lawful
permanent resident aliens . . . . . . . 49

        2.    The parole status of an LPR in
exclusion proceedings terminates
automatically upon departure from
the United States, and such aliens
are required to apply for parole each
time they seek to enter the United
States during the pendency of such
proceedings . . . . . . . . . . . . . . 55

    E.    Parole Documentation . . . . . . . . . . . 58

IV.    OTHER DOCUMENTS ISSUE . . . . . . . . . . . . . 62

V.    8 C.F.R. § 3.4 ISSUE . . . . . . . . . . . . . 65

VI.    BOND FORFEITURE/CANCELLATION ISSUE . . . . . . . 67

VII.    <u>MOLINA V. SEWELL</u> ISSUE . . . . . . . . . . . . . 70

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 73

CERTIFICATE OF SERVICE

ii

659

Doherty v. Thornburgh,
  943 F.2d 204 (2d Cir. 1991)
  cert. denied, 503 U.S. 901 (1992) . . . . . . . . . . . . 3

Ekiu v. U.S.,
  142 U.S. 651 (1892) . . . . . . . . . . . . . . . . . . 42

Etuk v. Blackman,
  748 F.Supp. 990 (E.D.N.Y. 1990) (Etuk I) . . . . 17, passim

Etuk v. Slattery,
  936 F.2d 1433 (2d Cir. 1991) ("Etuk II") . . . . . . 17, 19

Etuk v. Slattery,
  973 F.2d 60 (2d Cir. 1992) ("Etuk III") . . . . . . 17, 19

Etuk v. Slattery,
  803 F.Supp. 644 (E.D.N.Y. 1992) ("Etuk IV") . . . . . . 17

Etuk v. Slattery,
  1992 WL 106474 (E.D.N.Y. April 30, 1992) . . . . 17, 60, 61

Fernandez-Roque v. Smith,
  734 F.2d 576 (11th Cir. 1984) . . . . . . . . . . . . . 52

Gisbert v. U.S. Attorney General,
  988 F.2d 1437 (5th Cir. 1993) . . . . . . . . . . . 46, 53

Hernandez v. Casillas,
  520 F.Supp. 389 (S.D. Tex. 1981) . . . . . . . . . 44, 45

Hernandez v. Cremer,
  913 F.2d 230 (5th Cir. 1990) . . . . . . . . . . . . . 46

Hull v. Quitman County Bd. of Educ.,
  1 F.3d 1450 (5th Cir. 1993) . . . . . . . . . . . . . . 9

INS v. Miranda,
  459 U.S. 14 (1982) . . . . . . . . . . . . . . . . 20, 33

INS v. Stanisic,
  395 U.S. 62 (1969) . . . . . . . . . . . . . . . . . . 10

Jean v. Nelson,
  727 F.2d 957 (11th Cir. 1984),
  aff'd 472 U.S. 846 (1985) . . . . . . . . 22, 51, 52, 56

Kaplan v. Tod,
  267 U.S. 228 (1925) . . . . . . . . . . . . . . . . . . 57

Kleindienst v. Mandel,
  408 U.S. 753 (1972) . . . . . . . . . . . . . . . 2, passim

661

Knauff v. Shaughnessy,
    338 U.S. 537 (1950) . . . . . . . . . . . . . . . 44

Kwong Hai Chew v. Colding,
    344 U.S. 590 (1953) . . . . . . . . . . . . . . . 2

Landon v. Plascencia,
    459 U.S. 21 (1982) . . . . . . . . . . . . . 2, passim

Laredo-Miranda v. INS,
    555 F.2d 1242 (5th Cir. 1977) . . . . . . . . . . 37

Leng May Ma v. Barber,
    357 U.S. 185 (1958) . . . . . . . . . 46, 50, 52, 57

Lopez v. INS,
    178 F.2d 1390 (10th Cir. 1985) . . . . . . . . . 20

Lopez v. United States,
    758 F.2d 1390 (10th Cir. 1985) . . . . . . . . . 22

Lynch v. Cannatella,
    810 F.2d 1363 (5th Cir. 1987) . . . . . . . . . . 3

Marczak v. Greene,
    971 F.2d 510 (10th Cir. 1992) . . . . . . . . . . 56

Mason v. Brooks,
    862 F.2d 190 (9th Cir. 1988) . . . . . . . . . . 57

Mathews v. Diaz,
    426 U.S. 67 (1976) . . . . . . . . . . . . . . . 3

Mejia-Ruiz v. INS,
    51 F.3rd 358 (2d Cir. 1995) . . . . . . . . . . . 66

Molina v. Sewell,
    983 F.2d 676 (5th Cir. 1993) . . . . . . . 35, 70, 71, 72

Nishimura Ekiu v. United States,
    142 U.S. 651 (1892) . . . . . . . . . . . . . . 21

Northeast Women's Center v. McMonagle,
    665 F.Supp. 1147 (E.D.Pa.1987) . . . . . . . . . 9

Palma v. Verdeyen,
    676 F.2d 100 (4th Cir. 1982) . . . . . . . . . . 53

Perez-Perez v. Hanberry,
    781 F.2d 1477 (11th Cir. 1986) . . . . . . . . . 52

v

CutePDF - www.texiso.com

Quezada v. INS,
    898 F.2d 474 (5th Cir. 1990) . . . . . . . . . . . . . 66

Rafeedie v. INS,
    880 F.2d 506 (D.C. Cir. 1989) . . . . . . . . . . 43, 44

Rivera v. INS,
    810 F.2d 540 (5th Cir. 1987) . . . . . . . . . . . . . 26

Roho, Inc. v. Marquis,
    902 F.2d 356 (5th Cir. 1990) . . . . . . . . . . . . . . 9

Rosenberg v. Fleuti,
    374 U.S. 449 (1963) . . . . . . . . . . . . . . 2, passim

Santos v. INS,
    421 F.2d 1303 (9th Cir. 1970) . . . . . . . . . . . . 48

Saxbe v. Bustos,
    419 U.S. 65 (1974) . . . . . . . . . . . . . . . . 13, 24

Sierra Club, Lone Star Chapter v. FDIC,
    992 F.2d 545 (5th Cir. 1993) . . . . . . . . . . . . . . 9

Shaughnessy v. United States ex rel. Mezei,
    345 U.S. 206 (1953) . . . . . . . . . . . . . . 2, passim

Umanzor v. Lambert,
    782 F.2d 1299 (5th Cir. 1986) . . . . . . . . . . . . 66

United States v. Anello,
    765 F.2d 253 (1st Cir. 1985) . . . . . . . . . . . 20, 23

U.S. v. Blaize,
    959 F.2d 850 (9th Cir. 1992) . . . . . . . . . . . . . 66

United States v. Brignoni-Ponce,
    422 U.S. 873 (1975) . . . . . . . . . . . . . . . . . . 20

United States v. Campos-Serrano,
    404 U.S. 293 (1971) . . . . . . . . . 22, 23, 24, 39

United States v. Elder,
    601 F. Supp. 1574 (S.D. Tex. 1985) . . . . . . 20, 38, 43

U.S. v. Henry,
    604 F.2d 908 (5th Cir. 1979) . . . . . . . . . . . . . 33

U.S. v. Tuck,
    194 U.S. 161 (1904) . . . . . . . . . . . . . . . . . . 31

663

CutePDF - www.fasiou.com

I

U.S. ex rel. Polymeris v. Trudell,
    284 U.S. 279 (1932) . . . . . . . . . . . . . . 42

Vargas-Banuelos v. INS,
    466 F.2d 1371 (5th Cir. 1972) . . . . . . . . . . . 36

Weinstein v. Bradford,
    423 U.S. 147 (1975) . . . . . . . . . . . . . . 6

WJA Realty Limited Partnership v. Nelson,
    708 F. Supp. 1268 (S.D. Fla. 1989) . . . . . . . . . 21

Yee v. Barber,
    210 F.2d 613 (9th Cir. 1954),
    cert. den., 347 U.S. 988 (1954) . . . . . . . . . . 31

## ADMINISTRATIVE DECISIONS

Matter of A-T-,
    3 I&N Dec. 178 (BIA 1948) . . . . . . . . . . . . 42

Matter of Allied Fidelity Insurance Company,
    19 I&N Dec. 124 (Comm'r 1984) . . . . . . . . . 69, 70

Matter of Huang,
    19 I&N Dec. 749 (BIA 1988) . . . . . . . . . . . 49

Matter of Kazemi,
    19 I&N Dec. 49 (BIA 1984) . . . . . . . . . . . . 48

Matter of Kennedy,
    13 I&N Dec. 242 (BIA 1969) . . . . . . . . . . . 42

Matter of Nafi,
    19 I&N Dec. 430 (BIA 1987) . . . . . . . . . . . 47

Matter of R,
    3 I&N Dec. 45 (BIA 1947) . . . . . . . . . . . . 50

Matter of Salazar,
    17 I&N Dec. 167 (BIA 1979) . . . . . . . . . . . 35

664

## STATUTES

The Immigration and Nationality Act of 1952, as amended:

Section 101(a)(13) of the INA,
    8 U.S.C. §1101(a)(13) . . . . . . . . . . . . . . . 35, 55

Section 101(a)(20) of the INA,
    8 U.S.C. § 1101(a)(20) . . . . . . . . . . . . . . . 26, 48

Section 101(a)(27)(A) of the INA,
    8 U.S.C. § 1101(a)(27)(A) . . . . . . . . . . . . . . 48

Section 101(a)(43) of the INA,
    8 U.S.C. § 1101(a)(43) . . . . . . . . . . . . . . . . 1

Section 103 of the INA,
    8 U.S.C. § 1103 . . . . . . . . . . . . . . . . . . 9, 22

Section 106 of the INA,
    8 U.S.C. § 1105a(c) . . . . . . . . . . . . . . . . . 66

Section 212 of the INA,
    8 U.S.C. § 1182 . . . . . . . . . . . . . . . 21, 35, 61

Section 212(a)(2)(C) of the INA,
    8 U.S.C. § 1182(a)(2)(C) . . . . . . . . . . . . . . 7, 8

Section 212(a)(6)(E) of the INA,
    8 U.S.C. § 1182(a)(6)(E) . . . . . . . . . . 6, passim

Section 212(a)(6)(E)(i) of the INA,
    8 U.S.C. § 1182(a)(6)(E)(i) . . . . . . . . . . . . . 1

Section 212(c) of the INA,
    8 U.S.C. § 1182(c) . . . . . . . . . . . . . . 4, 5, 7, 8

Section 212(d)(5) of the INA,
    8 U.S.C. § 1182(d)(5) . . . . . . . . . . . . . . . . 51

Section 212(d)(5)(A) of the INA,
    8 U.S.C. § 1182(d)(5)(A) . . . . . . . . . . . . . . 2, 58

Section 235 of the INA,
    8 U.S.C. § 1225 . . . . . . . . . . . . . . . . . 21, 60

Section 235(a) of the INA,
    8 U.S.C. § 1225(a) . . . . . . . . . . . . 31, 32, 34, 64

Section 235(b) of the INA,
    8 U.S.C. § 1225(b) . . . . . . . . . . . . . . . . 32, 40

665

|

Section 235(c) of the INA,
    8 U.S.C. § 1225(c) . . . . . . . . . . . . . . . . 43, 44

Section 236 of the INA,
    8 U.S.C. § 1226 . . . . . . . . . . . . . . . . . . 44

Section 236(a) of the INA,
    8 U.S.C. § 1226(a) . . . . . . . . . . . . . . . . . 34

Section 236(b) of the INA,
    8 U.S.C. § 1226(b) . . . . . . . . . . . . . . . . . 34

Section 241(a)(2)(A)(iii) of the INA,
    8 U.S.C. § 1251(a)(2)(A)(iii) . . . . . . . . . . . . 4

Section 241(a)(11) of the INA,
    8 U.S.C. § 1251(a)(11) . . . . . . . . . . . . . . . 5

Section 242 of the INA,
    8 U.S.C § 1252 . . . . . . . . . . . . . . . . . 21, 68

Section 242(a) of the INA,
    8 U.S.C. § 1252(a) . . . . . . . . . . . . . . . . . 53

Section 244(a) of the INA,
    8 U.S.C. § 1254(a) . . . . . . . . . . . . . . . . . 54

Section 244(e) of the INA,
    8 U.S.C. § 1254(e) . . . . . . . . . . . . . . . . . 54

Section 261 of the INA,
    8 U.S.C. § 1301 . . . . . . . . . . . . . . . . . . 23

Section 262 of the INA,
    8 U.S.C. § 1302 . . . . . . . . . . . . . . . . . 11, 21

Section 264 of the INA,
    8 U.S.C. § 1304 . . . . . . . . . . . . . . . . . . 11

Section 264(d) of the INA,
    8 U.S.C. § 1304(d) . . . . . . . . . . . . . . . . . 14

Section 266 of the INA,
    8 U.S.C § 1306 . . . . . . . . . . . . . . . . . . . 23

Section 273(d) of the INA,
    8 U.S.C. § 1323 . . . . . . . . . . . . . . . . . . 32

Section 274 of the INA,
    8 U.S.C. § 1324 . . . . . . . . . . . . . . . . . . . 1

666

Section 274A of the INA,
    8 U.S.C. § 1324a . . . . . . . . . . . . . . . . . 21

Section 274A(b)(1)(A) of the INA,
    8 U.S.C. § 1324a(b)(1)(A) . . . . . . . . . . . 28, 29

Section 274A(b)(1)(B) of the INA,
    8 U.S.C. § 1324a(b)(1)(B) . . . . . . . . . 11, 12, 13

Section 274A(b)(1)(B)(v) of the INA,
    8 U.S.C. § 1324a(b)(1)(B)(v) . . . . . . . 12, 13, 14, 28

Section 274A(b)(1)(B)(v)(I) of the INA,
    8 U.S.C. § 1324a(b)(1)(B)(v)(I) . . . . . . . . . . 13

Section 274A(b)(1)(C) of the INA,
    8 U.S.C. § 1324a(b)(1)(C) . . . . . . . . . . . . . 28

Section 274(b) of the INA,
    8 U.S.C. § 1324(b) . . . . . . . . . . . . . . . . 29

Section 287(a)(1) of the INA
    8 U.S.C. § 1357(a)(1) . . . . . . . . . . . . . . . 21

Section 287(a)(2) of the INA,
    8 U.S.C. § 1357(a)(2) . . . . . . . . . . . . . . . 21

Section 291 of the INA,
    8 U.S.C. § 1361 . . . . . . . . . . . . . . 32, 35, 54

Section 292 of the INA,
    8 U.S.C. § 1362 . . . . . . . . . . . . . . . . . . 34

## REGULATIONS

8 C.F.R. § 2.1 . . . . . . . . . . . . . . . . . . . . 10

8 C.F.R. 3.4 . . . . . . . . . . . . . . . . . . . . . 65

8 C.F.R. § 100.2 . . . . . . . . . . . . . . . . . 10, 22

8 C.F.R. § 100.4 . . . . . . . . . . . . . . . . . . . 45

8 C.F.R. § 103.1(f)(3)(iii)(A) . . . . . . . . . . . . 68

8 C.F.R. § 103.6 . . . . . . . . . . . . . . . . . . . 67

8 C.F.R. § 103.6(e) . . . . . . . . . . . . . . . . 68, 69

x

667

8 C.F.R. § 211.1(b)(1)(i)(A)  . . . . . . . . . .  48

8 C.F.R. § 212.5  . . . . . . . . . . . . . . . .  51

8 C.F.R. § 212.5(d)(1)(i)  . . . . . . . . . . . .  57

8 C.F.R. § 235.1(a)  . . . . . . . . . . . . . . .  31

8 C.F.R. § 235.3(c)  . . . . . . . . . . . . . . .  51

8 C.F.R. § 235.6  . . . . . . . . . . . . . . . .  34

8 C.F.R. § 235.6(a)  . . . . . . . . . . . . . . .  34

8 C.F.R. § 236.2  . . . . . . . . . . . . . . . .  34

8 C.F.R. § 236.2(a)  . . . . . . . . . . . . .  48, 53

8 C.F.R. § 236.4  . . . . . . . . . . . . . . . .  54

8 C.F.R. § 242.2(a)  . . . . . . . . . . . . . . .  53

8 C.F.R. § 242.2(e)  . . . . . . . . . . . . . . .  68

8 C.F.R. § 253.3(c)  . . . . . . . . . . . . . . .  40

8 C.F.R. § 264.1  . . . . . . . . . . . . .  11, 12, 13

8 C.F.R. § 264.1(f)  . . . . . . . . . . . . . . .  15

8 C.F.R. § 274a.2(b)(1)(v)  . . . . . . . . .  28, 29

8 C.F.R. § 274a.2(b)(1)(v)(A)(4)  . . . . . . . . .  28

8 C.F.R. § 274a.2(b)(1)(v)(A)(5)  . . . . . . . . .  28

8 C.F.R. § 274a.2(b)(1)(v)(C)  . . . . . . . . . .  28

8 C.F.R. § 274a.2(b)(1)(v)(C)(7)  . . . . . . . . .  28

8 C.F.R. § 292.5(b)  . . . . . . . . . . . . . . .  33

20 C.F.R. § 422.107(e)  . . . . . . . . . . . . . .  29

## MISCELLANEOUS

Gordon, Mailman, and Yale-Loehr,
     Immigration Law and Procedure, vol. 2 (1995) . . . . . .  32

xi

6668

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO-GUZMAN, et. al.,[1]       )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )        C.A. No. B-94-215
                                   )
E.M. TROMINSKI, District           )
Director, Immigration and          )
Naturalization Service, HON.       )
JANET RENO, United States          )
Attorney General, and              )
IMMIGRATION AND NATURALIZATION     )
SERVICE,                           )
                                   )
        Defendants.                )
_____)

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' COUNTER MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is an immigration case in which all of the named plaintiffs have been subjected to proceedings to determine whether they should be excluded or deported from the United States on grounds ranging from aggravated felony drug trafficking convictions to alien smuggling.[2]

_____

[1] This case was initially captioned Herrera-Loa et. al., v. Trominski, et. al. After the death of plaintiff Herrera-Loa, plaintiffs moved the court to amend their complaint to remove Herrera-Loa from their pleading. The court has not issued a decision on plaintiffs' request. The defendants do not oppose plaintiffs' request, and have agreed to refer to this case as Ascencio-Guzman.

[2] Aggravated felony crimes for the purpose of the immigration laws are defined in 8 U.S.C. § 1101(a)(43); alien smuggling is grounds for exclusion (INA § 212(a)(6)(E)(i), 8 U.S.C. § 1182(a)(6)(E)(i)) as well as a crime (INA § 274, 8 U.S.C. 1324).

669

In their Motion for Partial Summary Judgment, they seek an order enjoining the government from certain practices that are undertaken in furtherance of enforcing the immigration laws. (See, e.g., Exhibit (3) -Declaration of Larry P. Doyle).  The plaintiffs, however, have not demonstrated that an alien in exclusion or deportation proceedings is entitled to retain the original alien registration card that was issued at the time of his prior lawful admission for permanent residence, or that the substitute documentation issued while his proceedings are pending is insufficient as a matter of law.  (See also Exhibit (4) - Declaration of Richard H. Ayala).  Neither the Supreme Court's decision in Rosenberg v. Fleuti, 374 U.S. 449 (1963), nor Kwong Hai Chew v. Colding, 344 U.S. 590 (1953), translate into the inviolate constitutional or statutory right of "international travel" across U.S. borders that has been suggested here, nor can such proposition be reconciled with Supreme Court jurisprudence generally.  See Landon v. Plascencia, 459 U.S. 21, 27-29, 31, 32-35 (1982).  Similarly, no reading of 8 U.S.C. § 1182(d)(5)(A) yields a statutory entitlement to be paroled into the United States pending exclusion proceedings.  Compare Kleindienst v. Mandel, 408 U.S. 753 (1972), with Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 208-10 (1953) (excluded former resident alien could not force U.S. to allow him into the country).  Any "cloud" that may interfere with these plaintiffs' enjoyment of their continued residence in this country is the necessary result of their own undisputed conduct in violation of its laws.  See

2

670

)

<u>Mathews v. Diaz</u>, 426 U.S. 67, 80 (1976) (Constitution does not require identical treatment of different classes of aliens). That the plaintiffs have acted to imperil their continued lawful permanent resident status in the United States does not require this Court to order measures that would severely impair the ability of the nation to control illegal immigration across its land borders. <u>Landon</u>, 459 U.S. at 34-35 ("Government's interest in efficient administration of the immigration laws at the border also is weighty").[3] As the plaintiffs have failed to establish any theory under which they may be entitled to the relief they seek, their Motion for Partial Summary Judgment should be denied, and judgment entered in favor of the United States.

## **BACKGROUND**

On July 15, 1994, plaintiffs filed a class action law suit against the defendants seeking to represent all lawful permanent resident (LPRs) aliens who are members of the class defined as all LPRs:

> who are under deportation or exclusion
> proceedings, in whose cases no final order of
> deportation or exclusion has been entered,
> who are not presently held in detention,
> whose I-151 or I-155 cards have been
> confiscated by Defendants, and are being
> retained by or under the authorization of the

---

[3]   <u>Cf</u>. <u>Doherty v. Thornburgh</u>, 943 F.2d 204, 209-10 (2d Cir. 1991) <u>cert. denied</u>, 503 U.S. 901 (1992) ("an alien's right to be at liberty during the course of deportation proceedings is circumscribed by considerations of the national interest"); <u>Lynch v. Cannatella</u>, 810 F.2d 1363, 1373 (5th Cir. 1987) ("sovereign interest in self-determination weighs so much more heavily * * * than does the [excludable] alien's interest in entering the country").

671

CAMPDF - www.fasiio.com

|

Harlingen Office of the Immigration and
Naturalization Service.

(Plaintiffs' Second Amended Petition at 12 (paragraph 38).)   All
the issues raised by plaintiffs related to the defendants
Harlingen, Texas office and/or the defendants Harlingen, Texas
branch offices.   Plaintiffs Juana Ascencio-Guzman,[4] Efrain
Merino, Arturo Lopez-Lozano, Alejandra Gutierrez, Juan Sanchez-
Salinas, Adelita Cantu de Cabrera, and Ramiro Gracia-Cantu are
all lawful permanent residents of the United States.   Plaintiffs
Ascencio, Merino, Gutierrez, Sanchez, and Cabrera were all in
exclusion proceedings, and plaintiffs Gracia and Lopez were in
deportation proceedings, in the Harlingen EOIR district at the
time of filing of the Original Complaint.   Plaintiffs Cabrera and
Lopez have since been granted relief by an Immigration Judge, and
have had their proceedings terminated.

### STATEMENT OF FACTS

1.   Plaintiff Ramiro Gracia-Cantu became a lawful permanent
resident on June 25, 1984.   Mr. Gracia was placed in deportation
proceedings by Order to Show Cause ("OSC") issued June 22, 1994,
alleging deportability for a conviction of an aggravated felony
(narcotics racketeering) pursuant to Title 8 U.S.C. § 1251
(a)(2)(A)(iii).   Deportability has been established, and his case
is set for an August 29, 1995 hearing on whether Mr. Gracia may
be granted a waiver of inadmissibility under Section 212(c) of

---

[4]   Julio Herrera-Loa was originally a named plaintiff.
However, his name was dropped from the lawsuit after his death.

4

672

the Immigration and Nationality Act (the "INA" or "Act"), 8
U.S.C. 1182(c).

When Mr. Gracia surrendered his LPR card to Defendants on
June 22, 1994, he was provided with temporary evidence of his LPR
status on Form I-94 (Plaintiffs' Exhibit A).  The form stated
that he was a permanent resident, and bore the notation
"Deportation Proceedings Initiated" on the back, but did not bear
an employment authorization stamp.  He was issued another I-94
which did not bear the notation about deportation proceedings,
and which did contain an employment authorization stamp
(Plaintiffs' Exhibits V and W).

2.  Plaintiff Arturo Lopez-Lozano became a LPR on
June 16, 1981.  Mr. Lopez was placed in deportation proceedings
by an OSC issued on May 3, 1988, alleging deportability for a
controlled substance violation (possession of 50-200 pounds
marijuana), pursuant to INA § 241(a)(11), 8 U.S.C. § 1251(a)(11)
(1988).  When he posted bond on May 17, 1988, his LPR card was
returned to him, and he was allowed to keep it throughout the
pendency of proceedings.

Plaintiff Lopez was ordered deported by the Immigration
Judge ("IJ") on May 17, 1990.  On appeal to the Board of
Immigration Appeals ("BIA"), his case was remanded to the IJ, and
Lopez was granted a Section 212(c) waiver of inadmissibility on
February 24, 1995.

When Plaintiff Lopez sought admission to the U.S. as a
returning resident on December 23, 1994, he was initially denied

5

673

admission, and his LPR card was confiscated, as the computer at the Port of Entry did not accurately reflect the current status of his immigration case.  After the Defendants were contacted by counsel for Mr. Lopez, steps were taken to correct the problem, and he returned to the United States on December 27, 1994.[5]

3 & 4.  Plaintiffs Juana Ascencio-Guzman and Efrain Merino have been LPR's since February 4, 1991 and January 6, 1992, respectively.  They were denied admission and placed in exclusion proceedings, and a Form I-122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge, was issued on July 3, 1994, charging excludability for alien smuggling, pursuant to INA § (212)(a)(6)(E), 8 U.S.C. § 1182(a)(6)(E).  Both plaintiffs were ordered deported and excluded by an IJ on October 19, 1994, after the IJ made a finding that they had made a meaningful departure from the United States and were excludable as charged. Their cases are currently on appeal to BIA.

Plaintiffs Ascencio and Merino both had their LPR cards confiscated by Defendants on the day they were placed in exclusion proceedings, and remained to Mexico.  On October 31, 1994, they were paroled into the United States pending completion of exclusion proceedings.  The parole

---

[5]  Mr. Lopez does not fit within the class sought to be certified by Plaintiffs.  He was allowed to keep his LPR card during the pendency of proceedings, and his problem in December of 1994 was a computer error which has nothing to do with any of the issues raised by Plaintiffs in this case.  His claim is also moot, as he has been granted relief.  (See Weinstein v. Bradford, 423 U.S. 147, 148-149 (1975) (An issue is considered moot when raised by a alien who no longer has a present interest affected by the governmental policy that he challenges.)

674

documents for both plaintiffs, Form I-94, carry a notation that
they have been paroled pending determination of their right to
re-enter, and contains a statement that employment is authorized.
(Plaintiffs Exhibit I.)  On May 2, 1995, both plaintiffs were
granted special permission for humanitarian reasons to leave the
United States and it was agreed that they would be paroled into
the United States upon their return from Mexico.

5.  Plaintiff Alejandra Gutierrez has been an LPR since
February 28, 1991.  She was placed in exclusion proceedings when
a Form I-122 was issued on August 4, 1994, charging excludability
for alien smuggling, pursuant to INA § 212(a)(6)(E), 8 U.S.C.
§ 1182(a)(6)(E).  At that time, she was denied admission into the
United States her LPR card was confiscated, and remained in
Mexico.  Her exclusion case is set for a hearing on the issue of
excludability for October 6, 1995.  On January 27, 1995, her
request for parole was granted.  Plaintiffs have not objected to
the form of the I-94 parole document issued to Ms. Gutierrez.

6.  Plaintiff Juan Sanchez-Salinas has been a LPR since
March 23, 1964.  He was placed in exclusion proceedings when a
Form I-122 was issued on November 4, 1991, charging excludability
for illicit trafficking in a controlled substance, pursuant to
INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C).  At a hearing on
May 10, 1995, the IJ found that Mr. Sanchez had made a meaningful
departure from the United States and was excludable as charged.
The case is set for a hearing on the merits of his application
for a Section 212(c) waiver of inadmissibility on August 2, 1995.

675

CutePDF - www.fasoo.com

Mr. Sanchez' LPR card was confiscated on November 4, 1991, and he was paroled into the United States for prosecution. Upon release from penal custody, he was transferred to the Port Isabel Service Processing Center, posted bond and was released from Immigration and Naturalization Service ("INS") custody on August 17, 1994. His card carried the notation "not valid for employment." Upon being notified of the error, the Service corrected it by issuing an I-94 without the offending notation. (Plaintiffs' Exhibit K.)

7. Plaintiff Adelita Cantu de Cabrera was granted LPR status on June 1, 1993, and was placed in exclusion proceedings when a Form I-122 was issued on October 8, 1993, charging excludability for illicit trafficking in a controlled substance, pursuant to § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C). The IJ found that Ms. Cantu had made a meaningful departure from the United States, and was excludable, but granted her a Section 212(c) waiver of inadmissibility on Jan. 25, 1995.

Ms. Cantu's LPR card was lifted on October 8, 1993, and she was paroled into the United States on November 9, 1993, but no employment authorization was noted on her Form I-94 until she became a plaintiff in this lawsuit.[6] (Plaintiffs' Exhibit M.)

---

[6] Having been granted a 212(c) waiver, her lawful permanent resident status has been restored, and this lawsuit is moot as to Ms. Cantu. (See With his release on parole, the petitioner has no further stake in this litigation because there is no reasonable expectation that he will again be subject to the long-term immigration detention of which he complains. Weinstein v. Bradford, 423 U.S. 147, 148-149 (1975).

676

## BURDEN OF PROOF

To prevail on a request for preliminary injunctive relief, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) they will suffer irreparable injury if the relief is not granted; (3) relative harm to the opposing party; and (4) the impact on the public interest.  Hull v. Quitman County Bd. of Educ., 1 F.3d 1450 (5th Cir. 1993); Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545 (5th Cir. 1993). The movant must is also required to carry the burden of proof on each factor.  Doe v. Duncanville Ind. Sch. Dist., 994 F.2d 160 (5th Cir. 1993); Roho, Inc. v. Marquis, 902 F.2d 356 (5th Cir. 1990).

Plaintiffs must satisfy three requirements for a permanent injunction to issue: (1) the court's exercise of equity jurisdiction must be proper; (2) plaintiffs must actually succeed on the merits of their claims; and (3) plaintiffs must show that the balance of equities tips in favor of injunctive relief. Northeast Women's Center v. McMonagle, 665 F.Supp. 1147, 1152-53 (E.D.Pa. 1987).

## STANDARD OF REVIEW

Under the Immigration and Nationality Act, the Attorney General of the United States is charged with the administration and enforcement of laws relating to immigration, including the exclusion, detention, and parole of inadmissible aliens, and is given authority to promulgate regulations necessary for carrying out this charge.  (See 8 U.S.C. § 1103.)  The Attorney General

677

has delegated to the Commissioner of the INS her authority to "issue regulations as deemed necessary or appropriate" in enforcing and implementing the immigration laws.  8 C.F.R. §§ 2.1 & 100.2.

The Court reviews the agency's interpretation of the INA for consistency with congressional intent and reasonableness under the circumstances.  Chevron v. Nat'l Resources Defense Council, Inc., 467 U.S. 837 (1984).  Questions of law are subject to de novo judicial review, but with deference to an agency's construction of any ambiguities in the statutes it is charged with administering and the regulations it promulgates.  Chevron, 467 U.S. at 837.  The Attorney General's interpretation of her own regulation is controlling unless plainly erroneous or inconsistent with the statute.  INS v. Stanisic, 395 U.S. 62, 72 (1969); Chevron, 467 U.S. at 842-43.

## DISCUSSION

I.   **THE COURT SHOULD UPHOLD THE ATTORNEY GENERAL'S DECISION TO ISSUE DOCUMENTS OTHER THAN THE FORM I-551 (GREEN CARD) AS EVIDENCE OF IDENTITY AND EMPLOYMENT AUTHORIZATION.**

Here, plaintiffs do not challenge the constitutionality of INA § 274A(b)(1)(B)(v), which provides that:

> [the] resident alien card or other alien registration card, [may be issued to evidence identity and employment authorization] if the card -
>
> > (I) contains a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this subsection, and

10

6)8

(II) is evidence of authorization of employment in the United States.

Rather, plaintiffs attack the Attorney General's use of any document other than the "resident alien card ("green card") claiming that such other  documents are not sufficient evidence of identity and employment authorization.

First, even a cursory reading of INA § 274A(b)(1)(B) shows that Congress clearly and unambiguously addressed and listed the documents which are sufficient to evidence identity and employment authorization.  In paragraph (v) of that section, Congress clearly states that the "alien card or other alien registration card" may be used if such card meets the requirements of subparagraphs (I) and (II).  Congress has expressly authorized the Attorney General, through INA § 264, 8 U.S.C. § 1304, "to prepare forms for the registration and finger printing of aliens under section 262 of the [INA]."  The use of the word "forms" in INA § 264(a) shows that Congress did not intend to limit the Attorney General to the use of only one form to fulfill the requirements of INA § 264.  As can be seen in 8 C.F.R. § 264.1 where the Attorney General cites INA § 264, 8 U.S.C. § 1304, among other INA provisions, as her authority to implement 8 C.F.R. § 264.1, the Attorney General reasonably did not perceive that Congress in anyway limited her authority to designate forms appropriate to evidence registration and fingerprinting of aliens.

Specifically, in 8 C.F.R. § 264.1, the Attorney General has identified the forms listed which she deems sufficient to carry

11

679

out her mandate under INA § 264 to prepare forms to evidence that
an alien is registered and has been fingerprinted. The Form I-
551 (known as the green card), I-94 Departure and Arrival Record
(the document in controversy here), and I-221 (Order to Show
Cause), are just a few of the many forms listed by the Attorney
General in 8 C.F.R. § 264.1 as evidence of registration. In that
the Form I-94, both Arrival and Departure, is and may be used by
the defendants as evidence of registration, the Attorney General
properly carried out Congress' directive in INA
§ 274A(b)(1)(B)(v) to use, if chosen, the "resident alien card or
other alien registration" to evidence both employment
authorization and identity. The Attorney General could have used
any of the forms listed in 8 C.F.R. § 264.1 to satisfy the
requirements of INA § 274A(b)(1)(B)(v) so long as the document
selected from those listed in 8 C.F.R. § 264.1 contained, as
required by subparagraphs (I) and (II) of INA § 274A(b)(1)(B)(v),
either a "photograph" of the alien or "such other personal
identifying information relating to the [alien] as the Attorney
General finds, by regulation, sufficient for purposes of [INA
§ 274A(b)(1)(B)]."

The Etuk[7] line of cases (discussed infra) hold that when

_____

[7] The defendants do not agree with the "Etuk" cases and
assert that that court encroached upon the authority of the
Attorney General in substituting its opinion, that the Departure
Document (Form I-94) was not sufficient to evidence identity and
employment authorization, for that of the Attorney General. (See
argument infra.) Additionally, the Second Circuit's decisions in
the Etuk cases are in no way binding upon this Court, which lies
within the appellate jurisdiction of the United States Court of
(continued...)

12

CutePDF - www.fasto.com

Congress used the language "sufficient for purposes of this subsection" which is contained in INA § 274A(b)(1)(B)(v)(I), that Congress was referring to the document to be issued by the INS. As discussed above, it is clear that Congress was not concerned in that subsection with the specific forms that the Attorney General would use for purposes of carrying out its mandate. <u>See</u> <u>Saxbe v. Bustos</u>, 419 U.S. 65, 72 (1974). Congress had already left it to the Attorney General's discretion in INA § 264.(a) to determine the forms to be used to evidence registration. Moreover, from the structure of subparagraph (v)(I) of INA § 274A(b)(1)(B), it is clear that the word "sufficient" relates, not to the document to be issued, but rather, to the "personal identifying information" that the Attorney General may prescribe to be placed on the alien card or registration card. Therefore, although the green card (Form I-155) is the form most commonly used, the Attorney General is not limited solely to that specific document.

Plaintiffs do not challenge the Attorney General's authority to issue any of the forms listed in 8 C.F.R. § 264.1, as evidence of registration. Thy should not succeed in their claim that the Form I-94 is not consistent with INA § 274A(b)(1)(B)(v). Because through INA § 274A(b)(1)(B)(v) Congress has clearly and unambiguously addressed the precise question at issue, the Court

_____

[7](...continued)
Appeals for the Fifth Circuit. However, to the extent this court believes they are persuasive in nature, defendants will analyze them.

681

should proceed no further with its review in regard to this question.  <u>Chevron</u>, 467 U.S. at 842-43.  Moreover, even if this Court finds that Congress failed to unambiguously address this question, it still may not substitute its own construction of INA § 274A(b)(1)(B)(v) for a reasonable construction by the Attorney General.  <u>Id</u>. at 843.  In such case, the Court must review the Attorney General's use of the From I-94 and other forms of registration used in place of the green card to determine whether such use is based on a "permissible construction of [INA § 274A(b)(1)(B)(v)]."  <u>Id</u>.  The Defendants' assert that, in light of Congress' act of authorizing the Attorney General, in INA § 264, to determine the forms to be used for alien registration that the construction given to INA § 274A(b)(1)B)(v) by the Attorney General is permissible.  Accordingly, the Defendant's request summary judgment in their favor as to Plaintiffs' claim that the Attorney General abused her discretion in issuing cards other than the green card for purposes of INA § 274A(b)(1)(B)(v).

## II.  ALIENS IN DEPORTATION PROCEEDINGS

A.   An alien lawfully admitted for permanent residence has no property interest in the green card, and thus it may be lifted, as long as adequate replacement documentation is provided.

The INS policy relating to the lifting of alien registration[8] from certain aliens placed into exclusion or

_____

[8]   The alien registration receipt card, or Form I-551, is initially issued pursuant to 8 U.S.C. § 1304(d).  For simplicity sake, it will be referred to in this motion as the "green card" (although it is no longer green in color).  Aliens lawfully admitted for permanent residence will be referred to as LPRs.

14

682

deportation proceedings, and providing them with alternate documentation, is found in a memorandum issued by the INS Commissioner, Gene McNary, on March 14, 1990, entitled "Disposition of Alien Registration Documentation after institution of deportation or exclusion proceedings" ((Exhibit (1) - McNary Memorandum .)  Pursuant to the McNary Memorandum, it is INS policy to lift the registration card of aliens under two limited circumstances.  The first is where an alien who seeks admission to the United States as a returning resident alien is not admitted, and is paroled into the United States pending completion of immigration proceedings.[9]  (Exhibit (1) at 2.) The second circumstance under which the registration card of an alien may be lifted is if the alien is in deportation proceedings, is not detained or incarcerated, and the "District Director, Chief Patrol Agent, or officer in charge determines that a temporary document is needed to assure the alien's appearance at hearings or for other justifiable reasons." (Exhibit (1) at 1.)  If the alien's green card is lifted, he or she is immediately provided with evidence of his LPR status, valid for one year, by either placing a stamp in the alien's passport, or, if the alien does not have a passport, by providing a Temporary I-551 on INS Form I-94, with the following legend:

> Processed For I-551.  Temporary Evidence Of
> Lawful Admission For Permanent Residence.

---

[9]  The exclusion policy is discussed _infra_.  The INS also lifts expired resident cards, pursuant to 8 C.F.R. § 264.1(f).

15

Valid Until _____.  Employment
Authorized.

If the Form I-94 is issued, a photo of the alien and an INS seal
are also placed onto the form, along with the alien's name, date
of birth, alien registration number and country of citizenship.
(Exhibit (1) at 1 and Exhibit (2) - INS Operations Instruction
264.2 .)

INS lifts the registration cards of certain aliens and
provides them with alternate documentation in an effort to
effectively enforce the immigration laws of the United States and
to fulfill its responsibility to control the nation's borders.
To achieve this end, it is necessary to lift the card of aliens
in immigration proceedings for a number of important reasons:
(1) to ensure the presence of the alien at the immigration
proceedings, as it is the concern of INS that unless the card is
lifted, many of the aliens will fail to appear at the
proceedings; (2) to ensure that the alien cannot continue to live
in the United States under color of law, or re-enter the United
States, if a final order of exclusion or deportation is entered,
as it is the concern of INS that it is often difficult to secure
these cards from aliens after proceedings have concluded and that
aliens often use these cards to avoid being detected as illegal
aliens; (3) to ensure, in those circumstances where an alien
applies for admission to the United States, but subsequently
withdraws the application for admission, that the alien cannot
use the card to gain admission to the United States at another
port of entry; and (4) to ensure that no invalid, expired, or

16

684

fraudulent card remains in use.   (Exhibits (3) and (4)
Declarations of Larry Doyle and Richard Ayala).[10]

Plaintiffs take the position, first of all, that Defendants
have no right to lift the cards of lawful permanent residents who
are in deportation proceedings.   Secondly, they take the position
that the replacement documentation authorized to be issued by the
McNary memorandum is inadequate, both in terms of the notations
which it contains and the time period for which it is valid, and
that it interferes with various claimed rights of Plaintiffs.
(Plaintiff's Motion Summary Judgement (PMSJ) at 9, 12-13.)   Thus,
Plaintiffs ask this court to enjoin Defendants from ever lifting
the green cards from aliens lawfully admitted for permanent
residence who are placed in deportation proceedings.   (PMSJ at
40-41 - Requests #1 and #2.)

In support of their arguments, Plaintiffs rely heavily upon
what they call the "Etuk trilogy".   (PMSJ at 3-7, 29-33, 39-40.)
Etuk v. Blackman, 748 F.Supp. 990 (E.D.N.Y. 1990) (Etuk I); Etuk
v. Slattery, 936 F.2d 1433 (2d Cir. 1991) ("Etuk II"); Etuk v.
Slattery, 973 F.2d 60 (2d Cir. 1992) ("Etuk III"); Etuk v.
Slattery, 803 F.Supp. 644 (E.D.N.Y. 1992) ("Etuk IV"); Etuk v.
Slattery, 1992 WL 106474 (E.D.N.Y. April 30, 1992) (unpublished
but reported on Westlaw).   Plaintiffs claim that the Etuk cases

_____

[10]   Plaintiffs claim that the McNary memorandum is
inconsistently implemented, and compare the operations of the
Border Patrol to the District office.   However, is clear that the
Border Patrol has simply chosen not to lift cards for practical
administrative reasons.   (Exhibit (5) - Declaration of Mario
Garcia, Jr. Border Patrol Agent.)

685

"rejected the proposition that ensuring an LPR's appearance at hearings was a valid basis for confiscating his or her green card. ... The Second Circuit left open the question of what circumstances, if any, would render "justifiable" the confiscation of the green cards of LPRs in deportation proceedings." (PMSJ at 5.)  However, this analysis by Plaintiffs of what the Etuk cases held is completely incorrect.

In Etuk I, the District Court enjoined the INS from confiscating green cards of aliens in deportation proceedings without the provision of adequate temporary replacements.  Etuk I at 1001.  Thus, the Etuk court clearly acknowledged that the INS has the right to lift the cards of LPRs, as long as adequate replacement documentation is provided.  Plaintiffs, accordingly, are wrong where they claim that Etuk said the INS could not confiscate LPR cards of aliens in deportation proceedings: "confiscation" was used by the Etuk courts only in a sense of referring to taking the card away without providing replacement documentation.  Again, Plaintiffs are wrong when they state that the Etuk courts rejected the proposition that ensuring an LPR's appearance at deportation hearings was a valid basis for lifting the green card.  As the District Court stated:

> The policy of confiscating green cards is rationally related to the INS's statutory mandate to enforce these laws.  The card is a valuable aid to aliens who seek to evade enforcement of United States law and remain and work in this country.  Possession of a green card with no expiry date, or a date far in the future, is a disincentive to comply with a deportation or exclusion order, or even to appear at deportation and exclusion proceedings, when an adverse decision and confiscation of the card is anticipated.

18

686

Etuk I at 10.  The United States Court of Appeals for the Second
Circuit agreed with the District Court on this point:  "... we do
not intend to undervalue the INS' legitimate concerns for
ensuring the appearance at a deportation proceeding of those who
have had deportation proceedings instituted against them." Etuk
II at 1447.  What the Court of Appeals stated that the INS could
not do was to "revoke" or confiscate the green cards without
providing any replacement documentation.  Etuk II at 1438, 1447.
The Court of Appeals did allow the INS to lift the green cards of
LPRs in deportation proceedings as long as the replacement
documentation was "subject to the same standards as LPRs who are
seeking replacement documentation" (i.e., the same standards as
applied by the court to LPRs who had lost their LPR cards). Etuk
II at 1447.  In Etuk III, the Court of Appeals held that the
arrival portion of the Form I-94 was a valid temporary proof of
status as a lawful permanent resident and of unrestricted work
authorization.  Etuk III at 63.[11]  Accordingly, the actions of
Defendants in lifting the cards and providing replacement
documentation, which Plaintiffs ask this court to enjoin in
Requests for Relief 1 and 2 of their Motion for Partial Summary
Judgment (PMSJ at 40-41), was in fact permitted by the very court
(Etuk) upon whose authority they so mightily rely!

The green card is not a personal document which "belongs" to
the alien.  The United States Courts of Appeals for the First and

---

[11]  Etuk II had held that the departure portion of the Form
I-94 was inadequate temporary proof of LPR status.

Third Circuits have held that a foreign passport is not a personal document, and that the government can seize it at the border, without violating the Fifth Amendment to the United States Constitution. U.S. v. Anello, 765 F.2d 253, 260 (1st Cir. 1985); DaCruz v. Holland, 241 F.2d 118, 119 (3rd Cir. 1957). The Third Circuit has also found that confiscation of a non-immigrant visa without a prior hearing did not violate the alien's due process rights. David v. INS, 548 F.2d 219, 222 (8th Cir. 1977). The United States Court of Appeals for the Tenth Circuit has held that the INS was not required to hold a due process hearing either before or after confiscating identification papers that could assist an alien in avoiding detection (a state driver's license). Lopez v. INS, 758 F.2d 1390, 1393 (10th Cir. 1985).

The Supreme Court has long recognized that there is a significant public interest in effective enforcement of the United States immigration laws and the control of aliens. See INS v. Miranda, 459 U.S. 14, 19 (1982); United States v. Brignoni-Ponce, 422 U.S. 873, 878-79 (1975). Lifting alien registration from certain aliens placed into immigration proceedings, and providing alternate documentation to them, represents a reasonable effort by the government to fulfill its obligation to protect the public at large, through effective enforcement of immigration laws. See United States v. Elder, 601 F. Supp. 1574 (S.D. Tex. 1985).

The INS derives its authority to lift alien registration and provide alternate documentation to aliens from a number of

688

sources.  First, the Executive has inherent power over immigration matters.  <u>WJA Realty Limited Partnership v. Nelson</u>, 708 F. Supp. 1268 (S.D. Fla. 1989). "It is an accepted maxim of international law that every sovereign nation has the power...to forbid the entrance of foreigners within its dominions, or to admit them in such cases and upon such conditions as it may see fit to prescribe." <u>Nishimura Ekiu v. United States</u>, 142 U.S. 651, 659 (1892).  It is settled law that the government's power over immigration matters is plenary and that "it is not within the province of any Court, unless expressly authorized by law, to review the determination of the political branch of government." <u>Kleindienst v. Mandel</u>, 408 U.S. 753 (1972); <u>Shaughnessy v. United States ex rel. Mezei</u>, 345 U.S. 206 (1953); <u>Bertrand v. Sava</u>, 684 F.2d 204 (2d Cir. 1982).

The second source of authority INS has over immigration matters stems from the power delegated to it by Congress, through statutes, such as the Immigration and Nationality Act (INA). Through the INA, Congress has conferred on INS broad authority over the control of aliens.  Under the INA, the INS is given authority: to inspect aliens, 8 U.S.C. § 1225; parole aliens under such conditions as it may prescribe, 8 U.S.C. § 1182; interrogate, arrest and deport aliens in the United States in violation of law, 8 U.S.C. §§ 1357(a)(1), (a)(2) and 1252, respectively; control the unlawful employment of aliens, 8 U.S.C. § 1324a; and register aliens, 8 U.S.C. § 1302.  These provisions reveal Congress' commitment to effective enforcement of the

689

nation's immigration laws.  Lopez v. United States, 758 F.2d
1390.  The power to lift green cards and provide aliens with
alternate documentation can readily be inferred from these
statutes, cf. Lopez v. United States, 758 F.2d 1390 (lifting
State drivers' license of alien is lawful exercise of federal
authority); Blackie's House of Beef, Inc. v. Castillo, 659 F.2d
1211, 1219 (D.C. Cir. 1981), cert. denied., 102 S.Ct 1432 (D.C.
1982) (inferring authority to search commercial establishments
for illegal aliens), and is particularly appropriate here, given
that the document being lifted has been provided to the alien by
the government primarily so that the INS can register and
thereafter be able to identify the alien.  United States v.
Campos-Serrano, 404 U.S. 293, 299-300 (1971).

Finally, a third source of authority can be derived directly
from 8 U.S.C. § 1103.  The effect of the Executive's and
Congress' plenary power over immigration matters permits Congress
"to make remarkably broad delegations of its authority in the
immigration field."  Jean v. Nelson, 727 F.2d 957, 964 (11th Cir.
1984), aff'd 472 U.S. 846 (1985). Pursuant to this authority, the
Attorney General has been broadly empowered, pursuant to 8 U.S.C.
§ 1103, to perform such "acts as she deems necessary for carrying
out her authority under the provisions of the [Immigration and
Nationality Act]."  Pursuant to 8 C.F.R. § 100.2, the Attorney
General has delegated this power over immigration matters to the
Commissioner of the INS.  Pursuant to this authority, the
Commissioner has authorized, under limited circumstances, that

22

690

the registration document of certain aliens be lifted and that
they be provided with alternate documentation.

To establish a constitutionally protected interest, an
individual must first establish an entitlement to the property at
issue.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972); Dean
Tarry Corp. v. Friedlander, 826 F.2d 210 (2d Cir. 1987).
Plaintiffs have failed to establish, as is their burden, any
constitutionally protected interest in the registration card.
Rather, the alien green card is a government document issued so
that the United States can register and thereby identify aliens
in the United States. 8 U.S.C. §§ 1301-1306.  See United States
v.Campos-Serrano, 404 U.S. 293, 299-300 (registration card is
principally an identity document).  Therefore, the primary
function of the card inures to the benefit of the United States,
the identifier, rather than the alien, the person being
identified.  As Plaintiffs have no entitlement to the green card,
the green card may be lifted by INS and plaintiffs do not possess
a constitutionally protectable interest in it.  See United States
v. Anello, 765 F.2d at 260 (passport is not personal property of
holder and government may seize it); David v. INS, 548 F.2d at
222 (no protected interest in immigration visa).

In fact, the United States Supreme Court has noted that the
Immigration and Naturalization Service has the authority to
decide which documents may be used to facilitate entry at the
border.  The Supreme Court noted that, if the INS wished, it
could even designate a document such as a driver's license to

23

691

serve as evidence of lawful admission for permanent residence when presenting oneself for entry into the United States. United States v. Campos-Serrano, 404 U.S. at 299. The Supreme Court clearly recognized that the INS has the right to designate which documents aliens may possess at any given time to evidence their status, as long as their status is evidenced. It is clearly the status itself which is privileged, not the card which happens to have been designated by the INS at any given time for the LPR to carry. Saxbe v. Bustos, 419 U.S. 65, 72 (1974). The alien registration receipt card's "essential purpose ... [is] to identify the bearer as a lawfully registered alien residing in the United States." Campos-Serrano, supra.

Thus, it is not the green card which gives the LPR his status and the accompanying privileges which that status entails; rather, the INS grants the LPR his status, and the green card merely serves as a document which identifies the LPR as having that status. The LPR has no right to the green card itself, and as stated infra the law does require an adequate document of some kind evidencing his status and his right to be employed within the United States.

> B.   The I-94 with the legend indicated in the
> McNary memorandum, along with any other
> notations which are factually correct,
> constitutes adequate replacement
> documentation for green cards lifted from
> LPR's in deportation proceedings.

Plaintiffs have identified various notations which have been placed on the I-94's that have been issued, which they feel place a "cloud" over the LPR's status, and which they allege interfere

24

692

with the privileges that the LPR status provides.  (PMSJ at 30, 32-33.)[12]  They complain of the following defects with the replacement documentation:  (1) if the I-94 does not include an "employment authorized" stamp or indicates that the bearer is not authorized to be employed; (2) if the I-94 indicates it is not valid for reentry; (3) if the I-94's time period is significantly shorter than the deportation proceedings can reasonably be expected to last; (4) if the I-94 indicates that the bearer is under deportation proceedings; (5) if the I-94 indicates that the bearer is on bond.  (PMSJ at 32.)

As for the first two items they complain about, the "employment authorized" and "not valid for reentry" notations, Plaintiffs are correct, except insofar as they claim that INS has "frequently" made such errors (PMSJ at 5), or that the INS has ever failed to quickly remedy such errors once brought to the attention of the INS personnel.  Only two such errors have been identified by Plaintiffs, and both were quickly corrected by the INS upon learning of the situation.  (See Defendants' Statement of Uncontroverted Facts at 8 - 9.)  Plaintiffs never even claimed that these two short-lived errors in any way prejudiced their abilities to work or remain in this country.  Clearly, aliens lawfully admitted for permanent residence retain their status and are authorized to be employed, reside in the United States, and make non-meaningful departures from the United States, so long as

---

[12]   The adequacy of notations placed on parole documents issued to LPRs in exclusion proceedings is discussed infra.

no administratively final order of deportation has been entered against them.  Rivera v. INS, 810 F.2d 540, 542 (5th Cir. 1987); 8 U.S.C. § 1101(a)(20).  Commissioner McNary clearly recognized these privileges and incorporated them into the stamp which he authorized to be used for LPRs in deportation proceedings. (Exhibit (1) at 1.)  No lawsuit needed to be brought to enforce what the INS had already recognized for years, and had again reinforced through the McNary memorandum in 1990.

Remaining in dispute, then, are the questions of whether Defendants may place a time limitation on the I-94's, and whether the I-94 may contain other notations which are factually correct, such as a reference to posting of a bond or to deportation proceedings.[13]  Of course, neither of the named Plaintiffs who were in deportation proceedings have actually alleged that the notations as to bond, time limitations, or deportation proceedings in any way personally hampered their abilities to obtain employment or reenter the United States.  As for the time limitations (no less than six months as per the McNary policy), Plaintiffs state that the card should approximate the length of the deportation proceedings.  However, as Plaintiffs well know, deportation proceedings, much like other types of litigation, can vary in length between one day and several years, depending upon a variety of factors, including the various continuances requested by the parties and granted by the immigration court.

---

[13]  It should be noted that a or green card itself contains all sorts of notations and codes on the back of it.

26

694

Six months is a reasonable increment of time.  As the Etuk court itself noted, "Possession of a green card with no expiry date, or a date far in the future, is a disincentive to comply with a deportation or exclusion order, or even to appear at deportation and exclusion proceedings when an adverse decision and confiscation of the card is anticipated."  Etuk I, 748 F.Supp at 1000.  A lawful permanent resident cannot normally be placed in deportation proceedings unless he has been convicted of a crime or otherwise violated his immigration status.[14]  An individual who has so little regard for the law may also be just as unlikely to voluntarily present himself to the INS to give up his green card at the conclusion of the deportation proceedings, and the government's interest in placing six-month expiration dates on the cards far outweighs the inconvenience to Plaintiffs of having to renew the cards.  Such inconvenience is surely less than the inconvenience of having to appear for deportation hearings.

As for the notations concerning posting of bond and codes regarding deportation proceedings, such notations are correct as a matter of fact and thus do not constitute misleading information.  Such notations also do not interfere with the ability of Plaintiffs to obtain employment.  In fact, none of the

_____

[14]  For example, both of the named Plaintiffs who were in deportation proceedings had convictions; Mr. Lopez-Lozano for possession of 50-200 pounds of marijuana, and Mr. Gracia-Cantu for racketeering.  Of course, Mr. Lopez was actually allowed to keep his card during the pendency of the deportation proceedings, from May 1988 to February 1995, and only had a problem for a few days when the immigration inspector at a port of entry, due to innocent computer error, lifted his card.  As soon as the supervisors learned of this problem, it was corrected.

695

named Plaintiffs have ever alleged that the I-94's caused them any difficulties in obtaining or keeping employment. Such notations are of little consequence and do not interfere with the LPR's ability to work and reside in the United States.

Plaintiffs' claim that such factually correct notations interfere with their privilege to obtain employment is frivolous. Alien registration, whether it is permanent or temporary evidence of registration, may be used as proof of employment authorization. 8 U.S.C. § 1324a(b)(1)(B)(v); 8 C.F.R. § 274a.2(b)(1)(v)(A)(4), (5) and (v)(C)(7). Moreover, pursuant to 8 U.S.C. § 1324a(b)(1)(C) and 8 C.F.R. § 274a.2(b)(1)(v)(C), plaintiffs may establish employment eligibility through documentation other than that provided by INS, such as a social security card. Pursuant to 8 U.S.C. § 1324a(b)(1)(A) and 8 C.F.R. § 274a.2(b)(1)(v), an employer must accept said documentation and cannot specify which of the documents listed as acceptable by statute and regulation must be presented. In fact, the Handbook For Employers, makes it explicit that employers may not specify which of the documents listed in the statute and regulations can be presented by employees (Exhibit (6) - Handbook for Employers.) Part Eight of the Handbook provides information in a question and answer format, and reveals on page eight, the following:

Q. May I specify which documents I will accept for verification?

A. No. You must accept any document or combination of documents listed on the I-9 or in Part Nine of the Handbook...

28

696

(Exhibit (6).)   In addition, the INS pamphlet entitled
Immigration Reform And Control Act of 1986 (IRCA): Your Job And
Your Rights (INS Employee Handbook), issued by INS to millions of
employees, provides at page 4 that "employers cannot require one
type document over another.   They must accept any of the listed
documents. . . ."  (Exhibit (7) - INS Employee Handbook.)
Plaintiffs assert that they have been living and working in the
United States for many years.  As such, they should have Social
Security cards and can use these cards to establish employment
eligibility.  Moreover, the Social Security Administration will
accept a Temporary I-551 in a passport or a Form I-94 as evidence
to establish a resident alien's employment eligibility and will
issue the individual a Social Security number and card.  See 20
C.F.R. § 422.107(e).  In fact, the Social Security Number Policy
And General Procedures Manual (Social Security Manual) at RM
00203.155G, specifically provides that a Temporary I-551 may be
used by an applicant to receive a Social Security number and/or
card.

Secondly, and most importantly, it is unlawful for an
employer to require a particular type of document to establish an
individual's employment eligibility, 8 U.S.C. § 1324a(b)(1)(A); 8
C.F.R. § 274a.2(b)(1)(v).  Such conduct is actionable under the
anti-discrimination provisions of the Immigration Reform and
Control Act (IRCA).  8 U.S.C. § 1324b.  It does not follow,
however, as plaintiffs would have the Court believe, that the
remedy for employer discrimination is to have a federal court

29

697

|

intervene and monitor the notations the INS places on its replacement documentation. Rather, employers who do not understand IRCA must be educated as to the requirements of the law. Those who continue to violate the law must be held accountable for their actions and charged under the anti-discrimination provisions. Given the serious potential for fraud on the part of aliens who "claim" that they have lost a green card, the suggestion that the remedy for employer illegality is for the INS to immediately cease use of I-94's with notations, or perhaps to even cease use of some of the other twenty-eight documents listed on the back of the Form I-9 which employers must fill out when they hire someone, is particularly troubling. The logical extension of plaintiffs' argument, that employer illegality requires INS to jettison its fully lawful and necessary practice of issuing Temporary I-551's to individuals in deportation proceedings to guard against fraud, is that employer illegality should create a new legal obligation upon INS, which further opens the door for an even greater potential for fraud. In fact, Plaintiffs themselves claim that the actual I-551 or green card is itself easily duplicated in Mexico.

(PMSJ at 9.)

30

698

## III.  EXCLUSION ISSUES

### A.  Putting LPR's in Exclusion Proceedings

> 1.  Returning LPRs are always subject to
> inspection by United States Immigration
> Officers when arriving at a United States'
> Port of Entry.

Every alien seeking to enter the United States must apply in

person at a place designated by the Attorney General at a port of

entry for aliens at a time when the immigration office at the

port is open for inspection; he must make his application in

person to an immigration officer and present any required

documents; and he must establish his admissibility to the

satisfaction of the immigration officer.  8 C.F.R. 235.1(a); 8

U.S.C. § 1225(a).  Although immigration authorities are empowered

to exclude only aliens, the immigration officer has a right to

detain and question even claimants to U.S. citizenship in order

to determine whether the citizenship claim is valid, at least

until he has established his U.S. citizenship in some reasonable

way.  U.S. v. Tuck, 194 U.S. 161 (1904); Yee v. Barber, 210 F.2d

613 (9th Cir. 1954), cert. denied., 347 U.S. 988 (1954).

Specific provisions of the Immigration and Nationality Act

provide as follows:

> § 235.  INSPECTION BY IMMIGRATION OFFICERS
>
> (a) ... All aliens arriving at ports of the
> United States shall be examined by one or
> more immigration officers at the discretion
> of the Attorney General and under such
> regulations as he may prescribe. ... The
> Attorney General and any immigration officer,
> including special inquiry officers, shall
> have power to administer oaths and to take
> and consider evidence of or from any person

31

699

touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this act and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. ...

(b) Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d), who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer.

§ 291 BURDEN OF PROOF

Whenever any person makes application ... for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not subject to exclusion under any provision of this Act, and if an alien, that he is entitled to the ... immigrant ... status claimed, as the case may be.

8 U.S.C. § 1225(a,b); 8 U.S.C. § 1361.

The border examination of entrants includes interrogation of each person who seeks ingress, learning his identity, scrutinizing his documents, and appraising his admissibility, and begins with primary inspection. Gordon, Mailman, and Yale-Loehr, Immigration Law and Procedure, vol. 2, p. 63-22 (1995). When the returning resident alien arrives at primary inspection at the port of entry, whether on foot or in a vehicle, his alien registration number is not then punched into any computer

32

670

database.[15]  Rather, he will be asked a few questions, such as
where he has been, and what he is bringing back, and then will
ordinarily be waived through inspection into the United
States.[16]  When the applicant's admissibility is not clearly
established to the satisfaction of the primary inspector, he
usually refers the entry applicant for secondary inspection at
the airport or land border port of arrival.  The United States
Court of Appeals for the Fifth Circuit has held that the referral
of a person entering this country to a secondary inspector is
part of the "routine" border interrogation, and does not, in the
context of a prosecution for a violation of criminal laws,
require a <u>Miranda</u> warning.  <u>U.S. v. Henry</u>, 604 F.2d 908, 920 (5th
Cir. 1979).  The regulations declare that an applicant for
admission has no right to be represented by counsel in either
primary or secondary inspection, unless the applicant has become
the focus of a criminal investigation and has been taken into
custody.  8 C.F.R. § 292.5(b).

Exclusion proceedings are the formal proceedings specified
by statute to test whether an alien seeking entry to the United
States shall be allowed to enter or shall be excluded and

---

[15]  Plaintiffs are clearly wrong when they imply that INS
currently has a procedure whereby they check each returning LPR's
card number on a computerized database.  (PMSJ at 31).  It would
be a physical impossibility for the primary inspectors to take
the time to punch in each LPR's number.  For example, in Fiscal
Year 1994, 67, 618, 246 primary inspections were conducted
through the Harlingen District ports of entry (See Government
Exhibit (C) - Larry Doyle's Declaration).

[16]  PMSJ at 38.

33

67 /

|

deported.[17]  8 U.S.C. § 1226(a).  The proceedings result from an immigration officer finding that an alien seeking entry is not "clearly and beyond a doubt entitled to land . . . ." 8 U.S.C. § 1226(b).[18]  When the officer refers the applicant for a hearing before the immigration judge,[19] he immediately signs and delivers to the alien a Notice to Alien Detained for Hearing by an Immigration Judge (Form I-122), and reads and explains the notice to the alien in his native language.  He also advises the alien of his right to representation by counsel of his choice at no expense to the Government, and of the availability of free legal services programs, furnishing the alien with a list of such programs.  8 C.F.R. § 235.6(a).  In the exclusion proceedings, a full range of hearing rights are afforded:  notice is given of the exclusion charge; the matter is heard and decided by an immigration judge; a verbatim record of the hearing is made; the alien may be represented by counsel (without expense to the government); and the alien may present, examine and object to evidence, and cross examine government witnesses.  8 U.S.C. §§ 1225(a), 1226(a), 1362; 8 C.F.R. §§ 235.6, 236.2.

---

[17]  Immigration law has always recognized a fundamental difference between exclusion proceedings and deportation proceedings.  See, e.g., Landon v. Plasencia, 459 U.S. 21, 25 (1982).

[18]  An alien who had "entered" the United States, whether by having been inspected and admitted, or by having effectively evaded inspection, would be subject to deportation proceedings, as opposed to exclusion proceedings.

[19]  The United States Immigration Judges are employed by the Executive Office for Immigration Review, which is part of the Department of Justice.

34

672

CNVPDF - www.teolia.com

2.   Returning LPR's bear the burden of proof in
     exclusion proceedings to demonstrate that
     they fall within the Fleuti doctrine.

For returning LPR's, two issues present themselves:  whether

they have "departed" from the United States within the meaning of

Rosenberg v. Fleuti, 374 U.S. 449 (1963), and secondly, whether

they are excludable under any provision of the Immigration and

Nationality Act.  In exclusion proceedings, the government bears

the burden to establish that returning LPRs are excludable for

one of the reasons set forth in Section 212 of the Immigration

and Nationality Act.  Matter of Salazar, 17 I&N Dec. 167, 169

(BIA 1979).  However, the lawful permanent resident alien will

bear the burden of proof in exclusion proceedings to show that he

comes within the statutory exception to the entry doctrine;

i.e., that he made a "brief, casual and innocent departure"

within the meaning of Rosenberg v. Fleuti, 374 U.S. 449 (1963).

Molina v. Sewell, 983 F.2d 676, 678 (5th Cir. 1993); Dabone v.

Karn, 763 F.2d 593, 597 (3rd Cir. 1985); 8 U.S.C. §1101(a)(13).

Surprisingly, however, Plaintiffs' claim that Molina reached

the opposite conclusion, and that the examining officer must be

able to demonstrate "reasonable cause" that the applicant is

making an entry before instituting exclusion proceedings.  (PMSJ

at 24--conclusion of law #9).  This is simply not correct.  Under

Molina, supra, it is the returning LPR who bears the burden on

the Fleuti issue, not the government.

Further, the United States Supreme Court has held that the

correct forum in which to perform the "Fleuti" analysis is in

35

673

fact the exclusion proceedings: "Nor is it in any way 'unfair' to decide the question of entry in exclusion proceedings as long as those proceedings themselves are fair.  Finally, the use of exclusion proceedings violates neither the 'scope' nor the 'spirit' of Fleuti . . . Congress intended that the determinations of both 'entry' and the existence of grounds for exclusion could be made at an exclusion hearing."  <u>Landon v. Plasencia</u>, 459 U.S. 21, 31-32.

Plaintiffs have also provided the court with an incomplete statement of the law, when they discussed the approach taken by the United States Court of Appeals for the Fifth Circuit in assessing whether a returning LPR made a "<u>Fleuti</u>" departure. Plaintiffs have cited <u>Vargas-Banuelos v. INS</u>, 466 F.2d 1371, 1374 (5th Cir. 1972), for the proposition that a returning LPR's subjective intent to violate the laws of the United States must always have been formed at the time the alien departed from the United States.  PMSJ at 17-18.  This is not a correct statement of current Fifth Circuit law.  The Fifth Circuit has held that a fully consummated intent to commit wrongdoing, even if formed after departure from the United States, would constitute a meaningful departure, where the alien's very attempted reentry was in the course of committing a crime.  An example would be where the returning LPR attempted to smuggle aliens into the

36

674

)

United States in the automobile which he was driving.   Laredo-
Miranda v. INS, 555 F.2d 1242, 1246 (5th Cir. 1977).[20]

> B.   Lifting cards when exclusion proceedings are
>      initiated.
>
> The Defendants are authorized by law to lift the green
> cards of returning lawful permanent resident aliens,
> without providing the LPR with any replacement
> documentation, when exclusion proceedings are
> initiated, pending the outcome of their exclusion
> hearings before the immigration judge.

When returning LPR's are stopped at the ports of entry and

placed in exclusion proceedings, their green cards are routinely

lifted and retained by the Defendants pending the conclusion of

the exclusion proceedings.   Plaintiffs assert that Defendants'

actions in doing so constitute a deprivation, without Due

Process, of Plaintiffs' liberty interests, because the

confiscation of the green cards forces Plaintiffs to return to

Mexico until such time as they are paroled into the United States

or exclusion proceedings are concluded.   (PMSJ at 27, 41 -

Requests for Relief 3 and 4.)   Plaintiffs do not seem to allege

that they have a property interest in the green cards.[21]   The

question of whether Defendants are justified in initially lifting

these green cards, is a different question than the questions of

under what circumstances returning LPRs should be paroled into

---

[20]   An immigration judge found that this was the violation
committed by two of the named plaintiffs, Plaintiff Guzman and
Plaintiff Merino.

[21]   As discussed supra, Plaintiffs do not in fact have
constitutionally protected property interest in the green card.

675

the country, and what documentation they should be provided at that point.

On this issue, Plaintiffs miss the point entirely.  It is not the lifting of the green cards which forces Plaintiffs to remain outside the borders of the United States pending a parole request or the completion of proceedings.  It is the institution of the exclusion proceedings themselves which acts to prevent Plaintiffs from entering.  Even if the green cards remained in Plaintiffs' possession, they would still in theory be forced to remain outside the borders of the United States, until they were paroled in or the exclusion proceedings were terminated.  In reality, however, retention of the green cards would allow returning LPR's who had made meaningful departures to quickly reenter the United States at another or perhaps even the same port of entry, as the immigration officers in primary inspection would not know that exclusion proceedings had already been initiated.  Thus, the primary purpose of exclusion proceedings, to prevent inadmissible aliens from entering the United States, would be entirely thwarted.  Etuk I at 1000 ("The card is a valuable aid to aliens who seek to evade enforcement of United States law and remain and work in this country."); U.S. v. Elder, 601 F.Supp. 1574, 1578 (S.D. Tex. 1985) ("The ability to control entry and to identify those admitted remains vital to the welfare and security of the people.")  The green card serves no useful purpose outside the borders of the United States, as it does not permit one to work or reside in a foreign country.  The interest

38

I

of the Government in retaining the card during exclusion

proceedings certainly outweighs the interest at stake for the

individuals in keeping the cards.   Landon v. Plasencia, 459 U.S.

at 34.

Further, the United States Supreme Court has noted that:

> . . . [The green card's] essential purpose is
> not to secure entry into the United States,
> but to identify the bearer as a lawfully
> registered alien residing in the United
> States.  It is issued to an alien after he
> has taken up residence in this country.  It
> is intended to govern his activities and
> presence within this country.  The card has
> been given a convenient, additional function
> as a permissible substitute for a visa or re-
> entry permit in facilitating reentry into the
> United States by a resident alien.  But,
> unlike a visa or a re-entry permit, an alien
> registration receipt card serves this
> function in only a secondary way.

U.S. v. Campos-Serrano, 404 U.S. 293, 299-300 (1971).

Clearly, the government has every right to confiscate the green

card once exclusion proceedings are initiated, and to keep it

throughout the pendency of the proceedings.

Using the same analysis, one can only arrive at the

inescapable conclusion that returning resident applicants are not

entitled to issuance of temporary replacement documentation when

their green cards are lifted in exclusion proceedings.  They are

not admissible pending the conclusion of the exclusion

proceedings.  However, if and when the returning residents

applicants are paroled into the United States, they are entitled

to a parole document which clearly evidences their status as

39

677

returning resident applicants who are authorized to work in the United States, as discussed _infra_.

## C.   Returning LPR's to Mexico

The Defendants are authorized by law to require returning LPR's who have been placed in exclusion proceedings to wait outside the borders of the United States unless and until proceedings are terminated or they are paroled into the United States.

The Immigration and Nationality Act authorizes Defendants to "detain" aliens for further inquiry before an Immigration Judge if they do not appear to the examining immigration officer to be "clearly and beyond a doubt entitled to land" at the port of entry.  8 U.S.C. § 1225(b).  The regulations provide that aliens arriving with documents at the port of entry who appear to be inadmissible to the inspecting officer may be "detained, paroled, or paroled for deferred inspection".  8 C.F.R. § 253.3(c). Plaintiffs claim that Defendants are not authorized by law to return returning residents to Mexico when instituting exclusion proceedings, in lieu of detaining or paroling them, and that "detain" does not mean "return to Mexico."  (PMSJ at 22-29.) They claim that returning them to Mexico causes a deprivation without Due Process of Plaintiffs' liberty interests.  Of course, the phrase "return to Mexico" does not in any way imply, nor do Plaintiffs allege, that the returning residents have "entered" the United States when they were denied admission by the immigration inspectors.  Rather, they have simply not been allowed to enter the borders of the United States, and have been kept outside of these borders.

40

678

Incredibly, Plaintiffs actually argue that they would prefer incarceration or detention in the United States during the pendency of the exclusion proceedings, to waiting in Mexico. (PMSJ at 23-24.)  Of course, they only prefer such detention if they can also create a new constitutional right to having a bond hearing (there is currently no right to a bond hearing in exclusion proceedings), and to being released after the bond hearing on their own recognizance.  In other words, what Plaintiffs really want to do is create a new privilege that would allow them to freely cross into the United States despite having made a meaningful departure and, thereafter, being placed into exclusion proceedings, e.g., plaintiffs wish to create a privilege whereby after having made a meaningful departure they would automatically be placed into deportation proceedings rather than exclusion proceedings thereby effectively erasing our border for all intents and purposes, a privilege not even afforded U. S. citizens.

It is so obvious that the United States has the right to keep aliens outside its borders during exclusion hearings, that the question raised by Plaintiffs is really being asked backwards.  The question should really be, what gives returning LPRs the right to enter the United States pending exclusion proceedings, absent the granting of parole?  As the Supreme Court stated in 1889:

> That the government of the United States ... can exclude aliens from its territories is a proposition which we do not think open to controversy.  Jurisdiction over its own

41

679

territory to that extent is an incident of
every independent nation.  It is a part of
its independence.  If it could not exclude
aliens, it would be to that extent subject to
the control of another power.

Chae Chan Ping v. United States, 130 U.S. 581 (1889).  Three

years later, the Supreme court stated that:  "It is an accepted

maxim of international law, that every sovereign has the power,

as inherent in sovereignty, and essential to preservation, to

forbid the entrance of foreigners within its dominions, or to

admit them only in such cases and upon such conditions as it may

see fit to prescribe."  Ekiu v. U.S., 142 U.S. 651 (1892).

More recently, the Supreme Court has stated the following:

"Aliens seeking entry from contiguous lands obviously can be

turned back without more."  Shaughnessy v. U.S. ex rel. Mezei,

345 U.S. 206, 215 (1953); see also Ahrens v. Rojas, 292 F.2d 406,

410 (5th Cir. 1961) (citing same).  The Supreme Court in Mezei

cited a 1932 Supreme Court decision which held that a returning

resident, a native and citizen of Greece, could be kept outside

the port of entry in Canada pending her exclusion hearing.  U.S.

ex rel. Polymeris v. Trudell, 284 U.S. 279, 280 (1932).  In

precedent decisions from the Board of Immigration Appeals, it can

be plainly seen from the facts of the cases that the applicants

were forced to remain outside the contiguous borders of the

United States pending their exclusion hearings, and yet the

legality of that procedure never became an issue in the cases.

Matter of Kennedy, 13 I&N Dec. 242 (BIA 1969) (Canadian border);

Matter of A-T-, 3 I&N Dec. 178 (BIA 1948) (Mexican border).  As a

42

680

I

recent decision by the United States District Court for the Southern District of Texas (Brownsville Division) noted:

> In discussing the importance of United States' immigration laws, the Supreme Court has repeatedly emphasized the importance which sovereign nations place upon controlling entry through their borders. . . . The ability to control entry and to identify those admitted remains vital to the welfare and security of the people. . . . Protection of the borders represents a national obligation fulfilled by the Government for the benefit of all Americans.

U.S. v. Elder, 601 F.Supp. 1574, 1578  (S.D. Tex. 1985).

As there is no case law holding that returning residents have a right to wait in the United States pending exclusion hearings, Plaintiffs try to attack the government's inherent right to make applicants for admission wait outside the land borders pending completion of their exclusion proceedings through five different arguments and "analogies".  The first such argument raised by Plaintiffs, is that making returning resident aliens wait outside the United States constitutes a form of "summary" exclusion, similar to the summary exclusion procedures authorized in Section 235(c) of the Immigration and Nationality Act, 8 U.S.C. §1225(c).  (PMSJ at 23-25, 27-29).[22]  However, no

---

[22]  In 1989, the United States Court of Appeals for the D.C. Circuit issued a preliminary injunction against the use of Section 235(c) summary exclusion procedures against a returning resident alien.  Rafeedie v. INS, 880 F.2d 506 (D.C. Cir. 1989). On remand, the District Court found that the procedures afforded the alien under Section 235(c), which included a single opportunity to present a written statement, did not satisfy due process; the court, however, held that the statute did not violate due process on its face, as it did not preclude the Attorney General from giving more process than was minimally
(continued...)

43

681

)

analogy can be drawn at all between summary exclusion procedures
and the facts of this case.  While remaining in Mexico, all
returning residents who are placed in exclusion proceedings under
Section 236 of the Immigration and Nationality Act, 8 U.S.C.
§ 1226, will have the full process due under those procedures,
including an evidentiary hearing before an independent
Immigration Judge held on the record, with an opportunity to
obtain counsel, present evidence and cross-examine witnesses, and
appeal to the Board and the appropriate district court.  Rafeedie
v. INS, 795 F.Supp. at 15.  These exclusion procedures provide
due process and are totally different from the summary Section
235(c) procedures, in which an applicant for admission is not
even entitled to appear before an Immigration Judge.  Knauff v.
Shaughnessy, 338 U.S. 537 (1950).

The second incorrect analogy which Plaintiffs try to draw,
is that the Defendants' procedures in requiring returning
resident aliens to wait outside the borders of the United States
pending a grant of parole or completion of the exclusion
proceedings are akin to accepting a waiver of such aliens' rights
to a hearing before an immigration judge and voluntary
abandonment of the permanent residence.  (PMSJ at 25-26).  In
support of this proposition, they cite Hernandez v. Casillas, in
which a District Court granted an injunction against one sector
of the Immigration and Naturalization Service from soliciting and

---

[22](...continued)
required by the statute.  Rafeedie v. INS, 795 F.Supp. 13 (D.C.
Cir. 1992).

682

accepting such waivers of exclusion hearings.  Hernandez v.
Casillas, 520 F.Supp. 389 (S.D. Tex. 1981).  However, this
argument by Plaintiffs is almost as farfetched as the argument
about "summary" exclusion procedures, discussed supra.  There
have been no allegations in this case that the Defendants sought
such waivers of their right to an exclusion hearing before an
Immigration Judge from any of the five named Plaintiffs in
exclusion proceedings, or that the Defendants in this District
even have such a practice.  Further, the Hernandez case was
limited in its scope to an injunction against the operations of
the INS in a different (the 14th) District.  The Harlingen INS
District, in which this lawsuit lies, falls within INS District
40.  Hernandez v. Casillas, supra at 394; 8 C.F.R. § 100.4.

     The third unfounded argument made on this issue by
Plaintiffs, is that requiring returning resident aliens to wait
outside the borders of the United States pending a grant of
parole or completion of the exclusion proceedings violates a
claimed "right to international travel."  (PMSJ at 2, 14-15, and
33-34).  In support of this proposition, they cite Apthekar v.
Sec'y of State, 378 U.S. 500 (1964).  However, Apthekar dealt
with the right of a U.S. citizen to engage in international
travel, in relation to a section of the Subversive Activities
Control Act which made it a felony for a member of a communist
organization to apply for a passport.  It is clear that the
"right to international travel" refers to a U.S. citizen's right
to travel abroad (part of the Due Process clause of the Fifth

45

683

CMsPDF – www.texia.com

Amendment), and not to an LPR's right to reenter this country. _Apthekar_, _supra_ at 505. Clearly, this would not apply to LPR's, who retain citizenship of their countries of origin and can easily depart from the United States for their home or other countries. An alien, including a returning LPR subject to exclusion proceedings, can claim no constitutional right to enter the United States, even temporarily. _Kleindienst v. Mandel_, 408 U.S. 753 (1972); _Shaughnessy v. Mezei_, 345 U.S. 206; _Gisbert v. U.S. Attorney General_, 988 F.2d 1437 (5th Cir. 1993). Plaintiffs have not even alleged that Defendants have attempted to stop Plaintiffs from departing the United States. To make the distinction doubly clear, the United States Court of Appeals for the Fifth Circuit, in a case involving an injunction against the San Antonio INS District regarding procedures as to United States citizens, has distinguished the "rights of an alien seeking entry into the United States" from the right of a United States citizen to travel outside the country or to return to the United States. _Hernandez v. Cremer_, 913 F.2d 230, 236 (5th Cir. 1990). As the court stated, "An alien and a citizen seeking entry into the United States are not owed the same process." _Cremer_, _supra_ at 237.[23]

---

[23]  Contrary to Plaintiffs' assertions (PMSJ at 20-21), the parole statute and regulations clearly do not yield any constitutional or other entitlement to immigration parole. _Shaughnessy v. Mezei_, 345 U.S. 206 (1953); _Gisbert v. U.S. Attorney General_, 983 F.2d 1437 (5th Cir. 1993); _Leng May Ma v. Barber_, 357 U.S. 185 (1958); _Ahrens v. Rojas_, 292 F.2d 406 (5th Cir. 1961).

684

Plaintiffs' fourth argument against having to wait outside the land borders of the United States until they are paroled into the United States or their exclusion proceedings are terminated, is that they are more likely to receive an _in absentia_ order in their case due to notice problems in Mexico, and that it will be more difficult, if not impossible, to obtain representation for the exclusion hearing.  (PMSJ at 26-27).  In support of this argument, Plaintiffs point to _Matter of Nafi_, 19 I&N Dec. 430 (BIA 1987).  _Matter of Nafi_ held that when an applicant for admission has notice of the exclusion hearing and fails to attend, the Immigration Judge may hold an _in absentia_ hearing and issue an order of exclusion and deportation.

In _Matter of Nafi_, however, the applicant had been paroled into the United States and had posted a United States address for notice purposes.  The court noted that, without _in absentia_ hearings, "an applicant could force the Immigration and Naturalization Service to take the extra time and expense of apprehending and detaining him to ensure his right to a hearing, or else the applicant could remain here [in the United States] indefinitely by simply refusing to appear for hearings."  _Matter of Nafi_, _supra_ at 431-32.  Thus, even if the returning residents were paroled into the United States, notice problems would still exist, and applicants for admission would have an even greater disincentive to show up for their hearings (they would already be in the United States).  _Matter of Nafi_ actually supports the rationale for keeping aliens who are subject to exclusion outside

47

685

the borders, absent a grant of parole.  Additionally, the immigration court will not conduct an in absentia hearing unless it is satisfied that notice was adequate; returning residents have the option of providing a United States address for notice purposes if they desire.  As to the claim that the returning residents will be unable to obtain counsel in Mexico, it need only be noted that all five of the named plaintiffs in this case were able to obtain counsel in their exclusion cases prior to pleading on the charges of excludability (Plaintiffs Ascencio-Guzman, Merino, and Gutierrez obtained counsel while still in Mexico).  The Immigration Judge provides all applicants at the initial hearing (as does the Immigration Service when proceedings are initiated) with a list of free legal services programs which represent individuals in exclusion proceedings.  8 C.F.R. § 236.2(a).

Plaintiffs' fifth argument, in support of their proposition that they should not be forced to wait outside of the United States pending their exclusion proceedings, is that the additional time spent in Mexico will somehow be used against them if there is an abandonment of residence issue in the exclusion case.  (PMSJ at 29.)  Abandonment of residence issues arise when the Immigration and Nationality Service alleges that returning residents are not returning to an "unrelinquished lawful permanent residence" after a "temporary visit abroad."  Santos v. INS, 421 F.2d 1303 (9th Cir. 1970); 8 U.S.C. §§ 1101(a)(20) and (a)(27)(A); 8 C.F.R. § 211.1(b)(1)(i)(A).  In support of their

argument, Plaintiffs cite, <u>inter alia</u>, <u>Matter of Kazemi</u>, 19 I&N Dec. 49 (BIA 1984), which states that an application for admission to the United States is a continuing application and an alien's admissibility is determined on the basis of the law and facts existing at the time the application is finally considered. However, time spent outside the borders of the United States during exclusion proceedings will not count against an applicant for admission on an abandonment of residence issue, as the Board has held that the intent of the alien will control in determining whether a visit is "temporary," and as the alien clearly intends to reenter the United States from the time exclusion proceedings are initiated. <u>Matter of Huang</u>, 19 I&N Dec. 749, 753 (BIA 1988). Thus, the time spent in Mexico during the pendency of exclusion proceedings will not prejudice returning resident aliens in their exclusion cases.

**D.   Parole rights**

> 1.   There is no right to a bond hearing or parole hearing in exclusion proceedings for returning lawful permanent resident aliens.

Plaintiffs in their Second Amended Petition are seeking to enjoin "Defendants from taking any actions that would interfere with the right of a lawful permanent resident of the United States to live and work in this country, including, but not limited to, failing to parole a lawful permanent resident placed in exclusion proceedings into the United States during the pendency of such proceedings, and failing to reparole such a person back into the United States following [what Plaintiffs

49

687

would claim was] a brief, casual, or innocent departure."
(Plaintiffs' Second Amended Petition at 18.)   Thus, Plaintiffs
are claiming two things with regard to the parole powers
exercised by the Attorney General.   First, they claim that all
returning resident aliens must be paroled into the United States,
and that the criteria governing release under bond in deportation
proceedings should now be extended to include exclusion hearings.
PMSJ at 23.   Thus, Plaintiffs claim that they have a 'right' to
an immigration parole or to a release under an immigration bond,
which does not exist in immigration law.   Secondly, Plaintiffs
claim that returning residents who have been granted parole do
not have that parole terminated by operation of law when they
make what they allege are "Fleuti" departures, or alternatively,
that even if the parole does automatically terminate, that said
aliens should automatically be re-paroled following an alleged
"Fleuti" departure, which are really two ways of saying the same
thing. ( PMSJ at 20-21.)   Since whether an alien made a "Fleuti"
departure is always potentially an issue in exclusion
proceedings, Plaintiffs in essence are saying that under no
circumstances should a lawful permanent resident ever be kept
outside the land borders of the United States during the pendency
of exclusion proceedings.

Parole procedure was initially an administrative device
fashioned by the Immigration Service to serve its purposes.  Leng
May Ma v. Barber, 357 U.S. 185 (1958); Matter of R, 3 I&N Dec. 45
(BIA 1947).  However, it was accorded statutory recognition in

50

688

the 1952 Immigration Act, which was amended and currently
provides as follows:

> (A)   The Attorney general may ... in his discretion
> parole into the United States temporarily under such
> conditions as he may prescribe for emergent reasons or
> for reasons deemed strictly in the public interest any
> alien applying for admission to the United States, but
> such parole of such alien shall not be regarded as an
> admission of the alien and when the purposes of such
> parole shall, in the opinion of the Attorney general,
> have been served the alien shall forthwith return or be
> returned to the custody from which he was paroled and
> thereafter his case shall continue to be dealt with in
> the same manner as that of any other applicant for
> admission to the United States.

8 U.S.C. § 1182(d)(5).  The regulations state that:  "In
determining whether or not an alien shall be detained, paroled or
paroled for deferred inspection, the inspecting officer shall
consider the likelihood that the alien will abscond or pose a
security risk."  8 C.F.R. § 235.3(c).  See also 8 C.F.R. § 212.5.
The regulations and INS Operations Instructions provide that the
Attorney General's authority to grant parole is delegated to the
district director in charge of the port of entry, and that it may
not be redelegated below the level of officer or immigration
inspector in charge.  8 C.F.R. § 212.5; INS Operations
Instruction 212.5(a).

The scope of the parole authority granted to the Attorney
General by Congress is close to plenary.  Amanullah v. Nelson,
811 F.2d 1, 5 (1st Cir. 1987).  As the Eleventh Circuit has said,
"Congress has delegated remarkably broad discretion to executive
officials under the [Immigration and Nationality Act], and these
grants of statutory authority are particularly sweeping in the

51

689

CutePDF - www.texto.com

context of parole." <u>Jean v. Nelson</u>, 727 F.2d 957, 977 (11th Cir. 1984) (en banc), <u>aff'd in part on nonconstitutional grounds</u>, 472 U.S. 846 (1985). The legislative history of the parole statute demonstrates clearly that Congress intended that parole be granted infrequently, where exigent circumstances were present. <u>Amanullah v. Nelson</u>, <u>supra</u> at 6. "The legislative history of the parole statute ... demonstrates beyond cavil that Congress consistently visualized parole as an indulgence to be granted only occasionally, in the case of rare and exigent circumstances, and only when it would plainly serve the public interest." <u>Amanullah v. Nelson</u>, <u>supra</u> at 6. The courts have consistently held that excludable aliens cannot challenge parole decisions under a claim of constitutional right. <u>Jean v. Nelson</u>, <u>supra</u> at 972; <u>Perez-Perez v. Hanberry</u>, 781 F.2d 1477, 1479 (11th Cir. 1986); <u>Alvarez-Mendez v. Stock</u>, 941 F.2d 956, 963 (9th Cir. 1991); <u>Amanullah v. Nelson</u>, <u>supra</u> at 8.

Aliens have no constitutional right to be admitted into this country. <u>Landon v. Plasencia</u>, 459 U.S. 21, 32; <u>Kleidienst v. Mandel</u>, 408 U.S. 753, 762 (1972). Denial of parole does not rise to the level of a constitutional infringement. <u>Fernandez-Roque v. Smith</u>, 734 F.2d 576, 581-82 (11th Cir. 1984). The United States Court of Appeals for the Fifth Circuit has recognized that it is dangerous for courts to interfere with the government's discretionary authority in parole cases, citing <u>Leng May Ma v. Barber</u>, 357 U.S. 185 (1958). <u>Ahrens v. Rojas</u>, 292 F.2d 406, 411 (5th Cir. 1961). In fact, the Fifth Circuit has held that there

690

is no right to a hearing on revocation of parole.  <u>Rojas</u>, <u>supra</u>
at 410.  The Fifth Circuit has further held that applicants for
admission to the United States do not have a constitutionally
protected liberty interest in being paroled:

> Petitioners contend that they have a liberty
> interest in their freedom, i.e. in being
> paroled from immigration detention. ... The
> petitioner's interest in immigration parole
> is created by the immigration statutes and is
> subject to the exercise of discretion by the
> Attorney General. ... The language of the
> statute does not require the Attorney General
> to parole any alien, nor does it mandate
> parole on any particular finding or findings
> or place any substantive restriction on the
> authority to deny parole.  Because
> petitioner's interests here are contingent
> upon the Attorney General's discretion, they
> have no liberty interest in being paroled.
> ... Immigration parole is a part of the
> admissions process, and its denial or
> revocation does not rise to the level of a
> constitutional infringement.

<u>Gisbert v. U.S. Atty. Gen.</u>, 988 F.2d 1437, 1443 (5th Cir. 1993).
If there is no right to a parole revocation hearing, then there
could not possibly be a right to a parole hearing in the first
place, or to a grant of parole.  <u>Shaughnessy v. Mezei</u>, 345 U.S.
206 (1953).

Despite the posturing by Plaintiffs on this issue, there is
simply no regulatory or statutory authority in exclusion
proceedings which would provide for an automatic right to parole
or a parole hearing comparable to the regulations allowing for
bond hearings in deportation proceedings.  <u>See</u>, <u>e.g.</u>, 8 U.S.C.
§ 1252(a); 8 C.F.R. § 242.2(a).  In fact, this one of many
differences between exclusion and deportation proceedings.  <u>See</u>,

53

691

e.g., Palma v. Verdeyen, 676 F.2d 100 (4th Cir. 1982). For example, unlike deportation proceedings, exclusion proceedings are generally not open to the public. 8 C.F.R. § 236.2(a). In deportation proceedings, the government has the burden of proving deportability by "clear, convincing and unequivocal evidence;" in exclusion proceedings, the burden is generally on the applicant to prove admissibility. Section 291 of the Act, 8 U.S.C. § 1361. Unlike deportation proceedings, in exclusion proceedings, the immigration judge is not authorized to grant suspension of deportation or voluntary departure. See, e.g., Landon v. Plasencia, 459 U.S. 21 (1982); 8 U.S.C. § 1254(a) and (e). Likewise, the immigration judge in exclusion proceedings can only grant adjustment of status under very specific and limited circumstances. 8 C.F.R. § 236.4.

In summary, the District Director is clearly entitled to exercise his discretion as to whether to parole returning resident aliens. See Kleindienst v. Mandel, 408 U.S. 753 (1972). This discretion is exercised on a case by case basis, after careful consideration of the facts presented in the request for parole. At any rate, Plaintiffs have not pointed to any specific objectionable actions by the District Director on the parole question. In fact, the District Director eventually granted the parole requests of all five of the named Plaintiffs. Thus, Plaintiffs cannot claim any prejudice whatsoever to themselves. Surprisingly, Plaintiffs have failed to even mention any cases in which the District Director has actually denied a parole request

54

692

to a returning resident alien, although, of course, he has the authority to do so.  Shaughnessy v. Mezei, 345 U.S. 206.

> 2.  The parole status of an LPR in exclusion proceedings terminates automatically upon departure from the United States, and such aliens are required to apply for parole each time they seek to enter the United States during the pendency of such proceedings.

Plaintiffs claim that returning residents who have been granted parole do not have that parole terminated by operation of law when they make "Fleuti" departures, or alternatively, that even if the parole does automatically terminate, that said aliens should automatically be 're-paroled'[24] following a "Fleuti" departure.  (PMSJ at 20-21.)  Either way Plaintiffs phrase their theory, since "Fleuti" is always a potential issue for returning LPR's in exclusion proceedings, Plaintiffs' interpretation of parole law would mean that returning LPR's would essentially be exempt from any further inspection by immigration officers once exclusion proceedings have begun, regardless of the circumstances surrounding subsequent arrivals by them at the ports of entry. Not only is this interpretation contrary to law, but it does not make any sense.  Fleuti, however, does not apply to excludable

---

[24]  Plaintiffs' speak in terms of being "re-paroled" upon return to the United States.  (PMSJ at 21.)  Defendants will speak in terms of 'obtaining a new parole'.  'Re-parole' is a term commonly used by immigration officers to refer to extending the time limits on a parole grant which remains valid, i.e., as to a grantee who still remains physically within the United States.  It is, of course, not possible to extend the time limit on a parole grant which expired by operation of law when the grantee left the United States, and thus the term 're-parole' is a misnomer as applied to the situation spoken of by Plaintiffs.

693

CVISPDF - www.texla.com

aliens in parole status.  Parole does not constitute an "entry" within the meaning of Section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13), anyway.  Plaintiffs' argument, if accepted, would mean in practical terms the extinction of exclusion proceedings for returning resident aliens.  But see Landon v. Plasencia, 459 U.S. 21 (1982) (holding that the INS has statutory authority to proceed in exclusion proceedings to determine whether returning aliens are making an "entry" and are excludable).

In essence, Plaintiffs seem to be saying that a grant of parole somehow affects a returning resident alien's status, so that the Fleuti doctrine will apply to the parole grant should the alien subsequently decide to leave the country during the pendency of exclusion proceedings.  However, this theory is clearly misguided, and the Supreme Court has spoken on this issue:

> For over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States.  ... The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.  It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this court. ... The acceptance of petitioner's position in this case, however, with its inherent suggestion of an altered parole status, would be quite likely to prompt some curtailment of current parole policy--an intention we are

56

694

reluctant to impute to the Congress.
(emphasis added.)[25]

Leng May Ma v. Barber, 357 U.S. 185, 188-90 (1958).  In Leng May

Ma, the Supreme Court cited an earlier decision by Justice Oliver

Wendell Holmes who stated:  "[When an applicant for admission

being detained on Ellis Island was paroled to the custody of the

Hebrew Society] [s]he was still in theory of law at the boundary

line and had gained no foothold in the United States."  Kaplan v.

Tod, 267 U.S. 228, 230 (1925).  Accord, Shaughnessy v. Mezei, 345

U.S. 206.

Thus, the Supreme Court has made it clear that parole grants

do not affect an alien's status, do not constitute an entry, and

may be revoked once its purpose has been served.  Of course, by

operation of law, parole is revoked automatically upon any

departure from the country, meaningful or otherwise.  The

regulations are quite clear on this point:  "Parole shall be

automatically terminated without written notice (i) upon the

departure from the United States of the alien..."  8 C.F.R.

§ 212.5(d)(1)(i).  Thus, in the opinion of the Attorney General

as set forth in the regulations, the purposes of the parole have

been served when the alien departs the United States.  By

contrast, an excludable alien who seeks admission or temporary

parole from a location outside the borders of the United States

"may only enter the United States temporarily at the discretion

---

[25] Parole regulations were changed after this case.  See
Jean v. Nelson, 472 U.S. 846; Marczak v. Greene, 971 F.2d 510,
514 (10th Cir. 1992).

695

of the Attorney General, unless he can establish independent
statutory grounds authorizing admission." <u>Mason v. Brooks</u>, 862
F.2d 190, 192 (9th Cir. 1988).  The Plaintiffs have identified no
statute that requires the Attorney General to parole them or any
other excludable alien into the United States.  <u>See</u>
§ 212(d)(5)(A) of the Act, 8 U.S.C. § 1182(d)(5)(A).

### E.  Parole Documentation

Defendants are authorized by law to issue an I-94
parole document to returning lawful permanent resident
aliens who are paroled into the United States pending
the outcome of their exclusion hearings before the
immigration judge, and to place the legend on it which
is described in McNary Memorandum.

In the March 14, 1990 memorandum from INS Commissioner Gene
McNary, he states the following with respect to parole
documentation which can be issued to returning resident aliens
who are placed in exclusion proceedings:

"If, however, the alien is to be paroled into the
United States pending the completion of exclusion
proceedings, the alien shall be provided with Form I-94
reflecting his or her status as a returning resident
applicant for admission, and which shall be endorsed
with the alien's "A" number and the following legend:

Returning resident applicant at ____(port) on
____(date).  Paroled pending determination of
right to reenter.  Employment authorized."

Plaintiffs claim that such a stamp interferes with their right to
engage in international travel, as well as to engage in
employment.  (PMSJ at 33.)  Plaintiffs seek a declaration from
the court that said documentation interferes with the right to
make <u>Fleuti</u> departures and constitutes a deprivation without due
process of their liberty interests, and also seek an injunction

against Defendants from issuing such parole documents.   PMSJ at 42.   The questions concerning a claimed right to international travel, the <u>Fleuti</u> doctrine as it does (or does not) apply to parole and exclusion doctrine, and the claimed right to liberty interests, are all discussed <u>supra</u>.   The question for consideration here, is what authority Defendants have, once they grant parole, to decide what form the parole document will take.

Plaintiffs seem to believe that the same legal analysis which applies to the topic of replacement documentation for the I-551 in deportation proceedings also applies to the topic of parole documentation.   This, however, is a serious mistake. Unlike replacement documentation for the I-551 in deportation proceedings, a document evidencing a grant of parole is not evidence of lawful entry into the United States, and is not intended as a temporary replacement document for the I-551 green card.   The applicant has not entered the United States by virtue of being granted parole, and that is why the card does not state that it is valid for reentry (parole is not an entry, as discussed <u>supra</u>).   Unlike the temporary I-551 issued on the I-94 to LPRs in deportation proceedings, the parole document I-94 is not valid for subsequent reentries and expires by operation of law when the holder leaves the United States.   Thus, a parole document is not temporary evidence of lawful admission as a permanent resident, and hence the language "returning resident applicant" is placed on the document.   Of course, once paroled into the United States, as the alien's permanent resident status

59

697

has not been terminated, he or she is authorized to work in the United States, and that is why the parole document states as much.

In making the mistake of equating the two concepts (replacement green card documentation in deportation proceedings and parole documentation in exclusion proceedings), Plaintiffs rely completely upon their interpretation of what they refer to as the 'Etuk trilogy' (actually, there were four published decisions and an unpublished one, as discussed supra). (PMSJ at 3-5.) Of course, the Etuk holdings are not binding upon this court or upon the Fifth Circuit, but to the extent they are considered persuasive by the Plaintiffs, they would be well advised to consider one of the unpublished orders issued by the district court in the Etuk litigation. Plaintiffs are (innocently) mistaken when they state that the Etuk court never addressed the issue of the adequacy of the parole documentation provided for returning residents who are placed in exclusion proceedings. (PMSJ at 3-4.)

On April 30, 1992, the District Court in the Etuk litigation issued a Memorandum and Order which decided the issue presented here, and which referred to an earlier December 16, 1991 Memorandum and Order in which the court had reached the same conclusions of law. Etuk v. Slattery, 1992 WL 106474 (E.D.N.Y. April 30, 1992) (Copy of case at - Government Exhibit (H).) In its April 30, 1992 order, the court began with reference to its published decision in September 27, 1990, in which it stated that

60

698

CitePDF - www.tavisa.com

"Congress has conferred on the Attorney General and the INS broad power to act to enforce all laws relating to immigration and naturalization . . . including the power to inspect aliens, § 1225, to parole aliens under such conditions it may prescribe, § 1182 ...". (emphasis added)  Etuk v. Blackman ("Etuk I"), 748 F.Supp. 990, 1000 (E.D.N.Y. 1990).  Thus, the District Court in its published decision clearly recognized the Attorney General's right to prescribe conditions of parole.  The earlier published decision had also stated that: "[i]t is not clear that permanent residents placed in exclusion proceedings and paroled into the country have been 'lawfully admitted' ... the court will reserve decision on this issue pending receipt of further papers."  Etuk I, supra at 1000.

Further papers were submitted on this issue, and the court came to the same conclusion both in its unpublished order issued initially on December 16, 1991, and then, upon a request for reconsideration of the exclusion issue, in the order issued on April 30, 1992:

> As the court stated in its December 16, 1991 Memorandum and Order, the distinction made by INS in the kind of evidence of authorization of employment to be furnished to those in deportation and those in exclusion proceedings who are paroled seems at best strange.  But plaintiffs have submitted nothing suggesting that the statutes permit this court to impose its own conditions for parole.
>
> Permanent resident aliens who return from abroad and are stopped at the border have statutory rights to challenge their exclusion.  Moreover, they have due process rights.  But this court is not persuaded that the INS violates such due process rights simply by substituting for green cards other documents pending completion of the exclusion proceedings even though

61

699

> <u>those documents do not meet the same standards required</u>
> <u>for those in deportation proceedings</u>.   (emphasis added)

<u>Etuk v. Slattery</u>, 1992 WL 106474 (E.D.N.Y. April 30, 1992).

Thus, the District Court, after hearing arguments and evidence

from both sides on this issue, clearly held that the standards

for documentation of parole during the pendency of exclusion

proceedings were not the same as the standards for documentation

serving as temporary evidence of lawful admission issued during

deportation proceedings.   Accordingly, even the <u>Etuk</u> court, which

Plaintiffs erroneously rely on as their sole authority on the

parole documentation issue, found in favor of the government's

practice and policies in the exclusion arena.

## IV.   OTHER DOCUMENTS ISSUE

> The Defendants are authorized by law to confiscate
> certain non-INS documents of returning lawful permanent
> resident aliens, namely state driver's licenses, social
> security cards, and state issued identification cards,
> when exclusion proceedings are initiated, pending the
> outcome of their exclusion hearings before the
> immigration judge

When applicants for admission are placed in exclusion

proceedings at the ports of entry, non-INS documents[26] in their

possession are sometimes taken into the custody of the

Defendants, pending the resolution of the exclusion proceedings.

This can happen for various reasons.   It may be, for example,

that the inspecting officers suspect that the documents do not

really belong to the individual whom they have placed in

---

[26]   As examples, Plaintiffs have identified drivers
licenses, social security cards, and state issued identification
cards.   (PMSJ at 41.)

700

*C*

proceedings, or that the documents are fraudulent.  It may also be that the inspecting officers believe that the documents will serve as evidence for the government in the exclusion proceedings in particular cases.  (Government Exhibit (C) - Doyle Declaration.)

Plaintiffs seek to have the court enjoin Defendants from confiscating green cards[27] and other non-INS issued documents from LPRs placed into exclusion proceedings.  Plaintiffs also seek a declaration from the court that said actions constitute a deprivation, without Due Process, of their liberty interests. (PMSJ at 41; Requests for Relief 3-4.)  In Plaintiffs' Second Amended Petition, however, although they allege that the INS does lift such non-INS documents "regardless of whether such documents had any evidentiary value in either the criminal prosecution or exclusion proceedings (Second Amended Petition at 9-10.) Plaintiffs do not seek any relief from the court in regard to such alleged actions by Defendants.  In their Amended Statement of Material Facts as to Which There Exists No Substantial Controversy, Plaintiffs omit the claim that the non-INS documents are seized regardless of whether they have any evidentiary value. Accordingly, it appears that Plaintiffs are claiming that seizure by the Defendants of non-INS documents, even where they have evidentiary value for an exclusion proceeding, is contrary to law.

---

[27]  The issue of INS confiscation of green cards from aliens placed into exclusion proceedings is discussed <u>supra</u>.

701

The relief sought by Plaintiffs with respect to the non-INS documents is improper at this time.  Plaintiffs have not identified this issue in their Second Amended Complaint as one for which they have sought relief.  Accordingly, this issue is outside the scope of Plaintiffs Second Amended Petition and should be dismissed for that reason alone.

Plaintiffs are not clear about how the lifting of the non-INS documents violates a protected property constitutional interest of aliens, and provide no authority in support of this claim.  That is because aliens do not have a constitutionally protected property interest in such non-INS documents.  INS officers, including immigration inspectors, are statutorily authorized to "take and consider evidence of or from any person touching the privilege of any alien . . . to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service . . . . ."  (emphasis added.) 8 U.S.C. § 1225(a).  These non-INS documents are not personal documents which "belong" to the alien, but rather, belong to the issuing governmental agency.

The INS officers are clearly authorized to temporarily confiscate such documents for use as evidence in exclusion cases, or because the documents are suspected to be counterfeit or otherwise not properly in the possession of the applicant for admission.  Summary judgment should be granted for Defendants on this issue.

64

702

## V.  8 C.F.R. 3.4 ISSUE

The <u>Fleuti</u> doctrine does not apply to 8 C.F.R. § 3.4, insofar as that regulation holds that the departure from the United States of a lawful permanent resident who is subject to an order of deportation which is pending review before the Board of Immigration Appeals constitutes a withdrawal of the appeal and renders the initial decision final.

Plaintiffs claim in their motion that it constitutes a deprivation of their liberty interests, without Due Process, to construe 8 C.F.R. §3.4[28] so as to hold that the departure from the United States of a lawful permanent resident who is subject to an order of deportation which is pending review before the Board of Immigration Appeals constitutes a withdrawal of the appeal and renders the initial decision final.  (PMSJ at 33-37, and Request for Relief numbers 9-10).[29]  Plaintiffs apparently did not realize that this issue was already decided twenty-two years ago by the United States Court of Appeals for the Fifth Circuit.[30]  <u>Aleman-Fiero v. INS</u>, 481 F.2d 601 (5th Cir. 1973). In <u>Aleman</u>, the appellant, who had been a permanent resident since 1964, left the United States while his appeal from an order of

---

[28]
8 C.F.R. § 3.4 in pertinent part provides that:

"...Departure from the United States of a person who is the subject to [sic] deportation proceedings subsequent to the taking of an appeal but prior to a decision thereon shall constitute a withdrawal of the appeal, and the initial decision in the case shall be final to the same extent as though no appeal had been taken."

[29]  Plaintiffs state that "This will doubtless be the most hotly contested legal point therein."  (PMSJ at 34.)

[30]  Apparently, plaintiffs mistakenly thought this was a Second Circuit case.  (PMSJ at 36-37.)

703

deportation was pending before the Board of Immigration Appeals.
The Board deemed the appeal withdrawn.  The district court
dismissed the suit for declaratory and injunctive relief.  The
court of appeals affirmed, holding that the Fleuti doctrine did
not apply to that regulation when the departure was strictly
voluntary.  Aleman-Fiero v. INS, supra at 602.

Other courts have considered the same issue and reached the
same conclusion.  See, e.g., Mejia-Ruiz v. INS, 51 F.3rd 358, 365
(2d Cir. 1995);  U.S. v. Blaize, 959 F.2d 850, 852 (9th Cir.
1992) (citing Aleman-Fiero v. INS).  In a similar vein, the
United States Court of Appeals for the Fifth Circuit has held
that it lacks jurisdiction to consider an alien's petition for
review of a deportation or exclusion order where the alien has
departed from the United States after the order was issued,
pursuant to 8 U.S.C. § 1105a(c).  Quezada v. INS, 898 F.2d 474,
476-77 (5th Cir. 1990);  Cipriano v. INS, 24 F.3rd 763 (5th Cir.
1994);  Umanzor v. Lambert, 782 F.2d 1299 (5th Cir. 1986).
Finally, as this issue was never raised by Plaintiffs in their
Seconded Amended Petition, it is improperly raised at this time,
and the court is without jurisdiction to consider this issue.
For all of the above mentioned reasons, it is appropriate to
grant summary judgment to Defendants on this issue.

66

704

## VI.  BOND FORFEITURE/CANCELLATION ISSUE

> Defendants have stayed within their statutory and
> regulatory authority when cancelling or forfeiting
> bonds for proposed class members.

Plaintiffs assert in their Second Amended Petition that if
Defendants were to cancel or forfeit the bonds of proposed class
members based solely upon the fact that the member departed from
the United States while on bond, then this would deprive the
member of liberty and property without due process of law.
Plaintiffs assert that they are entitled to both declaratory and
injunctive relief on this issue.[31]  (Plaintiffs' Second Amended
Petition at 17 (paragraphs 63-66).)

However, Plaintiffs have failed to allege in their Second
Amended Petition that Defendants have ever cancelled or forfeited
a bond of a proposed class member solely for the reason that said
member had departed from the United States.  None of the named
plaintiffs have ever had their bonds forfeited or cancelled.
Plaintiffs have failed to allege any acts by Defendants to
support their request for relief on this issue.

The forfeiture or cancellation of immigration bonds is
governed generally by the regulations set forth at 8 C.F.R.
§ 103.6, by the conditions set forth in the immigration bond
contract (INS Form I-352), and by applicable caselaw.  Bonds are
breached when there has been a substantial violation of the
stipulated conditions, and the district director notifies the

---

[31]  This issue has not been mentioned by Plaintiffs in their
Motion for Partial Summary Judgment.  However, Defendants will
assume that Plaintiffs have not abandoned this issue.

705

I

obligor of his decision, the reasons therefor, and the right to appeal on Form I-323 or Form I-391.  8 C.F.R. § 103.6(e). Appellate jurisdiction from decisions breaching bond lies with the Associate Commissioner for Examinations.  8 C.F.R. § 103.1(f)(3)(iii)(A).  Revocation and cancellation of a bond, on the other hand, is a discretionary determination for the district director to make, which results in the alien being taken back into custody and detained.  An appeal of the revocation and cancellation is to the Board of Immigration Appeals.  8 C.F.R. § 242.2(e).

The delivery bond constitutes a contract between the United States government and the obligor to produce and deliver a named alien upon each and every request by an officer of the Service. The conditions of a delivery bond are specific.[32]  They are

---

[32]   The pertinent stipulated conditions on Form I-352 are as follows:

(2)  BOND CONDITIONED FOR THE DELIVERY OF AN ALIEN
In consideration of the granting of the application of the above alien for release from custody under a warrant of arrest issued by the Attorney General charging that he/she is unlawfully in the United States, provided there is furnished a suitable bond as authorized by section 242 of the Immigration and Nationality Act, the obligor shall cause the said alien to be produced or to produce himself/herself to an immigration officer of the United States upon each and every request of such officer until deportation proceedings in his/her case are finally terminated or until the said alien is actually accepted by such immigration officer for detention or deportation, then this obligation shall be void; otherwise, it shall immediately become due and payable; Provided, that it is hereby specifically agreed by the obligor that no order issued by or under the authority of the Attorney General by virtue of which issuance or execution of any order of deportation is or may be deferred, or by virtue of which the said alien is or may be permitted to depart from the United States, shall be in any manner construed to impair or render void this
(continued...)

68

I

violated if the obligor fails to cause the alien to be produced upon each and every request until deportation proceedings in the case are finally terminated, or until the alien is actually accepted by an immigration officer for detention or deportation. Matter of Allied Fidelity Insurance Company, 19 I&N Dec. 124 (Comm'r 1984). Determining whether a violation is "substantial" within the meaning of 8 C.F.R. § 103.6(e) requires consideration of the following factors: (a) extent of breach; (b) whether the violation was intentional or accidental on the part of the alien; (c) whether the actions which constitute the violation were committed in good faith; and (d) whether the alien took steps to

---

[32] (...continued)
obligation or any part thereof.

(4) BOND FOR RELEASE OF ALIEN UNDER EXCLUSION PROCEEDINGS
In consideration of the granting of the application of the above named alien for release from custody subsequent to his/her exclusion from admission to the United States or pending the final disposition of his/her application for admission to the United States, provided there is furnished a suitable bond that he/she will deliver himself/herself into the custody of an immigration officer on demand, the obligor hereby furnishes such bond with the following conditions:  If said alien is released from custody and if the above obligor shall cause the said alien, as frequently as required, to be delivered to an immigration officer, until such time as said alien is finally admitted to or finally departs from the United States and proof satisfactory to the immigration officer of such departure is made, or such alien is finally accepted by such officer for detention or deportation, then this obligation shall be void; otherwise it shall immediately become due and payable, provided, that no order issued under the authority of the Attorney General by virtue of which the said alien is or may be granted additional time to comply with terms of his/her release, or by virtue of which execution of an order of deportation is or may be deferred, or by virtue of which the said alien is or may be permitted to depart voluntarily from the United States, shall be in any manner construed to impair or render void this obligation or any part thereof. ....

707

l

make amends, or to put himself in compliance.  <u>Matter of Allied</u> <u>Fidelity Insurance Company</u>, <u>supra</u> at 127.  It is clear that neither the regulations, the stipulated conditions of the immigration bond contract, nor existing case law authorizes the forfeiture of the bond of a proposed class member solely for the reason that they have left the United States.  It is equally clear that Plaintiffs have failed to allege that Defendants have ever forfeited or revoked and cancelled a bond for such a reason. Thus, as Plaintiffs have failed to allege any acts by Defendant in support of their request for declaratory and injunctive relief as to this issue, summary judgment for Defendants is appropriate on this issue.

## VII.  <u>MOLINA V. SEWELL ISSUE</u>

>     Defendants have complied with the court's decision in
>     <u>Molina v. Sewell</u>, 983 F.2d 676 (5th Cir. 1993).

There were two significant holdings set forth by the United States Court of Appeals for the Fifth Circuit in <u>Molina v.</u> <u>Sewell</u>, 983 F.2d 676.  The first holding of the court was that the lawful permanent resident alien seeking entry in exclusion proceedings will bear the burden to prove that he comes within the statutory exception to departure;  i.e., that he made a "brief, casual and innocent departure" within the meaning of <u>Rosenberg v. Fleuti</u>, 374 U.S. 449 (1963).  <u>Molina</u> at 678.[33]  The

_____

[33]  Plaintiffs have never mentioned this aspect of the <u>Molina</u> case in any of their pleadings in this case.  It seems that Plaintiffs are challenging the holding as Plaintiffs claim that the examining officer must be able to demonstrate "reasonable cause" that the applicant is making an entry before
(continued...)

70

second holding of the court was that the fact that a lawful permanent resident alien was in deportation proceedings at the time that he departed from the United States, is not a factor to consider when applying the Fleuti analysis to determine whether the departure was brief, casual and innocent.  Molina at 680.  It is this second holding of the Molina court which Plaintiffs contend Defendants are not following, and for which Plaintiffs seek injunctive and declaratory relief.  (Plaintiffs' Second Petition at 16, paragraphs 57-61; PMSJ at 37-38.)[34]

Plaintiffs have failed, however, to allege acts which would show that any immigration officers have improperly applied the Molina ruling in their determinations at the ports of entry whether to place returning resident aliens in exclusion proceedings.  The only "fact" which Plaintiffs have cited to show that Defendants are refusing to follow Molina is one sentence of legal argument from an INS pre-hearing brief in the Molina exclusion case on remand.  (Plaintiffs' Second Amended Petition, p. 10 at note 3.)  However, legal argument is simply that and no more, and Defendants clearly agree that the two Molina holdings as set forth supra are binding on Defendants.  In fact, after the immigration judge terminated proceedings in Molina's exclusion

---

[33](...continued)
instituting exclusion proceedings.  (PMSJ at 24--conclusion of law #9).

[34]   Relief as to this issue has not been sought by Plaintiffs in their Motion for Partial Summary Judgment. However, Defendants will assume that Plaintiffs have not abandoned their request for injunctive and declaratory relief on this issue.  Defendants' seek summary judgment on the issue.

CVisPDF - www.hawlia.com

case on remand, having found that Molina had met his burden to show that his departure was "brief, casual and innocent" within the meaning of Fleuti, the Service waived appeal, and instituted deportation proceedings.[35]  Further,  the United States Supreme Court has held that the correct forum in which to perform the "Fleuti" analysis is in fact the exclusion proceedings.  Landon v. Plasencia, 459 U.S. 21, 31-32.

None of the named plaintiffs in the case at hand have had any problems related to this second holding of Molina.  Of the five named plaintiffs who are in exclusion proceedings, four were eventually found by an immigration judge to be properly in exclusion proceedings as having made meaningful departures, and the fifth (plaintiff Gutierrez) is scheduled for a hearing on excludability and the Fleuti departure issue in October of this year.  Plaintiffs have failed to allege facts which would show that Defendants have ever instituted exclusion proceedings based solely upon a departure during deportation proceedings of a resident alien since the Molina decision was decided.  Thus, Plaintiffs have failed to present facts to support their request for injunctive and declaratory relief and it would be appropriate for the court to grant summary judgment in favor of Defendants on this issue.

---

[35]  Mr. Molina was ordered deported by the Immigration Judge, and has appealed that determination to the Board of Immigration Appeals.

710

## CONCLUSION

In the case at hand, plaintiffs have failed to even mention the four factors relating to requests for preliminary injunction discussed <u>supra</u>, much less carry their burden on each one.   Each and every issue of law in this case must be decided in favor of Defendants, according to all precedent authority.   Plaintiffs are not entitled to any of the relief which they seek, as a matter of law.   Accordingly, Defendants pray that this Honorable Court deny all of the relief sought by Plaintiffs and grant summary judgment in favor of Defendants on each and every issue presented in this case.

Respectfully submitted,

GAYNELLE GRIFFIN JONES
UNITED STATES ATTORNEY
Southern District of Texas

MARK C. WALTERS
Assistant Director

REGINA BYRD
NELDA C. REYNA
Attorneys
Assistant Deputy Director
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
Post Office Box 878
Ben Franklin Station
Washington, D.C.   20044
Telephone:   (202) 616-4860

Of Counsel:   KENNETH M. MUIR
General Attorney
Immigration and Naturalization
Service
U.S. Department of Justice
P.O. Box 1711
Harlingen, TX   78551

Dated: August 25, 1995.

73

711

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO-GUZMAN, <u>et</u>. <u>al</u>.,    )
                             )
     Plaintiffs,          )
                             )
v.                      )      C.A. No. B-94-215
                             )
                             )
E.M. TROMINSKI, District   )
Director, Immigration and  )
Naturalization Service, HON. )
JANET RENO, United States   )
Attorney General, and      )
IMMIGRATION AND NATURALIZATION )
SERVICE,                )
                             )
     Defendants.          )
_____)

**ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Upon consideration of the plaintiffs request for Partial Summary Judgment the opposition and Counter Motion for Summary Judgment filed by defendants, and the pleadings and evidence on file herein, it is:

ORDERED, that Plaintiffs' Motion for Partial Summary Judgment is be and is hereby DENIED.

Done at Brownsville, Texas,

this _____ day of _____, 1995.


_____
      DISTRICT COURT JUDGE

7/2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO-GUZMAN, et. al.,       )
                                )
        Plaintiffs,             )
                                )
v.                              )        C.A. No. B-94-215
                                )
E.M. TROMINSKI, District        )
Director, Immigration and       )
Naturalization Service, HON.    )
JANET RENO, United States       )
Attorney General, and           )
IMMIGRATION AND NATURALIZATION  )
SERVICE,                        )
                                )
        Defendants.             )
_____)

LIST OF DEFENDANTS' EXHIBITS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Come Defendants, and for the convenience of the Court, and

opposing counsel, file the instant list of the Exhibits filed by

Defendants, in support of their motion for summary judgment:

1.    Memorandum of Commissioner Gene McNary

2.    Operating Instructions 264.2

3.    Declaration of Larry P. Doyle

4.    Declaration of Richard H. Ayala

5.    Declaration of Mario Garcia, Jr.

6.    Handbook for Employers

7.    Immigration and Naturalization Service Handbook

8.    Etuk v. Slattery, WL 106474 (E.D.N.Y. 1992)

9.    Memorandum of James J. Hogan, Executive Assistant

Commissioner.

EXHIBIT (1)

7

714

ClickPDF – www.fastio.com

Case 1:94-cv-00215   Document 55   Filed in TXSD on 08/28/1995   Page 88 of 174

MIC/DB

U.S. DISTRICT COURT
HARLINGEN TEXAS

CO 236-P
CO 242.5-P

| Subject | Date |
|---|---|
| Disposition of Alien Registration Documentation after institution of deportation or exclusion proceedings | MAR 1 4 1990 |

| To | From |
|---|---|
| All District Directors<br>All Officers in Charge<br>All Chief Patrol Agents<br>All Service Centers<br>All Regional Processing Facilities<br>Director, Glynco, GA | Office of the Commissioner |

Litigation over the disposition of Forms I-151 and I-551 once the holders have been placed in deportation or exclusion proceedings has revealed a need for clarification of Service policy in this area. The instructions contained in this memorandum are effective upon receipt, and will be followed until appropriate regulations and operations instructions are published.

DEPORTATION PROCEEDINGS

A lawful permanent resident alien in deportation proceedings is required to be registered under section 261 or 262 of the Immigration and Nationality Act, as amended, and to be in possession of evidence of such registration. Form I-151 or I-551 is the appropriate evidence of alien registration for lawful permanent residents in the United States. Accordingly, when an order to show cause is issued, and the recipient is the holder of Form I-151 or I-551 and is not detained or incarcerated, he or she shall be allowed to retain possession of evidence of alien registration. If the alien has no evidence of alien registration, Form I-90 shall be filed and processed, and the appropriate documentation will be issued by the office having jurisdiction.

The alien registration evidence held by a lawful permanent resident in deportation proceedings will ordinarily be a laminated Form I-151 or I-551. If the district director, chief patrol agent or officer in charge determines that a temporary document is needed to assure the alien's appearance at hearings, or for other justifiable reasons, the laminated Form I-151 or I-551 will be lifted, and a temporary I-551 issued. In these cases, temporary Forms I-551 will be prepared in accordance with the guidance in O.I. 264.2, and will be issued for a period sufficient to allow completion of the deportation proceedings, but in no case less than six months.

rm G-2

7/5


GOVERNMENT
EXHIBIT
(1)

## EXCLUSION PROCEEDINGS

Returning residents who do not appear to the examining officer to be clearly and beyond a doubt admissible to the United States pursuant to section 235(b) of the I&N Act shall, with the exception noted below, be processed in accordance with O.I. 235.1(k)(1) through (4). Thus, Form I-151 or I-551 will be lifted, and Forms I-110 and 122 will be prepared and issued in those instances where exclusion hearings will be conducted. If, however, the alien is to be paroled into the United States pending the completion of exclusion proceedings, the alien shall be provided with Form I-94 reflecting his or her status as a returning resident applicant for admission, and which shall be endorsed with the alien's "A" number and the following legend:

Returning resident applicant at_____(port) on_____(date). Paroled pending determination of right to reenter. Employment Authorized.

Employment authorization will be granted without application or fee, and will be noted on the parole Form I-94, unless the paroling office has the capability to issue Form I-688B EAD, in which case the I-688B will be issued in addition to the parole I-94.

Gene McNary
Commissioner

EXHIBIT (2)

ファ/ファ

ClicPDF - www.festo.com

264.2          OPERATIONS INSTRUCTIONS              -

When an application is made for a new Form I-551 to
replace a lost or destroyed Form I-151 or I-551 and
the relating file is not available, a new Form I-551
may be issued on the basis of other evidence which
establishes the alien's admission for permanent resi-
dence.  For example, in a change-of-name case, a new
Form I-551 may be issued upon presentation of evidence
of a marriage and the old I-151 or I-551.  In such
cases, the relating files must be obtained and checked
on a post-audit basis.  (REVISED)

When an application is made for a new Form I-551 to
replace a lost or destroyed Form I-151 or I-551, the
loss or destruction must be satisfactorily estab-
lished.  An interview concerning the loss or destruc-
tion of a previously issued card may be required be-
fore action is taken on the application.  (REVISED)

An original Form I-551 shall be forwarded to a Service
officer or American consular officer abroad for deliv-
ery to an alien lawfully admitted for permanent resi-
dence when, because of an emergency, the alien's de-
parture is required before it can be delivered to the
alien.  (REVISED)

An application for replacement Form I-551 may be sub-
mitted by a lawfully admitted permanent resident

TM 107 (5-18-83)  Page 4242



GOVERNMENT
EXHIBIT
(2)

7/8

alien temporarily sojourning abroad, directly to a
Service officer stationed outside the United
States or through an American consular officer.
The application must be submitted in person and if
the applicant has not previously been issued Form
I-551, a completed Form I-89, with fingerprint,
shall be prepared by the Service or consular
officer and shall be forwarded by the Service
officer to the district director having
jurisdiction over the alien's place of residence
in the United States.  If the Service officer
abroad is in a position at the time the
application is initially received to note
pertinent information on the Form I-90, he shall
do so.  When issued, Form I-551 shall be forwarded
to the Service officer abroad for delivery.  If
the adjudicating officer in the United States
determines that the applicant should be
interviewed because of discrepancies existing
between information contained in the I-90 and the
applicant's file, Forms I-90 and I-89 shall be
accompanied by a memorandum requesting the Service
officer abroad to conduct such interview.  After
interview, I-90 and I-89 shall be returned to the
appropriate stateside office by memorandum
containing the information obtained including the
recommendation of the Service officer who
conducted the interview. (Revised)

When an application for a new Form I-551 is made
to an American consular officer, he will accept
the application and follow the procedure set forth
in the preceding paragraph.

When a Service officer stationed outside the
United States forwards a Form I-90 to a stateside
office for adjudication of the application, he
shall attach a route slip requesting that
adjudication, and mailing of the Form I-551 upon
approval be expedited.  Stateside offices shall
give priority to the adjudication of Forms I-90
received through consular or Service offices out-
side the United States, and to the preparation

719

264.2          OPERATIONS INSTRUCTIONS

and expeditious mailing of Forms I-551 issued in
such cases. Every Form I-551 forwarded abroad
shall be accompanied by Form G-94 in duplicate.

When any registration document is found in the
wrongful possession of another person, it shall
be lifted, if possible, and forwarded with an
explanatory memorandum, including copies of Form
I-213 or sworn statement, or both, to the file
of the alien to whom the document was issued.
However, counterfeit documents or documents with
alterations or photo substitutions, unless
needed for prosecution or other enforcement
purposes, shall be sent initially to the regional
intelligence officer for examination.

When such action is clearly warranted because of
an emergency, temporary evidence of lawful
admission for permanent residence shall be issued
on the arrival section of Form I-94. Only the
information regarding the alien's name, date of
birth, country of citizenship, and alien
registration number need be included. The
admission block of the arrival section of Form
I-94 shall be noted with a stamp using one of the
following legends:          (TM 3/86)

Processed for I-551. Temporary Evidence of
Lawful Admission for permanent residence. Valid
until _____ Employment authorized.

                    or:          .  .·

Temporary Form I-551. Admission for permanent
residence at _____(port)_____(date)
verified. _____(office of issuance) ____
     (date) _____(signature of issuing
officer) _____(title)

The stamp must be in special formula ink in
accordance with OI 103.2(m). A photo of the
applicant must be attached to the block next to

TM 138 (3-14-86)     Page 4244

CNPDF - www.fasiso.com

the admission block, thereby obliterating the
admission number. The Service seal shall then be
placed half over the admission block and half
over the photo. The alien shall be advised that
the form should not be surrendered at the time of
departure since it is a document for presentation
at time of reentry.               (TM 3/86)

The Form I-94 must be surrendered upon receipt of
the laminated Form I-551. Every effort must be
made to issue the laminated Form I-551 instead of
Form I-94 as temporary evidence of permanent
admission. Priority processing must be given to
any Form I-90 when the alien has indicated that
he/she intends to use the Form I-551 as a travel
document. Any alien required by 8 CFR 264.1 to
apply on Form I-90 shall do so prior to the
issuance of Form I-94 as temporary evidence of
permanent admission. For procedures for a
returning resident alien reapplying for
admission, see O.I. 235.1(k)(3) and O.I.
235.4(d).                          (TM 4/86)

  264.2a  Issuance of Form I-551 in maiden name
of a married woman. There is no objection to
issuing Form I-551 in the maiden name of a
married woman, if requested by her, and if the
use of the maiden name is sanctioned by the law
of the state in which she resides.

721

EXHIBIT (3)

722

CltilPDF – www.fastio.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JULIO HERRERA-LOA, et al.,　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　Plaintiffs,　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　　）　　　　C.A. No. B-94-215
　　　　　　　　　　　　　　　　　　）
E.M. TROMINSKI,　　　　　　　　　　）
HON. JANET RENO,　　　　　　　　　　）
　　　　and　　　　　　　　　　　　　）
IMMIGRATION AND NATURALIZATION　　）
　　　　SERVICE,　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　Defendants.　　　　　　　　　）
_____　）

DECLARATION OF LARRY P. DOYLE

My name is Larry P. Doyle.  I am the Assistant District Director
for Examinations in the Harlingen District of the United States
Department of Justice, Immigration and Naturalization Service.  I
have been the Assistant District Director for Examinations since
September of 1991.  As the Assistant District Director for
Examinations I am responsible for the operation of the
inspections program of the Harlingen District as well as the
adjudications program of the Harlingen District.  The inspections
program encompasses the nine ports of entry within the Harlingen
District, namely: the two ports of entry at Brownsville,
Progreso, Los Indios, Hidalgo, Los Ebanos, Rio Grande City, Roma,
and Falcon Heights Dam.

If a Lawful Permanent Resident Alien were to make an application
for admission at a United States Port of Entry, and were to
present either a laminated Form I-551 ("green card") or a Form
I-94 stamped with a notation that the alien was a Lawful
Permanent Resident of the United States (temporary I-551), the
alien would be inspected to determine if he was the rightful
owner of the document and 'a determination would be made whether
the document was valid.

GOVERNMENT
EXHIBIT
(3)

723

If satisfied that the document belonged to the alien and the document was valid, the inspector would, if admissible, admit the alien into the United States.  The alien would be placed in exclusion proceedings only if the inspector determined that the alien was inadmissible to the United States.  In order to be placed in exclusion proceedings, the alien would have had to make a "departure" from the United States as defined by the Supreme Court in Fleuti and there would have to be a ground of inadmissibility as enumerated in the Immigration and Nationality Act.  Before an alien is set up for exclusion, the decision by the inspecting officer is reviewed by a supervisor and prior to filing a charging document with the Immigration Judge, I review the case.

If it is determined that exclusion proceedings will be initiated, then, as per outstanding Service policy, including the March 14, 1990 Memorandum from INS Commissioner McNary, the Form I-551 will be lifted, and Forms I-122 and I-110 will be prepared and issued in those instances where exclusion proceedings will be conducted. If, however, it is determined at that time or subsequently that the alien is to be paroled into the United States pending the completion of exclusion proceedings, the alien shall be provided with Form I-94 reflecting his or her status as a returning resident applicant for admission.  The Form I-94 is stamped with the following legend:  "Returning resident applicant at ____ (port) on ____ (date).  Paroled pending determination of right to reenter.  Employment authorized."

The reason that the resident alien cards are lifted when resident aliens are placed in exclusion proceedings, is that otherwise an inadmissible alien could easily subsequently enter the United States at the same or another port of entry.  For fiscal year 1994, there were 30,911,005 inspections done at the Hidalgo Port of Entry, 23,428,577 inspections at the Brownsville Port of Entry, and 13,278,664 inspections at the other Ports of Entry, for a total of 67,618,246 inspections performed within the jurisdiction of the Harlingen District office.  There is simply neither time nor facilities in the primary inspection sufficient to allow the inspectors to enter each returning resident alien's card number into a computer database.  Secondary inspection exists to perform more detailed and time-consuming inquiries, so that the traffic can continue to flow in primary inspection.

2

724

Thus, if the returning resident applicants were allowed to keep their cards after being placed in exclusion proceedings, a subsequent inspector in the primary lanes would be unable to determine that the individual had already been placed in exclusion proceedings and was still inadmissible.

However, any individual placed into exclusion proceedings, including any returning resident applicant, can apply to be paroled into the United States.  The officers in secondary inspection and at the information desks in the Ports of Entry can answer questions about the parole procedure.  Each request for parole is reviewed by myself on a case by case basis, in which I carefully consider the factors presented in each request for parole.  In determining whether or not an alien shall be paroled into the United States, I consider the likelihood that the alien will abscond or pose a security risk.

While all Lawful Permanent Resident Aliens are subject to the identical procedures outlined above, Lawful Permanent Residents who do not have a laminated Form I-551 ("green card"), are more likely to be more closely inspected.  However, with repeated applications for admission, a holder of a temporary I-551 will become less likely to be subjected to a closer inspection.

In the event that notations appear on a temporary I-551, those notations would, of course, be read by the inspecting officer.  However, the fact that the notations may reflect that an alien could be subject to exclusion, would not cause the alien to be placed in exclusion proceedings unless he had made a departure as defined in <u>Fleuti</u>.  The mere fact that a returning resident alien applicant was in deportation proceedings when he or she left the United States would not constitute a meaningful departure upon their subsequent application for admission.

PURSUANT TO 28 U.S.C. §1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED THIS 27th DAY OF JULY, 1995.

LARRY P. DOYLE
Assistant District Director
for Examinations

3

725

CUtePDF - www.cutepdf.com

EXHIBIT (4)

726

CVISPDF – www.fastio.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JULIO HERRERA-LOA, et al.,        )
                                  )
                                  )
                                  )
        Plaintiffs,               )
                                  )
v.                                )        C.A. No. B-94-215
                                  )
E.M. TROMINSKI,                   )
HON. JANET RENO,                  )
        and                       )
IMMIGRATION AND NATURALIZATION    )
        SERVICE,                  )
                                  )
        Defendants.               )
_____  )


DECLARATION OF RICHARD H. AYALA

My name is Richard H. Ayala.  I am a Special Agent with the
United States Department of Justice, Immigration and
Naturalization Service.  I have been an investigator with the
Harlingen District Investigations division since 1977, and have
been stationed in Harlingen, Texas since that time.  For the last
two months, I was Acting Supervisory Special Agent for the ACAP
(Alien Criminal Apprehension Unit).

The ACAP unit has as its mission the identification and
apprehension of criminal aliens within the Harlingen District.

The ACAP unit is one of three major priorities within the
Harlingen District Investigations Section, the other two being
Employer Sanctions and Fraud.  Of the three investigative units
in the Harlingen District Investigations office, the ACAP unit
arrests and places in deportation proceedings most of the Lawful
Permanent Resident Aliens subject to deportation.

I have reviewed statistics compiled by the ACAP unit from January

727



1, 1993 through May 31, 1995.  Based upon my review, the ACAP
unit has arrested and processed a total of eight hundred and
eighty five (885) criminal aliens.  Additionally, from  January
1, 1993 through May 31, 1995, the Investigations division
processed eighty-nine (89)non-criminal aliens through its Fraud
and Employer Sanctions divisions (this figure does not include
statistics for Fraud for the 1993 year, as those statistics could
not be located).

Of the criminal aliens processed for Orders to Show Cause by the
Investigations unit, the majority are encountered at county jails
in Texas.  The primary county jails from which we process
criminal aliens are located in Cameron, Starr, and Hidalgo
counties.  We also process criminal aliens based upon referrals
from Federal and State Probation offices.

In cases where the Lawful Permanent Resident Alien does have his
card, the determination to lift that card is made pursuant to
outstanding Immigration and Naturalization Service policy,
including the memorandum issued by INS Commissioner McNary on
March 14, 1990.  We make this determination on a case-by-case
basis.  Resident Aliens whom we have determined to be minimal
flight risks will not be detained and will not have their
Resident Alien cards lifted.  Because the ACAP unit processes
criminal aliens, most if not all Lawful Permanent Resident Aliens
we encounter have criminal convictions.  Therefore, if ever
released from Immigration and Naturalization Service custody,
these aliens may pose a flight and/or public safety risk.

Resident Alien cards normally have no expiration date.
Therefore, if a Lawful Permanent Resident Alien chooses to
abscond after a final order of deportation has been entered
against him, and we have not taken measures to secure the alien's
Resident Alien card, then the alien would be able to use the
Resident Alien card indefinitely to re-enter the United States or
more easily disappear into the general population of the United
States.

When we lift the Resident Alien card, pursuant to outstanding
Immigration and Naturalization Service policy, we provide the
alien with a suitable replacement, valid for a period of no less
than six (6) months.  The replacement card is created by using
the Form I-94 and bears the alien's photograph, and has a stamp

2

reflecting the alien's status as a Lawful Permanent Resident
Alien.  The card also states that employment is authorized.  It
is our intention that this card be valid for all purposes and is
in every way a replacement for the Resident Alien card.  The
alien can travel outside the United States and may be employed
with this card.  The only limitation is that the card has an
expiration date; however, the card may be renewed by the
Immigration and Naturalization Service.

Some Special Agents will note in the comment portion of the I-94
that the alien is under a deportation proceeding, and the
specific ground(s) for the proceeding.  Also, some Special Agents
may note in the comment portion of the I-94 that the alien has
posted bond.  These notations are made because the alien may be
encountered again by another agent of the Immigration and
Naturalization Service anywhere in the United States.  Upon
seeing this notation, the agent will be advised that the alien
has already been processed for deportation.  This measure saves
time and resources, avoiding possible duplication of efforts by
another agent.  It also makes such encounters shorter and easier
for the alien.


PURSUANT TO 28 U.S.C. §1746, I DECLARE UNDER PENALTY OF PERJURY
THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED THIS _25th_ DAY
OF _July_ , 1995.




Richard H. Ayala
INS Special Agent




3

729

EXHIBIT (5)

7

730

CVISPDF – www.fastio.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JULIO HERRERA-LOA, et. al.,          )
                                     )
                                     )
              Plaintiffs,            )
                                     )
v.                                   )          Civil Action No. B-94-215
                                     )
E. M. TROMINSKI,                     )
HON. JANET RENO, and                 )
IMMIGRATION AND NATURALIZATION       )
        SERVICE,                     )
                                     )
              Defendants.            )
_____     )

DECLARATION OF MARIO GARCIA, JR.

My name is Mario Garcia, Jr.. My current title is Supervisory Border Patrol Agent/Intelligence. I am currently the Supervisory Intelligence Agent for the McAllen Sector of the United States Border Patrol, Immigration and Naturalization Service, in McAllen, Texas. I have served in this position since 1991.

The McAllen Sector of the United States Border Patrol covers the extreme southeastern corner of Texas. It is comprised of approximately 17,000 square miles of territory and has approximately 272 miles of territory along the Rio Grande River which borders Mexico. The McAllen Sector has a Sector Headquarters and nine individual stations. Of the nine stations, five of them border the Rio Grande River, two are coastal stations which border the Gulf of Mexico, and two are interior traffic checkpoint stations. The McAllen Sector apprehended 127,110 aliens during the past year of which approximately 2964 were criminal aliens.

The McAllen Sector does not currently "lift" the laminated Form I-551 ("green card") from apprehended Lawful Permanent Resident aliens. The McAllen Sector does not lift the Form I-551 because there is no mechanism within the Border Patrol to issue the suitable replacement document that is required. In order to replace the Form I-551, a Form I-94 must be issued along with, among other items, evidence that the alien is authorized to work. In order to obtain a Form I-94 for an alien, the Harlingen District Office must be contacted and the Harlingen District Office must have the document issued. In order to receive the document, it

731

GOVERNMENT
EXHIBIT
(5)

usually entails transporting the alien to the nearest Port of Entry.

PURSUANT TO 28 U.S.C. SEC. 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED THIS _28th_ DAY OF JULY, 1995.

Marto Garcia, Jr.
Supervisory Border Patrol
Agent/Intelligence

732

EXHIBIT (6)

733

# Handbook for Employers

## Instructions for Completing Form I-9

### *(Employment Eligibility Verification Form)*



If you have questions after reviewing this Handbook, please contact your local INS office at the address found in the back of this Handbook. Direct your letter to the attention of the *Employer Relations Officer.*

**DO NOT CONTACT THE INTERNAL REVENUE SERVICE (IRS)**

*M-274 (Rev. 11/21/91) N*

**GOVERNMENT EXHIBIT (6)**

734

CutePDF - www.fasiso.com

**U. S. Department of Justice**
Immigration and Naturalization Service

To United States Employers:

Thank you for your cooperation and assistance. For the past five years, you have worked with us to implement the employment eligibility verification and employer sanctions provisions of the Immigration Reform and Control Act of 1986. Your teamwork has made the law a success, ensuring fairness in applying the law and preserving jobs for those who are legally eligible to work -- citizens and nationals and aliens authorized to work in the United States.

Based on comments and suggestions received from the public and our experience in these first years,  we have revised the *Employment Eligibility Verification Form* (I-9) and expanded this *Handbook for Employers*. We have sought to simplify and clarify.

This Handbook provides a step-by-step explanation of what you as an employer must do to meet your responsibilities under the law.  It also explains the responsibilities and rights of employees in the hiring and verification process. We have included additional illustrations of documents that may be used to establish identity and employment eligibility.  The Handbook also provides expanded information about how to avoid employment discrimination based on citizenship or national origin.

The Immigration and Naturalization Service thanks you for your compliance with these requirements, now an established part of our nation's laws. We are counting on your continued cooperation.

Gene McNary
Commissioner
Immigration and Naturalization Service

735

# Contents

This Handbook is divided into eight (8) parts:

**Part 1** - Why Employers Must Verify Employment Eligibility of New Employees.
*See Page 1*

**Part 2** - When You Must Complete the Form I-9.
*See Page 3*

**Part 3** - How to Complete the Form I-9.
*See Page 3*

**Part 4** - Unlawful Discrimination.
*See Page 8*

**Part 5** - Penalties for Prohibited Practices.
*See Page 9*

**Part 6** - Instructions for Recruiters and Referrers for a Fee.
*See Page 11*

**Part 7** - Some Questions You May Have About the Form I-9.
*See Page 12*

**Part 8** - Acceptable Documents for Verifying Employment Eligibility.
*See Page 20*

This Handbook includes two copies of the Form I-9. At the back, you will also find a list of INS offices for you to contact if you need more information.

**United States Department of Justice**
*Immigration and Naturalization Service*

November 1991

# Part One

## Why Employers Must Verify Employment Eligibility of New Employees

In recent years, Congress has worked to reform our nation's immigration laws. These reforms, the result of a bipartisan effort, preserve our tradition of legal immigration while closing the door to illegal entry. The employer sanctions provisions, found at Section 274A of the Immigration and Nationality Act, were added by the Immigration Reform and Control Act of 1986 (IRCA). These provisions further changed with the passage of the Immigration Act of 1990. References to "the Act" in this Handbook refer to the Immigration and Nationality Act, as amended.

Employment is often the magnet that attracts persons to come to or stay in the United States. The purpose of the employer sanctions law is to remove this magnet by requiring employers to hire only persons who may legally work here: citizens and nationals of the United States and aliens authorized to work. To comply with the law, you must verify the identity and employment eligibility of anyone you hire, and complete and retain a Form I-9 like the one contained in this Handbook.

In addition, the law obliges you not to discriminate against individuals on the basis of national origin or citizenship, or to require more or different documents from a particular individual. (See Part 4.)

This law has been strongly supported by the public. Employers have joined, and continue to join, the effort to protect our heritage of legal immigration. This cooperation has made jobs available to American citizens and to aliens who are authorized to work in our country. In addition to being the law, it is good business practice for you to verify the identity and employment eligibility of your workers. The law deserves your support.

The Form I-9 was developed for verifying that persons are eligible to work in the United States. You should have completed a Form I-9 for everyone you have hired after November 6, 1986. The law requires you as an employer to:

- Ensure that your employees fill out Section 1 of the Form I-9 when they start to work;

736

2

- Review document(s) establishing each employee's identity and eligibility to work;

- Properly complete Section 2 of the Form I-9;

- Retain the Form I-9 for 3 years after the date the person begins work or 1 year after the person's employment is terminated, **whichever is later**; and

- Make the Form I-9 available for inspection to an officer of the Immigration and Naturalization Service (INS), the Department of Labor (DOL), or the Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) upon request. You will be given at least 3 days advance notice.

  *NOTE:   This does not preclude the INS, the DOL. or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

If you are an agricultural association, agricultural employer, or farm labor contractor who employs people, or recruits or refers people for a fee, these requirements apply to you. (See Part 6.)

If you employ anyone for domestic work in your private home on a regular basis (such as every week), these requirements apply to you.

If you are self-employed, you do not need to complete a Form I-9 on yourself unless you are also an employee of a business entity, such as a corporation or partnership, in which case the business entity is required to complete a Form I-9 on you.

The instructions in this Handbook will help you assess your responsibilities for completing the form and complying with the law

## New Developments in the Law

### The Immigration Act of 1990

On November 29, 1990, the President signed into law the Immigration Act of 1990 which amended the Immigration and Nationality Act. You should be aware of several provisions in this new law which affect your responsibilities as an employer.

New Anti-Discrimination Provisions

For the purpose of satisfying the employment eligibility verification requirements, an employer cannot request that an employee present more or different documents than are required. Also, an employer cannot refuse to honor documents which on their face reasonably appear to be genuine and to relate to the person presenting them. The new law makes these actions unfair immigration-related employment practices. (See Part 4.)

New Document Fraud Provisions

Under the new law, it is unlawful for anyone knowingly to engage in any of the following activities for the purpose of satisfying a requirement of the Act:

- To forge, counterfeit, alter, or falsely make any document;

- To use, attempt to use, possess, obtain, accept, or receive any forged, counterfeit, altered, or falsely made document;

- To use or attempt to use any document lawfully issued to a person other than the possessor (including a deceased individual); or

- To accept or receive any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of complying with the employment eligibility verification requirements. (See Part 5.)

## Where to Get the Form I-9

Two copies of the Form I-9 are included in this Handbook.   If you need more forms, you can photocopy or print the forms, provided both sides are reproduced.   The Instructions page must also be made available to both you and the employee during the completion of the form.   You may obtain a limited number of copies from the INS or you may order them in bulk from the Superintendent of Documents at the following address:

Superintendent of Documents
U.S. Government Printing Office
Washington, D.C.  20402

CEMPDF - www.tesko.com

# 'art Two

## .:hen You Must Complete the Form I-9

very time you hire any person to perform labor or
ervices in return for wages or other remuneration,
ju must complete the Form I-9. This requirement
ipiies to everyone hired after November 6, 1986.

nsure that the employee fully completes **Section 1**
? the form at the time of the hire -- **when the
-mpioyee begins work.**

:eview the employee's document(s) and fully
:omplete **Section 2** of the form **within 3 business
:ys** of the hire.

you hire a **person for less than 3 business
:ys, Sections 1 and 2 of the Form I-9 must be
:illy completed at the time of the hire -- when the
:mployee begins work.**

'ou **DO NOT** need to complete a Form I-9 for:

Persons hired before November 7, 1986, who
are continuing in their employment and have a
reasonable expectation of employment at all
times;

Persons you employ for casual domestic work in
a private home on a **sporadic, irregular,** or
**intermittent** basis;

Persons who are independent contractors; or

Persons who provide labor to you who are
employed by a contractor providing contract
services (e.g., employee leasing).

*NOTE:* *You cannot contract for the labor of
an alien if you know the alien is not authorized to
work in the United States.*

# Part Three

## How to Complete the Form I-9

**Section 1**

- Have your employees complete Section 1 at the
  time of the hire -- when they begin to work -- by
  filling in the correct information and signing and
  dating the form.

- If your employees cannot complete Section 1 by
  themselves or if they need the form translated.
  someone may assist them. The preparer or
  translator must read the form to the employee.
  assist him or her in completing Section 1, and
  have the employee sign or mark the form in the
  appropriate place. The preparer or translator
  must then complete the Preparer/Translator
  Certification block on the Form I-9.

- You are responsible for reviewing and ensuring
  that your employees fully and properly complete
  Section 1.

**Section 2**

- Employees must present to you an original
  document or documents that establish identity
  and employment eligibility within 3 business
  days of the date employment begins. Some
  documents establish **both** identity and
  employment eligibility (List A). Other documents
  establish **identity only** (List B) or **employment
  eligibility only** (List C). Employees can choose
  which document(s) they want to present from
  the lists of acceptable documents. These lists
  appear in Part 8 of this Handbook and on the
  back of the Form I-9.

- You must examine the original document or
  documents presented by the employee and then
  fully complete Section 2 of the Form I-9. You
  must examine one document from List A <u>or</u> one
  from List B and one from List C. Record the
  title, issuing authority, number, and expiration
  date (if any) of the document(s); fill in the date
  of hire and correct information in the certification
  block; and sign and date the Form I-9. You
  **must** accept any document(s) (from List A) or
  combination of documents (one from List B <u>and</u>
  one from List C) presented by the individual
  which reasonably appear on their face to be
  genuine and to relate to the person presenting
  them. You may not specify which document(s)
  an employee must present.

738

CRMPDF - www.fesiss.com

4

- If employees are unable to present the required document(s) within 3 business days of the date employment begins, they must present a **receipt** for the application for the document(s) within 3 business days. The employees **must** have indicated, by having checked an appropriate box in Section 1, that they are already eligible to be employed in the United States. When they provide you with a receipt showing that they have applied for a document evidencing that eligibility, you should record the document title in Section 2 of the Form I-9 and write the word "receipt" and any document number in the "Document #" space. The employee must present the actual document within 90 days of the date employment begins. At that time, you should cross out the word "receipt" and any accompanying document number, insert the number from the actual document presented, and initial and date the change.

- You must retain the Form I-9 for 3 years after the date employment begins or 1 year after the person's employment is terminated, **whichever is later**.

### Future Expiration Dates

Future expiration dates may appear on the Form I-9 or on the employment authorization documents of aliens, including, among others, permanent residents, temporary residents, and refugees. INS includes expiration dates even on documents issued to aliens with permanent work authorization. The existence of a future expiration date:

- Does not preclude continuous employment authorization;

- Does not mean that subsequent employment authorization will not be granted; and

- Should not be considered in determining whether the alien is qualified for a particular position.

Consideration of a future employment authorization expiration date in determining whether an alien is qualified for a particular job may constitute employment discrimination. (See Part 4.) You will, however, need to reverify the employee's eligibility to work when any expiration date on the Form I-9 is reached.

### Reverifying Employment Authorization for Current Employees

When an employee's work authorization expires, you must reverify his or her employment eligibility. You may use Section 3 of the Form I-9 or, if Section 3 has already been used for a previous reverification or update, use a new Form I-9. If you use a new form, you should write the employee's name in Section 1, complete Section 3, and retain the new form with the original. The employee must present a document that shows either an extension of the employee's initial employment authorization or new work authorization. If the employee cannot provide you with proof of current work authorization, you cannot continue to employ that person.

**To maintain continuous employment eligibility, an employee with temporary work authorization should apply for new work authorization at least 90 days before the current expiration date.** If the Service fails to adjudicate the application for employment authorization within 90 days, then the employee will be authorized for employment on Form I-688B for a period not to exceed 240 days.

*You must reverify on the Form I-9 not later than the date the employee's work authorization expires.*

### Reverifying or Updating Employment Authorization for Rehired Employees

When you rehire an employee, you must ensure that he or she is still authorized to work. You may do this by completing a new Form I-9 or you may reverify or update the original form by completing Section 3.

If you rehire an employee who has previously completed a Form I-9, you may **reverify** on the employee's original Form I-9 (or on a new Form I-9 if Section 3 of the original has already been used) if:

- You rehire the employee within 3 years of the initial date of hire; and

- The employee's previous grant of work authorization has expired but he or she is currently eligible to work on a **different** basis or under a **new** grant of work authorization than when the original Form I-9 was completed.

735

To reverify, you must:

- Record the date of rehire;

- Record the document title, number, and expiration date (if any) of any document(s) presented;

- Sign and date Section 3; and

- If you are reverifying on a new form, write the employee's name in Section 1.

If you rehire an employee who has previously completed a Form I-9, you may **update** on the employee's original Form I-9 or on a new Form I-9 if:

- You rehire the employee within 3 years of the initial date of hire; and

- The employee is still eligible to work on the **same** basis as when the original Form I-9 was completed.

To update, you must:

- Record the date of rehire;

- Sign and date Section 3; and

- If you are updating on a new form, write the employee's name in Section 1.

In all of the situations described above with respect to rehired employees, you always have the option of completing Sections 1 and 2 of a new Form I-9 instead of completing Section 3.

## Minors (Individuals Under Age 18)

If a minor -- a person under the age of 18 -- cannot present a List A document or an **identity** document from List B, the Form I-9 should be completed in the following way:

- A parent or legal guardian must complete Section 1 and write "Individual under age 18" in the space for the employee's signature;

- The parent or legal guardian must complete the "Preparer/Translator Certification" block;

- You should write "Individual under age 18" in Section 2, List B, in the space after the words "Document #"; and

- The minor must present a List C document showing his or her employment eligibility. You should record the required information in the appropriate space in Section 2.

## Handicapped Employees (Special Placement)

If a person with a handicap, who is placed in a job by a nonprofit organization or as part of a rehabilitation program, cannot present a List A document or an **identity** document from List B, the Form I-9 should be completed in the following way:

- A representative of the nonprofit organization, or a parent or a legal guardian, must complete Section 1 and write "Special Placement" in the space for the employee's signature;

- The representative, parent, or legal guardian must complete the "Preparer/Translator Certification" block;

- You should write "Special Placement" in Section 2, List B, in the space after the words "Document #"; and

- The handicapped employee must present a List C document showing his or her employment eligibility. You should record the required information in the appropriate space in Section 2.

6

## Section 1: To be completed by the EMPLOYEE

**STEP 1**
Fill in the personal information.

**STEP 2**
Check the box for work eligibility. Fill in other information if applicable.

**STEP 3**
Read, sign, and date.

**STEP 4**
*(Preparer/Translator only)*
Read, fill in information, sign, and date.



**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

Print Name: Last **Swenson**   First **Inga**   Middle Initial   Maiden Name **N/A**

Address (Street Name and Number) **213 Cambridge**   Apt. #   Date of Birth (month/day/year) **3/18/64**

City **Potomac.**   State **Md.**   Zip Code **01213**   Social Security # **211 99 7016**

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

☐ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien # A
☐ An alien authorized to work until **9 11 92**
(Alien # or Admission # **60 145 027340**

Employee's Signature **Inga Swenson**   Date (month/day/year) **9/11/91**

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct

Preparer's/Translator's Signature   Print Name

Address (Street Name and Number, City, State, Zip Code)   Date (month/day/year)

## Section 2: To be completed by the EMPLOYER

**STEP 5**
Examine the document(s) and fill in the document title, issuing authority, number, and expiration date (if any) in the space provided.

**STEP 6**
Read, fill in information (including the date employment begins in the certification), sign, and date.

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: **Passport & I-94** | | | | |
| Issuing authority **Sweden** | | | | |
| Document # **543211** | | | | |
| Expiration Date (month/day/year) **9 11 92** | | /  / | | /  / |
| Document # **60145027340** | | | | |
| Expiration Date (month/day/year) **9 11 92** | | | | |

CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) **9 11 91** and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).

Signature of Employer or Authorized Representative **R. W. Walsh**   Print Name **Joseph W. Walsh**   Title **President**

Business or Organization Name **Joseph Walsh Inc for N Main Drilling Tn**   Address (Street Name and Number, City, State, Zip Code)   Date (month/day/year) **9 11 91**

## Section 3: To be completed by the EMPLOYER

**STEP 7**
Fill in the new name and/or date of rehire (if applicable).

**STEP 8**
Examine the document(s) and fill in the document title, number, and expiration date (if any) in the space provided.

**STEP 9**
Read, sign, and date.

**Section 3. Updating and Reverification.** To be completed and signed by employer

A. New Name (if applicable) **Inga Sweden - Jones**   B. Date of rehire (month/day/year) (if applicable) **N/A**

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility. **Alien Arrival Card**

Document Title **I-551**   Document # **A------**   Expiration Date (if any) **6/14/87**

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

Signature of Employer or Authorized Representative **R. W. Walsh**   Date (month/day/year) **9 11 92**

Form I-9 11/21 91) N

Part Three of this Handbook gives instructions for completing the Form I-9 for minors and handicapped individuals who are unable to present a List A document or a List B (**Identity**) document.   This example shows a completed Form I-9 in which a parent has attested to a minor employee's identity.

**Section 1:** To be completed by the **PARENT, LEGAL GUARDIAN, OR REPRESENTATIVE OF THE NONPROFIT ORGANIZATION**

### STEP 1
Fill in the personal information.

### STEP 2
Check the box for work eligibility. Fill in other information as required.

### STEP 3
Read, then write "Individual under age 18" in the space for the employee's signature.

### STEP 4
*(Preparer/Translator)*
Read, fill in information, sign, and date.



### STEP 5
Examine a List C document establishing employment eligibility.  Fill in the document title, issuing authority, number, and expiration date (if any) in the space provided.   Under List B, write "Individual under age 18" in the space provided for "Document #."

### STEP 6
Read, fill in information, sign, and date.

**Section 2:** To be completed by the **EMPLOYER**



742

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

# INSTRUCTIONS
### PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1 - Employee.** All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

**Section 2 - Employer.** For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers, or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. **Employers must record:** **1)** document title; **2)** issuing authority; 3) document number, **4)** expiration date, if any, and 5) the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. **However, employers are still responsible for completing the I-9.**

**Section 3 - Updating and Reverification.** Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1. Employers **CANNOT** specify which document(s) they will accept from an employee

- If an employee's name has changed at the time this form is being updated/reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block B and:
  - examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),
  - record the document title, document number and expiration date (if any) in Block C, and
  - complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced provided both sides are copied. The instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the INS Handbook for Employers, (Form M-274). You may obtain the handbook at your local INS office.**

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L 99-603 (8 U.S.C. 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Naturalization Service, the Department of Labor, and the Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes, **2)** completing the form, 5 minutes, and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to both the Immigration and Naturalization Service, 425 I Street, N W , Room 5304, Washington, D. C. 20536, and the Office of Management and Budget, Paperwork Reduction Project, OMB No 1115-0136, Washington, D.C 20503.

Form I-9 (Rev 11-21-91) N

### EMPLOYERS MUST RETAIN COMPLETED I-9
### PLEASE DO NOT MAIL COMPLETED I-9 TO INS

743

8

# Part Four

## Unlawful Discrimination

### General Provisions

The Immigration and Nationality Act, as amended, and Title VII of the Civil Rights Act of 1964, as amended, prohibit employment discrimination. Employers with 4 or more employees are prohibited from discriminating against any person (other than an unauthorized alien) in hiring, discharging, or recruiting or referring for a fee because of a person's national origin, or in the case of a citizen or protected individual, because of a person's citizenship status. Employers with 15 or more employees may not discriminate against any person on the basis of national origin in hiring, discharge, recruitment, assignment, compensation, or other terms and conditions of employment.

*NOTE: For the definition of a "protected individual," see Question #41 on Page 18 of this Handbook.*

In practice, this means that employers must treat all employees the same when completing the Form I-9. Employers cannot set different employment eligibility verification standards or require that different documents be presented by different groups of employees. Employees can choose which documents they want to present from the lists of acceptable documents. An employer cannot request that an employee present more or different documents than are required or refuse to honor documents which on their face reasonably appear to be genuine and to relate to the person presenting them. An employer cannot refuse to accept a document, or refuse to hire an individual, because a document has a future expiration date. For example, temporary resident aliens have registration cards and persons granted asylum have INS work authorization documents that will expire, but they are ordinarily granted extensions of their employment authorization and they are protected by law from discrimination.

Generally, employers who have 4 or more employees cannot limit jobs to United States citizens to the exclusion of authorized aliens. Such a limitation may only be applied to a specific position when required by law, regulation, or executive order; when required by a Federal, state, or local government contract; or when the Attorney General determines that United States citizenship is essential for doing business with an agency or department of the Federal, state, or local government.

On an individual basis, an employer may legally prefer a United States citizen or national over an **equally** qualified alien to fill a specific position. **However, an employer may not adopt a blanket policy of always preferring a qualified citizen over a qualified alien.**

Verification of identity and employment eligibility is not required until an individual actually starts work. The Form I-9 should be completed at the same point in the employment process for all employees. Different procedures should not be established based on an individual's appearance, name, accent, or other factors.

### Procedures for Filing Complaints

Discrimination charges may be filed by an individual who believes he or she is the victim of employment discrimination, a person acting on behalf of such an individual, or an INS officer who has reason to believe that discrimination has occurred.

Charges of national origin discrimination against employers with 4 to 14 employees, and all charges of citizenship status discrimination against employers with 4 or more employees, should be filed with the Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) within the Department of Justice.

Discrimination charges must be filed with the OSC within 180 days of the discriminatory act. Upon receipt of a discrimination charge, the OSC will notify the employer within 10 days that the charges have been filed and that an investigation will be conducted. If the OSC has not filed a complaint with an administrative law judge within 120 days of receiving a charge of discrimination, it will notify the person making the charge of its determination not to file a complaint. The person making the charge (other than an INS officer) may file a complaint with an administrative law judge within 90 days after receiving the notice from the OSC. In addition, the OSC may still file a complaint within this 90-day period. The administrative law judge will conduct a hearing and issue a decision.

An employer is prohibited from taking retaliatory action against a person who has filed a charge of discrimination or who was a witness or otherwise participated in the investigation of another person's complaint. Such retaliatory action is a violation of the Act's anti-discrimination provision and of Title VII.

744

CutePDF - www.fenito.com

# U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

**Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.**

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name:   Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year)

City | State | Zip Code | Social Security #

| I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form. | I attest, under penalty of perjury, that I am (check one of the following): <br> ☐ A citizen or national of the United States <br> ☐ A Lawful Permanent Resident (Alien # A _____ ) <br> ☐ An alien authorized to work until ____/____/____ <br>     (Alien # or Admission # _____ ) |
|---|---|

Employee's Signature | Date (month/day/year)

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct

Preparer's/Translator's Signature | Print Name

Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year)

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: _____ | | _____ | | _____ |
| Issuing authority: _____ | | _____ | | _____ |
| Document #: _____ | | _____ | | _____ |
| Expiration Date (if any): ___/___/___ | | ___/___/___. | | ___/___/___ |
| Document #: _____ | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on** (month/day/year) ____/____/____ **and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).**

Signature of Employer or Authorized Representative | Print Name | Title

Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year)

**Section 3. Updating and Reverification.** To be completed and signed by employer

A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable)

C.   If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility

Document Title _____ | Document #: _____ | Expiration Date (if any): ___/___/___

**I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.**

Signature of Employer or Authorized Representative | Date (month/day/year)

Form I-9 (Rev. 11-21-91) N

745

CUMPDF - www.fasiio.com

746

CibPDF – www.fastio.com

# LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| **Documents that Establish Both Identity and Employment Eligibility** | **OR** | **Documents that Establish Identity** | **AND** | **Documents that Establish Employment Eligibility** |

**LIST A — Documents that Establish Both Identity and Employment Eligibility**

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship (INS Form N-560 or N-561)

3. Certificate of Naturalization (INS Form N-550 or N-570)

4. Unexpired foreign passport, with I-551 stamp or attached INS Form I-94 indicating unexpired employment authorization

5. Alien Registration Receipt Card with photograph (INS Form I-151 or I-551)

6. Unexpired Temporary Resident Card (INS Form I-688)

7. Unexpired Employment Authorization Card (INS Form I-688A)

8. Unexpired Reentry Permit (INS Form I-327)

9. Unexpired Refugee Travel Document (INS Form I-571)

10. Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B)

**LIST B — Documents that Establish Identity**

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

2. ID card issued by federal, state, or local government agencies or entities provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor, or hospital record

12. Day-care or nursery school record

**LIST C — Documents that Establish Employment Eligibility**

1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment)

2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card (INS Form I-197)

6. ID Card for use of Resident Citizen in the United States (INS Form I-179)

7. Unexpired employment authorization document issued by the INS (other than those listed under List A)

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

747

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

## INSTRUCTIONS
PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1 - Employee.** All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

**Section 2 - Employer.** For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers, or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. Employers must record: 1) document title; 2) issuing authority; 3) document number, 4) expiration date, if any, and 5) the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. **However, employers are still responsible for completing the I-9.**

**Section 3 - Updating and Reverification.** Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1. Employers **CANNOT** specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/ reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block C and:
  - examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),
  - record the document title, document number and expiration date (if any) in Block C, and
  - complete the signature block

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced provided both sides are copied. The Instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the INS Handbook for Employers, (Form M-274). You may obtain the handbook at your local INS office.**

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 U.S.C 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Naturalization Service, the Department of Labor, and the Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes; 2) completing the form, 5 minutes; and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to both the Immigration and Naturalization Service, 425 I Street, N.W., Room 5304, Washington, D. C. 20536, and the Office of Management and Budget, Paperwork Reduction Project, OMB No 1115-0136, Washington, D.C 20503.

Form I-9 (Rev. 11-21-91) N

**EMPLOYERS MUST RETAIN COMPLETED I-9**
**PLEASE DO NOT MAIL COMPLETED I-9 TO INS**

748

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB  1115-0136
**Employment Eligibility Verification**

---

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.**

---

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name:   Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

| Address (Street Name and Number) | | Apt. # | Date of Birth (month/day/year) |
|---|---|---|---|

| City | State | Zip Code | Social Security # |
|---|---|---|---|

| I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form. | I attest, under penalty of perjury, that I am (check one of the following): <br> ☐ A citizen or national of the United States <br> ☐ A Lawful Permanent Resident (Alien # A _____ ) <br> ☐ An alien authorized to work until ___/___/___ <br> (Alien # or Admission # _____ ) |
|---|---|

Employee's Signature                                      Date (month/day/year)

**Preparer and/or Translator Certification.** *(To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct*

Preparer's/Translator's Signature                      Print Name

Address (Street Name and Number, City, State, Zip Code)        Date (month/day/year)

---

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B **and** one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|

Document title: _____

Issuing authority: _____

Document #: _____

Expiration Date (if any): ___/___/___

Document #: _____

Expiration Date (if any): ___/___/___

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on** (month/day/year) ___/___/___ **and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)**

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|

---

**Section 3. Updating and Reverification.** To be completed and signed by employer

| A.  New Name (if applicable) | B.  Date of rehire (month/day/year) (if applicable) |
|---|---|

C.  If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____   Document #: _____   Expiration Date (if any): ___/___/___

**I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.**

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

Form I-9 (Rev. 11-21-91) N

749

CUSPDF - www.fesisi.com

750

## Additional Information

For more information about immigration-related discrimination, contact the Office of Special Counsel for Immigration Related Unfair Employment Practices, P.O. Box 65490, Washington, D.C., 20035-5490, or call 1-800-255-7688 or for the hearing impaired TDD 1-800-237-2515. In Washington, D.C., call (202) 653-8121 or TDD (202) 296-0168.

For more information on Title VII and policies and procedures of the Equal Employment Opportunity Commission, call 1-800-USA-EEOC.

# Part Five

## Penalties for Prohibited Practices

### A.   UNLAWFUL EMPLOYMENT

#### 1.   Civil Penalties

If an investigation reveals that an employer has knowingly hired or knowingly continued to employ an unauthorized alien, or has failed to comply with the employment eligibility verification requirements, with respect to employees hired after November 6, 1986, the INS may take action. When the INS intends to impose penalties, a Notice of Intent to Fine (NIF) is issued. Employers who receive a NIF may request a hearing before an administrative law judge. If a request for a hearing is not received within 30 days, the penalty will be imposed and a Final Order will be issued. When a Final Order is issued, the penalty is final and unappealable.

- Hiring or continuing to employ unauthorized aliens

  Employers determined to have knowingly hired unauthorized aliens (or to be continuing to employ aliens knowing that they are or have become unauthorized to work in the United States) may be ordered to cease and desist from such activity, and pay a civil money penalty as follows:

  - First Offense. Not less than $250 and not more than $2,000 for each unauthorized alien;

  - Second Offense. Not less than $2,000 and not more than $5,000 for each unauthorized alien; or

  - Subsequent Offenses. Not less than $3,000 and not more than $10,000 for each unauthorized alien.

  After November 6, 1986, if an employer uses a contract, subcontract, or exchange entered into, renegotiated, or extended, to obtain the labor of an alien and knows the alien is not authorized to work in the United States, the employer will be considered to have knowingly hired an unauthorized alien. The employer will be subject to the penalties set forth above.

751

# LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | OR | LIST B | AND | LIST C |
|---|---|---|---|---|
| **Documents that Establish Both Identity and Employment Eligibility** | | **Documents that Establish Identity** | | **Documents that Establish Employment Eligibility** |

**LIST A — Documents that Establish Both Identity and Employment Eligibility**

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship *(INS Form N-560 or N-561)*

3. Certificate of Naturalization *(INS Form N-550 or N-570)*

4. Unexpired foreign passport, with *I-551 stamp or attached INS Form I-94 indicating* unexpired employment authorization

5. Alien Registration Receipt Card with photograph *(INS Form I-151 or I-551)*

6. Unexpired Temporary Resident Card *(INS Form I-688)*

7. Unexpired Employment Authorization Card *(INS Form I-688A)*

8. Unexpired Reentry Permit *(INS Form I-327)*

9. Unexpired Refugee Travel Document *(INS Form I-571)*

10. Unexpired Employment Authorization Document issued by the INS which contains a photograph *(INS Form I-688B)*

**OR**

**LIST B — Documents that Establish Identity**

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

2. ID card issued by federal, state, or local government agencies or entities provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor, or hospital record

12. Day-care or nursery school record

**AND**

**LIST C — Documents that Establish Employment Eligibility**

1. U.S. social security card issued by the Social Security Administration *(other than a card stating it is not valid for employment)*

2. Certification of Birth Abroad issued by the Department of State *(Form FS-545 or Form DS-1350)*

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card *(INS Form I-197)*

6. ID Card for use of Resident Citizen in the United States *(INS Form I-179)*

7. Unexpired employment authorization document issued by the INS *(other than those listed under List A)*

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

Form I-9 (Rev. 11-21-91) N

752

- Failing to comply with the Form I-9 requirements

  Employers who fail to properly complete, retain, and/or make available for inspection Forms I-9 as required by law may face civil money penalties of not less than $100 and not more than $1,000 for each employee for whom the Form I-9 was not properly completed, retained, and/or made available.

- Requiring indemnification

  Employers found to have required a bond or indemnity from an employee against liability under the employer sanctions laws may be ordered to pay a civil money penalty of $1,000 for each violation and to make restitution, either to the person who was required to pay the indemnity, or, if that person cannot be located, to the United States Treasury.

- Good faith defense

  If an employer can show that he or she has complied with the Form I-9 requirements, then the employer has established a "good faith" defense with respect to a charge of knowingly hiring an unauthorized alien, unless the government can show that the employer had actual knowledge of the unauthorized status of the employee.

**2. Criminal Penalties**

- Engaging in a pattern or practice of knowingly hiring or continuing to employ unauthorized aliens

  Persons or entities who are convicted of having engaged in a pattern or practice of knowingly hiring unauthorized aliens (or continuing to employ aliens knowing that they are or have become unauthorized to work in the United States) after November 6, 1986, may face fines of up to $3,000 per employee and/or 6 months imprisonment.

- Engaging in fraud or false statements, or otherwise misusing visas, immigration permits, and identity documents

  People who use fraudulent identification or employment eligibility documents, or documents that were lawfully issued to another person, or who make a false statement or attestation for purposes of satisfying the employment eligibility verification requirements, may be fined, or imprisoned for up to 5 years, or both.

**B.  UNLAWFUL DISCRIMINATION**

If an investigation reveals that an employer engaged in unfair immigration-related employr practices under the Act, the OSC or the EEOC take action.  An employer will be ordered to stop prohibited practice and may be ordered to take on more of the following steps:

- Hire or reinstate, with or without back individuals directly injured by the discriminatic

- Lift any restrictions on an employ assignments, work shifts, or movements;

- Post notices to employees about their rights about employers' obligations;

- Educate all personnel involved in hiring an complying with the employer sanctions and discrimination laws about the requirement these laws; and/or

- Remove a false performance review or 1 warning from an employee's personnel file.

Employers may also be ordered to pay a civil mo penalty as follows:

- First Offense.  Not less than $250 and not r than $2,000 for each individual discrimin against;

- Second Offense.  Not less than $2,000 and more than $5,000 for each indivi discriminated against;

- Subsequent Offenses.  Not less than $3,000 not more than $10,000 for each indivi discriminated against; or

- Unlawful Request for More or Diffe Documents.  Not less than $100 and not r than $1,000 for each individual discrimin against.

Employers may also be ordered to keep ce records regarding the hiring of applicants employees.  If a court decides that the losing pa claim has no reasonable basis in fact or law, the c may award attorneys' fees to prevailing parties c than the United States.

753

## C. CIVIL DOCUMENT FRAUD

If an investigation reveals that an individual has knowingly committed or participated in acts relating to document fraud (see Part 1), the INS may take action. When the INS intends to impose penalties, a Notice of Intent to Fine (NIF) is issued. Persons who receive a NIF may request a hearing before an administrative law judge. If a request for a hearing is not received within 30 days, the penalty will be imposed and a Final Order will be issued. When a Final Order is issued, this penalty is final and unappealable.

Individuals may be ordered to pay a civil money penalty as follows:

- <u>First Offense</u>. Not less than $250 and not more than $2,000 for each fraudulent document used, accepted, or created and each instance of use, acceptance, or creation; or

- <u>Subsequent Offenses</u>. Not less than $2,000 and not more than $5,000 for each fraudulent document used, accepted, or created and each instance of use, acceptance, or creation.

# Part Six

## Instructions for Recruiters and Referrers for a Fee

Under the Immigration and Nationality Act, as amended by the Immigration Act of 1990, it is unlawful for an agricultural association, agricultural employer, or farm labor contractor to hire, or to recruit or refer for a fee, an individual for employment in the United States without complying with the employment eligibility verification requirements. This provision applies to those agricultural associations, agricultural employers, and farm labor contractors who recruit persons for a fee and those who **refer** persons or provide documents or information about persons to employers in return for a fee.

**This limited class of recruiters and referrers for a fee must complete the Form I-9 when a person they refer is hired.** The Form I-9 must be fully completed within 3 business days of the date employment begins, or, in the case of an individual hired for less than 3 business days, at the time employment begins.

Recruiters and referrers for a fee may designate agents, such as national associations or employers, to complete the verification procedures on their behalf. If the employer is designated as the agent, the employer should provide the recruiter or referrer with a photocopy of the Form I-9. However, recruiters and referrers are still responsible for compliance with the law and may be found liable for violations of the law.

Recruiters and referrers for a fee must retain the Form I-9 for 3 years after the date the referred individual was hired by the employer. They must also make available Forms I-9 for inspection to an INS, DOL, or OSC officer after 3 days (72 hours) advance notice.

*NOTE:   This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

The penalties for failing to comply with the Form I-9 requirements and for requiring indemnification, as described in Part 5, apply to this limited class of recruiters and referrers for a fee.

*NOTE:   All recruiters and referrers for a fee are still liable for knowingly recruiting or referring for a fee aliens not authorized to work in the United States.*

754

# Part Seven

## Some Questions You May Have About the Form I-9

### Questions About the Verification Process

1. **Q. Do citizens and nationals of the United States need to prove they are eligible to work?**

   A. Yes. While citizens and nationals of the United States are automatically eligible for employment, they too must present the required documents and complete an I-9. Citizens of the United States include persons born in Puerto Rico, Guam, the Virgin Islands, and the Northern Mariana Islands. Nationals of the United States include persons born in American Samoa, including Swains Island.

2. **Q. Do I need to complete an I-9 for everyone who applies for a job with my company?**

   A. No. You need to complete I-9s only for people you actually hire. For purposes of this law, a person is "hired" when he or she begins to work for you.

3. **Q. If someone accepts a job with my company but will not start work for a month, can I complete the I-9 when the employee accepts the job?**

   A. Yes. The law requires that you complete the I-9 only when the person actually begins working. However, you may complete the form earlier, as long as you complete the form **at the same point** in the employment process for all employees.

4. **Q. I understand that I must complete an I-9 for anyone I hire to perform labor or services in return for wages or other remuneration. What is "remuneration"?**

   A. Remuneration is anything of value given in exchange for labor or services rendered by an employee, including food and lodging.

5. **Q. Do I need to fill out an I-9 for independent contractors or their employees?**

   A. No. For example, if you contract with a construction company to perform renovations on your building, you do not have to complete I-9s for that company's employees. The construction company is responsible for completing the I-9s for its own employees. However, you must not knowingly use contract labor to circumvent the law against hiring unauthorized aliens.

6. **Q. What should I do if the person I hire is unable to provide the required documents within 3 business days of the date employment begins?**

   A. If an employee is unable to present the required document or documents within 3 business days of the date employment begins, the employee must produce a receipt showing that he or she has applied for the document. In addition, the employee must present the actual document to you within 90 days of the hire. The employee **must** have indicated on or before the time employment began, by having checked an appropriate box in Section 1, that he or she is already eligible to be employed in the United States.

   *NOTE: Employees hired for less than 3 business days must produce the actual document(s) and the I-9 must be fully completed at the time employment begins.*

7. **Q. Can I fire an employee who fails to produce the required documents within 3 business days?**

   A. Yes. You can terminate an employee who fails to produce the required document or documents, or a receipt for a document, within 3 business days of the date employment begins. **However, you must apply these practices uniformly to all employees.** If an employee has presented a receipt for a document, he or she must produce the actual document within 90 days of the date employment begins.

755

CMPDF - www.fesite.com

8. **Q. What happens if I properly complete a Form I-9 and INS discovers that my employee is not actually authorized to work?**

A. You cannot be charged with a verification violation. You will also have a good faith defense against the imposition of employer sanctions penalties for knowingly hiring an unauthorized alien, unless the government can show you had actual knowledge of the unauthorized status of the employee, if you have done the following:

° Ensured that employees fully and properly completed Section 1 of the I-9 at the time employment began;

° Reviewed the required documents which should have reasonably appeared to have been genuine and to have related to the person presenting them;

° Fully and properly completed Section 2 of the I-9, and signed and dated the employer certification;

° Retained the I-9 for the required period of time; and

° Made the I-9 available upon request to an INS, DOL, or OSC officer.

## Questions About Documents

9. **Q. May I specify which documents I will accept for verification?**

A. No   The employee can choose which document(s) he or she wants to present from the lists of acceptable documents You **must** accept any document (from List A) or combination of documents (one from List B and one from List C) listed on the I-9 and found in Part 8 of this Handbook which reasonably appear on their face to be genuine and to relate to the person presenting them.   To do otherwise could be an unfair immigration-related employment practice.  Individuals who look and/or sound foreign must not be treated differently in the hiring or verification process.

10. **Q. If an employee writes down an Alien Number or Admission Number when completing Section 1 of the I-9, can I ask to see a document with that number?**

A. No.  Although it is your responsibility as an employer to ensure that your employees fully complete Section 1 at the time employment begins, there is no requirement that employees present **any** document to complete this section.

When you complete Section 2, you may not ask to see a document with the employee's Alien Number or Admission Number or otherwise specify which document(s) an employee may present.

11. **Q. What is my responsibility concerning the authenticity of document(s) presented to me?**

A. You must examine the document(s) and, if they reasonably appear on their face to be genuine and to relate to the person presenting them, you must accept them. To do otherwise could be an unfair immigration-related employment practice. If the document(s) do not reasonably appear on their face to be genuine or to relate to the person presenting them, you must not accept them.

12. **Q. Why are certain documents listed in both List B and List C?   If these documents are evidence of both identity and employment eligibility, why aren't they found in List A?**

A. Three documents can be found in both List B and List C:  the U.S. Citizen ID Card and the ID Card for use of Resident Citizen in the U.S. -- acceptable as ID Cards in List B -- and a Native American tribal document. Although these documents are evidence of both identity and employment eligibility, they are not found in List A because List A documents are limited to those designated by Congress in the law.  An employee can establish both identity and employment eligibility by presenting one of these documents.   You should record the document title, issuing authority, number, and expiration date (if any) for that document in the appropriate spaces for **both** List B and List C.

756

14

13. **Q.** **Why is a Canadian driver's license acceptable as a List B document and not a Mexican driver's license?**

A. The United States-Canada Free-Trade Agreement and other reciprocal agreements between these 2 countries form the basis for accepting a Canadian driver's license as a List B identity document. No such reciprocal agreements currently exist between the United States and Mexico that would allow or permit the use of a Mexican driver's license as a List B identity document.

14. **Q.** **May I accept an expired document?**

A. You may accept an expired United States Passport. You may also accept an expired document from List B to establish identity. However, the document must reasonably appear on its face to be genuine and to relate to the person presenting it. You cannot accept any other expired documents.

15. **Q.** **How can I tell if an INS-issued document has expired?**

A. Some INS-issued documents, such as previous versions of the Alien Registration Receipt Card (I-151 and I-551), do not have expiration dates and are valid indefinitely. However, the 1989 revised version of the Alien Registration Receipt Card (I-551), which is rose-colored with computer readable data on the back, features a 2-year or 10-year expiration date. Other INS issued documents, such as the Temporary Resident Card (I-688) and the Employment Authorization Card (I-688A or I-688B) also have expiration dates. These dates can be found either on the face of the document or on a sticker attached to the back of the document.

16. **Q.** **Some people are presenting me with Social Security Cards that have been laminated. May I accept such cards as evidence of employment eligibility?**

A. You may not accept a laminated Social Security Card as evidence of employment eligibility if the card states on the back "not valid if laminated." Lamination of such cards renders them invalid. Metal or plastic reproductions of Social Security Cards are not acceptable.

17. **Q.** **Some people are presenting me with printouts from the Social Security Administration with their name, Social Security Number, date of birth, and their parents' names. May I accept such printouts in place of a Social Security Card as evidence of employment eligibility?**

A. No. Only a person's official Social Security Card is acceptable.

18. **Q.** **What should I do if persons present Social Security Cards marked "NOT VALID FOR EMPLOYMENT," but state they are now authorized to work?**

A. You should ask them to provide another document to establish their employment eligibility, since such Social Security Cards do not establish this.

19. **Q.** **What should I do if one of my employees tells me that his or her Social Security Number is invalid?**

A. You should tell the employee to get a proper Social Security Number by completing a Form SS-5. This form is available from the Social Security Administration. You do not need to amend your employment tax returns. However, when the employee gives you the new number, you should file a Form W-2C with the Social Security Administration for the years in which you reported income and withholding under the incorrect number. You will not be penalized or fined for the years during which you reported employees under incorrect numbers.

You should also be aware that any Social Security Number starting with a "9" is not a valid Social Security Number. Employees who are using such numbers should be instructed to get a proper Social Security Number using a Form SS-5.

20. **Q.** **May I accept a photocopy of a document presented by an employee?**

A. No. Employees must present original documents. The **only** exception is that an employee may present a **certified** copy of a birth certificate.

252

21. **Q.** **I noticed on the Form I-9 that under List A there are 2 spaces for document numbers and expiration dates. Does this mean I have to see 2 List A documents?**

**A.** No. One of the documents found in List A is an unexpired foreign passport with an attached INS Form I-94. The Form I-9 provides space for you to record the document number and expiration date for both the passport and the INS Form I-94.

22. **Q.** **When I review an employee's identity and employment eligibility documents, should I make copies of them?**

**A.** The law does not require you to photocopy documents. However, if you wish to make photocopies, you should do so for **all** employees, and you should retain each photocopy with the I-9. Photocopies must not be used for any other purpose. Photocopying documents does not relieve you of your obligation to fully complete Section 2 of the I-9 nor is it an acceptable substitute for proper completion of the I-9 in general.

**NOTE 1:** *Although a Certificate of Naturalization (INS Forms N-550 and N-570) provides across the face of the document that it may not be copied, such certificates* ***may be copied*** *in this limited situation.*

**NOTE 2:** *Copies of documents retained by Federal government employers must be kept separately from an employee's official personnel folder.*

## Questions About Completing and Retaining the Form I-9

23. **Q.** **When do I fill out the I-9 if I hire someone for less than 3 business days?**

**A.** You must complete **both** Sections 1 and 2 of the I-9 at the time of the hire. This means the I-9 must be fully completed when the person starts to work.

24. **Q.** **What should I do if I rehire a person who previously filled out an I-9?**

**A.** You do not need to complete a new I-9 if you rehire the person within 3 years of the date that the I-9 was originally completed, and the employee is still eligible to work. You should review the previously completed I-9, and if the employee's work authorization has not expired, note the date of rehire in the Updating and Reverification Section on the I-9 (Section 3), and sign in the appropriate space. If the employee's work authorization has expired, you also need to examine a document that reflects that the employee is authorized to work in the U.S., and record the document title, number, and expiration date (if any) in Section 3.

25. **Q.** **What should I do if I need to update or reverify an I-9 for an employee who filled out an earlier version of the form?**

**A.** You may line through any outdated information and initial and date any updated information. You may also choose, instead, to complete a new I-9.

26. **Q.** **Do I need to complete a new I-9 when one of my employees is promoted within my company or transfers to another company office at a different location?**

**A.** No. You do not need to complete a new I-9 for such promoted or transferred employees.

CSnPDF - www.festo.com

**27. Q. What do I do when an employee's work authorization expires?**

A. You will need to reverify on the I-9 in order to continue to employ the person. Reverification must occur not later than the date that work authorization expires. The employee must present a document that shows either an extension of the employee's initial employment authorization or new work authorization. You must review this document and, if it reasonably appears on its face to be genuine and to relate to the person presenting it, record the document title, number, and expiration date (if any), in the Updating and Reverification Section on the I-9 (Section 3), and sign in the appropriate space. You may want to establish a calendar call-up system for employees whose employment authorization will expire in the future.

*NOTE:  You cannot refuse to accept a document because it has a future expiration date. You **must** accept any document (from List A or List C) listed on the I-9 and in Part 8 of this Handbook which on its face reasonably appears to be genuine and to relate to the person presenting it. To do otherwise could be an unfair immigration-related employment practice.*

**28. Q. Can I avoid reverifying the I-9s by not hiring persons whose employment authorization has an expiration date?**

A. You **cannot** refuse to hire persons solely because their employment authorization is temporary. The existence of a future expiration date does not preclude continuous employment authorization for an employee and does not mean that subsequent employment authorization will not be granted. In addition, consideration of a future employment authorization expiration date in determining whether an alien is qualified for a particular job could be an unfair immigration-related employment practice.

**29. Q. As an employer, do I have to fill out all the I-9s myself?**

A. No. You may designate someone to fill out the I-9s for you, such as a personnel officer, foreman, agent, or anyone else acting in your interest. However, you are still liable for any violations of the employer sanctions laws.

**30. Q. Can I contract with someone to complete the I-9s for my business?**

A. Yes. You can contract with another person or business to verify employees' identity and work eligibility and to complete the I-9s for you. However, you are still responsible for the contractor's actions and are liable for any violations of the employer sanctions laws.

**31. Q. As an employer, can I negotiate my responsibility to complete the I-9s in a collective bargaining agreement with a union?**

A. Yes. However, you are still liable for any violations of the employer sanctions laws. If the agreement is for a multi-employer bargaining unit, certain rules apply. The association must track the employee's hire and termination dates each time the employee is hired or terminated by an employer in the multi-employer association.

**32. Q. What are the requirements for retaining the I-9?**

A. If you are an employer, you must retain the I-9 for 3 years after the date employment begins or 1 year after the date the person's employment is terminated, **whichever is later**. If you are an agricultural association, agricultural employer, or farm labor contractor, you must retain the I-9 for 3 years after the date employment begins for persons you recruit or refer for a fee.

259

CVIPDF - www.texiss.com

33. **Q. Will I get any advance notice if an INS, DOL, or OSC officer wishes to inspect my I-9s?**

A. Yes. The officer will give you at least 3 days (72 hours) advance notice before the inspection. If it is more convenient for you, you may waive the 3-day notice. You may also request an extension of time in which to produce the I-9s. The INS, DOL, or OSC officer will not need to show you a subpoena or a warrant at the time of the inspection.

*NOTE: This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

Failure to provide the I-9s for inspection is a violation of the employer sanctions laws and could result in the imposition of civil money penalties.

34. **Q. Do I have to complete an I-9 for Canadians who entered the United States under the Free Trade Agreement?**

A. Yes. You must complete an I-9 for all employees. Canadians must show identity and employment eligibility documents just like all other employees.

35. **Q. If I acquire a business, can I rely on the I-9s completed by the previous owner/employer?**

A. Yes. However, you also accept full responsibility and liability for all I-9s completed by the previous employer relating to individuals who are continuing in their employment.

36. **Q. If I am a recruiter or referrer for a fee, do I have to fill out I-9s on persons whom I recruit or refer?**

A. No, with three exceptions. Agricultural associations, agricultural employers, and farm labor contractors are still required to complete I-9s on all individuals who are recruited or referred for a fee. However, **all** recruiters and referrers for a fee must still complete I-9s for **their own employees** hired after November 6, 1986. Also, **all** recruiters and referrers for a fee are still liable for knowingly recruiting or referring for a fee aliens not authorized to work in the United States.

37. **Q. Can I complete Section 1 of the I-9 for an employee?**

A. Yes. You may help an employee who needs assistance in completing Section 1 of the I-9. However, you must also complete the "Preparer/Translator Certification" block. The employee must still sign the certification block in Section 1.

38. **Q. If I am a business entity (corporation, partnership, etc.), do I have to fill out I-9s on my employees?**

A. Yes, you must complete I-9s for all of your employees, including yourself.

760

CMPDF - www.fenix.com

18

39. **Q.** I have heard that some state employment agencies can certify that people they refer are eligible to work. Is that true?

**A.** Yes. State employment agencies may elect to provide persons they refer with a certification of employment eligibility. If one of these agencies refers potential employees to you with a job order or other appropriate referral form, and the agency sends you a certification within 21 business days of the referral, you do not have to check documents or complete an I-9 if you hire that person. However, you must review the certification to ensure that it relates to the person hired and observe the person sign the certification. You must also retain the certification as you would an I-9 and make it available for inspection, if requested. You should check with your state employment agency to see if it provides this service and become familiar with its certification document.

## Questions About Avoiding Discrimination

40. **Q.** How can I avoid discriminating against certain employees while still complying with this law?

**A.** You can avoid discriminating against certain employees and still comply with the law by applying the employment eligibility verification procedures of this law to **all** newly hired employees and by hiring without respect to the national origin or citizenship status of those persons authorized to work in the United States. To request to see identity and employment eligibility documents only from persons of a particular origin, or from persons who appear or sound foreign, is a violation of the employer sanctions laws and may also be a violation of Title VII of the Civil Rights Act of 1964. You should not discharge present employees, refuse to hire new employees, or otherwise discriminate on the basis of foreign appearance, accent, language, or name.

41. **Q.** I know that the Act prohibits discrimination on the basis of citizenship status against "protected individuals." Who are protected individuals?

**A.** Protected individuals include citizens or nationals of the United States, lawful permanent residents, temporary residents, and persons granted refugee or asylee status. The term does not include aliens in one of those classes who fail to make a timely application for naturalization after they become eligible.

42. **Q.** Can I be charged with discrimination if I contact the INS about a document presented to me that does not reasonably appear to be genuine and relate to the person presenting it?

**A.** No. The anti-discrimination provisions of the Act only apply to the hiring and discharging of individuals. While you are not legally required to inform the INS of such situations, you may do so if you choose to.

761

## Questions About Employees Hired Before November 6, 1986

43. **Q.** **Does this law apply to my employees if I hired them before November 7, 1986?**

  **A.** No. You are not required to complete I-9s for employees hired before November 7, 1986. However, if you choose to complete I-9s for these employees, you should do so for **all** your current employees hired before November 7, 1986.

    *NOTE: This "grandfather" status does not apply to seasonal employees, or to employees who change employers within a multi-employer association.*

44. **Q.** **What if an employee was hired before November 7, 1986, but has taken an approved leave of absence?**

  **A.** You do not need to complete an I-9 for that employee if the employee is continuing in his or her employment and has a reasonable expectation of employment at all times. However, if that employee has quit or been terminated, or is an alien who has been removed from the United States, you will need to complete an I-9 for that employee.

45. **Q.** **Will I be subject to employer sanctions penalties if an employee I hired before November 7, 1986, is an illegal alien?**

  **A.** No. You will not be subject to employer sanctions penalties for retaining an illegal alien in your workforce if the alien was hired before November 7, 1986. However, the fact that an illegal alien was on your payroll before November 7, 1986, does **not** give him or her any right to remain in the United States. Unless the alien obtains permission from the INS to remain in the United States, he or she is subject to apprehension and removal.

## Questions About Federal Income Tax Obligations

46. **Q.** **What advice should I give to my employees applying to legalize their status concerning their Federal income tax obligations?**

  **A.** You can advise employees that when they apply to INS for permanent resident status, they will be given an IRS publication explaining requirements for filing Form W-4 or W-4A to insure correct withholding of tax records (if an invalid social security number was used) and other guidelines relating to tax benefits.

47. **Q.** **What advice should I give to newly-hired employees who ask about their Federal income tax obligations?**

  **A.** First, you can tell them it is important to have a valid social security number and to properly complete a W-4 or W-4A so that the employer can withhold the proper amount for income tax. Second, you can encourage employees to apply for social security numbers for their dependent children who will be five years old or older by the end of the year. Since 1987, such numbers have been required to be provided for dependents claimed on tax returns.

CVAPDF - www.faxia.com

# Part Eight

## Acceptable Documents for Verifying Employment Eligibility

The following documents have been designated for determining employment eligibility by the Act. A person must present a document or documents that establish identity and employment eligibility. A comprehensive list of acceptable documents can be found on the next page of this Handbook and on the back of the Form I-9. Samples of many of the acceptable documents appear on the following pages.

To establish **both identity and employment eligibility**, a person can present a passport, an Alien Registration Receipt Card, or one of the other documents from List A.

If a person does not present a document from List A, he or she must present one document from List B which establishes identity **and** one document from List C which establishes employment eligibility.

To establish **identity only**, a person must present a document from List B, such as a state-issued driver's license, a state-issued identification card, or one of the other documents listed.

To establish **employment eligibility only**, a person must present a document from List C, such as a Social Security Card, a United States birth certificate, or one of the other documents listed.

If a person is unable to present the required document(s) within 3 business days of the date employment begins, he or she must present (within 3 business days) a receipt showing that he or she has applied for the document. The person then must present the actual document within 90 days of the date employment begins. The person must have indicated on or before the time employment began, by having checked an appropriate box in Section 1, that he or she is already eligible to be employed in the United States.

## LIST A
### Documents That Establish Both Identity and Employment Eligibility

- United States Passport (unexpired or expired)

- Certificate of United States Citizenship (INS Form N-560 or N-561)

- Certificate of Naturalization (INS Form N-550 or N-570)

- Unexpired foreign passport which:

  ° contains an unexpired stamp which reads "Processed for I-551. Temporary Evidence of Lawful Admission for permanent residence. Valid until _____. Employment authorized;" or

  ° has attached to it a Form I-94 bearing the same name as the passport and containing an employment authorization stamp, so long as the period of endorsement has not yet expired, and the proposed employment is not in conflict with any restrictions or limitations identified on the Form I-94.

  *NOTE: For more detailed information concerning the Form I-94, see page 23 of this Handbook.*

- Alien Registration Receipt Card (INS Form I-151 or I-551) provided that it contains a photograph of the bearer

- Unexpired Temporary Resident Card (INS Form I-688)

- Unexpired Employment Authorization Card (INS Form I-688A)

- Unexpired reentry permit (INS Form I-327)

- Unexpired Refugee Travel document (INS Form I-571)

- Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B)

763

## LIST B
### Documents That Establish Identity

For individuals 18 years of age or older:

- Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

- ID card issued by federal, state, or local government agencies or entities provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address (including U.S. Citizen ID Card [INS Form I-197] and ID Card for use of Resident Citizen in the U.S. [INS Form I-179])

- School identification card with a photograph

- Voter's registration card

- United States military card or draft record

- Military dependent's identification card

- United States Coast Guard Merchant Mariner Card

- Native American tribal document

- Driver's license issued by a Canadian government authority

For individuals under the age of 18 who are unable to present one of the documents listed above:

- School record or report card

- Clinic, doctor, or hospital record

- Day-care or nursery school record

## LIST C
### Documents That Establish Employment Eligibility

- U.S. Social Security Number Card other than one which has printed on its face "NOT VALID FOR EMPLOYMENT"

  *NOTE:  This must be a card issued by the Social Security Administration; a facsimile (such as a metal or plastic reproduction) is not an acceptable document.*

- Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

- Original or certified copy of a birth certificate issued by a state, county, municipal authority, or outlying possession of the United States bearing an official seal

- Native American tribal document

- U.S. Citizen ID Card (INS Form I-197)

- ID Card for Use of Resident Citizen in the U.S. (INS Form I-179)

- Unexpired employment authorization document issued by the INS

CVAPDF - www.teslio.com

# Document List A

## Documents That Establish Both Identity and Employment Eligibility

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

### United States Passport

Issued by the Department of State to United States citizens and nationals.



### Certificate of United States Citizenship
### N-560 or N-561

Issued by INS to individuals who:  1) derive citizenship  through  parental  naturalization;  2) acquired citizenship at birth abroad through United States parent or parents; or 3) acquire citizenship through application by United State citizen adoptive parent(s); and who, pursuant t section 341 of the Act, have applied for certificate of citizenship.



### Certificate of Naturalization
### N-550 or N-570

Issued by INS to naturalized United States citizens.



### Certificate of Naturalization
### N-550

Issued by INS to naturalized United State citizens who file for naturalization after October 1 1991.



## Unexpired Foreign Passport with I-551 Stamp

 

## I-94 Arrival/Departure Record

Arrival-departure record issued by INS to nonimmigrant aliens. An individual in possession of the departure portion of this document may only be employed if the document bears an "employment authorization" stamp or employment incident to the nonimmigrant classification is authorized with a specific employer (i.e. A-1, A-2, A-3, C-2, C-3, E-1, E-2, G-1, G-2, G-3, G-4, G-5, H-1A, H-1B, H-2A, H-2B, H-3, I, L-1, O-1, O-2, P-1, P-2, P-3, Q, NATO 1-7 and TC). The expiration date is noted on the Form I-94.

766

24

## Alien Registration Receipt Card I-151

Issued by INS prior to June 1978, to lawful permanent resident aliens. There are numerous versions of this card because it was periodically revised. Although this card is no longer issued, it is valid indefinitely. This card is also commonly referred to as a "green card" although most versions were blue.

 

## Alien Registration Receipt Card (Resident Alien Card) I-551

Issued by INS after March 1977, to lawful permanent resident aliens. Although this card is no longer issued, it is valid indefinitely. This card is commonly referred to as a "green card" and is the replacement for the Form I-151. This version is white with a blue logo.

 

## Alien Registration Receipt Card (Conditional Resident Alien Card) I-551

Issued by INS after January 1987, to conditional permanent resident aliens such as alien spouses of United States citizens or lawful permanent resident aliens. It is similar to the I-551 issued to permanent resident aliens. Although this card is no longer issued, it is valid for 2 years from the date of admission or adjustment. The expiration date is stated on the back of the card. This version is white with a blue logo.

 

## Alien Registration Receipt Card (Resident Alien Card) I-551

Currently issued by INS since 1989 to both conditional and lawful permanent resident aliens. Although it is similar to the previously issued I-551s, this card is valid only for a limited period of time -- 2 years from the date of admission or adjustment for conditional permanent resident aliens and 10 years from issuance for lawful permanent resident aliens. The expiration date is stated on the front of the card. This version is rose-colored with a blue logo.

 

762

## Temporary Resident Card I-688

Issued by INS to aliens granted temporary resident status under the Legalization or Special Agricultural Worker program.   It is valid until the expiration date stated on the face of the card or on the sticker(s) placed on the back of the card.




## Employment Authorization Card I-688A

Issued by INS to applicants for temporary resident status after their interview for Legalization or Special Agricultural Worker status.  It is valid until the expiration date stated on the face of the card or on the sticker(s) placed on the back of the card.



76F

26

---

## Employment Authorization Card I-688B

Issued by INS to aliens granted temporary employment authorization in the U.S.  The expiration date is noted on the face of the card.

 

## Unexpired Re-Entry Permit I-327

Issued by INS to lawful permanent resident aliens before they leave the United States for a 1-2 year period.

 

769

## Unexpired Refugee Travel Document I-571

Issued by INS to aliens who have been granted refugee status.  The expiration date is stated on page four (4).





28

# Document List B

## Documents That Establish Identity Only

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

### Sample Driver's License

A driver's license issued by any state or outlying possession of the United States (including the District of Columbia, Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa) or by a Canadian government authority is acceptable if it contains a photograph or other identifying information such as name, date of birth, sex, height, color of eyes, and address.

 

### Sample State Identification Card

An identification card issued by any state (including the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and the Northern Mariana Islands) or by a local government is acceptable if it contains a photograph or other identifying information such as name, date of birth, sex, height, color of eyes, and address.



**See List C for ID cards issued by INS.**

CIMPDF - www.fesko.com

# Document List C

## Documents That Establish Employment Eligibility Only

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

**Social Security Card** (other than one stating "NOT VALID FOR EMPLOYMENT," metal or plastic reproductions, . or certain laminated cards.)  There are many versions of this card.



This card is invalid if laminated.

This card is invalid if not signed by the number holder unless health or age prevents signature.

Improper use of this card and/or number by the number holder or any other person is punishable by fine, imprisonment or both

This card is the property of the Social Security Administration and must be returned upon request. If found, return to:
SSA—PO Box 1264
Baltimore, MD 1264
ATTN: FOUND SSN CARD (Return postage guaranteed)

**Department of Health and Human Services**
Social Security Administration
Form OA-702 ( 10-83 )      B 05193176

---

### Certifications of Birth Issued by the Department of State

| **FS-545** | **DS-1350** |
|---|---|
| Issued by U.S. embassies and consulates overseas to United States citizens born abroad. | Issued by the U.S. Department of State to United States citizens born abroad. |

772

**30**

## Sample Birth Certificates





### United States Citizen Identification Card I-197
Issued by INS to United States citizens.  Although INS no longer issues this card, it is valid indefinitely.





### Identification Card for Use of Resident Citizen in the United States I-179
Issued by INS to United States citizens who are residents of the United States.  Although INS no longer issues this card, it is valid indefinitely.





CIVPDF · www.texio.com

## I-20 ID Card Accompanied by a Form I-94

The Form I-94 for F-1 nonimmigrant students must be accompanied by an I-20 Student ID endorsed with employment authorization by the Designated School Official for off-campus employment or curriculum practical training.   INS will issue Form I-688B (Employment Authorization Document) to all  students (F-1 and M-1) authorized for a post-completion practical training period.



### Form I-20 Student ID  (Reverse)

Endorsement by Designated School Official for Employment Authorization.

Case 1:94-cv-00215   Document 55   Filed in TXSD on 05/28/1995   Page 148 of 174

**IAP-66 Accompanied by a Form I-94**

Nonimmigrant exchange visitors (J-1) must have an I-94 accompanied by an unexpired IAP-66, specifying the sponsor and issued by the United States Information Agency (USIA). (J-1 students working outside the program indicated on the IAP-66 also need a letter from their responsible school officer.)

Departure Number

742832045 01

U.S. IMMIGRATION
250 WAS ▓▓

Immigration and
Naturalization Service
I-94
Departure Record

SEP 13 1991
ADMITTED J-1
UNTIL
Oct 07, 1995

14 Family Name
SMITH

15 First (Given) Name
JANE

17 Country of Citizenship
UK

16 Birth Date (Day Mo Yr)
02.01.45

---

ASSURE THAT IMPRESSIONS ON
ALL COPIES ARE CLEAR

APPROVED OMB 3116-0005 EXP 10/31/83
*Estimated Burden Hours  15 mins. (See page 4)

PLEASE DO NOT STAPLE THIS FORM

**United States Information Agency**
EXCHANGE VISITOR FACILITATIVE STAFF GC-V
CERTIFICATE OF ELIGIBILITY FOR EXCHANGE VISITOR (J-1) STATUS

1. THE PURPOSE OF THIS FORM IS TO

SMITH        Jane

( 1 ) Begin a new program ( I supernumerary to continue using managers

2 ( ) Extend an on-going program

3 ( ) arrive to a different program

4 ( ) Replace a lost form

5 ( ) Permit visitor's immediate family members to enter U.S. separately

U.S. address

2.        will be sponsored by

to participate in Exchange Visitor Program No.        which is still valid and is officially described as follows

SAMPLE

3. This form covers the period from        to 09 08 95   Students are permitted to travel abroad & maintain status (e.g. obtain a new visa) under duration of the program as indicated by the dates on this form.

4. The category of this visitor is 1. ( )Student  2.( )Trainee  3.( )Teacher  4.( )Professor  Research Scholar or Specialist  5.( )International Visitor  6.( )Medical Trainee  7.( )Alien employee of the USIA  The Specific field of study research training or professional activity is        described as follows

5. During the period covered by this form

6. N S USE

IAP-66 (12-86)        Copy 1 - For Immigration and Naturalization Service        PAGE 1

775

# REMEMBER:

- Hiring employees without complying with the employment eligibility verification requirements is a violation of the employer sanctions laws.

- This law requires employees hired after NOVEMBER 6, 1986 to present documentation that establishes identity and employment eligibility, and employers to record this information on Forms I-9.

- Employers may not discriminate against employees on the basis of national origin or citizenship status.

776

**How to Obtain More Information:**   If you have questions after reviewing this handbook, you may obtain information from one of the following local INS offices.  Direct your letter to the attention of the *Employer and Labor Relations Officer.*

**ALABAMA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**ALASKA**
620 East 10th Ave., Suite 102
Anchorage, AK 99501

**ARIZONA**
2035 N. Central Ave.
Phoenix, AZ 85004

**ARKANSAS**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**CALIFORNIA**
300 N. Los Angeles St.
Los Angeles, CA 90012

880 Front St.
San Diego, CA 92188

630 Sansome St.
San Francisco, CA 94111-2280

**COLORADO**
4730 Paris St., Albrook Center
Denver, CO 80239-2804

**CONNECTICUT**
JFK Federal Building
Government Center
Boston, MA 02203

**DELAWARE**
1600 Callowhill St.
Philadelphia, PA 19130

**DISTRICT OF COLUMBIA**
4420 N. Fairfax Dr.
Arlington, VA 22203

**FLORIDA**
7880 Biscayne Blvd.
Miami, FL 33138

**GEORGIA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**GUAM**
595 Ala Moana Blvd.
Honolulu, HI 96813

**HAWAII**
595 Ala Moana Blvd.
Honolulu, HI 96813

**IDAHO**
900 N. Montana Ave.
Helena, MT 59601

**ILLINOIS**
10 W. Jackson Blvd., Rm. 533
Chicago, IL 60604

**INDIANA**
10 W. Jackson Blvd., Rm. 533
Chicago, IL 60604

**IOWA**
3736 S. 132nd St.
Omaha, NE 68144

**KANSAS**
9747 N. Conant Ave.
Kansas City, MO 64153

**KENTUCKY**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**LOUISIANA**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**MAINE**
739 Warren Ave.
Portland, ME 04103

**MARYLAND**
1530 Caton Center Dr., Bldg. D, Suite M
Baltimore, MD 21227

**MASSACHUSETTS**
JFK Federal Building
Government Center
Boston, MA 02203

**MICHIGAN**
Federal Building, 333 Mt. Elliott St.
Detroit, MI 48207

**MINNESOTA**
2901 Metro Dr., Suite 100
Bloomington, MN 55425

**MISSISSIPPI**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**MISSOURI**
9747 N. Conant Ave.
Kansas City, MO 64153

**MONTANA**
900 N. Montana Ave.
Helena, MT 59601

**NEBRASKA**
3736 S. 132nd St.
Omaha, NE 68114

**NEVADA**
2035 N. Central Ave.
Phoenix, AZ 85004

**NEW HAMPSHIRE**
JFK Federal Building
Government Center
Boston, MA 02203

**NEW JERSEY**
Federal Building, 970 Broad St.
Newark, NJ 07102

**NEW MEXICO**
343 U.S. Courthouse, P.O. Box 9398
El Paso, TX 79984

**NEW YORK**
68 Court St.
Buffalo, NY 14202

26 Federal Plaza
New York, NY 10278

**NORTH CAROLINA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**NORTH DAKOTA**
2901 Metro Dr., Suite 100
Bloomington, MN 55425

**OHIO**
1240 E. 9th St., Room 1917
Cleveland, OH 44199

**OKLAHOMA**
4149 Highline Blvd., #300
Oklahoma City, OK 73108

**OREGON**
511 N.W. Broadway
Portland, OR 97209

**PENNSYLVANIA**
1600 Callowhill St.
Philadelphia, PA 19130

**PUERTO RICO**
P.O. Box 365068
San Juan, PR 00936

**RHODE ISLAND**
JFK Federal Building
Government Center
Boston, MA 02203

**SOUTH CAROLINA**
Room 110 Federal Building
334 Meeting St.
Charleston, SC 29403

**SOUTH DAKOTA**
2901 Metro Dr., Suite 100
Bloomington, MN 55425

**TENNESSEE**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**TEXAS**
8101 N. Stemmons Freeway
Dallas, TX 75247

P.O. Box 9398
El Paso, TX 79984

805 No. T St.
Harlingen, TX 78550

509 N. Belt
Houston, TX 77060

727 E. Durango, Suite A301
San Antonio, TX 78206

**UTAH**
4730 Paris St., Albrook Center
Denver, CO 80239-2804

**VERMONT**
739 Warren Ave.
Portland, ME 04103

**VIRGINIA**
4420 N. Fairfax Dr.
Arlington, VA 22203

**VIRGIN ISLANDS**
PO Box 610, Charlotte Amilie
St. Thomas, VI 00801

Po Box 1270, Kingshill, Christiansted
St. Croix, VI 00850

**WASHINGTON**
815 Airport Way South
Seattle, WA 98134

**WEST VIRGINIA**
1600 Callowhill St.
Philadelphia, PA 19130

**WISCONSIN**
10 W. Jackson Blvd., Rm. 533
Chicago, IL 60604

**WYOMING**
4730 Paris St., Albrook Center
Denver, CO 80239-2804

Internal Revenue Service
W/XOO  9595
Rancho Cordova, CA   95743-9999

Official Business
Penalty for Private Use, $300
**Do Not Forward**

Bulk Rate
Postage and Fees Paid
**IRS**
Permit No. **G-48**

If you have questions after reviewing this Handbook, please contact your local
INS office at the address found in the back of this Handbook. Direct your letter
to the attention of the *Employer Relations Officer.*
# DO NOT CONTACT THE INTERNAL REVENUE SERVICE (IRS)

☆ U S GOVERNMENT PRINTING OFFICE  1991-285-500

778

EXHIBIT (7)

CVISPDF – www.fastio.com

U.S. Department of Justice
Immigration and Naturalization Service
and
Office of Special Counsel
for Immigration-Related
Unfair Employment Practices

*M-279 (4-88)*



# IMMIGRATION REFORM AND CONTROL ACT OF 1986 (IRCA):

# YOUR JOB AND YOUR RIGHTS





780

# YOUR JOB AND YOUR RIGHTS
## UNDER IRCA

The Immigration Reform and Control Act (IRCA) was signed by the President on November 6, 1986. It is now against the law for an employer to knowingly hire an alien who is not authorized to work in the United States. Consequently, *all* employees hired after that date, including United States citizens, must show their employers documents that prove their identity and their eligibility to work in this country.

However, while the law creates a new step in the employment process, it also provides important protections from discrimination by employers on the basis of national origin or citizenship status. Under IRCA, you have responsibilities and you have rights. To learn about both, we urge you to read this brochure.

Alan C. Nelson
Commissioner
Immigration and
Naturalization Service

Lawrence J. Siskind
Special Counsel
Office of Special Counsel
for Immigration-Related
Unfair Employment Practices



781

# I. WHO IS COVERED BY THE LAW

### 1. What's the most basic change brought about by the new law called IRCA that I need to know?

If you have been hired after November 6, 1986, you must fill out and sign a Form I-9. Within three business days you must also show your employer document(s) that establish your identity and your eligibility to work in the U.S. (For a copy of the form and other details, see pages 6-7.)

If you get your job through a recruiter or referrer who receives a fee for those employment services, you should be prepared to show your documents and fill out the Form I-9.

If you have continuously worked at your present job since prior to November 7, 1986, you do not have to fill out the Form I-9 or show the documents. Although not required by IRCA, your employer may ask you for those documents as long as he or she does so for *all* employees hired before that date.

### 2. If I am a United States citizen or national, do I need to prove that I am eligible to work?

Yes, even if you were born in the United States and have been a lifelong resident here. The law requires *all* newly hired employees to produce these documents—United States citizens and nationals, permanent resident aliens, and aliens authorized to work in the United States.

### 3. Does IRCA apply to all jobs?

Yes, it applies to all employment in the United States, including employment on U.S. ships and aircraft that touch at ports or airports in the United States. The provisions of the law apply even if the job is part-time, or for a short period of time with the *limited* exception of (1) casual domestic workers in private homes who work on an off-and-on basis and (2) poll workers and election judges who work on election day.

### 4. If I am self-employed, must I complete Form I-9?

If you are self-employed, you need *not* complete Form I-9 for yourself. However, you must complete Form I-9 for any of your employees.

### 5. If I am an independent contractor, must I fill out Form I-9?

Because you are not an employee, the person or business for which you are doing work is not required to have you complete Form I-9. On the other hand, if you *work for* an independent contractor, your employer should ask you to fill out a Form I-9 and show the necessary documents.

2



## II. DOCUMENTS YOU NEED TO SHOW

### 1. What kinds of documents must I present to my employer?

You must present original or certified copies of documents that establish (a) your identity *and* (b) your authorization to work in the United States.

### 2. Are there documents that establish both my identity and my work authorization?

Yes. Any *one* of the following documents will satisfy both requirements:

- United States passport (current or expired).
- Certificate of United States Citizenship, INS Form N-560 or N-561.
- Certificate of Naturalization, INS Form N-550 or N-570.
- Unexpired foreign passport which:
  Contains an unexpired stamp which reads "Processed for I-551. Temporary Evidence of Lawful Admission for Permanent Residence. Valid until _____. Employment Authorized."
  **OR**
  Has attached to it Form I-94 (Arrival-Departure Record) bearing an employment authorization stamp (so long as the period of employment authorization has not expired and the employment does not conflict with any restrictions noted on Form I-94).
- Alien Registration Receipt Card, INS Form I-151 or INS Form I-551, with a photograph.
- Temporary Resident Card, INS Form I-688.
- Employment Authorization Card, INS Form I-688A.

### 3. If I don't have one of these documents, what else can I use?

If you cannot provide one of these documents, then you must provide a combination of *two* documents—one for *identity* and another for *work authorization*.

Any *one* of the following will establish *identity*:

- State-issued driver's license with a photograph or identifying information (such as name, date of birth, sex, height, color of eyes, and address).
- State-issued identification card [1] with a photograph or identifying information (such as name, date of birth, sex, height, color of eyes, and address),

---

[1] This includes an identification card issued by any of the 50 states, the District of Columbia, Puerto Rico, Guam, the United States Virgin Islands, American Samoa and Swains Island.

3

- School identification card with a photograph.
- Voter's registration card.
- United States military card or draft record.
- Identification card issued by a federal, state, or local government agency.
- Military dependent's identification card.
- Native American tribal document.
- United States Coast Guard Merchant Mariner card.
- Driver's license issued by a Canadian government authority.

You must also produce *one* of the following to prove your work authorization:

- A Social Security number card (other than one which has printed on its face "not valid for employment"). This must be a card issued by the Social Security Administration; a facsimile (such as a metal or plastic reproduction that people can buy) is not acceptable.
- An original or certified copy of a birth certificate issued by a state, county, or municipal authority bearing an official seal.
- Unexpired Employment Authorization document issued by the Immigration and Naturalization Service.
- Unexpired re-entry permit, INS Form I-327.
- Unexpired Refugee Travel Document, INS Form I-571.
- Certificate of Birth issued by the Department of State, Form FS-545.
- Certificate of Birth Abroad issued by the Department of State, Form DS-1350.
- United States Citizen Identification Card, INS Form I-197.
- Identification Card for use of Resident Citizen in the United States, INS Form I-179.
- Native American tribal document.

Employers cannot require one type of document over another. They must accept any of the documents listed above, but may *not* accept any document that is *not* on one of these lists.

### 4. What if I do not have any of the documents in my possession when I start work?

If you do not have any of the necessary documents, then you must try to obtain the documents within three business days. Many of the approved documents can be obtained on the same day you apply. If you cannot get the document immediately, you must provide your employer with proof that you have applied for it. For example, you can show your employer the receipt given to you by the Social Security Administration when you applied for a Social Security card. Once you have applied for a document, you have 21 business days *from the date you were hired* to present the document or documents to your employer.



784          4

ChkPDF - www.fenito.com

If you are an alien who has applied to the Immigration and Naturalization Service for employment authorization, *you must receive the employment authorization document before you start your job.*

## 5. What if my job lasts for less than three days?

If you are hired for less than three days, then you and your employer must complete the Form I-9 by the end of the first working day.

## 6. Is any special consideration given to minors and handicapped individuals with respect to their documents?

Yes, but only with respect to *identity* documents. You will still need one of the work authorization documents listed above, unless you show a document that serves the dual purpose of identity and work authorization.

If you are *under* 18 years of age, or you are physically or mentally handicapped, and do not have any of the above *identity* documents normally required, you have two alternatives. First, you may produce one of the following:

● School record or report card.
● Clinic, doctor, or hospital record.
● Daycare or nursery school record.

Your other alternative is to have your parent or guardian complete the Form I-9 for you for purposes of identification.

In the case of handicapped individuals, a representative of a non-profit organization, association or vocational rehabilitative service may also complete the Form I-9.

785

## III. FILLING OUT THE FORM I-9

### 1. What information does the Form I-9 require?

When you are hired at a job, your employer will ask you to fill out and sign Part 1 of Form I-9. This is what it looks like.

**EMPLOYMENT ELIGIBILITY VERIFICATION (Form I-9)**

| Name *(Print or Type)* Last | First | Middle | Maiden Name |
|---|---|---|---|
| Smith | Mary | Ellen | Adams |

Address *(Street Name and Number)* ____ City ____ State ____ Zip Code
4502 Birch Ln, Danville, TN 37832

Date of Birth *(Month/Day/Year)*      Social Security Number
6/26/53                               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

☒ 1. A citizen or national of the United States.
☐ 2. An alien lawfully admitted for permanent residence (Alien Number A _____).
☐ 3. An alien authorized by the Immigration and Naturalization Service to work in the United States (Alien Number A _____ or Admission Number _____, expiration of employment authorization, if any _____).

Signature: Mary Ellen Smith     Date (Month/Day/Year): 6/25/87

*Your signature means you have sworn that the information you have provided is true.*

Your employer will have the form for you. You are only required to complete Form I-9 and present supporting documents *at the time* you are hired, *not when you are applying for the job.* However, the employer by choice, may have you complete Form I-9 earlier, if it is required for *all* applicants. Generally, it would be easier for you and your employer if you can produce the documents proving your identity and work eligibility on your first day of work.

After reviewing your completed Form I-9 and your documents, your employer will copy the numbers and expiration dates onto Part 2 of Form I-9. The Form I-9 remains in your employer's files; the documents must be returned to you, although photocopies may be kept on file, too.

It is extremely important that you keep the original documents and make sure they are kept current at all times. *Remember: You will need these documents any time you start a new job.*

### 2. The Form I-9 has a space for my Social Security number. Does this mean I can't start work without such a number?

You can start work as far as the Immigration Reform and Control Act (IRCA) is concerned, but you need that number for many other federal legal purposes, such as income tax deductions and payment of the Social Security tax. To get a Social Security card, call or visit any Social Security office

6



786

ClickPDF - www.fxesta.com

and ask for an application form SS-5. Find out what documents you need to complete the form and then *take them in person* to the Social Security office; *do not mail them.*

### 3. What if I need help filling out the Form I-9 because I do not read English, or have other problems?

If you do not read English or it is hard for you to understand or fill out the form, you may ask a friend, your employer, or any other person to help you. The person who helps you must sign the Preparer/Translator Certification as shown on the Form I-9, Part I. If you are a minor or handicapped, and your parent or 'guardian proves your identity and presents your employment eligibility documents for you, he or she will then fill out the Preparer's Certification of the Form I-9.

### 4. I have heard that employers sometimes require a new hire to pay money or post a bond to guarantee that the person is eligible to work in the United States. Is that legal?

No, it is *illegal* for your employer to require such payment, and you should call or visit the nearest office of the United States Immigration and Naturalization Service immediately to report the incident. Employers cannot require you to post a bond, buy insurance, pay money or agree to pay money, or give any other form of guarantee or indemnity for the purpose of protecting themselves from a penalty, under IRCA, for hiring, recruiting, or referring you. Any employer who does so can be fined and required to return your money.

### 5. What will happen if I refuse to sign the Form I-9 or if I fail to provide the documents?

Your employer can refuse to hire you or if you have already begun to work, fire you.

### 6. What will happen if I lie on the Form I-9?

You may be prosecuted if you lie, provide false documents, or use the documents of another person. The penalty may be a fine, imprisonment, or both.

7

# IV. PROTECTION AGAINST EMPLOYMENT DISCRIMINATION

### 1. How am I protected from employment discrimination?

Both the Immigration Reform and Control Act (IRCA) and Title VII of the Civil Rights Act of 1964 protect you from employment discrimination.

IRCA prohibits discrimination on the basis of your national origin and citizenship status. Discrimination is prohibited in hiring, firing, and recruitment or referral for a fee.

Title VII prohibits discrimination on the basis of your national origin and on other bases. Discrimination is prohibited in hiring, firing, recruitment, benefits, and other terms and conditions of employment.

You may also be protected by state and local laws.

### 2. Who enforces these laws?

The Office of Special Counsel for Immigration-Related Unfair Employment Practices (Office of Special Counsel) enforces IRCA's provisions with respect to discrimination. Fo employers with four to 14 employees, it enforces the prohibition against national origin discrimination. For employers with four or more employees, the Office of Special Counsel also enforces the law's prohibition against citizenship status discrimination.

For employers with 15 or more employees, the Equal Employment Opportunity Commission (EEOC) enforces Title VII's prohibition against national origin discrimination, as well as its prohibitions against employment discrimination on the basis of race, color, sex, and religion.

### 3. What protection do I have against discrimination because of my national origin?

An employer may not fire you or refuse to hire you because you or your relatives were born in another country or because you appear to be foreign or have a foreign name or accent. In addition, employers may not ask just those who look or sound foreign or who are of a particular national origin for documents required by IRCA. They must ask *all* new employees for proof of their identity and work authorization.

If your employer has 15 or more employees, you are also protected from employment restrictions based on English-language requirements, height and weight requirements, or job tests, if these requirements disproportionately affect persons of a particular national origin and are not essential to do the job.

8





788





**4. What kinds of protections do I have against discrimination based on citizenship?**

IRCA prohibits discrimination based on citizenship status by all employers who have four or more employees. People protected are United States citizens and nationals, and "intending citizens." The law does *not* protect aliens who are not authorized to work in the United States.

In addition, EEOC can investigate alleged citizenship discrimination by employers with 15 or more employees, to see if the discriminatory act has the purpose or effect of discriminating on the basis of national origin.

**5. How do I become an "intending citizen"?**

IRCA has two basic requirements for "intending citizens." First, you must be an alien in *one* of the following categories:

• Those granted legal permanent resident status.
• Those granted temporary resident status under IRCA's legalization program for aliens residing in the United States since January 1, 1982.
• Aliens granted asylum.
• Aliens admitted as refugees.

Second, you must also complete a declaration of intention to become a citizen using INS Form I-772, "Declaration of Intending Citizen" or INS Form N-315, "Declaration of Intention."

To remain an intending citizen:

• You must file your application for naturalization (INS Form N-400) within six months of becoming eligible to do so.
• Once you have applied for naturalization, you must become naturalized within two years of the date you applied (not counting the processing time of the Immigration and Naturalization Service).

**6. Am I protected from citizenship status discrimination if I have applied for legalization?**

If your application for temporary resident status has been approved, you are protected from citizenship status discrimination from the date indicated on the application fee receipt issued by the INS Legalization Office.

**7. Can employers limit jobs to U.S. citizens if they wish?**

Generally under IRCA, employers who have four or more employees *cannot* limit jobs to United States citizens. They can only do so under one or more of the following circumstances:

• If required by law, regulation, or executive order.
• If required by federal, state or local government contract.

9

785

• If the Attorney General of the United States determines th
the requirement of U.S. citizenship is essential for the
employer to do business with an agency or department of
the federal, state or local government.

However, on an individual basis, your employer may legally
prefer a United States citizen or national over an equally
qualified alien.

For employers with 15 or more employees, the circumstance
cited may not apply to a charge of discrimination filed with
EEOC.

### 8. What do I do if I believe an employer has discriminate against me and the employer is covered by one of these laws?

You or someone on your behalf may file a charge with the
appropriate agency. Charges must be filed within 180 days of
the discriminatory act. (Note: For Title VII charges, in some
states, it may be possible to file a charge with EEOC within
240 or 300 days; however, to protect your rights, it is
advisable to file within 180 days of the discriminatory act.)

Forms for filing charges under the Immigration Reform and
Control Act (IRCA) are available in English and Spanish at
local Immigration and Naturalization Service offices, United
States Attorneys' offices, Equal Employment Opportunity
Commission offices, and at:

> **The Office of Special Counsel**
> **P.O. Box 65490**
> **Washington, D.C. 20035-5490.**

Charges under IRCA must be mailed to the address above or
delivered to the Office of Special Counsel in Washington,
D.C. You do not have to use the charge form, but your charge
must be in writing, under oath, and must contain the informa
tion required in the form. Remember that for a charge of
citizenship discrimination, you must first file a declaration of
intention (Form I-772) with the INS,* if you are an alien.

EEOC charge forms are available at EEOC field offices.
Charges may be filed in person, by mail or by telephone.
To contact the appropriate field office, call toll free
**1-800-USA-EEOC.**

You may also be protected from employment discrimination
by state and local laws. For more information, call or visit
your state, county or municipal human rights or equal
employment opportunity or fair employment office.

---

*You may also use Form N-315, which is filed with any court exercising
naturalization jurisdiction.

10



790

**9. Can my employer take action against me because I have filed a charge of discrimination?**

No. You should report any such action immediately to the agency handling your charge. In addition, your employer cannot take action against you because you were a witness or participated in the investigation of someone else's charge. Again, you should report any such action immediately to the agency investigating the charge.

*For answers to other questions you may have, as well as information on how to file a charge, please see page 12.*

11

## HOW TO GET MORE INFORMATION

**For toll-free information from the Immigration and Naturalization Service, call 1-800-777-7700.**

Category 1, #5—Information on antidiscrimination provisions of the new law.

Category 6, #2—Documents a U.S. citizen may use to show work eligibility.

Category 6, #3—Documents an alien may use to show authorization to work.

**For specific information on the antidiscrimination provisions of IRCA or to file a charge, call or write:**

Office of Special Counsel for Immigration-Related Unfair
   Employment Practices
P.O. Box 65490
Washington, D.C. 20035-5490

1-800-255-7688 (toll free)
1-202-653-5710 (TDD for the hearing impaired)

In the Washington, D.C. area, call:   653-8121.

**For specific information on discrimination prohibited by Title VII of the Civil Rights Act of 1964, call:**

1-800-USA-EEOC (toll free)
1-202-634-7057 (TDD for the hearing impaired) ·

☆ U. S. GOVERNMENT PRINTING OFFICE: 1988  221-053/90152



792

EXHIBIT (8)

793

CVisPDF – www.fastio.com

Copr. (C) West 1995 No claim to orig. U.S. govt. works
Not Reported in F.Supp.
(Cite as: 1992 WL 106474 (E.D.N.Y.))

**Ime Archibong ETUK, et al., Plaintiffs,**
**v.**
**William S. SLATTERY, et al., Defendants.**
**No. 89 CV 3265.**
United States District Court, E.D. New York.
April 30, 1992.

The Legal Aid Society (Kathleen A. Masters, Esq., Margaret H.
McDowell, Esq., and Manuel D. Vargas, Esq., of counsel), New York
City, for plaintiffs.

Andrew J. Maloney, U.S. Atty. (Scott Dunn, Special Asst. U.S.
Atty., of counsel), Brooklyn, N.Y., for defendants.

MEMORANDUM AND ORDER

NICKERSON, District Judge,

*1 Plaintiff class, permanent resident aliens in the United
States, brought this action seeking declaratory and injunctive
relief. They allege that the defendants, officials of the
Immigration and Naturalization Service (INS), are violating
plaintiffs' rights under federal law and the United States
Constitution by withholding permanent resident alien cards, Form
I-151 or I- 551, ("green cards" in the vernacular) or adequate
replacements for the cards.

In Etuk v. Blackmun, 748 F.Supp. 990 (E.D.N.Y.1990),
familiarity with which is assumed, this court held that the INS,
under the pertinent statutory provisions, must issue to permanent
residents, who have lost their green cards or have had them taken
pending deportation proceedings, at least a temporary substitute in
lieu of a green card complying with the requirements of 8 U.S.C. s
1324a(b)(1)(B)(v) and containing no information casting doubt on
the bearer's status as a lawful permanent resident. The court held
that the INS's Form I-94 Departure Record, Form I-94 Arrival
Record, and the Form I-688B did not meet these requirements.

The court reserved decision on whether the same ruling should
apply to those in exclusion proceedings who had been paroled into
the United States.

On November 28, 1990, this court issued an order, familiarity
with which is assumed, implementing the above Memorandum and Order,
and directing that "Defendants shall provide temporary proof of
status no later than twenty-one business days after the date of
application and a receipt on the day of application." (P 6).

The Second Circuit upheld the September 27, 1990 decision in
general, directed this court to modify one part of the order, and
remanded for clarification or further consideration the adequacy of
the "I-94 Arrival Record" issued by INS as a temporary substitute
for a green card. Etuk v. Slattery, 936 F.2d 1433 (2d Cir.1991).

In a December 16, 1991 Memorandum and Order, familiarity with
which is assumed, this court modified the November 28, 1990 order
as directed by the Court of Appeals. This court also explained why
the I-94 Arrival Record was an inadequate temporary substitute and

declined to modify its order accordingly.

The court then considered the issue reserved in its September 27, 1990 Memorandum and Order, namely the matters concerning permanent residents placed in exclusion proceedings and paroled into the United States.

The INS says it provides those in exclusion proceedings who have been paroled with Form I-688B or I-94. The court had held in its September 27, 1990 order that these forms were inadequate as to those in deportation proceedings. But the court held that the INS may, under 8 U.S.C. s 1125(b), stop at the border any alien not "clearly and beyond doubt entitled" to enter, and the Attorney General may set such conditions on aliens paroled into this country as the Attorney General in his discretion deems in the public interest.

The court therefore held that the INS need not furnish "the same evidence of authorization" for employment as is required for those in deportation proceedings.

*2 Plaintiffs now move to reargue this section of the court's December 16, 1991 Memorandum and Order and seek to include lawful permanent residents in exclusion proceedings in the certified class subject to this court's order of November 28, 1990. The defendants oppose this motion.

In separate motions, plaintiffs also seek an order adding to paragraph six of this court's November 28, 1990 order the sentence: "Defendants shall provide the replacement permanent resident card (Form I-551) no later than 90 days after the day of application"; an order striking defendants' supplemental statement of facts pursuant to Rule 3(g) of the Local Rules of the court; and an order striking the entire declaration of Roseanne Sonchik, the J.F.K. International Area Port Director for the INS, regarding the implementation of a memorandum issued by INS Commissioner Gene McNary concerning paroled aliens in exclusion proceedings, and various paragraphs in the Declaration of INS Senior Special Agent and Employer and Labor Relations Officer Bruce Lupion regarding employer compliance with the immigration laws, and in the Declaration of INS Special Agent John P. Woods regarding the files of the named plaintiffs.

Defendants oppose these motions and cross-move to modify paragraph 6 of the November 28, 1990 order to permit INS to issue a temporary proof of status within ninety rather than twenty-one days, and to permit INS to issue a receipt of application within three business days instead of on the day of application. Defendants also move to strike the affirmations of Manuel D. Vargas regarding the inadequacy of the original I-94 Arrival Record, of Robert Belfort regarding the insufficiency of the I-94 Record for purposes of the Social Security Administration, of Daniel Jean Pierre regarding the difficulty of gaining employment without a replacement green card, and several paragraphs in Jill Davidson's affidavit regarding the insufficiency of the I-94 Arrival Record to satisfy employers and obtain government benefits.

I. Motions to Strike

The court declines to strike any of the declarations or affidavits and will accord them such weight and consideration as is appropriate.

795

|

II. Paroled Aliens in Exclusion Proceedings and Temporary Proof of Status

Plaintiffs say that the court erred in its December 16, 1990 Memorandum and Order when it distinguished between two sets of legal permanent resident aliens. As the court stated in its December 16, 1991 Memorandum and Order, the distinction made by INS in the kind of evidence of authorization of employment to be furnished to those in deportation and those in exclusion proceedings who are paroled seems at best strange. But plaintiffs have submitted nothing suggesting that the statutes permit this court to impose its own conditions for parole.

Permanent resident aliens who return from abroad and are stopped at the border have statutory rights to challenge their exclusion. Moreover, they have due process rights. But this court is not persuaded that the INS violates such due process rights simply by substituting for green cards other documents pending completion of the exclusion proceedings even though those documents do not meet the same standards required for those in deportation proceedings.

III. Modification of the November 28, 1991 Order

*3 Both parties seek modification of paragraph six of this court's November 28, 1990 order. That paragraph reads: "Defendants shall provide temporary proof of status no later than twenty-one business days after the date of application and a receipt on the day of application."

Plaintiffs wish to append to the end of the paragraph: "Defendants shall provide the replacement permanent resident card (Form I-551) no later than 90 days after the day of application." Defendants oppose this modification and cross-move to modify paragraph six of the order so that the word "ninety" replaces the word "twenty-one". Defendants justify this change on the basis of 8 C.F.R. s 274a.2(b)(1)(vi) as amended by 56 Fed.Reg. 41784 (1991), promulgated during the course of this lawsuit. Defendants also seek to replace "on the day" with "within three business days" to enable INS to issue a receipt of application within three days.

A. Temporary Proof of Status

1. Twenty-one Business Days for Issuance

As amended, 8 C.F.R. s 274a.2(b)(1)(vi) reads in relevant part,

If an individual is unable to provide the required document or documents [to establish employment authorization] within the time periods specified ..., the individual must present a receipt for the application of the replacement document or documents within three business days of the hire and present the required document or documents within 90 business days of the hire.

56 Fed.Reg. 41784 (Aug. 23, 1991).

For a lawful permanent resident alien, employment eligibility documents include an unexpired foreign passport with an INS stamp and attached Form I-94, INS Form I-151 or I-551 with attached color photograph, and INS Form I-688 or I-688A. 8 C.F.R. s 274a.2(b)(1)(v)(A).

The only change in 8 C.F.R. s 274a.2(b)(1)(vi) as amended is that the time for an individual alien to present an employment authorization document changed from twenty-one to ninety days.

CVAPDF - www.texlo.com

Although the amended regulation speaks only of what the alien is required to do and extends the time for the alien to comply, defendants nonetheless argue that the regulation warrants modifying what the defendants must do under paragraph 6 of this court's November 28, 1991 order so that their time to provide temporary proof of permanent residence is extended from twenty-one days to ninety days.

8 C.F.R. s 274a.2(b)(1)(vi) relates only to employment authorization. This court has found that legal permanent resident aliens require proof of their lawful status for numerous other reasons, including a statutory requirement that aliens possess proof of their status in order to avoid arrest, to establish eligibility for government programs such as food stamps, housing assistance, Aid to Families with Dependent Children, Medicaid, and the like, to use as an entry document when returning to the United states, and to obtain other documents such as social security cards. Etuk, 748 F.Supp. at 992, 936 F.2d at 1437.

**\*4** In addition, plaintiffs "demonstrated to the district court that the INS failed to provide them with proof of their [legal permanent resident] status despite repeated requests for such documentation". 936 F.2d at 1440. This delay, coupled with the importance of such documentation to lawful permanent resident aliens, has often resulted in severe hardships for the plaintiffs. See slip op. at 9 (Dec. 16, 1991).

This court did not rely upon 8 C.F.R. s 274a.2(b)(1)(vi) when it ordered the INS to provide an adequate temporary substitute document "no later than 21 business days, inclusive of the day of application". Etuk, 748 F.Supp. at 999. The court based the twenty-one day period upon INS's own representation that it "usually" issued temporary documentation within three weeks of receipt of the alien's application for a replacement document. Id. at 993. The court also considered the importance of such documentation for government benefits, the need to establish employment eligibility, and the severe hardships caused by extended deprivation of proof of lawful status.

Defendants say that ninety days are now necessary to issue employment authorization because of the increased number of applications which INS must process. 56 Fed.Reg. 41782 (Aug. 23, 1991). Paragraph six of the court's November 28, 1992 order does not affect the time period for issuance of green cards. The order requires INS to provide temporary proof of status. The order is not limited to employment authorization, nor does it require permanent replacement of the employment authorization documents listed in 8 C.F.R. s 274a.2(b)(v)(A) within twenty-one days. The order simply requires the INS to issue within twenty-one days a temporary document so that a lawful permanent resident alien may prove his status.

Except for some unarticulated aversion to deadlines in general, it is difficult to understand how INS will be harmed by a twenty-one day requirement. It currently issues a temporary proof of registration (Temporary I-551) to aliens "within 14-15 days". Brooks Decl., INS Superv.Info.Off., at P 2. The court's order merely requires INS to conform the temporary proof of status it already issues to the standards articulated by this court. 748

F.Supp. at 999.

The court declines to replace "twenty-one" with the word "ninety" in paragraph 6 of its November 28, 1991, and finds that a period of twenty-one days continues to be a reasonable accommodation between the plaintiffs' needs and defendants' administrative requirements.

2. Receipt on the Day of Application

Defendants also seek modification of paragraph six so that the INS has three business days in which to issue a receipt of an application to replace a green card. Def.Mem. of Law in Supp. of Mod. of Nov. 28 Ord. at 11.

Contrary to defendants' assertion, the court obviously did not base this judgment on 8 C.F.R. s 274a.2(b)(1)(vi), which at the time of the order allowed three business days for the alien to present a receipt of his or her application for employment verification. At any rate, defendants have submitted no reason or offered any evidence to show that issuing a receipt on the day of application impairs the interests of the INS. Plaintiffs, by comparison, are subject to criminal fine or imprisonment for not having on their person either an alien registration or alien registration receipt card. 8 U.S.C. s 1304(e). The court finds that requiring INS to issue a receipt on the day of application for proof of status continues to be reasonable from the perspective of both the alien applicant and the INS.

3. Receipt of application

*5 In their brief, plaintiffs challenge the sufficiency of the application receipt issued by INS in the form of a "call-in notice" in that it does not state that it is a "receipt" of an application for a new green card, nor does it indicate payment of a fee, required by regulation, as a receipt normally would. Plaintiffs also complain that such receipt is only relevant for employment applications and does not address the other needs plaintiffs have for temporary proof of status.

At oral argument, the court indicated that it would inspect the receipt. Mot.Tr. at 7-8 (Feb. 14, 1992). Neither party has furnished examples of the call-in notice. Upon receipt of them, the court will rule on this issue.

B. Ninety Days to Issue Green Card Replacement

Plaintiffs move to append to the end of paragraph six the sentence, "Defendants shall provide the replacement permanent resident card (Form I-551) no later than 90 days after the day of application" so that INS must issue a replacement green card within 90 days.

Defendants say that they have never been required to issue a replacement green card by a date certain. Compare 56 Fed.Reg. 41773 (Aug. 23, 1991) ("No specified time limit exists in which the [Immigration and Naturalization] Service must issue a replacement [employment] document to an alien") with 8 C.F.R. s 274a.2(b)(1)(vi) as amended by 56 Fed.Reg. 41784 (Aug. 23, 1991) (requiring alien to submit employment document within 90 days of application). Defendants also say that while they ordinarily issue replacement documents within ninety days, they occasionally need additional time because of various problems associated with adjudicating and processing the applications. Marotta Decl., Rec.

CUAPDF - www.texia.com

and Info. Serv. Mgr. of INS N.Y. Dist. Off. at P 2;  Mot.Tr. at 8-10 (Feb. 14, 1992).

Plaintiffs respond that INS itself stipulated that it takes "about three months" for them to issue a new green card.  Stip. at P 6 (Apr. 25, 1990).  And in an effort to illustrate the importance of a green card and the insufficiency of temporary documents, plaintiffs also cite federal, state, and city studies which conclude that employers require actual green cards before hiring aliens, fearing that temporary documents are either invalid or that the aliens are only temporary residents.  U.S. GAO, Immigration Reform:  Employer Sanctions and the Question of Discrimination, 43 (Mar. 29, 1990);  N.Y.S. Inter-Agency Task Force on Immig. Aff., Immigration in New York State:  Impact and Issues, 17-18 (Feb. 23, 1990);  N.Y.C. Comm. on Hum. Rights, Tarnishing the Golden Door: A Report On The Widespread Discrimination Against Immigrants And Persons Perceived To Be Immigrants Which Has Resulted From The Immigration Reform And Control Act Of 1986, 33-34 (Aug.1990).

The court recognizes the administrative burdens faced by INS in enforcing the immigration laws of the United States generally and issuing replacement green cards specifically.  Absent a showing of affirmative misconduct by the INS, I.N.S. v. Miranda, 459 U.S. 14, 103 S.Ct. 281 (1982), the court will not impose a ninety day deadline for replacement of green cards.  So ordered.

**\*6** A Memorandum and Order of Honorable Eugene H. Nickerson, United States District Judge, having been filed on May 5, 1992 memorializing findings of fact, decisions and holdings made in: (1) Etuk v. Blackman, 748 F.Supp. 990 (E.D.N.Y.1990);  (2) a September 27, 1990 Memorandum and Order;  (3) a November 28, 1990 Memorandum and Order;  and (4) a December 16, 1991 Memorandum and Order;  declining to strike any of the declarations or affidavits submitted by the plaintiffs in this case;  declining to modify the December 16, 1991 Order and Memorandum as requested by the plaintiffs;  and declining to modify the November 28, 1990 Order and Memorandum as requested by both plaintiffs and defendants, it is

ORDERED and ADJUDGED that upon review of the record, the Court declines to strike any of the declarations or affidavits submitted by the plaintiffs in this case;  declines to modify the December 16, 1991 Order and Memorandum as requested by plaintiffs;  and declines to modify the November 28, 1990 Order and Memorandum as requested by plaintiffs and defendants.

END OF DOCUMENT

EXHIBIT (9)

800

CVisPDF – www.fasiio.com

RECEIVED

92 NOV 16 PM 1:11

INS HARLINGEN T

FOBO

CO 264-C

Date   NOV - 3 1992

Subject

Temporary I-551 on Form I-94

From   Office of Operations

To
All District Directors
All Officers in Charge
All Staff Assistant Field Operations
ODTF Glynco, GA & Artesia, NM

In a recent litigation, Etuk v. Slattery, F.2d No. 92-6040(2d Cir. August 4, 1992), the Second Circuit Court of Appeals reversed a decision in which the federal district court ordered the Service to create a form reflecting lawful permanent resident status when temporary evidence of such status is necessary. Had the district court decision been allowed to stand, the Service would have been required to issue another form indicating LPR status and unrestricted employment authorization. This would have been counter to the Commissioner's stated goal of reducing documents evidencing LPR status and employment authorization.

Accordingly, the "temporary I-551" stamp on Form I-94 continues to be the appropriate document to issue for temporary evidence of LPR status both in New York and elsewhere. The O.I.s at 264.2 contain instructions for preparation of the temporary I-551, and must be followed when preparing the document.

James L. Hogan
Executive Associate Commissioner

Int. Rel.   12-7-92

GOVERNMENT
EXHIBIT
9

801