obtaining employment, seeking unemployment compensation, etc.), violates that person's rights under the Privacy Act, 5 USC 552a(b). As stated therein, with exceptions not pertinent herein:

> **(b) Conditions of disclosure.**--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains...

Given that, as the Court in *Etuk* noted, a green card is now "much more than a monitoring device for the government," placement of such notations on a substitute card is tantamount to unauthorized disclosure of this information to third parties who will view the document, including employers and potential employers.

It is for this reason that Plaintiffs also object to the statement on replacement documents given to class members in exclusion proceedings, stating that the person is being paroled "pending determination of right to re-enter." The status of a resident's immigration case is between the individual and INS, and should not be stated on a multi-use document such as a substitute green card.

Moreover, in *Etuk* II, *supra* at 1438, it was noted that the District Court had found that the provision of inadequate substitute documents to residents whose green cards had been lost, stolen, or confiscated, "often interfered with a LPR's ability to obtain employment." [14] About mid-way during the instant ligigation, Defendants re-asserted their supposed right to make such notations, and the extent to which the offending annotations interfere, as a practical matter, with the ability of class members to obtain

---

[14] There is no indication that the Plaintiffs therein objected to these notations on privacy grounds, and this issue was not addressed by the Court.

11

405

employment, suddenly emerged a "material" fact in dispute. [15]

If an evidentiary hearing were held, Plaintiffs would affirm, as an offer of proof, that, even apart from the offending annotations, a great many local employers are distrustful of the cardboard substitute documents, and that it often requires intervention by legal counsel, to convince them that they are valid. The placement of notations on such cards regarding deportation proceedings, bond, etc., only aggravates the problem, which is particularly invidious, given that it is so arbitrary, depending on the whim of the Officer who processes the individual for deportation proceedings.

> 2. EMPLOYERS AND POTENTIAL EMPLOYERS HAVE NO RIGHT TO BE AFFIRMATIVELY INFORMED THAT AN INDIVIDUAL IS UNDER DEPORTATION OR EXCLUSION PROCEEDINGS, PARTICULARLY WHERE EQUIVALENT INFORMATION IS NOT OBTAINED FROM ALL EMPLOYEES AND POTENTIAL EMPLOYEES.

The Court also asked whether employers and potential employers have a right to be informed that a given person is under immigration proceedings. To the extent that such information is *sought* by an employer, as part of a bona fide business process, and in a manner which does not discriminate on the basis of national origin, there is little if any question but that it would be appropriate. [16]

However, it is submitted, for INS to affirmatively bring such information to the attention of an employer not only violates the individual's rights under the Privacy Act, but invites illegal

---

[15] During the early months of the instant action, if it was brought to the attention of Defendants' (prior) counsel that such notations had been placed on a substitute document, a "clean" version would be issued. *See*, Plaintiffs' Exhibits A, V and W.

[16] For example, a question posed to citizens and non-citizens alike, as to whether they are involved in any proceedings, whether civil or criminal, which might affect their future availability to work would not be objectionable. However, such a question, posed only of *non-citizens*, would violate 8 USC Section 1324b.

discrimination. Particularly given the arbitrary form in which such notations are made, it is inherently unfair to the unlucky ones on whose substitute documents the notations are made.

> a. UNDER 8 USC 1324b, MOST EMPLOYERS MAY NOT DISCRIMINATE ON THE BASIS OF NATIONAL ORIGIN, OR REFUSE TO EMPLOY AN ALIEN AUTHORIZED TO BE EMPLOYED ON THE GROUNDS OF IMMIGRATION STATUS.

With very few exceptions, relating mostly to very small businesses, and agencies and organizations performing sensitive governmental functions, it is illegal for an employer to discriminate against anyone, (other than an "unauthorized alien"), on the grounds of national origin, and in many cases involving lawful permanent residents and other "protected" individuals, on the basis of citizenship status. 8 USC Section 1324b.

> b. TO AFFIRMATIVELY BRING INFORMATION REGARDING AN ALIEN'S IMMIGRATION PROCEEDINGS TO THE ATTENTION OF AN EMPLOYER OR POTENTIAL EMPLOYER INVITES ILLEGAL DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN.

As previously stated, where an employer has a *bona fide* business reason for wanting to know what would otherwise be "private" information about an employee or potential employee, it is perfectly acceptable to seek such information, so long as it is accomplished in a non-discriminatory manner.

However, for INS to affirmatively bring such information to the attention of an employer or potential employer, violates that person's right to privacy. Moreover, as found in *Etuk*, and as would be shown by Plaintiffs, at an evidentiary hearing, it often interferes with the ability of class members to exercise the rights and privileges attendant upon their status as lawful permanent residents of the United States.

13

407

B. ONCE A DETERMINATION HAS BEEN MADE TO PAROLE A LAWFUL PERMANENT RESIDENT INTO THE UNITED STATES FOR EXCLUSION PROCEEDINGS, AND ABSENT A CHANGE IN CIRCUMSTANCES, SAID DETERMINATION SHOULD APPLY EQUALLY TO SUBSEQUENT REQUESTS FOR PAROLE.

The second issue upon which the Court requested supplemental briefing relates to the restrictions placed on the right of a lawful permanent resident to make cross-border, *Fleuti*-type excursions, while deportation or exclusion proceedings are pending, and the extent to which it is appropriate to curtail such rights.

Ironically, the manner in which the current system operates permits such excursions for residents under deportation proceedings unless and until the Immigration Judge orders the person deported, and not thereafter, while an almost mirror image exists for residents under exclusion proceedings. [17]

Since at least the late 1970's, and until the instant action was filed, it was the "conventional wisdom" in the Rio Grande Valley, subscribed to by permanent residents and INS personnel alike, that a resident under deportation proceedings could not make cross-border excursions. [18] While this problem was corrected early in the instant litigation, at least so long as no deportation order has been entered, there has been no equivalent correction for residents in exclusion proceedings, who have been paroled into the United States during the pendency of such proceedings. It is submitted that no rational basis exists for allowing residents under deportation proceedings to make such excursions, while denying the same privilege to residents under exclusion proceedings.

---

[17] While 8 CFR 3.4 is currently interpreted as prohibiting even lawful permanent residents under deportation proceedings from making *Fleuti*-type excursions while their cases are on appeal, it does not apply to residents under exclusion proceedings, whose departure from the U.S. does *not* constitute a withdrawal of their appeal. *See, Matter of Keyte*, 20 I&N Dec. 158 (BIA 1990).

[18] *See* Plaintiffs' Exhibit T.

14

401

Defendants do not object, in principle, to class members in exclusion proceedings making such excursions, (INS:55). Rather, the dispute centers on the mechanism by which such requests are made, and the arbitrariness by which parole authority is exercised.

It is Plaintiffs' contention that once the decision has been made to parole a class member into the United States for exclusion proceedings, *and in the absence of changed circumstances*,[19] there should be no need for a separate application, particularly one which costs $70, and requires several weeks to be adjudicated, in order for a class member to make a brief, casual, and innocent excursion across the border. Indeed, it is almost a contradiction in terms, given the elaborate preparations required.

Moreover, the criteria upon which such applications are adjudicated are entirely arbitrary, and vary from one request to another. For example, in May of 1995, when Plaintiffs Ascencio and Merino sought permission to visit Ms. Ascencio's hospitalized mother in Mexico, Defendants advised them as follows, (Plaintiffs' Exhibit EE):

> Persons who have been ordered excluded and deported are not normally granted permission to depart the United States and return while their cases are pending a final determination by the Board of Immigration Appeals.

However, when they requested permission to make a second such trip in early 1996, they were advised to file a form I-131, (costing $70 each), and that the applications should be filed in Houston, where they reside. They complained that it was unfair to require such a fee, where the request would probably be denied, since their cases

---

[19] Plaintiffs do not allege, as Defendants assert, (INS:55), that residents would be "exempt from any further inspection ... regardless of the circumstances surrounding subsequent arrivals by them at the ports of entry." To the contrary, they are simply stating that, in the *absence* of changed circumstances, they should be re-paroled on their return, without the necessity of a formal, fee-paid, application, filed in advance.

15

were still on appeal. They also requested that if this policy had been changed, they be given written notice of the change. In response, they were advised, (*Id.*):

> Each case is reviewed and a decision made based on the facts of the case. Just because an individual has been ordered excluded and deported does not mean the request will generally be denied as you indicate in your letter.

The two letters were written less than a year apart, and by the same individual. Yet it appears as though, by the time of the second letter, the writer had not only forgotten what had been stated in the earlier letter, but had forgotten that the fact that the case was on appeal had ever been considered a reason to deny such a request. Moreover, this was the first time known to the undersigned that form I-131, and payment of a fee, had been required in the case of a lawful permanent resident under exclusion proceedings seeking parole. See, Plaintiffs' Exhibits J, S and EE.

This illustrates perfectly the arbitrary manner in which parole authority is exercised by Defendants. They are suddenly demanding $70 each time a class member wishes to make such an excursion, but are still unwilling to specify the criteria under which these requests will be handled. Indeed, they do not even seem to recall the position that had been taken less than a year ago!

Plaintiffs assert that this procedure conflicts with the mandates of cases such as *Molina v. Sewell*, 983 F.2d 676 (5th Cir. 1993). In that case, a lawful permanent resident who was under deportation proceedings made a *Fleuti*-type excursion to Mexico, and was detained, and placed in exclusion proceedings on his return. INS claimed that, under *In re Becerra-Miranda*, 12 I&N Dec. 358 (BIA 1967), the fact that he had been under deportation proceedings took his departure outside the parameters of *Fleuti*, and rendered him properly subject to exclusion proceedings on his return. The Fifth

16

4/10

Circuit disagreed, holding as follows, *Id*. at 680 (emphasis added):

> *Landon v. Plasencia* [20] also dissuades us from adopting the *Becerra* rule. *Landon* recognized that, unlike an alien seeking to enter the United States for the first time, a returning resident alien retains a constitutional right to due process. 459 U.S. at 32-33. *The fact that an alien is subject to deportation proceedings does not affect his status as a permanent resident alien.* ...
>
> Lozano was indisputedly a permanent resident alien when he departed to Mexico. Although he was subject to deportation proceedings, no final order had issued. To conclude that upon his return to the United States Lozano affected an "entry" as a matter of law is inconsistent with the due process requirements of *Landon* and contrary to the subjective inquiry mandated by *Fleuti*.

Plaintiffs contend that this reasoning is equally applicable to lawful permanent residents in exclusion proceedings.[21] Pursuant to 8 USC Sections 1182(d)(5)(A) and 1225(b), INS only has three (lawful) choices when a class member presents him or herself at a port of entry. They may admit him or her as a returning resident; they may detain the person, or they may parole him or her into the United States. *See also, Matter of Sanchez-Avila*, Interim Decision 3283 (BIA 1996); 8 CFR Section 235.3(c).

It is only because INS has been (improperly) returning such persons to Mexico to await a hearing that the instant question even arises, as a class member who has been paroled into the U.S. for an exclusion hearing would not *need* advance permission to make such excursions if INS were following the law. Each time a *Fleuti*-type excursion were made, INS would be obliged to admit, detain, or parole the individual on return. Presumably, standardized criteria

---

[20] 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

[21] And to lawful permanet residents in deportation proceedings whose cases are on appeal, 8 C.F.R. Section 3.4 notwithstanding.

17

would be employed, such that, in the absence of a change in circumstances, the same decision would be made each time.

It is this result that Plaintiffs seek. They are willing to be quite flexible in *how* that result is achieved. In that sense, the resolution of this issue, like that of the confiscation of documents such as Social Security Cards, driver's licenses, etc., depends greatly on the determination of whether INS may properly return a class member placed under exclusion proceedings to Mexico to await a hearing. *See, Matter of Sanchez-Avila, supra.*

## CONCLUSION

In conclusion, it is Plaintiffs' position that, in accordance with the provisions of the McNary Memorandum, and the decisions of the Second Circuit in the *Etuk* cases:

1. The green cards of lawful permanent residents placed under deportation proceedings should *not* be confiscated, absent a particularized reason for doing so in a given case;
2. The goal of ensuring a person's presence at deportation proceedings is properly addressed through custody and bond determinations, and is not a proper reason for confiscating his or her green card;
3. Speculation that a person might continue to use the green card improperly, if and when a final order of deportation were entered, is also not a proper reason for confiscating that card;
4. When *bona fide* reasons exist for confiscating the green card of a class member under deportation proceedings, said card may only be lifted upon provision of a substitute document which comports with the requirements of Operation Instruction 264.2, and which does not contain any notations not specifically authorized by said Instruction, including notations to the effect that the individual is on bond, or under deportation proceedings.

18

412

In addition, Plaintiffs urge that:

5. Class members paroled into the United States for exclusion proceedings should be given a document similar to that provided to those under deportation proceedings, which does not include information which would advise anyone *other than an INS agent* that the individual is under exclusion proceedings; and

6. Once a determination has been made to parole a class member into the United States for exclusion proceedings, and in the absence of changed circumstances, the same determination should apply to subsequent requests for re-parole into the United States.

Respectfully Submitted,



Lisa S. Brodyaga
Attorney at Law
402 E. Harrison, 2nd Floor
Harlingen, Texas 78550


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served, first-class postage prepaid, on Regina Byrd, Attorney, OIL, Box 878, Ben Franklin Sta, Washington, D.C. 20044, and Ken Muir, SAUSA, P.O. Box 1711, Harlingen, Texas 78551, this 14th day of August, 1996.

19

413