UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 3 0 1996

Michael N. Milby
Clerk of Court



JUANA ASCENCIO-GUZMAN, et al     )
                                 )
v.                               )          No. B-94-215
                                 )
E.M. TROMINSKI, et al.           )
_____)


PETITIONERS' REPLY TO INS'
SUPPLEMENTAL BRIEF IN SUPPORT OF
COUNTER MOTION FOR SUMMARY JUDGMENT

Come Petitioners, by and through their undersigned counsel, and
file the instant Reply to INS' Supplemental Brief in Support of
their pending Counter Motion For Summary Judgment, (hereinafter
referred to as "INS' Brief," and cited as (INS:__)).


I.  INTRODUCTION

In its Brief, INS addresses two issues:  its (uncontested)
authority to "refuse to admit into the United States every persons
[sic] claiming to be lawful permanent residents," (INS:6-10), [1]
and its (very much contested) claim to be entitled to force such
persons to remain in Mexico until such time as their right to be
admitted has been fully and finally adjudicated,(INS:10-24).

_____

[1]  This issue is a "red herring," and will not be addressed
herein.  Plaintiffs do not assert, as INS alleges, that "Defendants
violate the rights of LPRs by not automatically admitting such
persons into the United States," (INS:6).  Rather, Plaintiffs
assert that if Defendants consider that such persons may not be
admissible to the United States, and opt to place them in exclusion
proceedings, they are obligated to either detain them, or parole
them into the United States, and that by forcing them to remain in
Mexico for the often protracted duration of the exclusion
proceedings, Defendants violate their rights under the law, (8 USC
Section 1225(b); 8 CFR 235.3(c)), and under the U.S. Constitution.

3/9

CMPDF - www.fesco.com

INS makes a point of noting that the inspection and admission procedures apply to U.S. citizen and alien alike, (INS:3,7). This point is well taken, because if INS has the authority to force persons who are concededly lawful permanent residents to remain in Mexico for the duration of exclusion proceedings, this power would apply equally to (documented) United States citizens whose citizenship is, for whatever reason, contested by INS.

Defendants base their claim to such authority on their interpretation of the statutory term "detain," as used in 8 USC Sections 1225(b) and 1226(a), as read together with 8 USC Section 1182(d)(5)(A) (INS:4).[2] INS asserts that this term is sufficiently elastic to enable them to selectively and arbitrarily return certain aliens and suspected aliens, including documented lawful permanent residents, to Mexico, and urges that this interpretation should be upheld because it is supported by "many years of administrative practice and judicial interpretation," (Id.).

What Defendants are actually requesting is that this Court uphold the interpretation of the local INS Office, on the grounds that it is more authoritative than that of the Attorney General or the Board of Immigration Appeals. By promulgating 8 CFR Section 235.3(d), the Attorney General has interpreted the term to "detain" as meaning to "assume custody."

And the most recent and authoritative administrative interpretation of the statute in question is precisely that urged by the Plaintiffs herein. *Matter of Sanchez-Avila*, Interim Decision 3283, Slip Opinion at page 16 (BIA June 14, 1996) ("... the term 'detained' in sections 235 and 236 refers to 'custody'"), a copy of which is attached hereto for the convenience of the Court,

---

[2] The most pertinent statutory and regulatory provisions are attached hereto as Exhibit FF. They include 8 USC Sections 1182(d)(5)(A), 1225(b) and 1226(a), and 8 CFR Section 235.3.

2

·7

INS makes a point of noting that the inspection and admission procedures apply to U.S. citizen and alien alike, (INS:3,7). This point is well taken, because if INS has the authority to force persons who are concededly lawful permanent residents to remain in Mexico for the duration of exclusion proceedings, this power would apply equally to (documented) United States citizens whose citizenship is, for whatever reason, contested by INS.

Defendants base their claim to such authority on their interpretation of the statutory term "detain," as used in 8 USC Sections 1225(b) and 1226(a), as read together with 8 USC Section 1182(d)(5)(A) (INS:4).[2] INS asserts that this term is sufficiently elastic to enable them to selectively and arbitrarily return certain aliens and suspected aliens, including documented lawful permanent residents, to Mexico, and urges that this interpretation should be upheld because it is supported by "many years of administrative practice and judicial interpretation," (Id.).

What Defendants are actually requesting is that this Court uphold the interpretation of the local INS Office, on the grounds that it is more authoritative than that of the Attorney General or the Board of Immigration Appeals. By promulgating 8 CFR Section 235.3(d), the Attorney General has interpreted the term to "detain" as meaning to "assume custody."

And the most recent and authoritative administrative interpretation of the statute in question is precisely that urged by the Plaintiffs herein. Matter of Sanchez-Avila, Interim Decision 3283, Slip Opinion at page 16 (BIA June 14, 1996) ("... the term 'detained' in sections 235 and 236 refers to 'custody'"), a copy of which is attached hereto for the convenience of the Court,

---

[2] The most pertinent statutory and regulatory provisions are attached hereto as Exhibit FF. They include 8 USC Sections 1182(d)(5)(A), 1225(b) and 1226(a), and 8 CFR Section 235.3.

2

320

(Plaintiffs' Exhibit GG, herein incorporated by reference). [3]

Indeed, if the Court considered that the statutory term "detain" were ambiguous, and, consistent with *Chevron USA v. Natural Resources Defenses Council*, 467 U.S. 837 (1984), found that it was appropriate to grant deference to the agency interpretation, as urged by INS, (INS:4), the result would be that the Court should grant summary judgment for Plaintiffs on this issue, based on 8 CFR Section 235.3, and the holding of the BIA that it was the intent of Congress that "detain" would mean actual "custody."

## II.  REBUTTAL ISSUES ADDRESSED

A.  THE TERM "DETAIN" DOES NOT INCLUDE RETURNING A LAWFUL PERMANENT RESIDENT TO MEXICO FOR THE DURATION OF EXCLUSION PROCEEDINGS.

    1.  INS' INTERPRETATION IS NOT CONSISTENT EITHER WITH THE PLAIN MEANING, OR THE MOST AUTHORITATIVE ADMINISTRATIVE INTERPRETATION OF THE TERM "DETAINED"

    2.  DEFENDANTS' "FLOODGATES" ARGUMENT IS BOTH FACTUALLY FARFETCHED AND LEGALLY IRRELEVANT.

B.  EVEN IF THE TERM "DETAINED" WERE SUFFICIENTLY ELASTIC TO PERMIT SUCH ACTIONS IN THE CASE OF ALIENS WHO HAVE NOT BEEN ADMITTED FOR LAWFUL PERMANENT RESIDENCE, ITS APPLICATION TO THE PLAINTIFF CLASS VIOLATES THEIR RIGHTS TO DUE PROCESS OF LAW.

## III.  ARGUMENT

A. THE TERM "DETAIN" DOES NOT INCLUDE RETURNING A LAWFUL PERMANENT RESIDENT TO MEXICO FOR THE DURATION OF ANY EXCLUSION PROCEEDINGS.

---

[3] Defendants claim that *dicta* in this decision supports their interpretation, (INS:21).  As will be discussed more fully below, Plaintiffs would disagree with this characterization of the Board's opinion, and would note that the reasons given by the Board therein for rejecting Defendants argument apply with equal force herein.

321

The heart of the instant case revolves around the manner in which the local INS Office deals with lawful permanent residents who have applied for re-admission at a port of entry in the Harlingen INS District, but whom the inspecting officer considers have committed some act which breaks the continuity of their U.S. residency, and that they are therefore attempting to make an "entry," as defined by 8 USC Section 1101(a)(13), and as interpreted in *Rosenberg v. Fleuti*, 374 US 449 (1962) (lawful permanent resident who makes brief, casual, and innocent visit abroad does not make an "entry" on return and is not subject to exclusion proceedings). [4]

If such a person has committed an act of sufficient gravity to warrant criminal prosecution, (e.g., someone stopped at the border with a load of marijuana or other contraband), that person is generally "paroled" into the United States for prosecution, and thereafter "detained" within the United States for exclusion proceedings. If, however, criminal prosecution is not contemplated, (e.g., as in the case of Plaintiffs Ascencio and Merino, who were accused to trying to bring their sick, two year old nephew into the United states for medical treatment), a different procedure is often followed.

---

[4]  INS asserts that an alien "who is presently residing in the United States, whether by having been inspected and admitted, or by having effectively evaded inspection, would be subject to deportation proceedings as opposed to exclusion proceedings," (INS:10,n.4). This is misleading.

The distinction between exclusion and deportation proceedings does not depend on where the person is *residing*, but whether or not an *entry* is being made. This is largely a function of the person's state of mind at the time of departing the U.S. A lawful permanent resident, *residing* in Brownsville, who goes for lunch to Mexico and comes back through the bridge, is not making an *entry* on return, and would not be subject to exclusion proceedings, even if he had, for example, been previously convicted of an offense, and was under deportation proceedings. Such a person who goes to Mexico for the purpose of bringing in contraband, however, *is* making an *entry*, and would be subject to exclusion proceedings. *Rosenberg v. Fleuti, supra; Molina v. Sewell*, 983 F.2d 676 (5th Cir. 1993).

322

In such cases, INS frequently confiscates the resident's documents, including the "green card," driver's license, and social security card, prepares the paperwork to initiate exclusion proceedings, and sends the individual back to Mexico for the duration of the often protracted exclusion proceedings before an Immigration Judge and Board of Immigration Appeals.   It is this procedure which is challenged herein, on the basis that it is not authorized by law, and that it is the equivalent of summary exclusion, which unlawfully deprives the residents of the attributes of lawful permanent residence, including the right to live and work and raise their families in the United States.

Petitioners claim that this procedure is not authorized by the pertinent statutory and regulatory provisions.   It was also the subject of a recent decision by the Board of Immigration Appeals, *Matter of Sanchez-Avila, supra*.   In that case, the Board held that under such circumstances, and even in situations *not* involving lawful permanent residents, unless the applicant for admission appeared and *consented* to the assumption of jurisdiction by the Immigration Judge, it was proper for the Immigration Judge to terminate exclusion proceedings. The Board based this holding on its reading of 8 USC Section 1226(a), which only vests the Immigration Judge with jurisdiction to determine the excludability of an alien "who has been detained" for that purpose.

>    1.  INS' INTERPRETATION IS NOT CONSISTENT EITHER WITH THE
>    PLAIN MEANING OR THE MOST AUTHORITATIVE INTERPRETATIONS
>                   OF THE TERM "DETAINED."

The key statutory provision herein is 8 USC  Section 1225(b), which provides, in relevant part, as follows:

>    Every alien ... who may not appear to the examining
>    immigration officer to be clearly and beyond a doubt
>    entitled to land shall be detained for further inquiry to
>    be conducted by a special inquiry officer.

5

*3̸2̸3̸*

Once such a person "has been detained," Section 1226(a) vests the Immigration Judge with jurisdiction to conduct exclusion proceedings. Section 1182(d)(5)(A) establishes a procedure whereby aliens applying for admission who are not clearly admissible may be *paroled* into the United States, but requires that when the conditions of the parole are concluded, the alien must either leave the United States, or be "returned to the custody from which he was paroled," i.e., be "detained" pursuant to 8 USC Section 1225(b).

These three statutory provisions must be read together, and are jointly implemented by 8 CFR Section 235.3, which sets forth a two-tiered approach to aliens arriving at a port of entry, who do not appear to be admissible to the inspecting officer. If the individual has false documents, or no documents, 8 CFR Section 235.3(b) requires that the person "be detained in accordance with section 235(b) of the Act," and specifies that such persons shall be considered for parole only in accordance with 8 CFR Section 212.5(a). In the case of other aliens, including the members of the Plaintiff class, who do not appear to be admissible, 8 CFR Section 235.3(c) offers a wider range of options, to wit, such a person may be "detained, paroled, or paroled for deferred inspection *by the inspecting officer*." (emphasis added). [5]

Perhaps most significant for purposes of the instant litigation is the provision which follows, 8 CFR Section 235.3(d), which provides, in relevant part, as follows (emphasis added):

> (d) *Service custody. The Service will assume custody of any alien subject to detention under Section 235.3(b) or (c)* of this section, except in the case of an alien who is presented as a Transit Without Visa (TROV) passenger.

---

[5] In other words, the decision of whether or not to grant parole at that point belongs to the officer on the scene. There is no need for a formal application for parole, or for the matter to be referred to a higher authority.

6

324

From this, it is clear that the *Attorney General's interpretation* of the term "detain" is that it relates to actual custody. Defendants' arguments to the contrary, including their observation that the term has other meanings in other contexts, (INS:17), are little more than a claim that each INS District Director is entitled to interpret the law differently, and that this Court must sustain the interpretation chosen by the INS District Director in a given geographical area, even where that interpretation is inconsistent with that expressed by the Attorney General, through the governing regulations.  This is patently incorrect.

Moreover, in *Matter of Sanchez-Avila,* the BIA rejected the very arguments made by Defendants herein.  The Board held that there is no provision, either in the statute or implementing regulation, (8 CFR 235.3), which would authorize INS to return an alien to Mexico to await exclusion proceedings.  As explained therein, *supra,* at page 16, (emphasis in original):

> We agree with the Immigration Judge that the language of the statute, principally Sections 235 and 236 of the Act,[6] read along with section 212(d)(5)(A) of the Act, [7] indicates that Congress contemplated that aliens seeking admission to the United States, who did not appear to be clearly admissible, in the ordinary course would be detained in custody for further proceedings.  The language of section 235(b) stating that an alien "<u>shall be detained for further inquiry</u> to be conducted by a [Immigration Judge]" (emphasis added), and the language of section 236(a) that an Immigration Judge shall have authority to determine whether an arriving alien "<u>who has been detained for further inquiry</u> under section 235 shall be allowed to enter or shall be excluded and deported" (emphasis added), clearly indicates such an intent. Moreover, the language of section 212(d)(5)(A) of the Act, which directs that a paroled alien, whose purposes

---

[6]   8 USC Sections 1225 and 1226.

[7]   8 USC Section 1182(d)(5)(A).

7

325

of parole have been served, "shall forthwith return or be returned <u>to the custody</u> from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" (emphasis added), reflects a congressional understanding that the term "detained" in sections 235 and 236 refers to "custody."

The Board also held that INS had not presented sufficient evidence to prove that the necessary conditions existed to find that Congress had ratified their "interpretation" by re-enacting the statute. [8] In the case at bar, Defendants have made *no* attempt to create a record which would cure these defects. This omission is striking, since the instant action was filed in July, 1994, and the cases which culminated in the Board's decision of June 14, 1996, also arose in 1994 and 1995. Defendants *attempted* in the cases leading to the Board's decision in *Sanchez-Avila* to build the necessary record, but were able to locate only one memo, from 1984, relating to the practice, *Id.* at 24-25. Apparently, they have no additional evidence to offer this Court.

It is submitted that Defendants' claim must fail for other reasons as well. As noted by Board Member Lory Rosenberg, in her separate opinion, at page 2, concurring in part, and dissenting in part:

> I believe that the language of the statute is plain, and, therefore, controlling. Manifestly, "detention" or "detain" is not the same as "restrain" or "repulse," and the existence of plenary power does not supplant our duty of allegiance to the controlling principles of statutory construction. The majority acknowledges this point eventually, <u>see</u>, <u>supra</u> p. 22, but persists in looking for resolution of this matter in the principle that once statutory terms acquire a settled usage and application,

---

[8] To wit, that it was a longstanding interpretation of a term within the expertise of the agency, which interpretation was *known* to Congress, and was *not* inconsistent with the plain language of the statute. *C.f., Mid-Louisiana Gas Co. v. FERC*, 664 F.2d 530, 534 (5th Cir. 1981), vac. on other grounds, 103 S.Ct. 3024.

326

subsequent congressional enactments not disturbing the statute may indicate acquiescence or adoption of the construction. See, supra pl 19. That may be, but not when the language is plain, as it is here; and not when the plain language is markedly different from the Immigration Service's preferred interpretation, which I find to be strained and without support in either established practice or judicial decisions. In such a case, the Supreme Court requires that we and the courts afford the language its plain meaning "and that is the end of the matter." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc. 467 U.S. 837 (1984).

In fact, as noted above, the Board *did* conclude that the intent of Congress was that the term "detain" refer to actual custody, *Matter of Sanchez-Avila, supra* at p. 16, so the discussion by the majority of INS' failure to prove its allegedly longstanding practice is best viewed as *dicta*, even apart from the fact that there has never been any significant evidence presented, to the Board, or to this Court, to support Defendants' claim to the contrary.

2.  DEFENDANTS' "FLOODGATES" ARGUMENT IS BOTH FACTUALLY
        FARFETCHED AND LEGALLY IRRELEVANT.

INS also raises the familiar "floodgates" argument, which, in the case at bar, approaches the ludicrous. According to INS, (INS:5):

> [Under Plaintiffs' interpretation] all aliens claiming to be LPRs would have to be detained within the United States when their entitlement to enter is in question. [9] Such interpretation of the word "detained" would result in the INS being required to detain hundreds of aliens in facilities within the United States or to parole them into his country based merely on the alien's claimed LPR

---

[9]     Defendants are apparently assuming that the INS District Director would never exercise his authority under 8 USC Section 1182(d)(5)(A) to parole persons such as Plaintiffs into the U.S. for the duration of exclusion proceedings. This is contradicted by their own admission, (INS:9,n.3), that all five of the named Plaintiffs herein who are in exclusion proceedings were eventually paroled into the United States.

9

327

> status.  Such interpretation would encourage any alien
> who desires to enter the United States to make such a
> claim, even if unfounded, so as to enter this country.
> Thus, the INS would lose control of this nation's
> boundaries and borders and would be required to open this
> nation's boundaries and borders to every one who claimed
> LPR status.

The suggestion that an individual would falsely claim to be a
lawful permanent resident, so as to have the "privilege" of being
detained in the United States for an exclusion hearing, is absurd.
Certainly, INS has the ability to determine quickly, through their
computerized data-base, whether a person's claim to lawful
permanent resident status is supported by their own records. [10]  If
the claim were false, detention, or parole for criminal
prosecution, would not be unreasonable.  If the claim were true,
then detention, or parole, depending on the individual facts of the
case, is similarly not unreasonable.  It is also what the law and
the regulations require.

Defendants also urge that the construction urged by Plaintiffs,
which is the same as is required by 8 CFR Section 235.3(d), ("The
Service will assume custody of any alien subject to detention under
Section 235.3(b)( or (c) of this section ..."), would lead to an
"absurd result or ... thwart the overall purpose of the statute,"
(INS:12).  This is equally fallacious.

In support of this argument, Defendants claim that INS would have
been required to detain some 67 million people in Fiscal 1994,
because that is how many primary inspections occurred, (INS:14).
However, they do not state how many of those primary inspections

---

[10]    Part of INS' "floodgates" argument is that there is
allegedly "no meaningful way to distinguish between LPR and other
aliens" seeking entry to the United States, (INS:14).    It is
submitted that this claim would come as a great surprise to the
GAO, the Attorney General, and others, given the huge amount of
money that has been spent on INS' computer systems.

328

resulted in *admissions* to the United States.  Clearly, the vast majority of those who present themselves for admission are allowed to enter.  One need only spend a few minutes at the International Bridge to verify this fact.  Nor does INS state how many of those who were not admitted were paroled into the United States, or permitted to withdraw their applications, and were not set up for exclusion proceedings.  *See, Matter of Sanchez-Avila, supra*.  In the absence of this information, their numbers are meaningless, and serve only to show that Defendants have no real basis for their alleged "floodgate" concerns.

Defendants' claim that the Antiterrorism and Effective Death Penalty Act somehow supports their position similarly shows that they are grasping at straws.  Said Act has absolutely *no bearing* on the instant controversy.

B.  EVEN IF THE TERM "DETAINED" WERE SUFFICIENTLY ELASTIC TO PERMIT SUCH ACTIONS IN THE CASE OF ALIENS WHO HAVE NOT BEEN ADMITTED FOR LAWFUL PERMANENT RESIDENCE, ITS APPLICATION TO THE PLAINTIFF CLASS VIOLATES THEIR RIGHTS TO DUE PROCESS OF LAW.

Even assuming, arguendo, that the term "detained" were sufficiently elastic to permit the construction sought by Defendants, and that the Board of Immigration Appeals had not already rejected their arguments, it is submitted that Defendants' interpretation, as applied to Plaintiffs, violates their rights to Due Process of Law.

Defendants claim the right to summarily return Plaintiffs to Mexico for the duration of exclusion proceedings, which, as in the case of Plaintiff Cantu de Cabrera, may last several years.  It is conceded that there is no Due Process involved in this decision.  Nor, so as evidenced by the decision of the Board of Immigration Appeals in *Matter of Sanchez-Avila*, do there exist any guidelines as to which aliens are to be subjected to this procedure.  Rather, it is apparently left to the whim of the officer in charge of the case.

329

In certain cases, where the national security is at stake, the law permits summary temporary exclusion of aliens, 8 USC Section 1225(c). This is significant for two reasons. First, it demonstrates that such summary procedures exist, but only under appropriate circumstances. This fact further negates INS' claim that the term "detained" is broad enough to encompass a procedure which has this effect. *See*, *Matter of Sanchez-Avila*, Opinion of Board Member Rosenberg, at page 1, note 1.

Moreover, such procedures, when applied to lawful permanent residents, violate their rights to Due Process of Law. In *Rafeedie v. INS*, 880 F.2d 506 (D.C. Cir. 1989), the Court upheld a preliminary injunction issued by the District Court against the institution or continuation of proceedings under 8 USC Section 1225(c) against a lawful permanent resident accused of subversive activities. The Board concluded that Mr. Rafeedie retained his right to Due Process in determining whether or not he was entitled to re-enter the country. Certainly the Plaintiffs herein, who stand accused of such nefarious activities as attempting to smuggle an ailing, if undocumented, child into the U.S. for medical care, are entitled to at least as much Due Process as was Mr. Rafeedie.

It is undisputed that the members of the Plaintiff class remain lawful permanent residents, notwithstanding the institution of exclusion or deportation proceedings. As held in *Molina v. Sewell*, 983 F.2d 676, 680 (5th Cir. 1993) (emphasis added):

> *Landon v. Plasencia* [11] also dissuades us from adopting the *Becerra* [12] rule. *Landon* recognized that, unlike an

---

[11] 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

[12] *In re Becerra-Miranda*, 12 I&N Dec. 358 (BIA 1967) (Lawful permanent resident alien who leaves the U.S. while under deportation proceedings is subject to exclusion upon return, notwithstanding *Fleuti*-type nature of departure).

/

alien seeking to enter the United States for the first
time, a returning resident alien retains a constitutional
right to due process. 459 U.S. at 32-33. *The fact that
an alien is subject to deportation proceedings does not
affect his status as a permanent resident alien.* A
permanent resident's status terminates only when the
order of deportation is affirmed by the BIA or otherwise
becomes administratively final. (citation omitted).

Lozano was undisputably a permanent resident alien when
he departed to Mexico. Although he was subject to
deportation proceedings, no final order had issued. To
conclude that upon his return to the United States Lozano
effected an "entry" as a matter of law is inconsistent
with the due process requirements of *Landon* and contrary
to the subjective inquiry mandated by *Fleuti.*

The consequences of Defendants' actions are often drastic. The
resident loses, for an extended period of time, the right to *reside*
in the United States, with all that such a loss entails, in terms
of the ability to work in this country, to raise one's family here,
and to participate in the life of the community. As noted in
*Rafeedie v. INS, supra,* 880 F.2d at 518:

Finally, the district court found that if a Sec. 235(c)
exclusion order is entered against him, Rafeedie will
lose his liberty and his right to work in the United
States. Rafeedie v. INS, 688 F.Supp. 729, 740, 754
(D.D.C.1988). These rights are "weighty" and "rank[ ]
high among the interests of the individual." Landon v.
Plasencia, 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74
L.Ed.2d 21 (1982); 459 U.S. at 37, 103 S.Ct. at 332
(Marshall, J., concurring). Their loss would be
especially severe in this case, since Rafeedie is the
sole source of financial support for his family.

It is urged that the construction proposed by Defendants, under
which INS claims the authority to deprive the Plaintiff class of
these rights, even "temporarily," (i.e., for a period of a few
months or a few *years*), in a totally arbitrary fashion, and with
absolutely no recourse and no Due Process, would be inconsistent
with the guarantees of the Fifth Amendment of the Constitution, and

13

331

CUaPDF - www.fenio.com

with the mandates of cases such as *Landon v. Plasencia, supra;
Rosenberg v. Fleuti, supra,* and *Molina v. Sewell, supra.* [13]

This fact provides further reason why the statute should not be so
construed. *See, U.S. v. Kirk,* 70 F.3d 791, 799-800 (5th Cir. 1995)
(whenever possible, a statute should be interpreted so as to avoid
constitutional issues).

IV.  CONCLUSION

In conclusion, it is respectfully urged that this Court hold that
the term "detained," as used in 8 U.S.C. 1225(b) ("... shall be
*detained* for further inquiry to be conducted by a special inquiry
officer"), means "detained in custody." *See, Matter of Sanchez-
Avila, supra* at 16, ("[T]he term 'detained' in sections 235 and 236
refers to 'custody'"); 8 CFR Section 235.3(d) ("The Service will
assume custody of any alien subject to detention under Section
235.3(b) or (c) of this section...").

It is further urged that this Court hold that for Defendants to
return members of the Plaintiff class to Mexico to await exclusion
proceedings is *ultra vires.*

---

[13]  Defendants appear to argue, (INS:22,n.5), that the Board's
decision in *Sanchez-Avila* cures any problems caused by requiring
Plaintiffs to wait in Mexico, since the Judge would find that the
application for admission had been "withdrawn," and could not hold
their hearings *in absentia,* if they did not receive notice, or for
other reasons did not appear.  However, this would be of little
consolation if the resident waited indefinitely for a hearing of
which s/he never received notice, and were subsequently found to
have "abandoned" his or her status, a potential pitfall of a
finding that the application had been "withdrawn."  Nor would it
resolve the problem if the resident became desperate, and returned
illegally to the U.S., only to discover that by doing so, s/he had
lost all entitlement to relief from exclusion, *Matter of Hernandez-
Casillas,* 20 I&N Dec. 262 (BIA 1990; AG 1991) (LPR who enters
without inspection is ineligible for Section 212(c) relief).

14

332

CUePDF - www.ten.lo.com

It is further urged that this Court grant Plaintiffs' motion for summary judgment on this point, and issue a permanent injunction, enjoining and restraining Defendants from returning lawful permanent residents to Mexico to await exclusion proceedings, and ordering Defendants to abide by the mandates of 8 CFR 235.3(c);

It is further urged that Defendants be ordered to issue and abide by guidelines (Operations Instructions), implementing 8 CFR 235.3(c), specifying the criteria to be taken into consideration by the "inspecting officer" in determining in which such cases to "detain[], parole[], or parole[] for deferred inspection" a given applicant for admission to the United States who does not fall within the parameters of 8 CFR Section 235.3(b) (e.g., aliens with no documentation or false documentation), and that said guidelines be based on the criteria stated therein, to wit, the "likelihood that the alien will abscond or pose a security risk." [14]

Respectfully Submitted,

Lisa S. Brodyaga                          Thelma O. Garcia
Attorney at Law                           Attorney at Law
402 E. Harrison, 2nd Floor                301 E. Madison
Harlingen, Texas 78550                    Harlingen, Texas 78550
(210) 421-3226                            (210) 425-3701

---

[14] Since these are the same criteria considered in determining whether and in what amount a bond is to be set for an individual placed under deportation proceedings, *Matter of P-C-M-*, 20 I&N Dec. 432, 434 (BIA 1991) ("The factors to be considered in determining the need for or the amount of bond are those relevant to deciding whether the alien is a poor bail risk or a threat to national security"), it is submitted that the guidelines should follow the case law developed in this context.

15

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, together with Plaintiffs' Exhibits "FF" and "GG," was served, first-class postage prepaid, on Regina Byrd, Attorney, OIL, Box 878, Ben Franklin Sta, Washington, D.C. 20044, and Ken Muir, SAUSA, P.O. Box 1711, Harlingen, Texas 78551, this 30th day of August, 1996.



16

334

CMsPDF - www.fastio.com

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

JUANA ASCENCIO-GUZMAN, et al     )
                                      )
v.                                )       No. B-94-215
                                      )
E.M. TROMINSKI, et al.         )
_____)

**PETITIONERS' EXHIBIT "FF"**

335

Case 1:94-cv-00215   Document 86   Filed in TXSD on 08/30/1996   Page 19 of 51

relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States. Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer or special inquiry officer may, in the event of neglect or refusal to respond to a subpena issued under this subsection or refusal to testify before an immigration officer or special inquiry officer, issue an order requiring such persons to appear before an immigration officer or special inquiry officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

**(b) Detention for further inquiry; challenge of favorable decision.** Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d) [8 USCS § 1323(d)], who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.

**(c) Temporary exclusion; permanent exclusion by Attorney General.** Any alien (including an alien crewman) who may appear to the examining immigration officer or to the special inquiry officer during the examination before either of such officers to be excludable under paragraph (27), (28), or (29) of section 212(a) [8 USCS § 1182(a)(27), (28), or (29)] shall be temporarily excluded, and no further inquiry by a special inquiry officer shall be conducted until after the case is reported to the Attorney General together with any such written statement and accompanying information, if any, as the alien or his representative may desire to submit in connection therewith and such an inquiry or further inquiry is directed by the Attorney General. If the Attorney General is satisfied that the alien is excludable under any of such paragraphs on the basis of information of a confidential nature, the disclosure of which the Attorney General, in the exercise of his discretion, and after consultation with the appropriate security agencies of the Government, concludes would be prejudicial to the public interest, safety, or security, he may in his discretion order such alien to be excluded and deported without any inquiry or further inquiry by a special inquiry officer. Nothing in this subsection shall be regarded as requiring an inquiry before a special inquiry officer in the case of an alien crewman.

(June 27, 1952, ch 477, Title II, Ch 4, § 235, 66 Stat. 198.)

Case 1:94-cv-00215   Document 86   Filed in TXSD on 08/30/1996   Page 20 of 51

**§235.2  Examination postponed.**

Whenever an alien on arrival is found or believed to be suffering from a disability which renders it impractical to proceed with the examination under the Act, the examination of such alien, members of his family concerning whose admissibility it is necessary to have such alien testify, and any accompanying aliens whose protection or guardianship will be required should such alien be found inadmissible shall be deferred for such time and under such conditions as the district director in whose district the port is located imposes.

[22 FR 9791, Dec. 6, 1957]

**§235.3  Detention and deferred inspection.**

(a) *Prior to inspection.* All persons arriving at a port in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the master, commanding officer, purser, person in charge, agent, owner, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The Service will not be liable for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissability by a Service officer.

(b) *Aliens with no documentation or false documentation.* Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents (except an alien for whom documentary requirements are waived under §211.1(b)(3) or §212.1 of this chapter) or who arrives with documentation which appears on its face to be false, altered, or to relate to another person, or who arrives at a place other than a designated port of entry, shall be detained in accordance with section 235(b) of the Act. Parole of such aliens shall only be considered in accordance with §212.5(a) of this chapter.

(c) *Aliens with documents.* Any alien who appears to the inspecting officer to be inadmissible, but who does not fall within paragraph (b) of this section, may be detained, paroled, or paroled for deferred inspection by the inspecting officer. In determining whether or not an alien shall be detained, paroled or paroled for deferred inspection, the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

(d) *Service custody.* The Service will assume custody of any alien subject to detention under §235.3 (b) or (c) of this section, except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger.

(e) *Notice to carriers.* In the opinion of the examining immigration officer, it is not practical to resolve a question of admissability at the time of arrival of an alien passenger on a vessel or aircraft, the officer shall execute a Form I 259C to notify the agent, master, or commanding officer of the vessel or aircraft, if applicable, that the alien passenger may be excludable from the United States and in the event the alien is formally ordered excluded and deported, the carrier will be responsible for detention and transportation expenses to the last foreign port of embarkation as provided in §237.5 of this chapter.

(f) *Detention in Non-Service facility.* Whenever an alien is taken into Service custody and detailed at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are: (1) 24-Hour Supervision, (2) Conformance with Safety and Emergency Codes, (3) Food Service and (4) Availability of Emergency Medical Care.

(g) *Privilege of communication.* The mandatory notification requirements of consular and diplomatic officers pur-

329

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


JUANA ASCENCIO-GUZMAN, et al )
                             )
v.                           )          No. B-94-215
                             )
E.M. TROMINSKI, et al.       )
_____)


PETITIONERS' EXHIBIT "GG"


337

08/06/96  14:38  NATIONAL IMMIGRATION PROJECT → 210 421 5420

#3283

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

# PUBLISH

File:  A92 764 131 — El Centro

Date:  JUN 14 1996

In re:  LUIS ALFONSO SANCHEZ-AVILA

IN EXCLUSION PROCEEDINGS

CERTIFICATION

ON BEHALF OF APPLICANT:  Pro se

303-298-
0005

AS AMICUS CURIAE:  Daniel C. Horne, Esquire
Daniel M. Kowalski, Esquire
1555 First Interstate Tower South
621 Seventeenth Street
Denver, Colorado 80293

ON BEHALF OF SERVICE:  David Dixon
Chief Appellate Counsel

EXCLUDABLE:  Sec. 212(a)(2)(A)(i)(II), I&N Act [8 U.S.C.
§ 1182(a)(2)(A)(i)(II)] — Controlled substance
violation

Sec. 212(a)(2)(C), I&N Act [8 U.S.C.
§ 1182(a)(2)(C)] — Controlled substance
trafficker

APPLICATION:  Admission to the United States

Before:  Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman,
VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE,
VILLAGELIU, MATHON, and GUENDELSBERGER, Board Members.
Concurring/Dissenting Opinion: ROSENBERG, Board Member.

HOLMES, Board Member:

    In a decision dated March 9, 1995, the Immigration Judge
ordered exclusion proceedings terminated in this and 12 other
cases.  He and another Immigration Judge, who had terminated
other exclusion proceedings on the identical grounds, certified
their decisions to this Board for review pursuant to the
provisions of 8 C.F.R. § 3.1(c) (1995).  The Immigration and
Naturalization Service filed a brief in response to the
Immigration Judges' decisions, arguing that the orders of
termination were in error and requesting that the proceedings be
remanded with instructions to proceed in absentia.

    As the decisions in these certified cases presented
significant questions of statutory and regulatory construction
and as the applicants not only were unrepresented, but also did
not appear at their exclusion proceedings or respond to the
notice of certification, the Board invited the submission of
amicus curiae briefs.  Pursuant to the Board's request for
further briefing, the Service filed a supplemental brief.  An
amicus brief ultimately was filed on behalf of the American

A92 764 131

Immigration Lawyers Association.  The decision in this case will
be fully addressed as it is representative of the others.  The
decision of the Immigration Judge will be affirmed in part.

### I.  FACTS

The applicant apparently arrived by vehicle at the land border
port of Calexico, California, on November 10, 1994, and applied
for entry into the United States as a resident alien commuter.  He
was not admitted.  Instead, that same day he was served with a
Notice to Applicant for Admission Detained for Hearing Before
Immigration Judge (Form I-122), which put him on notice that he
appeared to come within the exclusion provisions of sections
212(a)(2)(A)(i)(II) and (C) of the Immigration and Nationality
Act, 8 U.S.C. §§ 212(a)(2)(A)(i)(II) and (C) (1994).  Both
exclusion grounds relate to involvement with controlled substances.

The Form I-122 advised the applicant that he was "detained
under the provisions of section 235(b) of the Immigration and
Nationality Act, as amended, for a hearing before an Immigration
Judge to determine whether or not [he was] entitled to enter the
United States or whether [he should] be excluded or deported."
This form also reflected that the hearing before the Immigration
Judge was to be scheduled at a later date and that the applicant
wanted the notice of hearing sent to an address in Mexico.  On
November 10, 1994, the applicant also signed a separate, untitled
form that in part reflected that he understood that he had been
placed in exclusion proceedings and that the notice of the
scheduled hearing would be sent to him at the address in Mexico
that he had provided.  This form included the warning:  "If you do
not appear for your scheduled hearing, you will be ordered
excluded and deported in your absence."

On December 15, 1994, a notice of hearing was mailed to the
applicant by the Office of the Immigration Judge (now called the
Immigration Court) advising him that an exclusion hearing before
an Immigration Judge was scheduled for 8:00 A.M. on February 7,
1995.  This notice was sent by regular mail to the applicant and
apparently was not returned to the Immigration Court as
undeliverable.  The address to which the notice was mailed was
largely complete.  However, it was not identical to the address
provided by the applicant. 1/

When the exclusion proceedings convened on February 7, 1995,
the Immigration Judge noted that the applicant had not appeared
for the hearing.  The Immigration Judge advised the Service that

--------------------------------------------------------------

1/  In view of the resolution of this case, the discrepancy in
addresses need not be further addressed.  We note, however,
that supplemental briefing was requested on the issue of mail
service to Mexico.  Any issues posed by such service were not
further addressed by the parties.

-2-

341

Case 1:94-cv-00215  Document 86  Filed in TXSD on 08/30/1996  Page 24 of 51



A92 764 131

there was an initial jurisdictional issue which needed to be addressed because the applicant, who had not appeared, had not been detained or paroled by the Service.  The Immigration Judge indicated that he had received briefs from the Service on the relevant jurisdictional issue in other cases and he was prepared to enter an order terminating proceedings if the Service wished him to proceed with this case rather than "renoticing it."  The Service requested that the Immigration Judge proceed with a decision.

## II.  DECISION OF THE IMMIGRATION JUDGE

In his March 9, 1995, decision, the Immigration Judge emphasized the following facts.  The applicant sought entry into the United States at Calexico, California.  Immigration inspectors were unable to determine that he was entitled to enter the United States.  The applicant was refused admission.  However, he was neither detained nor paroled by the Service.  Instead, he was held only so long as was necessary to complete the initial inquiry and be served with a charging document initiating exclusion proceedings (the Form I-122).  He was then told to wait in Mexico for his hearing.  The Immigration Judge characterized this sequence of events as "tantamount to temporary exclusion by the officer at the port of entry."  The Immigration Judge noted that the charging document was filed with the Immigration Court "following the release and temporary exclusion of the [applicant] to Mexico."  The alien did not appear at the scheduled exclusion hearing to pursue his application for admission.

In the Immigration Judge's view, this case raised the threshold issue of "whether an Immigration Judge has jurisdiction to hear an exclusion case in absentia if the alien has not been detained or paroled under the Act."  "Applying the plain language of the statute," the Immigration Judge concluded that he was "without jurisdiction to proceed in absentia in the limited circumstances of [this case.]"

The principal statutory provisions relating to the entry and exclusion process are sections 235 and 236 of the Act, 8 U.S.C. §§ 1225 and 1226 (1994).  The Immigration Judge pointed out that under section 235(b) of the Act the Attorney General "shall detain for further inquiry [any alien] who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land."  Section 236(a) of the Act provides that an Immigration Judge "shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 235 shall be allowed to enter or shall be excluded and deported."  (Emphasis added.)  The Immigration Judge noted that in discussing these provisions of law, the U.S. Supreme Court had observed that aliens who do not

-3-

342

64 131

appear entitled to enter the United States will be "detained" for examination and that a hearing will be held before an Immigration Judge "if an alien is so detained." See Jean v. Nelson, 472 U.S. 846, 855 (1985); Landon v. Plasencia, 459 U.S. 21, 27-28 (1982).

The Immigration Judge concluded that this language of section 236 of the Act, particularly as analyzed by the Court, is "plain." By its terms, if an alien "has not been detained for further inquiry, or has not been paroled (as a subset of detention), then the Immigration Judge does not have any authority in the matter." The Immigration Judge noted that, when the language of the controlling statute is plain, there is no issue of construction or interpretation. Rather, "the plain language is applied." See United States v. Menasche, 348 U.S. 528, 538-39 (1955).

However, the Immigration Judge further found that the "plain words of the statute are even more clear when the overall statutory and regulatory scheme about exclusion is examined." In this regard, he observed that the statutory scheme is implemented in part by 8 C.F.R. § 235.3(b) (1995), which provides: "Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents . . . or who arrives with documentation which appears on its face to be false, altered, or to relate to another person, . . . shall be detained in accordance with section 235(b) of the Act. Parole of such aliens shall only be considered in accordance with § 212.5(a) of this chapter." (Emphasis added.) Under 8 C.F.R. § 235.3(c), aliens who arrive with documentation, but who appear to be inadmissible, "may be detained, paroled, or paroled for deferred inspection." (Emphasis added.) The Immigration Judge also noted that the provisions of 8 C.F.R. § 235.3(d) make clear that "the Service will assume custody of any alien subject to detention under § 235.3(b) or (c) of this section, except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger."

The Immigration Judge observed that the "parole statute likewise shows the centrality of detention to the exclusion statute." Section 212(d)(5) of the Act provides in relevant part:

> The Attorney General may . . . in [her] discretion parole into the United States temporarily under such conditions as [she] may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be

-4-

343

A92 764 131

> returned to the _custody_ from which he was
> paroled and thereafter his case shall continue
> to be dealt with in the same manner as that of
> any other applicant for admission to the United
> States.

(Emphasis added.)  The "use of the word 'custody' [in this
section] makes clear the intent of Congress [that persons] not
paroled are expected to be in custody."  In fact, the Immigration
Judge noted, the United States Court of Appeals for the Ninth
Circuit recently opined that this very language in section
212(d)(5) "suggests that excludable aliens are to be held in
'custody' whenever the Attorney General finds that parole is not
appropriate."  See Barrera-Echavarria v. Rison, 44 F.3d 1441, 1446
(9th Cir.), cert. denied, 116 S.Ct. 479 (1995).

The Immigration Judge ruled that this statutory and regulatory
language makes clear that the detention referred to in sections
235 and 236 of the Act does not contemplate a mere stop at the
border; rather it contemplates "custody."  The "harshness" of this
custody requirement, however, is ameliorated by the parole
provisions of section 212(d)(5).  In this regard, the Immigration
Judge noted, the Supreme Court has observed that parole is "simply
a device through which needless confinement is avoided while the
administrative proceedings are conducted."  Leng May Ma v. Barber,
357 U.S. 185, 190 (1958).  The Immigration Judge concluded that
"the Court was of the view that parole was the answer to detention
and that, without parole, aliens would otherwise be in 'needless'
confinement . . . while the administrative proceedings are
conducted."

The Immigration Judge noted that the statute does provide
limited authority under which an alien can be temporarily excluded
without being detained or paroled.  See section 235(c) of the
Act.  However, this statutory authority to temporarily exclude
aliens is limited to grounds of excludability related to national
security, a matter not in issue here.

Considering the statute, the regulations, and the caselaw, the
Immigration Judge ruled that he could not "hold a hearing in
absentia when the alien seeking admission has not been detained
(or paroled) for further inquiry under section 235 and has not
appeared before the court to submit to its authority."  In the
present case, the Service did not detain or parole the alien as
mandated by law.  Instead, the Immigration Judge opined, the
Service "seems to have embarked on a policy of temporary exclusion
beyond the security bounds of section 212(a)(3) as limited under
section 235(c)."

The Immigration Judge was not persuaded by the Service's
argument that it had a long history of returning aliens at land

Case 1:94-cv-00215   Document 86   Filed in TXSD on 08/30/1996   Page 27 of 51

A92 764 131

border points to Mexico or Canada to await their exclusion hearings. The Immigration Judge noted that "custom alone does not make a practice law or even lawful in the American system of justice." Moreover, the Immigration Judge concluded, if the practice in question had a long history, it was not one that was well known, particularly in that the Service's policy had never been published. There was no indication that Congress was even aware of the actions of the Service in this regard. Moreover, the Immigration Judge stated, the Service's evidence in support of its claim of a longstanding practice in part conflicted with its own published parole regulations. See 8 C.F.R. § 212.5(a) (1995).

The Immigration Judge also found no meaningful support for the Service's practice in the Service Operations Instructions because those instructions do not have the force of law or regulation and are not binding on Immigration Judges.

The Immigration Judge finally rejected the Service's argument that "its practice of temporary exclusion is a permissible exercise of the plenary power of the government to control the admission of aliens." The Immigration Judge quoted the following from Jean v. Nelson, supra: "'This case does not implicate the authority of Congress, the President, or the Attorney General. Rather, it challenges the power of low-level politically unresponsive government officials to act in a manner which is contrary to federal statutes . . . .'" Id. at 853 (quoting Brief for Petitioners). The Immigration Judge concluded that "the plenary power doctrine was not a catch-all, cure-all for the Service." This was particularly true where the procedures available to the Service to promulgate rules by regulation had not been followed.

The Immigration Judge opined that a "weak argument" could be made that, since the alien was briefly detained at the time of the inspection, such detention, however slight, could bring the alien within the ambit of section 236 of the Act. However, in the Immigration Judge's view, this brief stop was not "detention for further inquiry" as defined by the statute.

In summary, the Immigration Judge found that against "this historical, statutory, and regulatory backdrop, the plain language of section 236 is unassailable." Under section 236 of the Act, an Immigration Judge "shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 235 shall be allowed to enter or shall be excluded and deported." (Emphasis added.) The alien in this case was not detained for further inquiry as required by section 235 of the Act and 8 C.F.R. § 235.3. The alien was not paroled under the authority of section 212(d)(5) of the Act. He did not appear before the court to "submit to its authority." Instead, he was

-6-

345

A92 764 131

"temporarily excluded from the United States and released into Mexico even before charging documents were filed with the court." On these facts, the Immigration Judge held, he had no authority to make a determination regarding excludability. Accordingly, he terminated proceedings and certified his decision to this Board for review.

### III.  POSITION OF THE IMMIGRATION AND NATURALIZATION SERVICE

#### A. March 23, 1995, Service Brief

On certification, the Immigration and Naturalization Service argues that the Immigration Judge erred in terminating the exclusion proceedings. The Service submits that the proper statutory interpretation of section 235 of the Act, particularly in light of the "plenary power" of the United States to control its borders, vests jurisdiction with the Immigration Court to proceed in absentia under the facts of this case. According to the Service the Immigration Judge erred in finding that "either parole or detention of aliens in exclusion proceedings, pursuant to INA §§ 212(d)(5) or 235(a), is a condition precedent to [his] jurisdiction, and that the 'exclusion policy' of the Service [of requiring certain aliens to await their exclusion hearings in either Mexico or Canada] is tantamount to 'temporary exclusion' under INA § 235(c)."

The Service argues that it has three options when it refuses to admit an alien at a port of entry and places the alien in exclusion proceedings. It can: (1) place the alien in custodial detention until exclusion proceedings are completed; (2) parole the alien into the United States until exclusion proceedings are completed; or (3) if the alien seeks entry at a "land" port (Mexico or Canada), require the alien to remain outside the United States pending his or her exclusion hearing.

The Service submits that this third option of "[r]equiring aliens to remain in Mexico or Canada pending their exclusion proceedings is a longstanding practice which has survived years of scrutiny." Large numbers of aliens are placed in exclusion proceedings each year and are required to remain in Canada and Mexico pending their hearings. The "propriety of this action has endured without challenge until termination of the subject exclusion cases. Moreover, a [p]ragmatic analysis of the exclusion policy imparts a clear understanding that a contrary practice ultimately would result in a significant burden on tax payers as a result of increased detention, meaningful loss of control over the borders as a result of liberal granting of parole, and the virtual death of exclusion as a means of immigration control."

A92 764 131

The Service's argument proceeds as follows. A basic premise of immigration law is that an alien within any of the classes of excludable aliens enumerated in section 212(a) of the Act shall be excluded from admission into the United States. Both the language and history of the Act reflect a congressional intent that an exclusion hearing is the sole and exclusive procedure for determining whether an alien should be admitted. This authority "is derived from the plenary power of the United States to preserve its dominion, as exercised by executive and legislative branches of our federal government."

This plenary power doctrine is "the essence of this nation's legal right to preserve the integrity of its borders and ultimately its sovereignty." And, the Service argues, its exclusion policy of requiring certain aliens to await their exclusion hearings in either Mexico or Canada (hereinafter "the exclusion policy") is "a practical exercise of plenary power." The Immigration Judge's rejection of the Service's authority in this regard is "misguided, and it represents legal reasoning whose trajectory is well outside of established law on this issue."

As legal support for this exclusion policy, the Service cites Mersereau v. Ingham, 875 F. Supp. 148 (W.D.N.Y. 1975); two recent unpublished district court decisions 2/; a reference in Gordon & Mailman, Immigration Law and Procedure; a San Diego District Director memorandum, dated December 26, 1984; and INS Operations Instructions 235.6(a) and (b) (1995). The Service also references the Supreme Court decisions in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953), and United States ex rel. Polymeris v. Trudell, 284 U.S. 279 (1932).

- The Service notes that it has a statutory obligation to inspect an alien presenting himself for admission to the United States under section 235 of the Act. An immigration inspector may detain the alien for further inquiry to be conducted by a Immigration Judge if he finds the alien is not clearly and beyond a doubt entitled to admission to the United States under the terms of section 235(b) of the Act. An alien placed in exclusion proceedings is entitled to a hearing before an Immigration Judge under the terms of section 236 of the Act. Moreover, the alien "has no right to unilaterally withdraw his application for

--------------------------------------------------------------------

2/ Both before the Immigration Judge and on certification, the Service referenced two unpublished district court decisions. Copies of those decisions were not submitted to the Immigration Judge. The Service was requested to provide the Board copies of these decisions, which has not been done. Accordingly, the referenced unpublished decisions will not be further considered.

349

CVisPDF - www.festo.com

Case 1:94-cv-00215  Document 86  Filed in TXSD on 08/30/1996  Page 30 of 51

A92 764 131

promulgated by Congress and the Service's interpretation of its legislative mandate." The Immigration Judge's decision-making process and resulting statutory analysis "far removes the law from pragmatic realities which are an integral part of the law's purpose in a civilized and functional society."

The Service argues that the Immigration Judge's departure from "legal pragmatism" is brought into particular focus upon examination of Mersereau v. Ingham, supra. Mersereau involved an alien from Canada who had been neither paroled into the United States nor placed into custodial detention. He was required to remain outside the United States pending his exclusion proceedings. He successfully litigated the issue of parole in the United States district court, but the "Service's legal authority to turn him around at the border and to place him in exclusion was never questioned."

The Service further notes that one of its "quandaries in responding to the Immigration Judge's termination of these matters is determining whether the issue framed by the Immigration Judges solely is 'jurisdictional' or whether there are traces of constitutional dabbling or motivation in the mix." However, the Service states, once terms in a statute acquire "settled judicial or administrative interpretations, and Congress subsequently amends or revises that statute without substantial change, it is reasonable to conclude that Congress intended to adopt the settled interpretation." Citing Shaughnessy v. United States ex rel. Mezei, supra, and United States ex rel. Polymeris v. Trudell, supra, the Service argues that since at least 1932, the Supreme Court has held that aliens seeking entry into the United States from contiguous countries may be forced to wait outside its borders while their right to a hearing is being determined. The Service also urges that this principle was acknowledged by the United States Court of Appeals for the Eleventh Circuit in Jean v. Nelson, 727 F.2d 957, 972 (11th Cir. 1984), when the court noted that parole was an "act of extraordinary sovereign generosity" and that similarly situated aliens "would probably be turned away at the border" if they sought to enter by land, rather than sea or air.

The interpretation of the statutory scheme, the Service continues, "must not be viewed with a blind eye toward the dire consequences of legal misconstruction when the answer to the subject controversy easily may be found within established law." In this regard, the Service asserts, the Immigration Judges erred in construing the word "detained" in sections 235 and 236 to only mean actual custodial detention. This construction ignores well-established meanings of the word "detained" to also mean "to check, to stay, to stop or restrain from proceeding."

348



A92 764 131

The Service concludes its initial brief arguing that its exclusion policy comports with law; that parole or detention of an alien is not a condition precedent to vest jurisdiction with the Immigration Court in exclusion proceedings; that by longstanding legal definition all aliens in exclusion proceedings are considered to be outside of the physical boundaries of the United States; that its exclusion policy is consistent with this legal fiction; that the Service's interpretation of section 235 of the Act is reasonable and a responsible use of the plenary power of the United States to control its border; that the Service has used its lawful authority to require aliens awaiting exclusion proceedings to remain outside the boundaries of this nation pending hearings; and, that the Immigration Judge's decision fails to acknowledge the Service's "right to construe and execute its legislative mandate to secure our nation's borders."

### B. Supplemental Brief of the Service

On July 11, 1995, the Service submitted a supplemental brief in which it submits that the "linchpin of the judges' determination that they lack jurisdiction in these cases is their interpretation of the word 'detained' to mean solely physical custody." Although the term "detain" may be defined as requiring physical custody, such an unnecessarily narrow definition is neither reasonable nor consistent with Congress' statutory and regulatory scheme controlling the exclusion of aliens.

Under the Immigration Judge's interpretation, the Service states, it would "be required to <u>physically detain in custody</u> every alien who may not appear to the examining immigration officer to be clearly and beyond a doubt entitled to land." Although this interpretation of the Act "may be considered reasonable at an airport within the United States, it is illogical and contrary to longstanding practice at land border ports of entry." A more reasonable understanding of the statutory language, particularly at land border ports of entry, is that "the INS must <u>restrain</u> aliens <u>from proceeding</u> into the United States if the immigration inspector determines that the alien may not be clearly and beyond a doubt entitled to land." This reading of the statute is consistent with the established Service practice that permits immigration inspectors to allow applicants to withdraw their applications for admission. This practice makes clear that inspectors are <u>not</u> required to take every applicant who may be inadmissible into custody.

"Moreover," the Service continues, "section 236 authorizes the Immigration Judge to conduct exclusion proceedings to determine whether aliens who are <u>restrained from proceeding</u> into the United States are, in fact, admissible to the United States." The plain language of section 235 and 236 "grants Immigration Judges the

CSMPDF — www.fineto.com

A92 764 131

authority to hear exclusion cases without regard to whether the alien is detained in custody or whether the alien is in the United States."

Although not a matter of record, the Service states that along the northern border of the United States aliens are routinely returned to Canada to await their exclusion hearings. In Buffalo, New York, for example, "approximately 120-140 aliens are placed into exclusion proceedings each week and returned to Canada to await their hearings." Parole of an alien into the United States from Canada to await an exclusion hearing is a rare exception. Only "suspected alien smugglers and aliens convicted of aggravated felonies are physically detained to await an exclusion hearing." Approximately 65% to 70% of the aliens who are returned to Canada to await their hearings appear for hearings. The Immigration Judges in Buffalo routinely order those who do not appear excluded in absentia.

In its supplemental brief, the Service reiterates that all aliens in exclusion proceedings are considered to be legally outside the United States. The Service notes that the Immigration Judge's decision in this case ironically would divest him of jurisdiction in exclusion proceedings when the alien is, in fact, outside the United States. Such a result would be inconsistent with the overall statutory and regulatory scheme concerning exclusion.

The Service notes that Board precedent is clear that once an alien comes within the jurisdiction of the Service in an exclusion proceeding, the alien may not defeat that jurisdiction by unilaterally withdrawing his application for admission. See Matter of Gutierrez, supra; Matter of Vargas-Molina, 13 I&N Dec. 651 (BIA 1971). And, the Service argues, the Immigration Judge's decision in this case is clearly contrary to this Board's precedent because it permits aliens to defeat jurisdiction by not attending their exclusion hearings. Moreover, the governing regulations require an Immigration Judge to conduct an in absentia hearing if the applicant fails to appear and the Immigration Judge is satisfied that the court provided the applicant with written notice of the time and location of the proceeding to the most recent address in the record of proceeding. See 8 C.F.R. § 3.26(a) (1995).

In conclusion, the Service submits:

> Immigration Judges have the authority under the Act and the regulations to hear an exclusion case of any applicant for admission whom the INS restrains from proceeding into the United States. The [Immigration] Judge's jurisdiction is established by filing by the Service of a

-12-

350



A92 764 131

> charging document with the Office of the
> Immigration Judge. Furthermore, the
> regulations require the court to proceed in
> absentia if the applicant does not appear for
> hearing, following written notice.

Accordingly, the Service urges that the decision of the
Immigration Judge in this case should be reversed and the record
remanded for proceedings in absentia.


## IV.   POSITION OF AMICUS

The American Immigration Lawyers Association ("AILA"), pursuant
to 8 C.F.R. § 292.1(e) (1995), filed an amicus brief in support of
the decisions of the Immigration Judges in these certified cases.
Addressing six principal points, AILA argues that Immigration
Judges have the authority to rule on jurisdictional issues and
that the Immigration Judge's decision in this certified case is
correct.

AILA first states that this case revolves around a simple issue
of statutory construction and that the Immigration Judge properly
concluded that the "plain language of the [Act] and its
implementing regulations dictate that Immigration Judges retain
subject-matter jurisdiction over exclusion hearings only for
applicants for admission who have either been detained or paroled
by the INS."

As AILA points out, section 235(b) states that an alien who
does not appear clearly and beyond a doubt entitled to land "shall
be detained for further inquiry to be conducted by a special
inquiry officer." Section 236(a) of the Act explicitly states
that the Immigration Judge "shall have authority in any case to
determine whether an arriving alien who has been detained for
further inquiry under section 1225 of this title shall be allowed
to enter or shall be excluded and deported." The Supreme Court
has observed that an Immigration Judge's jurisdiction is
contingent upon the Service actually detaining (or paroling) the
alien in question. See Landon v. Plasencia, supra, at 27-28.
Thus, according to AILA, the language of the Act, particularly
after Supreme Court interpretation, makes clear that an "alien
must be currently detained for examination before an [Immigration
Judge] has jurisdiction to hold an exclusion hearing."

Second, amicus states, the Immigration Judges accorded the word
"detained" in sections 235 and 236 of the Act with its only
accepted meaning, "physical custody." A review of over 100 Board
decisions, from Volume 1 of the Administrative Decisions under
Immigration and Nationality Laws of the United States to present,



A92 764 131

"reveals that the Board consistently uses and understands the term 'detention' to mean physical custody, and <u>never</u> the type of temporary repulsion into Mexico or Canada now posited by the Service." Moreover, the express reference to "custody" in section 212(d)(5) of the Act and in the regulations at 8 C.F.R. § 235.3(d) makes clear that both Congress and the Service have already contemplated that persons not paroled into the United States are expected to be held in custody.

The Service argues in this case for an interpretation of the word "detained" to also include the practice of "repulsing" aliens from the United States. However, amicus submits, such a "new interpretation is oddly convenient [in that when] trying to defend its Haitian detention policies in the 1980's, INS has already interpreted the same word 'detain' to <u>necessarily imply</u> confinement." <u>See Louis v. Nelson</u>, 544 F. Supp. 973, 993 (S.D. Fla. 1982), <u>aff'd in part, rev'd in part sub nom., Jean v. Nelson</u>, 711 F.2d 1455 (11th Cir. 1983). In both Haitian and Cuban litigation, the Service has steadfastly argued that sections 235 and 236 of the Act "require the INS to take allegedly inadmissible applicants into <u>physical custody</u>, and that release from said custody (parole) under [section 212(d)(5)] is to be the rarely-employed exception to the rule of physical custody." <u>See Louis v. Nelson, supra; Barrera-Echavarria v. Rison, supra</u>. The Service, "having fought for years for the right to construe the word 'detain' to mean 'confinement,' . . . severely undercuts its current claim that the word 'detain' need not necessarily imply confinement or parole." It cannot, amicus urges, now claim that the "mere repulsion" of aliens at the border constitutes the detention required by these sections of the Act.

Third, amicus asserts, even if the Service's "novel interpretation" of the Act were deemed rational and such a reversal of its arguments were permissible, this new statutory interpretation could only be implemented in conformance with the requirements of the Administrative Procedure Act ("APA") because it would have to be deemed "the adoption of a new 'rule,' as defined by the [APA]." According to AILA, "It has general applicability and future effects in a way designed to implement, interpret, or prescribe law or policy." Thus, it was error for the Service to adopt this policy without adhering to the APA's rulemaking procedures. As such, the Service "cannot enforce such a policy, and in no way can it expect the Executive Office for Immigration Review to become complicit to such an unlawfully enforced policy."

Further, amicus states, the Immigration Judges correctly ruled that the Service may not "temporarily exclude" any aliens other than those listed in section 212(a)(3) of the Act and that none of the aliens involved in this case were excludable under that section.

352

Case 1:94-cv-00215 Document 86 Filed in TXSD on 08/30/1996 Page 35 of 51

A92 764 131

Fifth, it is argued that the Service's claim on appeal that requiring aliens to remain in Canada or Mexico pending their exclusion proceedings "is a long-standing practice which has survived years of scrutiny" is "utterly and egregiously false -- a fact immediately apparent from reading both the briefs and the Immigration Judge's decision." Further, AILA states, "No court has _ever_ reviewed INS' policy of temporarily excluding aliens not found to pose a national security risk." And the Service, "for all its posturing, has produced _no_ case scrutinizing its policy." Had the Service done so, "their briefs certainly would have contained fewer dubious policy arguments acting in lieu of any real legal authority."

AILA finally urges that the Service's argument that the San Diego District Director has "plenary power over immigration matters is a ridiculous claim [which] begs for some legal authority, [yet] INS cites none." According to amicus, "It is Congress, the President, and the Attorney General, who may at times exercise plenary power over immigration matters, not the San Diego district director." Plenary authority does not lie with lower level officers such as district directors. While the Service apparently "takes umbrage" at the San Diego District Director being described as a low level official, within the context of the plenary power doctrine such is the case. Within this context, "high level" executive officials are such officials as the President and the Attorney General.

In conclusion, amicus submits, the position of the Service now being argued defies the statutory requirements, its implementing regulations, caselaw, and the APA. The Service "must take aliens such as the applicant into custody, or alternatively parole them in, or allow them to withdraw their applications for admission into the United States -- an increasingly frequent option." These are "the _only_ options (with a few notable exceptions, e.g., deferred inspection or temporary exclusion) allowed to INS under the law." Neither the Act nor the regulations allow the Service "to come up with 'functional equivalents' to either detention or parole," and the San Diego District Director cannot claim any kind of plenary power as an excuse to ignore the Act's plain language. "If [the Service] now claims discontent with the statutory mandate," amicus submits, "its concerns are better expressed in a Congressional hearing than before the Board." Accordingly, amicus concludes, the Immigration Judge's decision in this case should be affirmed.

## V. ANALYSIS OF THE PARTIES' POSITIONS

At the outset, we note that there are aspects of each of the parties' positions in this case with which we agree and disagree.

CMPDF - www.fenko.com



A92 764 131

## A. Immigration Judge's Decision

We agree with the Immigration Judge that the language of the statute, principally sections 235 and 236 of the Act, read along with section 212(d)(5)(A) of the Act, indicates that Congress contemplated that aliens seeking admission to the United States, who did not appear to be clearly admissible, in the ordinary course would be detained in custody for further proceedings. The language of section 235(b) stating that an alien "shall be detained for further inquiry to be conducted by a [Immigration Judge]" (emphasis added), and the language of section 236(a) that an Immigration Judge shall have authority to determine whether an arriving alien "who has been detained for further inquiry under section 235 shall be allowed to enter or shall be excluded and deported" (emphasis added), clearly indicates such an intent. Moreover, the language of section 212(d)(5)(A) of the Act, which directs that a paroled alien, whose purposes of parole have been served, "shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" (emphasis added), reflects a congressional understanding that the term "detained" in sections 235 and 236 refers to "custody."

It is not surprising that the statute was drafted in this manner because, when enacted in 1952, detention in the exclusion context was the norm. As the United States Court of Appeals for the Eleventh Circuit has noted: "Prior to 1954 it was INS policy to detain almost all aliens at the port of entry pending a determination of their admissibility. Large detention centers existed for this purpose at San Francisco, California and Ellis Island, New York." Jean v. Nelson, 711 F.2d 1455, 1468-69 (11th Cir. 1983) (citations omitted). In fact, detention in exclusion proceedings had a long history before 1952. The Immigration Act of 1917, 39 Stat. 874, for example, provided for "boards of special inquiry" at sea and land border ports "for the prompt determination of all cases of immigrants detained at such ports under the provisions of the law." See section 17 of the Immigration Act of 1917.

We also agree with the Immigration Judge that the regulations implementing these provisions of law reflect a similar understanding of the exclusion process. The language of 8 C.F.R. §§ 235 and 236 (1995) is fully consistent with the Immigration Judge's reading of the statute. For example, 8 C.F.R. §§ 235.3(b) and (c) provide that aliens who appear inadmissible shall be detained or paroled. Further, as noted by the Immigration Judge, 8 C.F.R. § 235.3(d) explicitly states: "The Service will assume custody of any alien subject to detention under section 235.3(b) or (c) of this section, except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger."

-16-

354

A92 764 131

Moreover, as the Immigration Judge correctly notes, there is no explicit provision in the Act or its implementing regulations authorizing the return of applicants for admission to Mexico or Canada to await future exclusion proceedings, other than the provisions for temporary exclusion in section 235(c), which are inapplicable here.

We do not agree, however, with the Immigration Judge's conclusion that the Service's conduct in this case is akin to the practice of temporary exclusion. Section 235(c) of the Act does not simply provide for the temporary exclusion of an alien pending a hearing by an Immigration Judge; rather, it permits the Attorney General in certain circumstances to order the exclusion of an alien "without any inquiry or further inquiry" before an Immigration Judge. The Service is not arguing that the applicant in this case could or should be found excludable without a hearing (or an opportunity for a hearing) before the Immigration Judge. Rather, the Service urges that the Immigration Judge has greater jurisdiction to conduct such hearings than the Immigration Judge finds he does.

Finally, we note that the decision of the Immigration Judge does not expressly discuss the fact that section 236(a) of the Act provides that an Immigration Judge shall have authority in any case to determine whether an alien who "has been" detained for further inquiry under section 235 should be allowed to enter or should be excluded and deported. Section 236 does not limit the Immigration Judge's authority to cases where the applicant for admission "is" detained.

## B. Service's Arguments

We agree with the Service that Congress and the executive branch have broad authority over, and weighty responsibility regarding, immigration matters. This country has asserted its right to control the entry and presence of aliens since at least the passage of the Alien Act of 1798, 1 Stat. 570. The Supreme Court has recognized that "[c]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the Executive and the Legislature." Landon v. Plasencia, supra at 35; see also The Chinese Exclusion Case, 130 U.S. 581 (1889). In fact, the Court has "repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909)). The Act itself vests broad authority in the Attorney General "to control and guard the boundaries and borders of the United States against the illegal entry of aliens." Section 103(a) of the Act, 8 U.S.C. § 1103(a) (1994). And, the Commissioner of the Service is charged with "any

-17-

255

A92 764 131

and all responsibilities and authority in the administration of
. . . [the] Act . . . as may be delegated to [her] by the Attorney
General." Section 103(b) of the Act. These are not matters
brought into any dispute by the case before us.

However, one cannot simply "leap" from a general discussion of
the broad authority of Congress and the Executive to control
immigration to a "pragmatic analysis" of the exclusion policy in
issue here. One first looks to the law and its implementing
regulations to determine how this immense power has been exercised
by Congress and the executive branch.

The principal statutorily-based argument advanced by the
Service in this case is that the Immigration Judge erred in
"narrowly" construing the word "detained" in sections 235 and 236
of the Act to mean custodial detention. Instead, the Service
argues, this word should be construed to mean "to check, to stay,
to stop or restrain from proceeding"; i.e, a more reasonable
understanding of the statutory language, particularly at land
border ports of entry, is that an immigration inspector must
"restrain aliens from proceeding into the United States" if they
do not clearly appear to be admissible. However, the Service has
not directed us to any meaningful support for this interpretation
of the law in the statute, its implementing regulations, or
caselaw.

The initial difficulty with the Service's argument in this
regard arises from the language of the statute itself. Sections
235 and 236 make no distinction between procedures to be applied
at land border ports and other ports of entry. Moreover, these
sections direct that applicants will be "detained for further
inquiry," not "detained from entering the United States." And,
the Service does not explain how its argument in this regard can
be reconciled with the language of section 212(a)(5) of the Act
and with the relevant implementing regulations at 8 C.F.R.
§§ 235.3 and 235.6.

The Service urges that its practice in this regard has survived
years of legal scrutiny, but ultimately points to no case that has
specifically addressed and sanctioned the exclusion practice in
question. The Service cites the language of the Supreme Court in
Shaughnessy v. United States ex rel. Mezei, supra at 215, that
states: "Aliens seeking entry from contiguous lands obviously can
be turned back at the border without more." But the Court there
was referring to its decision in United States ex rel. Polymeris
v. Trudell, supra, which involved two aliens who had been detained
and found excludable after seeking entry at a land border port.
The Court was contrasting the ease with which these aliens could
then be excluded from the United States as compared to Mr. Mezei,

256

A92 764 131

who had been <u>detained and ordered permanently excluded</u> by the Attorney General, but who had been stranded on Ellis Island for years because no other country would take him back.

Further, we do not find the decision of the district court in <u>Mersereau v. Ingham</u>, <u>supra</u>, to be of particular significance in resolving this case because it did not address the issue now before us. Rather, as the Service notes, <u>Mersereau</u> was decided on other grounds and the legal authority at issue in the present case simply was never challenged. Moreover, <u>Matter of Nafi</u>, 19 I&N Dec. 430 (BIA 1987), where we first ruled that in absentia exclusion proceedings could be conducted, even though not specifically authorized by statute, involved an alien who had been paroled into the United States.

The Service has established that the practice at issue here has never been successfully challenged administratively or in the courts. However, the Service has not identified any caselaw affirmatively sanctioning this practice. Rather, it would appear that the issue has simply never been raised until the case before us.

Thus, the Service has not identified any explicit statutory or regulatory authority for the exclusion practice at issue here, nor has it cited any judicial or administrative decision directly on point. The Service, however, also argues that its authority arises from "plenary power" and that its "longstanding" practice should be affirmed because it is a settled interpretation of the Act that has never been amended by Congress.

As recognized above, Congress and the Executive have broad power to control this country's borders. Not only do they have such authority, but most would agree they have the responsibility to ensure the integrity of our borders. However, we first note regarding this issue that, whatever the breadth of the concept of plenary power, it is not a power that attaches to district directors, who have no authority to make nationwide policy determinations.

Although district directors occupy positions of significant importance and authority, the Immigration Judge and amicus are correct that, within the context of arguments related to plenary power, they are "low-level" government officials as contrasted, for example, to the President and the Attorney General. See <u>Jean v. Nelson</u>, <u>supra</u>, at 853. As noted above, the statute vests significant authority in the Attorney General to control this country's borders. <u>See</u> section 103(a) of the Act. Under section 103(b) of the Act, the Attorney General in turn has delegated the principal responsibility for enforcing the Act to the Commissioner of the Service. <u>See</u> 8 C.F.R. § 2.1 (1995). This broad authority, however, has not been redelegated to Service district directors. <u>See</u> 8 C.F.R. § 103.1(g)(2)(ii) (1995). Thus, the Service has not

-19-

357

A92 764 131

established that the concept of plenary power can be exercised at the district director level, and there is a scarcity of evidence before us that the practice in issue today results from an exercise of plenary power by senior executive officials.

The Service submits, and we agree, that there is a rule of statutory construction that "once terms in a statute acquire settled judicial or administrative interpretations, and Congress subsequently amends or revises that statute without substantial change, it is reasonable to conclude that Congress intended to adopt the settled interpretation." See Lorillard v. Pons, 434 U.S. 575, 580-81 (1978).

In fact, although somewhat surprisingly not referenced by the parties, we note that in 1974 in an immigration case involving aliens who lived in Mexico and Canada and commuted to the United States to work, the Court concluded that a longstanding administrative construction that such aliens were not nonimmigrants was "entitled to great weight, particularly when . . . Congress has revisited the Act and left the practice untouched." Saxbe v. Bustos, 419 U.S. 65, 74 (1974). Citing Massachusetts Trustees v. United States, 377 U.S. 235 (1964), and United States v. Midwest Oil Co., 236 U.S. 459 (1915), the divided Court stated: "Such a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language." Saxbe v. Bustos, supra, at 74. But see Demarest v. Manspeaker, 498 U.S. 184, 190 (1991)("Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction.").

Our concern with the Service's argument in this regard is not with the underlying principle advanced, but instead is with the evidence (or lack of evidence) presented in support of its claim that the practice of returning some applicants for admission at land border points to Mexico or Canada is a well-known, widely practiced policy of long duration. In this regard, we compare the evidence of the administrative practice presented in Saxbe v. Bustos, supra, and the evidence in the case before us.

In Saxbe v. Bustos, the Court referenced the fact that the administrative practice in question dated back to 1927 and was supported by a formal Department of Labor ("DOL") general order. 3/ That administrative construction in the DOL regulation

---

3/ Immigration functions were vested with the Secretary of Labor between 1913 and 1940. The functions and powers of the Secretary of Labor relating to the administration of the immigration and nationality laws were transferred to the Attorney General effective June 14, 1940.

-20-

358

Case 1:94-cv-00215  Document 86  Filed in TXSD on 08/30/1996  Page 41 of 51

A92 764 131

was carried forward in Department of Justice regulations even prior to 1952. _See_ 8 C.F.R. § 110.6 (1947). The practice was reviewed and sustained in various published Board decisions before 1952. _See, e.g., Matter of D-C-_, 3 I&N Dec. 519 (BIA 1949). This Board reaffirmed the validity of the practice after the enactment of the 1952 Act. _See, e.g., Matter of M-D-S-_, 8 I&N Dec. 209 (BIA 1958). Moreover, when the 1952 Act was reported, the Senate Judiciary Committee described the practice in some detail. The resulting Senate Report (S. Rep. No. 1515, 81st Cong., 2d Sess. (1950)) revealed a clear "congressional acceptance of the system." _Saxbe v. Bustos, supra,_ at 78. Minor changes to the provisions of the Act relevant to commuters were made in 1965 with no suggestion of change to the administrative practice. Numerous reports by committees of Congress indicated that Congress was "very knowledgeable" about the administrative practice that dated back to 1927 and had not reached a consensus that the policy was wrong. _Id._

In support of the administrative practice in the case before us, the Service cites to one sentence in its 1982 Operations Instructions 235.6(a) ("When the alien is returned to [a] contiguous territory to await an appointment at a later date, the alien's foreign address shall be noted on the face of the duplicate copy of the [Form I-122]"); one sentence in the INS _Examinations Handbook_ ("Deferred inspections from land border ports should be minimal, since inadmissible applicants will normally be required to remain outside the United States until the grounds for excludability are overcome"); a San Diego District Director's memorandum, dated December 26, 1984; and, a single sentence in 1 Charles Gordon et al., _Immigration Law and Procedure,_ § 8.09[1], at 8-17 (rev. ed. 1996) ("When an inspection is not promptly completed at a border station, the applicant from an adjacent country can be asked to return at a later time."). In its Supplemental Brief, the Service, without proffering any specific supporting evidence, makes statements regarding its practice at the Canadian border, particularly at its Buffalo District Office.

The Service points to no regulatory support for the practice in question here, no administrative or judicial precedent sanctioning it, nor to any reference in any legislative history reflecting a congressional awareness and approval of the practice. On the present record, there is a rather stark contrast between the evidence in support of the longstanding administrative practice at issue in _Saxbe v. Bustos_ and that underlying the practice here.

We find some support for the Service's argument in this regard, but we cannot conclude on the evidence before us that there is a sufficiently established, clear, longstanding, agency-wide

359



A92 764 131

administrative construction of the Act to enhance the force of the
its argument relating to congressional "silence." We note that
Sarbe v. Bustos, and the cases referenced by the Service on appeal
regarding this issue of statutory construction, involved a
practice supported by agency regulation or clear evidence of
congressional approval of the construction of law, or both. See
Sarbe v. Bustos, supra, at 74-78; Lorillard v. Pons, supra, at
581; Barrera-Echavarria v. Rison, supra, at 1444-46; cf. Brown v.
Gardner, 115 S.Ct. 552, 556-57 (1995)("[T]he record of
congressional discussion preceding reenactment makes no reference
to the VA regulation, and there is no other evidence to suggest
that Congress was even aware of the VA's interpretive position.").

We do agree with the Service that the regulations regarding
exclusion proceedings require the Immigration Judge to proceed
with an in absentia hearing if there is adequate evidence of
notice of hearing. See 8 C.F.R. § 3.26(a). However, the
Immigration Judge did proceed with an in absentia hearing here, he
simply ruled against the Service. The fact that a hearing is
conducted in absentia does not divest an Immigration Judge of all
authority to rule on issues of jurisdiction or to otherwise rule
on issues raised in the case. For example, the Service does not
argue that it has authority to require aliens who arrive at
airports to return to their home countries to await an exclusion
hearing (e.g., to return visitors for pleasure to New Zealand and
tell them to appear later at their own expense to establish that
they were genuinely nonimmigrant visitors or face in absentia
orders of exclusion). Presumably, the Service would not contest
in such a case that an Immigration Judge would properly terminate
any initiated exclusion proceedings if the alien did not appear
for a hearing.

Finally, we agree with the Service that requiring every alien
who appears at this country's border seeking admission either to
be detained or released into American society if they do not
clearly appear admissible could lead to dire results. But, that
is not a result required by the decision of the Immigration
Judge. We note that the Service only asserts the right to employ
the practice at issue here at land border ports and it does not
allege that dire consequences have resulted at other ports of
entry. This argument by the Service does not address the
consensual practice of allowing the withdrawal of applications for
admission. 4/ Most significantly, however, the issue before us is

---

4/ The Service does not argue that the exclusion practice in issue
here results from an agreement between the parties (e.g., a
consensual practice akin to a voluntary withdrawal of an
application for admission).

360

A92 764 131

simply whether the Service has the right under existing law and regulation to an in absentia <u>order of exclusion</u> if an applicant for admission does not return to pursue that application if he or she is neither detained nor paroled and has been turned away at the border to await a future hearing. The Immigration Judge's decision in this case does not compel the Service to detain or parole any alien. Neither the Immigration Judge nor the Board has the authority to order the Service to do either.

### C. Arguments of Amicus

We agree with the amicus arguments that the plain language of a statute controls over practical necessity. We similarly agree that a review of some 50 years of administrative and judicial decisions does not reflect any case addressing the issue specifically raised in the present case; i.e., we could find no decision specifically sanctioning the practice urged by the Service. We agree that the statutory and regulatory language, and the apparent arguments advanced by the Service in other cases involving the word "detained" in sections 235(b) and 236(a) of the Act, reflect that this term in these provisions of law has been understood to refer to "custody." And, we agree that if the issue in this case were to be resolved by the Service's "plenary power" over immigration matters, that such power could not simply be exercised by individual district directors.

We do not agree, however, that an Immigration Judge only has jurisdiction to hold an exclusion hearing if an alien is detained or has been paroled. The language of section 236(a), insofar as it refers to an alien who "has been detained," is in our view broad enough to provide the Immigration Judge authority to proceed with an exclusion hearing in the case of an alien who is neither detained nor paroled, but who appears at the exclusion hearing before the Immigration Judge seeking to pursue his or her application for admission. Applicants for admission have a difficult task in seeking to compel the Service to parole them. See Bertrand v. Sava, 684 F.2d 204, 211 (2d Cir. 1982) ("Although the discretionary decisions of INS District Directors to parole unadmitted aliens may be judicially reviewed, the scope of the review is necessarily narrow."). In the ordinary course, such applicants understandably have little interest in seeking to force the Service to take them into custody. However, the statute clearly contemplates that they do have the right to establish their admissability before an Immigration Judge unless they come within exclusion grounds related to national security.

Finally, as regards the arguments of amicus, at least based on the present evidentiary record, we agree that the exclusion practice in issue is best addressed through agency regulation or statutory change.

361



A92 764 131

## VI. CONCLUSIONS

The issue before us is whether under existing law and regulation the Service can deny entry to an applicant for admission at a land border port; not detain him, parole him into the United States, or offer him the opportunity to withdraw his application for admission; return him to Mexico with instructions to return for a subsequent exclusion hearing; and then, so long as there is adequate evidence that a notice of hearing was mailed to the last address provided by the alien, demand an in absentia order of exclusion from the Immigration Judge if the applicant does not appear or otherwise participate in the scheduled exclusion hearing.

There is no explicit statutory or regulatory authority for a practice of returning applicants for admission at land border ports to Mexico or Canada to await their hearings. In fact, the language of the statute and present regulations indicates that aliens who appear for inspection (whether at land borders or not) shall either be detained for further inquiry or paroled into the United States. However, the Service urges, and we agree, that the Government has immense power to control this country's borders. The Act specifically vests broad authority in the Attorney General in this regard.

Particularly in light of this "plenary" power, the Service urges that the "longstanding" exclusion policy at issue in this case must be sanctioned by dint of its unchallenged history and the absence of any congressional action to change the practice. But, if the Service's factual statements regarding this exclusion policy are correct, it has offered remarkably little _evidence_ in support of this argument. We note that we do not find the absence of explicit administrative or judicial decisions supporting the practice determinative because this is an issue that likely would infrequently be litigated; i.e., aliens who fail to appear at exclusion hearings and who abandon their attempts to lawfully enter this country are unlikely to litigate an exclusion order. Moreover, this Board has certainly reviewed some exclusion cases of this nature and is not aware of the issue presented in this case ever having been raised by a party.

However, as noted above, the evidence offered to establish that this in fact has been a Service-wide practice of long duration is slim. It is not clear from the record before us whether this is a practice that is or has been used in all or only some Service districts; how long the practice has been followed; whether it has been a consistent Service practice; and, what Service-wide standards, if any, have been established for the practice. Other



A92 764 131

than one district director's 1984 memorandum, we have been offered
no written guidance regarding the specific circumstances or
limitations under which this policy applies.  For example, it is
stated on appeal that the practice does not apply to "suspected
alien smugglers and aliens convicted of aggravated felonies," but
we have been offered nothing to establish that this is Service
policy.  And, in the case before us, the Service argued before the
Immigration Judge that the applicant was caught at the border with
some 14 pounds of marijuana hidden in bundles in a compartment in
his car, yet he apparently was simply turned away at the border
after being served a Form I-122.  We do not reference this as part
of any evaluation of Service "policy," we raise these points
because they lead to questions whether we are confronted with a
clear historical agency practice or simply with practices at
particular Service district offices.

We note that there is no discussion provided by the Service
regarding the interplay, if any, between this practice and the
process of requesting or encouraging aliens to withdraw their
applications for admission.  We have not been provided or directed
to any evidence that this is a practice known to Congress (e.g.,
references in committee reports, etc.).  And, it is certainly more
difficult either to rely on arguments tied to "plenary" power or
claims of longstanding agency practice in the absence of a
supporting regulation.  This is particularly true when the
practice would not appear entirely consistent with the language of
an existing regulation.

We are not convinced that the present statutory scheme
necessarily would preclude a policy such as that espoused by the
Service.  But, if so, we would expect it to be based on the
consent of the parties (e.g., as is the case with the practice of
voluntary withdrawals of applications for admission); have
well-established, longstanding roots (e.g., such as were
demonstrated in Saxbe v. Bustos, supra); or be implemented by a
regulation tied to the broad power vested in the Attorney General
under section 103(a) of the Act.

In this later regard, we find the situation here somewhat akin
to that presented in Matter of Toscano-Rivas, 14 I&N Dec. 523 (BIA.
1972, 1973; A.G. 1974), which concerned the Service's authority to
include a condition prohibiting unauthorized employment in an
appearance and delivery bond in connection with a deportation
hearing.  The Attorney General ultimately concluded in that case
that the pertinent statutory provisions authorized this practice,
at least in some circumstances, but that the practice "should be
specifically governed by a published regulation of the Service."
Id. at 553-55.  The reasons for regulatory support for the policy
at issue here appear equally as strong.  First, because the
statute itself makes no distinction between procedures to be

A92 764 131

utilized at land border ports and other ports of entry.  Second,
because there is tension between the practice and the existing
regulation at 8 C.F.R. § 235.3.  Third, because it is unclear how
widespread the present practice is and under what conditions or
circumstances it is to be used.  And, finally, because this would
appear to be a matter in which guidance to both Service officers
and the public is important.

## VII. RULING AND ORDER

The Service does not argue that its "exclusion policy" is a
consensual practice.  The record does not include sufficient
evidence for us to conclude that this "policy" is a longstanding
agency practice that, in effect, has been sanctioned by Congress
as was the case in Saxbe v. Bustos, supra.  There is no regulation
establishing the policy that implicates the Attorney General's
broad authority vested in section 103(a) of the Act to "control
and guard" this country's borders.  Accordingly, on the record
before us, we conclude that the Immigration Judge did not err in
terminating exclusion proceedings.  Under the present statutory
and regulatory scheme, we find that this case is most reasonably
viewed as one in which the Service, by simply directing the
applicant to leave the country after being served with an I-122,
in effect consented to the withdrawal of his application for
admission when he elected not to return to the United States to
pursue that application.

ORDER:   The decision of the Immigration Judge terminating
exclusion proceedings is affirmed.

*David B. Holmes*

FOR THE BOARD

U.S. Department of Justice          Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041          # PUBLISH

File: A92 764 131 - El Centro          Date:    JUN 1 4 1996

In re: LUIS ALFONSO SANCHEZ-AVILA

CONCURRING/DISSENTING OPINION: Lory D. Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I concur with the conclusion of the majority that the Immigration Judge properly terminated exclusion proceedings under the circumstances in the case before us. Simply stated, the Service effectively consented to a withdrawal of the alien's application for admission in this case, when, following issuance and service of a  Notice to Applicant for Admission Detained for Hearing before Immigration Judge (Form I-122), which initiates exclusion proceedings, it permitted the alien to leave the United States and the alien did not appear subsequently to pursue his application in such proceedings.

My reasons for arriving at this conclusion are somewhat distinct from those expressed and adopted in the majority opinion. I believe that the Immigration Judge was absolutely correct when he characterized the issue as a jurisdictional one, and determined that the plain language of the statute did not authorize an exclusion hearing in absentia when an alien has not been detained or paroled within the United States as prescribed by the Act. The Immigration Judge's reasoning is adequately reported by the majority, see supra pp. 3-6, and I will not address it in further detail here.

In essence, the Service asserts that it has long engaged in its "exclusion policy" of serving an alien with notice of an exclusion hearing for an undesignated time and place and then requiring the individual to remain outside the United States pending the eventual hearing.  The Service argues that this policy, (resulting, in essence, in an alien's exclusion by the Service without a hearing before an Immigration Judge or review before this Board, a practice which, in and of itself, I find to be of some concern), has the endorsement of subsequent legislative enactments which have not in any way disturbed it; [1] that in absentia exclusion hearings are authorized by the implementing regulations

---

[1] There is no express provision in the statute or regulations that authorizes such a practice. To the contrary, the statute does specifically provide for temporary exclusion, but only in the case of an alien who "may appear to the examining immigration officer or the special inquiry officer during the examination before either . . . to be excludable under subparagraph A (other than clause(ii)),(B), or (C) of section 212(a)(3)." Section 235(c) of the Immigration and Nationality Act, 8 U.S.C. § 1225(c) (1994). Silence in the statutory section in question should not be given the same effect as that worked by section 235(c), as no provision of law should be construed to render a word

365

once an alien has been service with Form I-122; and that we are in danger of mass influxes of aliens across our borders without this practical means of immigration control.

Much of the dispute over the Immigration Judge's interpretation compared to the Service's position, revolves around the reading of the statutory language concerning the requirement of detention of an alien seeking to enter the United States who does not appear "clearly and beyond a doubt entitled to land." Section 235(b) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b) (1994). The statute provides that such detention by the Service is explicitly for the purpose of further inquiry before an Immigration Judge, and that the Immigration Judge has authority to admit or exclude an alien who has been so detained. Section 236(a) of the Act, 8 U.S.C. § 1226(a) (1994). The Service argues that the words "detention" or "detained" may be read to mean to "restrain" from entering or to "repulse," while the Immigration Judge gives the term what I find to be its common and accepted meaning of physical custody.

At the very crux of the issue before us is the fact that the alien, with or without having received any further notice of the exclusion hearing, is not present to put forth his position as to how to treat his absence. Consequently, we have received briefing on the issue by the American Immigration Lawyers Association ("AILA"), acting as amicus. Amicus AILA asserts that the language is plain and was properly understood by the Immigration Judge, and notes further that the Service's proposed reading should be considered against its history and current practice of invoking the statutory language in other contexts as requiring physical custody and confinement for all arriving aliens, subject only to exercise of its discretionary parole authority. I agree.

I believe that the language of the statute is plain, and, therefore, controlling. Manifestly, "detention" or "detain" is not the same as "restrain" or "repulse," and the existence of plenary power does not supplant our duty of allegiance to the controlling principles of statutory construction. The majority acknowledges this point eventually, see supra p. 22, but persists in looking for resolution of this matter in the principle that once statutory terms acquire a settled usage and application, subsequent congressional enactments not disturbing the statute may indicate acquiescence or adoption of the construction. See supra p. 19. That may be, but not when the language is plain, as it is here; and not when the plain language is markedly different from the Immigration and Naturalization Service's preferred interpretation, which I find to be strained and without support in

---

or clause surplusage. See Kungys v. United States, 485 U.S. 759 (1988); INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987); see also Matter of Hou, 20 I&N Dec. 513 (BIA 1992) (Congress' use of two separate standards requires the Board to give each independent effect); Matter of Soleimani, 20 I&N Dec. 99, 105 (BIA 1989).


either established administrative practice or judicial decisions. In such a case, the Supreme Court requires that we and the courts afford the language its plain meaning " and that is the end of the matter." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

It is settled that where the law is plain, subsequent reenactment does not constitute Congress' adoption of a construction by the agency which is contrary to the plain statutory language. See Demarest v. Manspeaker, 498 U.S. 184 (1991), in which the Supreme Court held that an administrative construction which had been upheld by federal courts of appeal, nonetheless, was not entitled to deference when the proposed construction was contrary to the plain language of the statute, and, Brown v. Gardner, 115 S.Ct. 552 (1994), in which the Supreme Court ruled that a longstanding agency regulation not disturbed by intervening legislation should nonetheless be rejected as being contrary to statutory language.

In Brown v. Gardner, supra, the Veterans Administration ("VA") argued that Congress ratified the VA's practice of requiring "fault" when it reenacted the statute in 1934 and did nothing to change the administrative interpretation. Alternatively, the VA argued, Congress' legislative silence as to the VA's regulatory practice over the preceding 60 years served as an implicit endorsement of its "fault-based" policy. In resolving the issue, the court first noted that the statute did not include "so much as a word about fault." Id. at 554-55. Citing Demarest, the court repeated the rule that "'[w]here the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction.'" Id. at 556 (emphasis added) (quoting Demarest v. Manspeaker, supra, at 190). Further, the court found that congressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute. Id. at 557 (citing Patterson v. McLean Credit Union, 491 U.S. 164, 175 n.1 (1989)).

Thus, I see no reason for the majority's indulgence in a lengthy discussion of Saxbe v. Bustos, 419 U.S. 65 (1974), which involved the question of whether to classify alien commuters from contiguous countries as lawful permanent residents or nonimmigrants. While the majority appears to latch on to that case in an effort to help the Service out of its predicament, I'm afraid that effort is unavailing and wholly inconsistent with the majority's concession that the disposition of this case is controlled by the plain language of the statute. Saxbe is no different from Lorillard v. Pons, 434 U.S. 575, 580-81 (1978), which the Service cites for the proposition that where there exists a longstanding agency-wide administrative construction of the statutory language, we should defer. Those cases and that principle simply are inapposite to the present situation in which we are dealing with statutory language which is plain.

Further, I must dissent from the majority's suggestion that our decision in this case is somehow only the result of a failure of proof on the part of the Service. First, I am not persuaded that there is evidence of such a pervasive practice of requiring applicants for admission to remain outside the United States.

To the contrary, while I recognize that applicants for admission at a land border as opposed to other ports of entry, such as an airport, may be treated differently, detention is the norm.[2] It is the more familiar scenario, borne out by repeated habeas corpus petitions in which aliens so detained have sought release on parole, that the Service routinely detains in custody all persons seeking admission, often indiscriminately without even exercising the discretion found in the statute, the regulations, and in agency policy proclamations. See, e.g., Jean v. Nelson, 472 U.S. 846 (1985); Marczak v. Greene, 971 F.2d 510, 515-18 (10th Cir. 1992); Mason v. Brooks, 862 F.2d 190 (9th Cir. 1988); Garcia-Mir v. Smith, 766 F.2d 1478, 1485 (11th Cir. 1985), cert. denied sub nom. Marquez-Medina v. Meese, 475 U.S. 1022 (1986); Bertrand v. Sava, 684 F.2d 204, 211 (2d Cir. 1982); Noorani v. Smith, 810 F.Supp. 280 (W.D. Wash. 1993); Pierre v. United States INS, 793 F.Supp. 440 (E.D.N.Y. 1992); Li v. Greene, 767 F.Supp. 1087 (D. Colo. 1991); Gutierrez v. Ilchert, 682 F.Supp. 467, 472 (N.D. Cal. 1988); Gallego v. INS, 663 F.Supp. 517 (W.D. Wis. 1987).

Second, our concern should be not so much with the absence of any evidence provided by the Service in support of its position, see supra p. 20 as with the fact that it is doubtful such evidence, if it exists, would withstand scrutiny when compared to the plain statutory language and the Service's own declarations in other contexts that the "detention/detained" language in sections 235 and 236 refer to the requirement of physical custody. Demarest v. Manspeaker, supra.

Third, there is the very real issue of notice lurking in the position urged by the Service. Certainly as pragmatic a concern as those advanced by the Service is how, assuming a hearing was scheduled, the applicant would ever receive reasonable notice of such a hearing, provide a change in address or delivery information from that supplied at the land border, or be assured of reliable delivery.

Further, the majority affirms the interpretation of the Immigration Judge up to the point that it reads him to suggest that the Service is engaging in temporary exclusion. See supra p. 17. Despite the distinction made by the majority that section 235(c) precludes a hearing, and that here, the Service wishes to proceed with one, albeit in absentia, I don't know how else to describe the practice in which the Service is engaging and which it claims is a longstanding policy.

---

2  Even the title of Form I-122 contemplates detention. Further, Service-imposed detention regulations include  8 C.F.R. §§ 212.5, 235.3(b) and (c), and 235.6 (1995), each of which contemplates physical custody or parole therefrom.  Under the regulations at 8 C.F.R. § 235.3(b), aliens will be automatically detained if they: (1) arrive without documents (except where waived under 8 C.F.R. § 211.1(b)(3)(1995) or 8 C.F.R. § 212.1 (1995)); (2) arrive with documents which appear on their face to be false, altered, or to relate to another person; (3) arrive at a place other than a designated port of entry.  See Singh v. Nelson, 623 F.Supp. 545 (S.D.N.Y. 1985);  Ishtaq v. Nelson, 627 F.Supp. 13 (E.D.N.Y. 1983).  Moreover 8 C.F.R. § 235.3(c) specifically addresses the considerations involved in adjudicating release from custody.

-4-

368

NATIONAL   IGRATION PROJECT → 216-421-3423

In my view, when an alien seeks admission, is not admitted, and is returned involuntarily to a point outside our borders, he or she is excluded, although not in compliance with the process described in the statute and regulations and without the imprimatur of the Immigration Judge's order or the statutory consequences which would ordinarily accompany such an order. It may not be for this Board to go so far as to address the possible constitutional implications of such a practice; however, I must conclude that such "exclusion" is tantamount to withdrawal of the application and divests the Immigration Judge of jurisdiction over the applicant even where there is a Form I-122 outstanding. Cf. Matter of Lin, 18 I&N Dec. 219, 222 (BIA 1982) (finding that escape from detention does not divest the Immigration Judge of authority to conduct exclusion proceeding).

I do agree, however, that the Immigration Judge's jurisdiction over an alien who is the subject of a Form I-122 can vest by a subsequent appearance by the applicant at a scheduled hearing. Should that alien be fortunate enough to receive any further notification of an opportunity for a hearing and present him or herself at the border, he or she can be treated then, as well as throughout the time during which the hearing is conducted, as continuing to apply for admission. Matter of Kazemi, 19 I&N Dec. 49, 51 (BIA 1984). I find that such voluntary submission to the jurisdiction of the Immigration Court protects the applicant's notice interests, while not unnecessarily tying the Immigration Judge's hands in such cases. With that exception, I see no basis to conclude that an exclusion hearing may be conducted when the legal fiction that an applicant for admission is not really here in the United States, has by reason of the Service's actions, become the reality.

*Lory D. Rosenberg*

Lory D. Rosenberg
Board Member

369