UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 6 1996

Michael N. Milby, Clerk

JUANA ASCENCIO-GUZMAN, et al        )
                                    )
v.                                  )        No. B-94-215
                                    )
E.M. TROMINSKI, et al.              )
_____)


PLAINTIFFS' REBUTTAL TO INS'
RESPONSE TO THEIR SUPPLEMENTAL BRIEF IN SUPPORT OF
COUNTER MOTION FOR SUMMARY JUDGMENT
AND REQUEST FOR FURTHER HEARING TO CLARIFY OUTSTANDING ISSUES.


Come Plaintiffs, by and through their undersigned counsel, and file
the instant Rebuttal to INS' Response to their Supplemental Brief
in Support of their pending Counter Motion For Summary Judgment,
(hereinafter referred to as "INS' Response" and cited as (INS:__)).
Simultaneously, Plaintiffs would request a further hearing/status
call before the Court, to clarify the outstanding issues.


I.   INTRODUCTION


In its Response, Defendants assert that Plaintiffs have not
addressed all of the issues requested by the Court, to wit, that
Plaintiffs did not brief the question of whether Defendants may
confiscate such documents as (valid) driver's licenses, and social
security cards, from class members who are stopped at a port of
entry, placed under exclusion proceedings, and returned to Mexico
to await their hearings, (INS:2).  It was Plaintiffs' understanding
at the July 31, 1996 hearing that the Court had advised Plaintiffs
that this issue would ride with the underlying issue of whether INS
has the authority to return class members to Mexico to await their
exclusion hearings, and had declined to hear argument at that time.


261

In the substantive portion of their Response, Defendants have raised one new issue, and purport to reply to two issues briefed by Plaintiffs. The new issue is a claim that Plaintiffs lack standing to challenge the placement of extraneous notations such as the fact that they are under deportation or exclusion proceedings on substitute documentation provided when Defendants confiscate their green cards, (INS:8-13). Of the issues raised by Plaintiffs, Defendants purport to rebut (a portion of) the claim that such extraneous notations are unauthorized by law, and violate Plaintiffs' rights, (to wit, INS attempts to rebut the portion of Plaintiffs' argument based on the Privacy Act, (INS:13-18)).

Defendants also attempt to reply to Plaintiffs' argument that, once a determination has been made to parole a class member into the United States during exclusion proceedings, and in the absence of changed circumstances, that determination should apply to subsequent requests for parole, (INS:18-25). Unfortunately, this reply is based on a mis-characterization of Plaintiffs' argument.

Given the confusion as to which issues the Court wished to have briefed, and also given the various points and authorities which have been submitted by the Parties, Plaintiffs would request a further status conference, to clarify which issues the Court considers outstanding, so that they may be properly addressed.

Plaintiffs would also offer the following rebuttal to the substantive points briefed by Defendants in their Response.

## II. ISSUES PRESENTED

A.   PLAINTIFFS HAVE STANDING TO ASSERT THAT IT IS IMPROPER FOR INS TO PLACE EXTRANEOUS NOTATIONS ON SUBSTITUTE DOCUMENTATION ISSUED WHEN DEFENDANTS CONFISCATE THEIR GREEN CARDS.

B.   DEFENDANTS' CONDUCT IN PLACING SUCH NOTATIONS IS NOT ONLY UNAUTHORIZED BY LAW, BUT VIOLATES PLAINTIFFS' PRIVACY RIGHTS.

2

262

C. DEFENDANTS PERSIST IN MIS-CHARACTERIZING PLAINTIFFS' ARGUMENTS REGARDING PAROLE PROCEDURES, THEREBY TACITLY ADMITTING THEIR MERIT.

### III. ARGUMENT

**A. PLAINTIFFS HAVE STANDING TO ASSERT THAT IT IS IMPROPER FOR INS TO PLACE EXTRANEOUS NOTATIONS ON SUBSTITUTE DOCUMENTATION ISSUED WHEN DEFENDANTS CONFISCATE THEIR GREEN CARDS.**

Defendants first assert that Plaintiffs lack standing to challenge the extraneous notations placed on the temporary Form I-551, (INS:7). The basis of INS' argument is stated as follows:

> Because Plaintiffs have not identified even one class member who has personally been denied employment as a direct result of the notations, their challenge must fail. *Nat'l. Treasury Employees Union and Carrie L. Bravo v. United States*, 25 F.3d 237, 240 (5th Cir. 1994).

From this, Defendants generalize that Plaintiffs "do not claim that any of their class members have been injured or threatened as a result" of this practice. (INS:8). This argument is bogus.

Cards bearing such extraneous notations were issued to all of the named Plaintiffs herein with the sole exception of Arturo Lopez-Lozano. *See*, Plaintiffs' Exhibits A, B, D, K and M. Plaintiffs claim that these notations place a cloud over their status as lawful permanent residents, and "interfer[e] with the exercise of the rights which attend that status." Plaintiffs' Second Amended Petition and Class Action Complaint, paragraph 13.

Among other difficulties, Plaintiffs claim that they are more likely to be denied employment if they present such a card. *See*, Plaintiffs' Second Amended Petition and Class Action Complaint, paragraphs 13, 32, and 48. It is true that Plaintiffs have not identified any specific class members who have been denied

Case 1:94-cv-00215   Document 89   Filed in TXSD on 09/16/1996   Page 4 of 15

4

employment on this basis. But this is not fatal to their claim that the placement of such notations is unauthorized by law, or even the McNary memorandum, and that it violates their rights.

In addition to problems caused in obtaining employment, Plaintiffs also claim that the placement of such notations makes it more likely that they will be detained and placed in exclusion proceedings following a Fleuti-type excursion, Id, paragraph 27. They also assert that many class members have legitimate business and personal needs which require them to make trips, and that they have been deterred from doing so by the placement of such notations, and the increased likelihood that they will experience problems at the border when they return, Id., paragraph 31.

There is no genuine issue of fact with regard to these allegations. Indeed, Defendants have even submitted a Declaration from one of their own Supervisory Officers, stating that class members whose substitute documentation carries such extraneous notations will be "more closely inspected" when attempting to re-enter the U.S. following a Fleuti-type trip to Mexico, (INS Exhibit 3 in support of Motion for Summary Judgment, at page 3).

What this means in practical terms can be seen by the experiences of (now deceased) Plaintiff Herrera-Loa, and Plaintiff Arturo Lopez-Lozano, who were "more closely inspected" when seeking re-admission after Fleuti-type trips while under deportation proceedings. Mr. Herrera-Loa asserted as follows, (Plaintiffs' First Amended Petition, paragraph 22):

As a proximate result of the fact that he did not present his green card, but only an I-94 stating that he was under deportation proceedings, Mr. Herrera was interrogated and detained for approximately one and three-quarters hours, while he, his vehicle, and his personal effects, including his wallet, were searched in a manner which exceeded any reasonable search for contraband, and

Case 1:94-cv-00215   Document 89   Filed in TXSD on 08/14/1996   Page 5 of 15

caused him both inconvenience and public humiliation.

In the case of Plaintiff Lopez-Lozano, being "more closely inspected" meant that a search was conducted both manually, and with the aid of a drug-sniffing dog, resulting in the lining of the car ceiling being ripped. Plaintiffs' Exhibit H.

This is very different from the situation in the case relied upon by Defendants, *National Treasury Employees Union v. U.S.*, 25 F.3d 237 (5th Cir. 1994). The fatal defect in that case was that *no such allegations had been made*. As explained therein, (Id at 241):

In the present case, however, the plaintiffs do not allege that any represented member of the NTEU has actually suffered any such injury as a result of the "suitability" questionnaire. There is no allegation that an employee has been penalized for failing to waive the privilege; indeed, there is no allegation that any employee has even asserted the privilege as a basis for declining to answer the suitability questionnaire; nor is there any allegation that an employee has provided an incriminating response, which the government has attempted to use against him in a criminal proceeding. Consequently, the plaintiffs have failed to assert an injury.

In the case at bar, Plaintiffs have demonstrated that such annotations are unauthorized. Notably, Defendants have made no attempt to counter Plaintiffs' argument [1] that such notations are not authorized by the McAnly Memorandum. Nor have they asserted any other authorization for placing such notations. This should be taken as an admission that the practice is unauthorized.

Moreover, Plaintiffs have not only *asserted injury*, they have *proven it.* The fact that they have not proven *all* of the different

---

[1] Petitioners' Supplemental Points and Authorities in Support of Motion for Partial Summary Judgment, hereinafter cited as (POINTS:(___), at pages 3,6-7.

5

types of injuries which Defendants' conduct causes does not deprive them of standing to complain of this conduct.

In the alternative, and if this Court determines that the named Plaintiffs do not have standing to complain about the extraneous notations placed on their temporary evidence of lawful permanent residence, it would be appropriate to allow intervention by one or more class members who have suffered the specific type of injury at issue, to wit, who have experienced difficulties in obtaining employment as a result of these notations. See, Central Wesleyan College v. Grace & Co., 6 F.3d 177, 188 (4th Cir. 1993) (intervention proper where named plaintiff found not to have standing).

B. DEFENDANTS' CONDUCT IN PLACING SUCH NOTATIONS IS NOT ONLY UNAUTHORIZED BY LAW, BUT VIOLATES PLAINTIFFS' PRIVACY RIGHTS.

INS appears to claim that, notwithstanding the fact that there is no authorization for the practice, which is followed by some, but not all, of their agents, of placing extraneous notations on the substitute documentation issued when Plaintiffs green cards are confiscated, Plaintiffs cannot complain about the practice on privacy grounds, because they have no reasonable expectation that the fact that they are under immigration proceedings, or that they have been released under bond, would be kept confidential, (INS:6).

It is uncontested that there is no authority, in the McNary Memorandum, or elsewhere, for the placement of such notations. It is also uncontested that the McNary Memorandum specifically directs that the replacement documentation be prepared in accordance with "the guidance" of Operation Instruction 264.2, which governs the issuance of temporary evidence of lawful permanent resident status when application has been made for a new green card, to replace one that was lost or destroyed, (Government Exhibit 2 in support of Motion for Summary Judgment). Said OI nowhere authorizes the placement of extraneous notations on such a temporary document.

7

Instead of responding to this argument, Defendants focus on Plaintiffs' alternative basis, i.e., that not only is this conduct unauthorized, but that it violates Plaintiffs' rights to privacy.

The right to privacy has two sources: the Privacy Act, and the United States Constitution. INS collapses the two, and asserts that the same test applies to the Privacy Act, and the constitutional guarantees. INS claims as follows, (INS:6):

> The Privacy Act seeks to protect individuals from having to be embarrassed or in anyway personally injured by information disclosed by the government that it obtained from the individual under confidential circumstances.

As support for this proposition, INS cites *National Treasury Employees Union, supra* at page 242, and *Plante v. Gonzalez*, 575 F.2d 1119, 1132 (5th Cir. 1978). Neither of these was a Privacy Act case. Rather, both were based on the constitutional right.

The plain language of the Privacy Act is clear and unambiguous. As previously noted, (POINTS:11) (emphasis added), its prohibition is absolute and uncompromising:

> No agency shall disclose any record which is contained in a system of records *by any means of communication* to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains...

In support of their claim that the statute does not mean what it says, Defendants quote (INS:14), from *Johnson v. Department of Treasury*, 700 F.2d 971, 975 (5th Cir. 1983), as follows:

> The information which the Privacy Act protects, however, is "*information given by a an* [sic] *individual in in* circumstances of confidence ...." *Id.* (emphasis added).

This passage demonstrates just how far Defendants will "stretch the

Case 1:94-cv-00215   Document 89   Filed in TXSD on 09/16/1996   Page 8 of 15

"truth" to support a non-viable argument.  The above quotation does
not represent the holding of the case, or even *dicta*, or any
statement made by the Court.   Nor does it bear on any issue
involved in the case.   Rather, it is taken out of context from a
statement made by Senator Goldwater, during debate on the Privacy
Act, as quoted by the Court.  As more fully set forth therein, (*Id.*
at 975-76), Senator Goldwater asserted as follows (emphasis added):

    Senator Goldwater, a cosponsor of an amendment to S.
    3418, explained what the concept of "privacy" entails:

        By privacy, I mean ... the right to be protected
        against disclosure of information given by an
        individual in circumstances of confidence, and
        against disclosure of irrelevant embarrassing facts
        relating to one's own private life, both rights
        having been included in the authoritative
        definition of privacy agreed upon by the
        International Commission of Jurists at its world
        conference of May, 1967.

Even Senator Goldwater was not limiting the definition of privacy
to information obtained under "circumstances of confidence."
Rather, he specifically included therein the "disclosure of
irrelevant embarrassing facts relating to one's own private life."
It is precisely this branch of Senator Goldwater's definition of
"privacy" about which Plaintiffs complain herein. The existence of
deportation or exclusion proceedings is an "embarrassing fact[]
relating to one's own private life." There can be no question but
that the disclosure by INS to third parties of such embarrassing
facts falls within the absolute prohibition of the Privacy Act.

By contrast, claims based on the constitutional right to privacy
are limited to areas in which there was a legitimate expectation of
privacy. They are also subject to a balancing test. As recently
set forth in *Cantu v. Rocha*, 77 F.3d 795, 806 (5th Cir. 1996):

    In the context of government disclosure of personal

269

6

matters, an individual's right to privacy is violated if:
(1) the person had a legitimate expectation of privacy;
and (2) that privacy interest outweighs the public need
for disclosure. Fadjo v. Coon, 633 F.2d 1172, 1175-76
(5th Cir.1981) (discussing the balancing test required to
evaluate privacy right claims).

It is submitted that INS' conduct fails even this, more generous,
test. The privacy rights of persons under exclusion proceedings
are protected by statute, and by regulation. Section 236 of the
Act, (8 USC Section 1226), provides that such proceedings "shall be
kept separate and apart from the public." *See also*, 8 CFR
236.2(a). This in an of itself should dispose of Defendants'
arguments with respect to disseminating information about LPRs
under exclusion proceedings.

The application of this test to those Plaintiffs under deportation
proceedings would be more complex. Deportation proceedings are not
afforded the same, absolute, statutory protection as is extended to
exclusion proceedings, but neither are they matters of public
record. As provided by 8 CFR Section 242.16(a) (emphasis added):

Deportation proceedings shall be open to the public,
*except that the Immigration Judge may*, in his discretion
*or for the purpose of protecting witnesses, respondents,
or the public interest, direct that the general public or
particular individuals shall be excluded from the hearing
in any specific case*.

If INS had the unabridged right to disclose the fact that a given
individual was under deportation proceedings, this procedure would
be seriously undermined. Moreover, INS has set forth no viable
justification for its conduct, against which to balance the rights
of those Plaintiffs under deportation proceedings. [2]

--------------------

[2] INS once again invokes the "floodgates" argument, noting
that 67 million primary inspections were conducted in the Harlingen
INS district in 1994. And once again, it is beside the point. INS

10

INS also argues that the Privacy Act does not authorize this Court to grant Plaintiffs the injunctive relief requested. Once again, this misrepresents the nature of Plaintiffs' argument, and the law. It is true that this Court would not be authorized by the Privacy Act to issue an injunction, forbidding Defendants from making such extraneous notations on any substitute documentation provided. *Clarkson v. IRS*, 678 F.2d 1368 (11th Cir. 1982) cert. den., 107 S.Ct. 1961, 481 U.S. 1031, 95 L.Ed.2d 533 (Though this section expressly provides for injunctive relief for two types of agency misconduct, i.e., wrongful withholding of documents and wrongful refusal to amend record, remedy for violations of all other provisions of this section is limited to recovery of damages upon showing that agency acted in intentional or willful manner).

However, Plaintiffs are not invoking the Privacy Act as the source of this Court's power to issue an injunction. Nor are they asserting a Privacy Act violation, *per se*. Rather, the Privacy Act is invoked merely to reinforce their claim that INS' conduct in making such notations is not only unauthorized, but is improper.

INS also claims that their disclosure of this information would not be an actionable offense under the Privacy Act because they "do not intend to violate any rights that plaintiffs may have." (INS:17). Hopefully, Defendants are not trying to claim that they are entitled to pursue an illegal course of conduct, simply because the Court is powerless enjoin it (under the Privacy Act), and that, because the Court is powerless to enjoin it, it is not illegal.

INS has made no attempt to demonstrate how many of such primary inspections involve class members under deportation proceedings. Moreover, placing such notations on their temporary I-551s would not facilitate their task, even of inspecting *class members*. The fact that an LPR may be under deportation proceedings is irrelevant to the issue of whether he or she should be denied admission as a returning resident, and placed under exclusion proceedings, *Molina v. Sewell*, 983 F.2d 676, 679-680 (5th Cir. 1993).

11

If Defendants want to quibble over the form of relief which can be granted, means could be found to accommodate them. The Court could limit the rationale for injunctive relief to the other bases advanced by Plaintiffs. The Court could also issue a Declaratory Judgment, declaring the conduct in question to be a violation of Plaintiffs' rights under operative law, the McNary Memo, the Constitution, and the Privacy Act. Indeed, Plaintiffs have requested such a Declaratory Judgment, Plaintiffs' Second Amended Petition, Paragraph 55. If, following such a Declaratory Judgment, INS persisted in the practice, Plaintiffs could also seek damages, under the *Privacy Act*.

C. DEFENDANTS PERSIST IN MIS-CHARACTERIZING PLAINTIFFS' ARGUMENTS REGARDING PAROLE PROCEDURES, THEREBY TACITLY ADMITTING THEIR MERIT.

Finally, Defendants have been forced to resort to the time honored ruse of setting up, and knocking down, "straw" arguments, on the issue of re-paroling into the United States an LPR in exclusion proceedings who has made a *Fleuti*-type trip to Mexico. Defendants characterize Plaintiffs' arguments on this issue as follows, (INS:18-19) (emphasis added):

Plaintiffs seemingly disagree that parole terminates automatically when an alien, including an LPR, physically departs the United States. ... Further still, they assert that LPRs who have been paroled into the United States, should not have their parole terminated by operation of law when they make "*Fleuti*" departures. Alternatively, they argue that even if the parole does automatically terminate, that said aliens should automatically be re-paroled following a "*Fleuti*" departure. ... Consequently, under Plaintiffs interpretation of parole law, all returning LPRs would essentially be exempted from any further inspection by immigration officers once exclusion proceedings have begun, regardless of the circumstances surrounding subsequent arrivals by them at the ports of entry. This result would occur because as a threshold matter, all returning LPRs who contest their exclusion proceedings allege that they have made "*Fleuti*."

departures.

It is difficult to know where to begin to rebut a statement that so grossly misrepresents not only the argument advanced by Plaintiffs, but the procedures currently in place at the ports of entry.

First, Plaintiffs are not contesting the fact that parole terminates by operation of law when an LPR who has been paroled into the U.S. departs. Rather, Plaintiffs are objecting to INS' failure to follow their own regulations in terms of deciding whether an LPR who has been granted parole during exclusion proceedings should be re-paroled into the U.S. following a *Fleuti*-type excursion. INS seems to assert that such LPRs who allege that they have made "*Fleuti*" departures would "essentially" be exempted from any further inspection." This is another red herring, which indicates nothing but INS' desperation to avoid the real issue.[3]

INS' claim that Plaintiffs do not have standing to raise this issue, because they have all been paroled into the United States, and "do not have standing ... because they cannot show that any class member has been injured by the claim [sic] unlawful conduct," (INS:18,n.6), is equally bogus.

The cases of Plaintiffs Ascencio and Merino illustrate the problem perfectly. They were stopped at the Brownsville port of entry, and placed under exclusion proceedings, on or about July 3, 1994, for the reason that they were allegedly attempting to illegally cross their sick nephew into the United States for medical treatment. Their documents were confiscated, including their green cards, driver's license, and Texas identification card, and they were

_____

[3] The suggestion that lawful permanent residents seeking re-admission to the U.S. need only assert that they have made a *Fleuti*-type departure, and that thereafter they would "essentially" be exempted from any further inspection," is beyond ironic, in the context of the case at bar.

12

returned to Mexico to await their hearings. Defendants' Answer to Plaintiffs' Second Amended Complaint, Paragraphs 21-22, and Plaintiffs' Exhibits I, Q, S, X and BB.

On October 19, 1994, an Immigration Judge found them excludable, and held that they were ineligible for relief from exclusion. They appealed, which appeal is still pending. On October 31, 1994, INS granted their request for parole into the United States, and on November 21, 1994, they were finally able to return to their home in Houston, Texas. Id.

In early 1995, Ms. Ascencio's mother was hospitalized, and they requested permission to make a brief trip to Mexico to visit her. After a hearing on this and other issues before the U.S. Magistrate, INS allowed them to make the trip, but took pains to point out that requests for parole were not usually granted where the cases were on appeal to the Board of Immigration Appeals. In 1996, Plaintiffs Ascencio and Merino sought leave to make another visit to Mexico. This time they were told that they had to file written applications, costing $70 each. Id.

Given the prior advisal that parole was not usually granted under such circumstances, Plaintiffs wrote back, attempting to clarify the criteria that would be utilized in adjudicating the request, only to be told that INS had never made such a statement. Plaintiffs were unwilling to spend $140 on what was likely to be a futile application. They were also afraid to risk going to Mexico, and seeking re-parole on their return. They had no more reason to believe that the inspecting officer would abide by 8 CFR Section 235.3(c) under current circumstances than was the case on July 3, 1994, when they first sought re-admission as returning residents, and they did not wish to get "stuck" in Mexico for another lengthy period. Consequently, they have been unable to make the trip.

Case 1:94-cv-00215   Document 89   Filed in TXSD on 09/16/1996   Page 14 of 15

Under 8 CFR 235.3(c), the decision of whether to detain, parole, or parole for deferred inspection, persons such as Plaintiffs Ascencio and Merino, is supposed to be made, by the inspecting officer, at the time they apply for admission.  The criteria to be utilized in making this decision are also set for in the regulation:  to wit, whether they are likely to abscond, and whether they pose a security risk.  THIS PROCEDURE WAS NOT FOLLOWED when they applied for re-admission in July of 1994.

Nor, unfortunately, is this the usual procedure.  Rather, the decision made by the inspecting officer is usually whether to detain, or return such persons to Mexico.  And INS continues to assert that this is proper.  If Plaintiffs Ascencio and Merino went to Mexico at this point in time, and returned to the bridge, asking that they be allowed back into the United States, they have no more reason to believe that INS would follow 8 CFR Section 235.3(c) at the present than they did on July 3, 1994.  They have absolutely no reason to believe that the inspecting officer would make a decision of whether or not to parole them, based on the likelihood that they would abscond, or pose a security risk.  Rather, they have every reason to believe that they would simply be returned to Mexico, as they were on July 3, 1994.

What Plaintiffs seek, on their own behalf, and on behalf of the class they represent, is that 8 USC Section 1225(b), as read together with 8 USC Section 1182(d)(5)(A), and jointly implemented by 8 CFR 235.3(c), be given meaningful effect.  They are asking that procedures be put into effect so that LPRs who seek re-admission as returning residents, but are placed in exclusion proceedings, be detained, paroled, or paroled for deferred inspection, by the inspecting officer, and that this decision be made solely on the basis of whether or not they are likely to abscond, or pose a security risk.

They further request that there be some degree of certainty that the same set of facts will (normally) produce the same results. Namely, once it has been determined that they do *not* to present either a risk of absconding, or a security threat, and in the absence of changed circumstances, they would like to be able to make brief trips to Mexico, and have a degree of confidence that they will be re-paroled, upon their return, as is contemplated by 8 CFR Section 235.3(c). In other words, they ask only that INS be obliged to follow its own regulations. *U.S. v. Wong Kim Bo*, 472 F.2d 720, 723 (5th Cir. 1973) ("What and all that is required is that the INS abide by its own regulations."). Unfortunately, it is clear that this will not occur without an Order from this Court.

Respectfully Submitted,


Lisa S. Brodyaga                Thelma O. Garcia
Attorney at Law                 Attorney at Law
402 E. Harrison, 2nd Floor      301 E. Madison
Harlingen, Texas 78550          Harlingen, Texas 78550
(210) 421-3226                  (210) 425-3701

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served, first-class postage prepaid, on Regina Byrd, Attorney, OIL, Box 878, Ben Franklin Sta, Washington, D.C. 20044, and Ken Muir, SAUSA, P.O. Box 1711, Harlingen, Texas 78551, this 16th day of September, 1996.



15

275