*179*

United States District Court
Southern District of Texas
FILED

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JAN 0 9 2003

Michael N. Milby
Clerk of Court

| | |
|---|---|
| ASCENCIO-GUZMAN et al, ) | |
| ) | |
| v. ) | C.A. No.  B-94-215 |
| ) | |
| TROMINSKI, et al. ) | |
| ———————————————— ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

I.   ISSUES PRESENTED ................................   1

II.  ARGUMENT .........................................   1

   A.   THIS COURT HAS ALREADY REJECTED INS' PROCEDURAL
   OBJECTIONS, WHICH ARE GROUNDED IN A MISREADING OF THE
   FIFTH CIRCUIT'S OPINION ..........................   1

   B.   INS' DISCUSSION OF THE PAROLE ISSUES IS LIMITED
   TO WHETHER THE STATUTE IS CONSTITUTIONAL ON ITS FACE,
   AND FAILS TO ADDRESS WHETHER IT IS CONSTITUTIONAL *AS
   APPLIED* TO LPRs STRANDED IN MEXICO. ..............   4

      1.   *WEST COVINA,* NOT *MULLANE,* GOVERNS PLAINTIFFS'
      NOTICE CLAIM ..................................   4

      2.   PLAINTIFFS' LIBERTY AND PROPERTY RIGHTS ARE
      GREATLY IMPACTED WHEN THEY ARE RETURNED TO MEXICO
      AND THEY ARE ENTITLED TO DUE PROCESS WITH RESPECT
      TO AVAILABLE PREHEARING RELIEF .................   6

      3.   INS' CLAIM THAT THE BALANCE UNDER *MATHEWS*
      FAVORS THE GOVERNMENT IS UNSUPPORTED BY EITHER THE
      FACTS OR THE LAW ...............................   10

         a. RISK OF ERRONEOUS DEPRIVATION AND VALUE OF
         ADDITIONAL PROCEDURAL SAFEGUARDS .............   10
         b.   PROTECTING THE NATIONAL INTEREST .........   11
         c.   ALLEGEDLY "HUGE" ADMINISTRATIVE BURDEN ...   11

   C.   INS' CLAIM THAT THERE IS NO "LEGAL AUTHORITY"
   WHICH WOULD PREVENT THEM FROM PUTTING SUCH PERSONAL
   INFORMATION ON I-94s IS ALSO WITHOUT MERIT ......   13

1. PLACING SUCH INFORMATION ON PLAINTIFFS' I-94s
VIOLATES THE PRIVACY ACT, AND THE PRINCIPLE THAT
THE GOVERNMENT MAY NOT ACCOMPLISH INDIRECTLY THAT
WHICH IT IS FORBIDDEN FOR THEM TO DO DIRECTLY ..      13

2.  INS CANNOT INVOKE THE "ROUTINE USE" EXCEPTION
WITHOUT HAVING FULFILLED THE REQUIREMENTS THEREOF      15

3.  THE SAME PRINCIPLES OF INDIRECT DISCLOSURE
APPLY TO INS' ARGUMENTS UNDER 8 U.S.C. §1304(b)  .     16

III.   CONCLUSION .......................................      17

## TABLE OF AUTHORITIES
### CASES

*Abernethy v. I.R.S.*,
    909 F.Supp. 1562 (D.Ga. 1995)  . . . . . . . . . . . .  14

*Atkins v. Parker*,
    472 U.S. 115 (1985) . . . . . . . . . . . . . . . 5, 6

*Chevron v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . 4

*City of West Covina v. Perkins*,
    525 U.S. 234 (1999) . . . . . . . . . . . . . . 5-7, 17

*Crow v. Smith*,
    261 F.3d 558 (5th Cir. 2001) . . . . . . . . . . . . 2

*Efe v. Ashcroft*,
    293 F.3d 899 (5th Cir.2002) . . . . . . . . . . . . 11

*Federal Crop Insurance Corp. v. Merrill*,
    332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . 5

*Gisbert v. Attorney General*,
    988 F.2d 1437 (5th Cir. 1993) . . . . . . . . . . . 7

*Hernandez-Leija et al v. Trominski, et al*,
    CA B-01-201 (S.D.Texas) . . . . . . . . . . . 10, 13, 18

*Keenan v. Tejeda*,
    290 F.3d 252 (5th Cir. 2002) . . . . . . . . . . . 15

ii

*Knauff v. Shaughnessy,*
     338 U.S. 537 (1950)  . . . . . . . . . . . . . . . . 6, 9

*Kwong Hai Chew v. Colding,*
     344 U.S. 590 (1953)  . . . . . . . . . . . . . . . . 6

*Landon v. Plasencia,*
     459 U.S. 21 (1982)  . . . . . . . . . . . . . . . . . 6

*Loa-Herrera v. Trominski,*
     231 F.2d 984 (5th Cir.2000)  . . . . . . . . 1, 3, 13, 19

*Mathews v. Eldridge,*
     424 U.S. 319 (1976)  . . . . . . . . . . . . 4, 5, 10, 18

*Memphis Light v. Craft,*
     436 U.S. 1 (1978)  . . . . . . . . . . . . . . . . 5, 17

*Molina v. Sewell,*
     983 F.2d 676 (5th Cir. 1993)  . . . . . . . . . . . 15

*Mullane v. Hanover Bank & Trust,*
     339 U.S. 306 (1950)  . . . . . . . . . . . . . . . 4, 5

*NLRB v. USPS,*
     128 F.3d 280 (5th Cir. 1998)  . . . . . . . . . . . 16

*Perry v. Sindermann,*
     408 U.S. 593 (1972)  . . . . . . . . . . . . . . . . 15

*Rafeedie v. INS,*
     880 F.2d 506 (D.C.Cir.1989)  . . . . . . . . . . . 11

*Reyna-Montoya et al v. Trominski et al,*
     C.A. B-02-026 (S.D.Texas)  . . . . . . . . . . . . 12

*Rosenberg v. Fleuti,*
     374 U.S. 449 (1963)  . . . . . . . . . . . . . . . 6, 7

*San Antonio v. General Electric Co.,*
     935 F.2d 78,82 (5th Cir. 1991), modified on
     other grounds, 935 F.2d 78 (5th Cir. 1991)  . . . . . . . 2

*Sierra v. INS,*
     258 F.3d 1213 (10th Cir. 2001)  . . . . . . . . . . . 7

iii

*Streber v. IRS,*
    138 F.3d 216 (5th Cir.1998)  . . . . . . . . . . . . . . . 12

*U.S. v. Lopez-Ortiz,*
    2002 U.S. App. LEXIS 23740 (5th Cir. 2002)  . . . . . . . . . 7

*U.S. v. Salerno,*
    481 U.S. 739 (1987)  . . . . . . . . . . . . . . . . . .7-9

*USPS v. Nat. Assoc. Letter Carriers,*
    9 F.3d 138 (D.C.Cir. 1993) . . . . . . . . . . . . . . . 16

*Zadvydas v. Davis,*
    121 S.Ct. 2491 (2001)  . . . . . . . . . . . . . . . . 7, 9

## STATUTES

5 U.S.C. §522a(a)(7)  . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. §552a(b)(3)  . . . . . . . . . . . . . . . . . 15, 16

5 U.S.C. §552a(e)(3)(C) . . . . . . . . . . . . . . . . . . 16

5 U.S.C. §552a(e)(4)(D) . . . . . . . . . . . . . . . . 15, 16

5 U.S.C. §552b  . . . . . . . . . . . . . . . . . . . . . 14

8 U.S.C. §1182(a) . . . . . . . . . . . . . . . . . . . . . 8

8 U.S.C. §1182(d)(5)  . . . . . . . . . . . . . . . . . 3, 4, 7

8 U.S.C. §1225(b)(2)(C)  . . . . . . . . . . . . . 4, 6, 7, 11, 12

8 U.S.C. §1225(c)(1989)  . . . . . . . . . . . . . . . . . 11

8 U.S.C. §1226(a) . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. §1226(c) . . . . . . . . . . . . . . . . . . . . 12

8 U.S.C. §1226(e) . . . . . . . . . . . . . . . . . . . 3, 12

8 U.S.C. §1304(b) . . . . . . . . . . . . . . . . . . 16, 17

8 U.S.C. §1304(d) . . . . . . . . . . . . . . . . . 3, 13, 17

8 U.S.C. §1304(e) . . . . . . . . . . . . . . . . . . . . 14

8 U.S.C. §1304(e) . . . . . . . . . . . . . . . . . . . 17

8 U.S.C. §1324a . . . . . . . . . . . . . . . . . . . 14

8 U.S.C. §1531 . . . . . . . . . . . . . . . . . . . 11

8 U.S.C. §1536 . . . . . . . . . . . . . . . . . . . 11

### REGULATIONS

8 C.F.R. §1.1(p) . . . . . . . . . . . . . . . . . . . 15

8 C.F.R. §212.5(b) . . . . . . . . . . . . . . . . . 3, 7

8 C.F.R. §235.3(c) . . . . . . . . . . . . . . . . . 3, 7

8 C.F.R. §236 . . . . . . . . . . . . . . . . . . . 11

8 C.F.R. §264.5(g) . . . . . . . . . . . . . . . . . . 1

### OTHER

62 Federal Register 36572 . . . . . . . . . . . . . . . 15

Operations Instruction 264.2 . . . . . . . . . . . . . 17

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO-GUZMAN et al,          )
                                )
v.                              )       C.A. No.  B-94-215
                                )
TROMINSKI, et al.               )
_____ )

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs hereby oppose Defendants' Motion For Summary Judgment,[1] and rebut their claims about the procedural history of the case.

## I.  ISSUES PRESENTED

A.  THIS COURT HAS ALREADY REJECTED INS' PROCEDURAL OBJECTIONS, WHICH ARE GROUNDED IN A MISREADING OF THE FIFTH CIRCUIT'S OPINION.

B.  INS' DISCUSSION OF THE PAROLE ISSUES IS LIMITED TO WHETHER THE STATUTE IS CONSTITUTIONAL ON ITS FACE, AND FAILS TO ADDRESS WHETHER IT IS CONSTITUTIONAL *AS APPLIED* TO LPRs STRANDED IN MEXICO.

C.   INS' CLAIMS REGARDING THE "LEGAL AUTHORITY" PRECLUDING PUBLICATION OF PLAINTIFFS' PERSONAL INFORMATION ALSO LACK MERIT.

## II.  ARGUMENT

**A.  THIS COURT HAS ALREADY REJECTED INS' PROCEDURAL OBJECTIONS, WHICH ARE GROUNDED IN A MISREADING OF THE FIFTH CIRCUIT'S OPINION.**

INS still claims that the purpose of the Fifth Circuit remand was *solely* to allow the government to urge its Due Process complaints, and persists in arguing that the Fifth Circuit limited the issues "ripe for consideration on remand" to that of "whether the document provided to returning LPRs ... complies with 8 C.F.R. §264.5(g)." (INSsj3:3).  To that end, INS asserts as follows, *id.*:

> [In] particular, the Fifth Circuit indicated that the remand was not intended to allow plaintiffs to restructure their claims and to present new argument.

This is incorrect.  The Fifth Circuit no-where "indicated" that Plaintiffs would not be allowed to "restructure their claims [or] present new argument."  Rather, the Court stated, *Loa-Herrera v.*

_____

[1]  Said motion will henceforth be cited as (INSsj3:__).

*Trominski*, 231 F.2d 984,988 (5th Cir.2000) (emphasis added):

> More troubling is the government's contention that the district court failed to give the government an opportunity to present argument before issuing its order. Because of our rulings on the government's substantive claims, which we discuss below, we do not address these allegations. **Instead, we vacate the order and remand for further proceedings, during which the INS assuredly will have ample opportunity to press any additional legal or factual arguments it wishes to make and thereby to cure any procedural defects regarding the order.**

Clearly, this was not intended to create *new* procedural defects, by allowing *only* INS to present "additional... arguments" on remand.

As previously discussed, the implicit source of INS' claim that on remand, this Court may only consider whether the I-94s issued by INS are in proper format is the "mandate rule," which was explained in *Crow v. Smith*, 261 F.3d 558,562 (5th Cir. 2001), as follows:

> The mandate rule is considered a corollary to the law of the case doctrine, which prevents a district court on remand from revisiting an issue of law or fact decided on appeal. ... The law of the case proscription applies regardless of whether the issue was decided explicitly or by necessary implication. [2]

The disputed rulings are that: 1) absent "legal authority to the contrary," the Attorney General may put personal information on an I-94 provided as proof of LPR status, to further the employers' interest "in knowing a potential employee's present and future

---

[2] The "law of the case" doctrine, in turn, has been explained as follows, *San Antonio v. General Electric Co.* 935 F.2d 78,82 (5th Cir. 1991), modified on other grounds, 935 F.2d 78 (5th Cir. 1991):

> Under settled "law of the case" principles, issues decided by an appellate court cannot be re-examined by the district court on remand. ... The law of the case doctrine, however, is not an inexorable command and may theoretically be overcome if one of three circumstances occurs:
>
> > (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice.

immigration status"[3] and 2) jurisdiction over complaints about the parole authority of 8 U.S.C. §1226(a) are barred by §1226(e).[4] Neither bars consideration of the issues under discussion.

Assuming that the parole authority derived from §1226(a),[5] the Fifth Circuit adopted INS' assertion that §1226(e) applied. Hence, whether INS is administering in a constitutional manner the authority of §1182(d)(5) to parole LPRs detained at the border, who are not arrested "on a warrant," as required for jurisdiction to vest to grant "conditional parole" under §1226(a), was not decided on appeal. Nor was it decided whether any legal authority exists which would prohibit INS from divulging personal information about LPRs to potential employers and others to whom they must show the I-94s given as proof of LPR status. To the contrary, the door was left open for Plaintiffs to make such a showing on remand.

**B. INS' DISCUSSION OF THE PAROLE ISSUES IS LIMITED TO WHETHER THE STATUTE IS CONSTITUTIONAL ON ITS FACE, AND FAILS TO ADDRESS WHETHER IT IS CONSTITUTIONAL *AS APPLIED* TO LPRs STRANDED IN MEXICO.**

---

[3] As the source of the "statutory discretion" to place such information on LPRs' green cards, the Fifth Circuit cited 8 U.S.C. §1304(d), which states that every properly registered alien:

> ...shall be issued a certificate of alien registration or an alien registration receipt card in such form and manner and at such time as shall be prescribed under regulations issued by the Attorney General.

Hence, discretion is not exercised by individual INS officers, but through the regulations. No regulation authorizes such disclosures.

[4] INS has again flip-flopped on this issue, and contends that said section is still applicable "in light of the district court's January 13, 1999 order." (INSsj3:6). But INS' own arguments show that parole for "arriving aliens" is governed by §1182(d)(5), not §1226(a). *See,* (INSsj3:7-8), citing 8 C.F.R. §235.3(c), that parole of arriving aliens is controlled by 8 C.F.R. §212.5(b), the implementing regulation of §1182(d)(5). And even if §1226(e) were previously implicated, there is no viable argument that it still applies, since the Fifth Circuit vacated this Court's 1999 Order!

[5] *Loa-Herrera v. Trominski*, 231 F.3d 984,991 (5th Cir. 2000):

> It is § 1226(a)... that authorizes [the Attorney General] to grant parole within the United States to an LPR subject to removal proceedings.

On the merits, INS' arguments are inadequate, [6] if not willfully obtuse. [7] Some are simply incorrect, [8] others, at best, misleading. [9] Most importantly, however, INS fails to recognize that Plaintiffs challenge §1182(d)(5)(A) *as applied herein,* not on its fact.

### 1. *WEST COVINA, NOT MULLANE,* GOVERNS PLAINTIFFS' NOTICE CLAIM.

INS first argues that *Mullane v. Hanover Bank & Trust,* 339 U.S. 306 (1950), rather than *Mathews v. Eldridge,* 424 U.S. 319 (1976), is

---

[6] For example, INS claims that "Congress specifically chose not to exempt lawful permanent resident aliens from the need to make a showing regarding parole." (INSsj3:20). However, INS cites no legislative history indicating that Congress even *considered* the impact of §1182(d)(5), *as applied* to LPRs returned to Mexico under §1225(b)(2)(C). Absent such legislative history, no conclusion can be drawn from Congressional *silence. See generally, Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

[7] For example, INS characterizes Plaintiffs' assertion that information about parole is more readily available to LPRs within the U.S. than those stranded in Mexico as follows, (INSsj3:13):

> [P]laintiffs' argument is essentially that those class members outside of the United States have a greater due process claim to notice than those individuals in the United States.

This is downright silly. The Due Process entitlements are the same. It is the availability of the information that is different.

[8] For example, INS claims that conducting parole hearings would place a "huge administrative burden" on INS, (INSsj3:22), and that Plaintiffs' Due Process rights derive from the statute, not from the Constitution. (INSsj3:14). Both assertions are incorrect.

[9] For example, INS restates Plaintiffs' claim that they are entitled to a hearing before an Immigration Judge or other impartial adjudicator as follows, (INSsj3:8) (emphasis added):

> [Plaintiffs claim] that they are entitled as a matter of due process to a hearing before an "impartial adjudicator," i.e., an immigration judge, **as opposed to the District Director,** on their applications for parole.

This conveys the impression that Plaintiffs receive a "hearing" before the District Director. This is not the case. The District Director adjudicates parole applications without conducting any type of hearing. In general, the District Director would never even meet an LPR returned to Mexico to await a hearing, pursuant to 8 U.S.C. §1225(b)(2)(C), who has sought parole under §1182(d)(5).

4

the correct test to apply to Plaintiffs' notice claim, and restates that test as follows, (INSsj3:9): [10]

> Under the <u>Mullane</u> test, the relevant question before the Court is whether notice was "reasonably calculated under all the circumstances." [11]

*Mullane* addresses the *sufficiency* of notice, where such notice is mandated, not the circumstances under which individualized notice must be given. This can be seen from the full sentence, *id.* at 314:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [12]

Whether individualized notice must be given of remedial procedures is governed by *City of West Covina v. Perkins,* 525 U.S. 234 (1999), and *Memphis Light v. Craft* 436 U.S. 1 (1978). The differing results derived from the specific circumstances of each case, *i.e.,* whether the information is otherwise "generally available." The cases cited by INS, [13] that "publication of government procedures is sufficient notice of those procedures," (INSsj3:10), are not to the contrary. These cases do not address notice of provisional remedies, where adverse action was taken without prior legal process. Rather, they involve published changes in eligibility requirements. Moreover, *Atkins v. Parker*, quoted at (INSsj3:11), much more nearly supports Plaintiffs' position than that of Defendants, 472 U.S. at 131:

> Surely Congress can presume that such a notice relative to a matter as important as a change in a household's

---

[10]  Plaintiffs would apply *Mathews* to their hearing claim, not to whether or not notice of parole is constitutionally required.

[11]  This quotation is clearly taken out of context, as it does not answer the implicit question: Reasonably calculated to do what?

[12] This type of notice is given by service of the Order to Show Cause, ("OSC"), or Notice To Appear, ("NTA").

[13]  *E.g., Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947); and *Atkins v. Parker,* 472 U.S. 115 (1985).

> food-stamp allotment would prompt an appropriate inquiry
> if it is not fully understood.  The entire structure of
> our democratic government rests on the premise that the
> individual citizen is capable of informing himself about
> the particular policies that affect his destiny.

The premise that a citizen is "capable of informing himself about
... particular policies..." in turn rests on the assumption that an
"appropriate inquiry" will elicit the pertinent information. But an
appropriate inquiry by an LPR stranded in Mexico is insufficient to
elicit information about parole. (Exhibits KK & BBB). [14]  So, as INS
seemingly admits, Plaintiffs are entitled to notice, (INSsj3:12):

> Rather, as identified in <u>City of West Covina</u>, the notice
> simply has to provide that the relief is available and
> from whom it can be obtained.

INS made this admission while arguing that the notice need not
include the standards for adjudicating parole requests.  But even
a simple notice "that relief [parole] is available and from whom it
can be obtained" would provide 90% of what Plaintiffs seek!

### 2.  PLAINTIFFS' LIBERTY AND PROPERTY RIGHTS ARE IMPACTED WHEN THEY ARE RETURNED TO MEXICO AND THEY ARE ENTITLED TO DUE PROCESS WITH RESPECT TO AVAILABLE PREHEARING RELIEF.

INS also asserts that Plaintiffs' Due Process rights derive solely
from the statutes, and not the Constitution. (INSsj3:14).  This is
patently incorrect.  *Knauff v. Shaughnessy,* 338 U.S. 537 (1950),
did not involve an LPR, and *Landon v. Plasencia,* 459 U.S. 21 (1982)
clearly does not support INS' claim:  the Court held only that the
issues presented could adequately be heard in exclusion, rather
than deportation proceedings, and remanded for the Court of Appeals
to consider whether the respondent, a permanent resident alien, was
"accorded due process at the exclusion hearing." *Id.* at 22.  *See
also, Rosenberg v. Fleuti,* 374 U.S. 449 (1963), which summarizes
*Kwong Hai Chew v. Colding,* 344 U.S. 590 (1953), as follows:

---

[14]  INS' claim that Plaintiffs can obtain this information from
the statute and BIA decisions, (INSsj3:12), contradicts their prior
admission that parole procedures are difficult for LPRs stranded in
Mexico to ascertain, and follow. (R5:1219,1295). INS serves various
documents on LPRs detained under §1225(b)(2). Adding a bi-lingual
explanation of parole would cause only trivial inconvenience.

> [A] returning resident alien is entitled as a matter of due
> process to a hearing on the charges underlying any attempt
> to exclude him, a holding which supports the general
> proposition that a resident alien who leaves this country
> is to be regarded as retaining certain basic rights.

Nor are *U.S. v. Lopez-Ortiz*, 2002 U.S. App. LEXIS 23740 (5th Cir. 2002),
and *Gisbert v. Attorney General*, 988 F.2d 1437 (5th Cir. 1993), on
point. [15] The issue is not whether there is a "liberty interest" in
parole, any more than the question in *West Covina* was whether the
plaintiff had property rights in the remedial procedures. Rather,
the point lies in the fact that Plaintiffs are deprived of liberty
and property interests [16] by their summary return to Mexico, under
§1225(b)(2)(C), just as property rights of the plaintiff in *West
Covina* were abridged when his property was seized. Hence, the issue
is whether the provisional remedy, here, parole under §1182(d)(5),[17]
is administered in a manner which converts their summary return
into a process which satisfies Substantive, and Procedural, Due
Process. As explained in *U.S. v. Salerno*, 481 U.S. 739,746 (1987):[18]

---

[15]  Neither *Gisbert*, nor *Sierra v. INS*, 258 F.3d 1213 (10th Cir.
2001), involved LPRs. *Gisbert* also predated *Zadvydas v. Davis,* 121
S.Ct. 2491 (2001). The claim (INSsj3:18,n5), that *Zadvydas* "made no
finding regarding a liberty interest" is misleading. *id.* at 2502:

> [A]n alien's liberty interest is, at the least, strong enough
> to raise a serious question as to whether, irrespective of
> the procedures used, ... the Constitution permits detention
> that is indefinite and potentially permanent.

Nor is the discretionary nature of parole controlling, *id.*:

> But while "may" suggests discretion, it does not
> necessarily suggest unlimited discretion.   In that
> respect the word "may" is ambiguous.

[16]  The property interests include lost wages. For example, Mr.
Merino lost his job because of the time he spent in Mexico before
he obtained counsel, and was granted parole. (R4:969-972).

[17]  *See*, 8 C.F.R. §235.3(c) ("Parole of [arriving aliens] shall
only be considered in accordance with §212.5(b) of this chapter.")

[18]  INS' discussion of the statute under which Plaintiffs are
"deemed" to be seeking admission, (INSsj3:18-19), begs what may be
the ultimate question in some cases, to wit, whether *Fleuti, supra,*

> [T]he Due Process Clause protects individuals against two
> types of government action. So-called "substantive due
> process" prevents the government from engaging in conduct
> that "shocks the conscience," *Rochin* v. *California*, 342
> U.S. 165, 172 (1952), or interferes with rights "implicit
> in the concept of ordered liberty," *Palko* v. *Connecticut*,
> 302 U.S. 319, 325-326 (1937). When government action
> depriving a person of life, liberty, or property survives
> substantive due process scrutiny, it must still be
> implemented in a fair manner. *Mathews* v. *Eldridge*, 424
> U.S. 319, 335 (1976). This requirement has traditionally
> been referred to as "procedural" due process.

*Salerno* is particularly instructive, because it involved pretrial
detention in criminal cases, which is conceptually very similar to
the restrictions on liberty involved herein. The Court weighed the
government's "legitimate and compelling" interest in preventing
crime against "the individual's strong interest in liberty," which
may, "where the government's interest is sufficiently weighty, be
subordinated to the greater needs of society." Id. at 750-51.
However, the existence of clear standards, and strong procedural
safeguards, were key to the Court's decision, *id*. at 711-12:

> Nor is the Act by any means a scattershot attempt to
> incapacitate those who are merely suspected of these serious
> crimes. The Government must first of all demonstrate
> probable cause to believe that the charged crime has been
> committed by the arrestee, but that is not enough. In a
> full-blown adversary hearing, the Government must convince a
> neutral decisionmaker by clear and convincing evidence that
> no conditions of release can reasonably assure the safety of
> the community or any person.
> ...
> [T]he procedures by which a judicial officer evaluates the
> likelihood of future dangerousness are specifically designed

---

was constitutionally based, and therefore, not subject to reversal
by Congress. This issue is still percolating through the courts.
It is particularly crucial, since under 8 U.S.C. §1101(a)(13)(C)(v)
LPRs whose offenses were committed long ago, or who may not even be
deportable under §1227(a), are deemed to be arriving aliens and may
be found to be inadmissible under §1182(a). *See, e.g., Fuentes v.
Cabrera*, CA M-02-540. Ms. Fuentes received deferred adjudication
for an offense which did not render her deportable, but after a
*Fleuti*-type departure, she was ruled inadmissible, under §1182(a).

to further the accuracy of that determination. Detainees have a right to counsel at the detention hearing.... They may testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing... The judicial officer charged with the responsibility of determining the appropriateness of detention is guided by statutorily enumerated factors, which include the nature and the circumstances of the charges, the weight of the evidence, the history and characteristics of the putative offender, and the danger to the community. ... The Government must prove its case by clear and convincing evidence. ... Finally, the judicial officer must include written findings of fact and a written statement of reasons for a decision to detain... The Act's review provisions, ... provide for immediate appellate review of the detention decision.

No such safeguards are present herein. Neither the statute nor the regulations differentiate between LPRs, and those seeking initial entry, who have no constitutional rights. *Knauff v. Shaughnessy,* *supra.* There is no hearing, no neutral decisionmaker, no appellate review. *As applied* herein, [19] this violates both Substantive and Procedural Due Process. *See also, Zadvydas, supra* at 2498-99:

> The Fifth Amendment's Due Process Clause forbids the Government to "depriv[e]" any "person ... of ... liberty ... without due process of law." Freedom from imprisonment--from government custody, detention, or

---

[19] INS only returns LPR to Mexico when criminal prosecution is not contemplated. As Defendants previously explained, (R3:810-811):

> When a lawful permanent resident applies for admission as a returning resident at a port of entry under the jurisdiction of the Harlingen, Texas, INS Office, and Respondents have reason to believe that said person has committed an act which would subject him or her to exclusion proceedings, if criminal prosecution is also contemplated, it is the practice of Respondents to parole the individual into the United States for prosecution, and place him or her under exclusion proceedings. If the prosecution results in a conviction, it is the practice of Defendants to detain said individual at the Service Processing Center at Los Fresnos, Texas, pending exclusion proceedings. Upon request of counsel, and in some cases upon payment of a bond, such persons are frequently paroled into the United States. If criminal prosecution is not contemplated, it is the practice of Defendants to initiate exclusion proceedings, and, in most instances, return said person to Mexico, without advising him or her of the possibility of being paroled into the United States.

> other forms of physical restraint--lies at the heart of
> the liberty that Clause protects. ...    And this Court
> has said that government detention violates that Clause
> unless the detention is ordered in a *criminal* proceeding
> with adequate procedural protections, see United States
> v. Salerno, ..., or, in certain special and "narrow" non-
> punitive    "circumstances,"    ...    where    a    special
> justification, such as harm-threatening mental illness,
> outweighs the "individual's constitutionally protected
> interest in avoiding physical restraint."

Under the circumstances, there is little question but that, as this
Court previously concluded, the authority to parole LPRs returned
to Mexico to await removal hearings "is not implemented in a fair
manner," and *as applied,* violates Plaintiffs' right to Due Process.

### 3. INS' CLAIM THAT THE BALANCE UNDER *MATHEWS* FAVORS THE GOVERNMENT IS BOTH FACTUALLY AND LEGALLY UNSUPPORTED.

#### a. RISK OF ERRONEOUS DEPRIVATION AND VALUE OF PROCEDURAL SAFEGUARDS

INS' argument on erroneous deprivation is largely a restatement of
the claim that there is no liberty interest in parole.   INS also
urges that nothing "can be submitted to the immigration judge which
cannot be submitted to the District Director," (INSsj3:21).

But it is undisputed that: 1) the District Director does not
regularly conduct face-to-face interviews, let alone hearings, on
parole requests; [20] 2) A request may be denied for clearly arbitrary
and capricious reasons, (*e.g.,* parole is not in INS' interest,
reflecting the fact that the District Director is not a "neutral
decisionmaker"), and 3) hearings before an Immigration Judge may
well produce different results. [21] Further, lacking notice that

---

[20] Such encounters are crucial to credibility findings. *Efe v.
Ashcroft,* 293 F.3d 899 (5th Cir.2002) (court gives great deference
to immigration judge's decision on credibility), and particularly
for unrepresented LPRs, facilitates development of the pertinent
factors, such as flight risk, and danger to the community.

[21] INS denied Plaintiff Grimaldo's parole request in *Hernandez-
Leija et al v. Trominski,* CA B-01-201, on the grounds that it was
not in **INS'** interest, but the Judge ordered his release on bond.

parole existed, and how to request it, Plaintiffs Merino, Ascencio and Guterriez spent months in Mexico, at great emotional and financial cost to them and their U.S. citizen families, before they found counsel, who quickly obtained parole on their behalf.

It is therefore clear that, lacking notice and a Due Process hearing, however summary, the risk of erroneous deprivation of parole is extremely high, as are the costs of such deprivation.

### b.  PROTECTING THE NATIONAL INTEREST

INS argues, (INSsj3:22) that, to be "more accountable to the needs of the Executive," the parole authority must remain with the INS District Director. This overlooks the fact that Immigration Judges are also under the Department of Justice, and harks back to the arguments made in support of the old summary exclusion provisions for aliens deemed security risks, 8 U.S.C. §1225(c) (1989), which, in an opinion authored by (now) Justice Ginsberg, was construed as inapplicable to LPRs, *Rafeedie v. INS,* 880 F.2d 506 (D.C.Cir.1989).

INS has adequate tools to address concerns that a given LPR might be a terrorist, without depriving **all** allegedly inadmissible LPRs of Due Process. [22]  Even before the PATRIOT Act, INS had ample authority to deal with suspected terrorists. *See, e.g.,* 8 U.S.C. §1531 *et seq,* "Alien Terrorist Removal Procedures." In fact, there is a specific detention procedure, §1536, for such persons. [23] Those tools were greatly strengthened by the PATRIOT Act.

### c.  ALLEGEDLY "HUGE" ADMINISTRATIVE BURDEN

INS now claims that mandating parole hearings would cause a "huge administrative burden." No such claim was made before the Fifth Circuit, even though this Court's injunction, requiring both notice

---

[22]  It would also be foolish for INS to return such persons to Mexico under §1225(b)(2)(C), given the ease with which they could thereafter gain surreptitious entry into the United States.

[23]  Ironically, 8 U.S.C. §1536 affords bond hearings to accused terrorists who are also LPRs, who bear the burden of proving that they will not "endanger national security," or the community.

and hearings, had been in effect for nearly a year and a half. [24]
Nor is the claim supported with statistics as to the number of LPRs
returned to Mexico under §1225(b)(2)(C), the percentage of these
LPRs who requested hearings, or who filed appeals, while the
injunction was in effect, or any other evidence, even though such
evidence would be within the sole control of INS. The failure to
produce such evidence gives rise to an inference that it would not
support INS' claim of a "huge administrative burden." *See, Streber
v. IRS,* 138 F.3d 216,221-22 (5th Cir.1998) (internal cites omitted):

> In general, a court may draw a negative inference from a
> party's failure to produce a witness "whose testimony would
> elucidate the transaction." ... The strength of the inference
> "is rooted in notions of common sense[,] ... will vary with
> the facts of each case," and may be drawn only where a
> witness has information "peculiarly within his knowledge..."

Even assuming that the number of LPRs returned to Mexico were of
the same order of magnitude as LPRs held in the Harlingen INS
District under 8 U.S.C. §1226(c), this would be only about 200-250
per year. [25] If they all requested hearings, were all denied parole
and all filed appeals, this would comprise less than one tenth of
one percent of the approximately 271,000 appeals received per year
by the EOIR. (Plaintiffs' Exhibit EEE, incorporated by reference,
at page 2). This is hardly a "huge" administrative burden. [26]

By contrast, notice of the existence of parole and even minimal Due
Process safeguards in adjudicating parole requests would make a

---

[24] Ironically, Plaintiffs' attempt to avoid undue burden, by
having parole hearings conducted like bond hearings, which are much
less formal than removal hearings and do not require transcripts,
etc., gave INS the excuse to assert that its claim that §1226(e)
barred jurisdiction over this claim derived from the reference to
8 C.F.R. §236 in the Court's order. Notably, INS never argued to
the Fifth Circuit that this reference was the source of its claim!

[25] *See,* Declaration of Aaron Cabrera, submitted with INS'
"Objection to Magistrate Judge's Report and Recommendation" [Dkt.
21] in *Reyna-Montoya et al v. Trominski et al,* C.A. B-02-026.

[26] Notably, the BIA reduced its backlog from 56,000 to 47,000
in the six months preceding the August 23, 2002 press release. *Id.*

huge difference to Plaintiffs such as Ms. Ascencio and Mr. Merino. Between the time they were detained, on July 3, 1994, and their eventual parole, in November, 1994, Mr. Merino had lost his job, leaving the family with no income; they were separated from their eighteen month old U.S. citizen son for four months, and their U.S. citizen daughter missed the beginning of the school year, and cried constantly. (R4:955-56,967-72;R5:1292-93,1312). The parole hearing with the Immigration Judge also made a huge difference to Plaintiff Grimaldo in *Hernandez-Leija*, as it led to his eventual release.

## C. INS' CLAIM THAT NO "LEGAL AUTHORITY" WOULD PRECLUDE THEM FROM PUTTING PERSONAL INFORMATION ON I-94s IS ALSO WITHOUT MERIT.

### 1, PLACING SUCH INFORMATION ON PLAINTIFFS' I-94s VIOLATES THE PRIVACY ACT, AND THE PRINCIPLE THAT THE GOVERNMENT MAY NOT ACCOMPLISH INDIRECTLY THAT WHICH IT IS FORBIDDEN FOR THEM TO DO DIRECTLY.

INS quotes, (INSsj3:27), the comment of the Fifth Circuit, *Loa-Herrera, supra* at 989, to the effect that the notations on the I-94s given as temporary proof of Plaintiffs' LPR status enable INS:

> ... to caution employers that a potential worker, although an LPR and therefore currently authorized to work in the United States, is also facing pending deportation proceedings and thus may not be available for an extended period of employment.

However, INS then proceeds to claim that this does not violate the Privacy Act, because INS is not the one disclosing the information, (INSsj3:28) (**bold** emphasis added) (underlining by INS):

> ... [T]he document is provided directly to the alien as "evidence of permanent resident status <u>until ordered deported or excluded</u>,"[27] not to a third party. ... The issuance of the registration card is pursuant to INA § 264(d), not pursuant to a request from a third party.[28]

---

[27] Actually, the sentence should read, "until ordered deported or excluded, or until proceedings are terminated in the LPR's favor." All seven named Plaintiffs herein won their cases, so a final order of deportation or exclusion is by no means inevitable.

[28] Ironically, this can be viewed as an admission that the potential employer has not even requested the information regarding a class member's immigration status. As discussed in Plaintiffs' summary judgment motion, at p. 16, the fact that the information was never requested makes its disclosure even more problematic.

> Furthermore, the card is issued to the plaintiff class member who must keep it in his or her possession pursuant to INA § 264(e). **If the plaintiff class member elects to reveal the information contained therein to a third party, it cannot be said that the INS has made a "disclosure" as contemplated by the Privacy Act.** <u>See generally Abernethy v. I.R.S.</u>, 909 F.Supp. 1562, 1571 (D. Ga. 1995) (holding that an agency cannot be sued for disclosures which an individual makes himself).

This overlooks one crucial fact: LPRs do not "choose" to show proof of LPR status to potential employers.  Rather, providing proof of LPR status is a pre-condition to obtaining lawful employment, and other benefits which by law may only be provided to LPRs. *See*, 8 U.S.C. §1324a.  This is a far cry from *Abernethy,* which held:

> Finally, the Privacy Act was not violated when the Plaintiff informed the employees in the Estate and Gift Tax Group that Plaintiff was being removed from his position as their supervisor and the reason for the removal. The Plaintiff cannot sue Defendant IRS for disclosures which the Plaintiff made himself.

Apparently, INS would have it both ways, claiming that the Attorney General has the right to inform potential employers of LPRs' legal problems, while urging that it is the LPRs who actually do so. This ignores the plain language of the statute, which forbids disclosure "by any means," 5 U.S.C. §552b (emphasis added): [29]

> (b)  Conditions of disclosure.  No agency shall disclose any record which is contained in a system of records **by any means of communication to any person, or to another agency,** except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains

As the Fifth Circuit acknowledged, writing something on a document that another will see is clearly a "means of communicat[ing]" that

---

[29]  INS also appears to claim that a purpose of these notations is to allow "the government to be aware of the number of aliens in the country and their status." (INSsj3:28).  By definition, Plaintiffs' status is that of lawful permanent residents. *See,* 8 C.F.R. §1.1(p); *Molina v. Sewell,* 983 F.2d 676 (5th Cir. 1993). If their purpose were to communicate with other INS officials, this could easily be accomplished by the use of encoded notations.

information to the other. It also violates the maxim that the government may not accomplish indirectly what it is forbidden to do directly. *See, Keenan v. Tejeda*, 290 F.3d 252,258 (5th Cir. 2002):

> As this court explained in Colson, if government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly. Id. at 509-10; Perry v. Sindermann, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697, 33 L. Ed. 2d 570 (1972).

Particularly given the Fifth Circuit's frank recognition of the purpose of such notations, INS cannot hide behind legal sophistry, claiming that it is the LPR who exhibits the I-94 to potential employers and others to whom he must show proof of LPR status.

### 2. INS CANNOT INVOKE THE "ROUTINE USE" EXCEPTION WHERE IT HAS NOT FULFILLED THE STATUTORY REQUIREMENTS THEREOF

INS fares no better in its invocation of the "routine use" exception to the Privacy Act, (INSsj3:29):

> [I]nsofar as the alien registration card sets forth that a plaintiff class member is in proceedings, the information assists the INS and other government agencies, federal and state, to aid the INS to carry out its functions and statutory mandates. Such "disclosure" of information is a "routine use" and is not prohibited by the Privacy Act. <u>See</u> 62 FR 36572; 5 USCA § 552a(b)(3).

In fact, 62 FR 36572 provides an excellent example of the "routine use" exception. The only problem is, however, that it contains a "routine use" publication by the Federal Election Commission, not by INS. 5 U.S.C. §552a(b)(3) exempts only those routine uses "described under subsection (e)(4)(D)." Subsection (e)(4)(D), in turn, requires that the agency publish in the Federal Register:

> D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

Therefore, in the absence of such a publication, (of which Plaintiffs have located, and INS has identified, NONE), the agency

15

may not invoke the "routine use" exception to the Privacy Act. *See NLRB v. U.S. Postal Service,* 128 F.3d 280,282 (5th Cir. 1998):

> The Privacy Act ... prohibits the disclosure of employee information, absent employee consent, unless a specified exception is met. One such exception, the "routine use" exception, allows "the use of [a] record for a purpose compatible with the purpose for which it was collected." 5 U.S.C. § 522a(a)(7). **Consistent with this authorization, the [Postal] Service has promulgated "routine use" exceptions,** including Routine Use "m" ...

INS has apparently not taken advantage of the authorization of the Privacy Act to "promulgate[] 'routine use' exceptions." Without such publication, and having met certain other requirements, the agency may not rely on the routine use exception. *U.S. Postal Serv. v. Nat. Assoc. Letter Carriers,* 9 F.3d 138,140 (D.C. Cir. 1993):

> As to the latter, the union relied on an exception to the Privacy Act authorizing disclosures of information concerning employees if the disclosure is "for a routine use," 5 U.S.C. § 552a(b)(3) (1988), which is defined only as a "use for a purpose which is *compatible* with the purpose for which it was collected," 5 U.S.C. § 552a (a)(7) (1988) (emphasis added). However, **under the Act a government agency must notify employees as to such uses. The agency must publish in the Federal Register a notice of "each routine use of the records contained in the system, including the categories of users and the purpose of such use," 5 U.S.C. § 552a(e)(4)(D) (1988), and must also "inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual" of the routine uses to which the information is subject.** 5 U.S.C. § 552a(e)(3)(C) (1988).

It is therefore clear that the Privacy Act provides compelling "legal authority to the contrary," with respect to INS' claim that it is entitled to put personal information about LPRs on the I-94s provided under 8 C.F.R. §264.5(g) as proof of their LPR status.

### 3. **THE SAME PRINCIPLES OF INDIRECT DISCLOSURE APPLY TO INS' ARGUMENTS UNDER 8 U.S.C. §1304(b).**

INS also argues with respect to 8 U.S.C. §1304(b), (INSsj3:29-30),

16

that in issuing an I-94 to a class member:

> INS is merely issuing an alien registration card as required
> by INA § 264(d) that an alien must possess pursuant to INA
> § 264(e). If an alien subsequently elects to publish the
> information to a third party, such as an employer, it is not
> the INS that has violated the confidentiality of its
> records. Accordingly, the INA § 264(d) does not prohibit
> the INS from noting on an alien registration document that
> an alien is in immigration proceedings.

In other words, if an LPR under proceedings "elects" to seek
employment, it is INS' position that he or she cannot complain that
some INS official has placed such personal information on the I-94
issued as proof of LPR status. Similarly, if the LPR "elects" to
apply for a driver's license, Social Security card, or federally
funded legal services, and must show proof of LPR status, the fact
that an INS agent has taken it upon him or herself to put such
notations on the I-94, does not, according to INS, violate the
Privacy Act, or 8 U.S.C. §1304(b). [30]    This argument is just as
incorrect with respect to §1304(b) as it is under the Privacy Act.

### III.  CONCLUSION

In conclusion, it is urged that the Court deny Defendants' motion
for summary judgment. The question of whether Plaintiffs need be
informed of the existence, and means for requesting, provisional
remedies, following the summary deprivation of liberty or property
interests, is governed by *Memphis Light* and *City of West Covina*,
*supra*, and depends on whether those procedures are "arcane" and are
"not set forth in documents accessible" to the Plaintiffs, [as in
*Memphis Light*] or are set forth in "generally available [] statutes
and case law," [as in *West Covina*], and whether an "appropriate

---

[30] It is worth repeating that whether such information is noted
on an I-94 depends on the official who prepares it. Neither the
regulations nor the Operations Instructions which govern such I-
94s, (OI 264.2, submitted by INS as an exhibit to their first
motion for summary judgment (R3:717-21)), require it. So this is
not a case where the Attorney General has exercised his discretion
under 8 U.S.C. §1304(d) to specify the form of an alien
registration document to be issued, by promulgating a regulation.

inquiry" will elicit the pertinent information, as in *Atkins v.
Parker, supra.* Defendants have submitted no evidence to show that
the pertinent statutes and case law are "generally available" to
Plaintiffs in Mexico, or that an "appropriate inquiry" will elicit
this information. Indeed, they have previously admitted that the
parole procedures are difficult for LPRs stranded in Mexico to
ascertain, and follow. Further, as INS also conceded, Plaintiffs
are entitled at least to minimal notice. *See,* (INSsj3:12):

> Rather, as identified in <u>City of West Covina</u>, the notice
> simply has to provide that the relief is available and
> from whom it can be obtained.

The balancing test mandated by *Mathews v. Eldrige, supra,* clearly
supports Plaintiffs' claim that they are entitled to a Due Process
hearing, however summary, before their applications are finally
denied. The stakes are enormous for Plaintiffs, as seen by the
experience of Plaintiffs Ascencio and Merino, who spent four months
in Mexico, at great emotional and financial cost, before they
obtained counsel, and were granted parole. The risk of erroneous
deprivation is also high. There is an inherent conflict of interest
where the decision to grant parole is vested in the INS District
Director. He is also the "prosecutor," and, as with Plaintiff
Grimaldo in *Hernandez-Leija, supra,* may well deny it for the simple
reason that granting parole is not in the interests of INS. [31]

And INS' crocodile tears notwithstanding, no **evidence** was produced
to support their claim that granting parole hearings would entail
a "huge administrative burden." (INSsj3:22). This Court's Order was
in effect for two years before being vacated by the Fifth Circuit,[32]

---

[31] LPRs who are detained without bond are much more likely to
forego the legal struggle to salvage their LPR status, as occurred
with Rafael Gonzalez-Noyola, CA B-01-058, who gave up his struggle
and accepted deportation, even though the Immigration Judge had
granted his application for relief, which INS had appealed.

[32] INS sought, and was denied, a stay by this Court, but never
made such a request to the Fifth Circuit, as would be expected if
the Court's order were creating a "huge administrative burden."

and information as to how many Plaintiffs made such requests, were
granted hearings, and filed appeals, is solely within INS' control.
Such statistics as Plaintiffs located indicate that the additional
burden would have been trivial. (Exhibit EEE).

Nor do INS' arguments as to the Privacy Act and 8 U.S.C. §1304(d)
have merit.  As the Fifth Circuit noted, *Loa-Herrera, supra* at 989,
putting notations regarding Plaintiffs' legal problems on the I-94s
provided as temporary proof of LPR status enables INS to warn
employers that the person is under proceedings. and "thus may not
be available for an extended period of employment." Thus INS cannot
claim that it is not the agency, but the LPRs, who inform employers
and others to whom, by law, they must show proof of LPR status, of
their legal problems.  And since INS has not jumped through any of
the legal hoops required to invoke a "routine use" exception to the
Privacy Act, that claim is also groundless.

It is therefore urged that both of Defendants' pending motions for
summary judgment be denied.

Respectfully Submitted,

Lisa S. Brodyaga, Attorney
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226
Fed ID:    1178
Texas Bar: 03052800

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed, first
class postage prepaid, to Anthony Payne, Attorney, OIL, Box 878,
Ben Franklin Sta., Washington, D.C. 20044, on January 9, 2003.

19

United States District Court
Southern District of Texas
FILED

JAN 1 0 2003

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ASCENCIO-GUZMAN et al,      )
                            )
v.                          )        C.A. No.  B-94-215
                            )
TROMINSKI, et al.           )
_____)

EXHIBIT "EEE"
FILED IN SUPPORT OF

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Come Plaintiffs, and file herewith, in support of their Opposition
to INS' Motion For Summary Judgment, printouts of statistics from
the official websites of INS and the Executive Office for
Immigration Review, ("EOIR").


Respectfully Submitted,

Lisa S. Brodyaga, Attorney        Thelma O. Garcia, Attorney
17891 Landrum Park Road           301 E. Madison
San Benito, TX 78586              Harlingen, TX 78550
(956) 421-3226                    (956) 425-3701
(956) 421-3423 (fax)              (956) 428-3731
Fed. ID.  1178
Texas Bar 03052800


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, and accompanying
Exhibit, were mailed, first-class postage prepaid, to Anthony
Payne, Attorney, OIL, at P.O. Box 878, Ben Franklin Station,
Washington, D.C., 20044, on January 9, 2003.

 **Department of Justice**

FOR IMMEDIATE RELEASE
FRIDAY, AUGUST 23, 2002
(202) 202-514-2007

EOIR
WWW.USDOJ.GOV
TDD (202) 514-1888

## FACT SHEET
## BOARD OF IMMIGRATION APPEALS: FINAL RULE

### *The Purpose of the Rule:*
### Providing Quality Service Through More Expeditious Review

*People from around the world come to the U.S. to seek the same dreams that have inspired millions of others: they want a better life for their families and children. In keeping with the Administration's commitment to transforming the immigration service system to one that ensures fairness and integrity, yet also provides timely and accurate services, these reforms are intended to provide all immigrants with efficiency and effectiveness in the immigration adjudication process.*

**Revamping the Structure and Procedures of the BIA.** This final rule revises the structure and procedures of the Board of Immigration Appeals (BIA, or Board) to enable the Board to reduce delays in the administrative review process, eliminate the existing backlog of cases, and focus more attention and resources on those cases presenting significant issues for resolution. The reforms mandated by this rule are part of a broader reorganization process that the Department of Justice is undertaking in order to better serve its mission of protecting national security, enforcing our nation's laws, and providing quality service to immigrants, citizens, and businesses.

**Four Important Objectives:** The Attorney General has stressed four important objectives in the disposition of administrative immigration appeals:

- Eliminating the current backlog of cases pending before the Board;

- Eliminating unwarranted delays in the adjudication of administrative appeals;

- Utilizing the resources of the Board more efficiently; and

- Allowing more resources to be allocated to the resolution of those cases that present difficult or controversial legal questions -- cases that are most appropriate for searching appellate review and that may be appropriate for the issuance of precedent decisions.

### *Addressing Concerns with the BIA's Efficiency and Effectiveness:*
## A Significant Backlog of Cases Has Developed Over Time, Slowing Down the System for Many

**The BIA Has Been Unable to Effectively and Efficiently Adjudicate Its Caseload in Years Past.** The immigration court system receives a staggering number of cases - approximately 271,000 a year. Due to an inefficient adjudication process, the Board has not been able to keep up with its appellate caseload. Despite a steady increase in the number of Board members over the last several years, the Board has accrued a backlog of more than 56,000 cases.

- **The Attorney General Recognized the Problem, and Mandated Reform.** The Attorney General recognizes that the delays have affected the Department's law enforcement effectiveness, while contributing to the public perception that "justice delayed is justice denied." To address this problem, which is fundamentally an issue of procedures and not personnel, the Attorney General has mandated reforms to the Board's adjudication process and has made these reform a top priority of the Department.

- **The Reforms Build on the Streamlining Initiative that Has Already Produced Results.** The Board's streamlining initiative has significantly reduced the current backlog within the last 6 months to less than 47,000 cases and allowed the Board to resolve twice as many cases than before. This rule will expand upon the streamlining process already in place and make it the dominant method for adjudicating the majority of cases before the Board.

### *Summarizing the Key Reforms:*
## Reforms Will Ensure Timely Adjudication and Strengthen the BIA's Review Process

**Necessary Reforms.** This rule reflects a variety of necessary reforms to achieve the goals of strengthening the Board's review process, enhancing the function of the Board in resolving issues, providing effective guidance regarding the implementation of the immigration laws, and improving the timeliness of the Board's review. Some of the key reforms include:

- **Improved Streamlining.** The reform procedures expand the existing streamlining process by which the Board resolves routine appeals through a single member adjudication process. The rule expands the existing streamlining process and makes it the dominant method of adjudication for the majority of routine cases before the Board.

  - ✓ The Department agrees with the fundamental assessment by outside evaluators that the Board's use of the streamlining process already in place has been successful.

✓ As a retired Board Member testified before the House Judiciary Committee, the "overwhelming percentage of immigration judge decisions . . . [are] legally and factually correct."

✓ Single-member review is appropriate in these straightforward cases where there has been no historic disagreement within the Board over the result.

- **Three-Board Member Review Remains for Complex Cases, and for Those that Require Interpretation of Law, or the Correction of Clear Errors of Fact.** The rule provides for three member review in cases that require the Board to correct clear errors of fact, interpret the law, and provide guidance regarding the exercise of discretion. This will enable the Board to resolve simple cases efficiently, while reserving its limited resources for more complex cases and the development of precedent to guide the immigration judges and the parties. Three-member panels will focus on:

  ✓ Settling inconsistencies among the rulings of different immigration judges;

  ✓ Establishing precedent construing the meaning of laws, regulations, or procedures;

  ✓ Reviewing decisions by immigration judges or the Immigration and Naturalization Service (INS) that are not in conformity with the law or with applicable precedents;

  ✓ Resolving cases or controversies of major national import; and

  ✓ Reviewing clearly erroneous factual determinations by immigration judges.

- **According an Appropriate Amount of Deference to Immigration Judges' Fact-Findings.** The rule replaces the existing standards of review with the more deferential "clearly erroneous" standard for review of immigration judges' factual findings. Under the current procedure, which may apply the *"de novo"* standard of review, the Board may look at a case anew without according deference to the immigration judge's factual or other findings. The final rule requires the Board to apply the much more deferential "clearly erroneous" standard in its review of immigration judges' fact findings. Under the "clearly erroneous" standard, the Board may not disturb an immigration judge's fact findings unless they were so clearly wrong that they must be overturned.

  ✓ The Board's historic rule of not considering new evidence on appeal is codified in this rule. The Board, however, may remand cases to the immigration judge for any fact-finding that may be required after a case goes on appeal.

  ✓ The rule will allow the Board to continue reviewing the decisions of the INS under the broader *"de novo"* standard of review.

- **Establishing Reasonable Deadlines for the Completion of Board Decisions.** The time period allowed for transcript production, briefing, and the adjudication of the appeals will be shortened. The Chairman will be responsible for a case management screening system to review all incoming appeals and to provide for prompt and appropriate disposition of all cases.

  - ✓ After a case is ready for adjudication, ideally single-member adjudications will be completed within 90 days and three-member adjudications will be completed within 180 days.

  - ✓ Appeals that are untimely filed and must be dismissed on that basis will be processed more efficiently.

  - ✓ Immigration judges will be required to review their decisions and the hearing transcripts in a timely manner.

  - ✓ Parties will be required to brief cases expeditiously, generally within a 21-day period.

- **After a Transition Period, the Board Will Be Reduced in Size.** After a transition period to implement the new procedures and to reduce the current backlog, the size of the Board will be reduced to 11 members. Eleven members is the appropriate size for the Board based on the historic capacity of appellate courts and administrative appellate bodies to adjudicate the law in a cohesive manner, the ability of individuals to reach consensus on legal issues, and the requirements of the existing and projected caseload.

### *Developing the Final Rule:*
### Giving Careful Consideration to the Comments of Those Affected

**A Process that Accorded Opportunity for Comment.** The proposed rule was published on February 19, 2002. The Department received nearly 70 helpful comments. After a careful review of these comments, the Department has made a number of changes, including provisions for:

- **Consecutive filing of briefs in non-detained cases**, rather than the proposed rule provision for concurrent filing.

- **Discretionary determinations of when a case should be heard by a three-member panel,** rather than the proposed rule provision that made these determinations mandatory.

- **Discretionary determinations of when a case should be summarily dismissed,** rather than the proposed rule provision that permitted no discretion.

4

- **The "clearly erroneous" standard will be applied only to factual determinations by immigration judges**, not INS determinations or questions of law or judgment.

- **The "clearly erroneous" standard will be applied only to appeals filed after the effective date of the rule.**

- In addition, because of concerns raised in comments received, **the Attorney General has instructed the Board's Chairman to:**

  - ✓ **Establish a system of quality assurance** in Board decisions; and

  - ✓ **Ensure**, with the Chief Immigration Judge, that **transcripts of proceedings are provided to the parties in a timely manner.**

*All of the changes in the final rule were the product of suggestions provided by the public as well as the components of the Department of Justice.*

This is a printer friendly version of
http://www.ins.usdoj.gov/graphics/aboutins/statistics/msrsep02/INSP.HTM

# INSPECTIONS

Compared to September 2001, total inspections of citizens and aliens for entry to the United States increased 9 percent. Air admissions increased 22 percent and land admissions increased 7 percent compared to the previous September. Sea admissions increased 10 percent and inadmissibles decreased 5 percent compared to September 2001. Total inspections for fiscal year 2002 decreased 13 percent compared to fiscal year 2001.

| | Month | | | Fiscal Year | | | Total |
| | Sep-2002 | Sep-2001 | % Change | FY 2002 to Date | FY 2001 to Date | % Change | FY 2001 |
|---|---|---|---|---|---|---|---|
| Total Inspections | 36,236,125 | 33,182,827 | 9 | 444,710,152 | 510,583,046 | -13 | 510,583,0 |
| Air Admitted | 5,833,025 | 4,793,053 | 22 | 69,496,831 | 79,391,669 | -12 | 79,391,6 |
| Land Admitted | 29,082,760 | 27,194,794 | 7 | 357,983,614 | 413,947,270 | -14 | 413,947, |
| Sea Admitted | 1,014,334 | 924,706 | 10 | 12,225,794 | 11,869,375 | 3 | 11,869, |
| Inadmissible | 57,867 | 60,820 | -5 | 733,440 | 700,807 | 5 | 700,8 |

Data Source: PAS G-22.1



Seasonally Adjusted Total Inspections - Land, Air & Sea Admissions

- September 2002 total inspections decreased about 6,382,000 compared to August 2002. The

Case 1:94-cv-00215   Document 179   Filed in TXSD on 01/09/2003   Page 32 of 36
INS Online: Printer Friendly Version Of INSPECTIONS

Page 2 of 2

same comparison for last fiscal year showed a decrease of about 14,016,000.

- About 14 million U.S. citizens were admitted at INS ports of entry during September 2002, compared to approximately 23 million aliens admitted during the same month. The above categories of admission include individuals who make multiple entries, for example, citizens who leave and reenter the United States multiple times, permanent residents who make multiple entries, or aliens who hold non-immigrant visas or border crossing cards and commute back and forth each week from Canada or Mexico.

- The total inadmissible count for September 2002 was 57,867, a 5 percent decrease compared to September 2001. Inadmissible persons include aliens referred to secondary inspection who withdraw, are refused entry, are paroled in, or are referred to an Immigration Judge for a removal hearing. Also included are expedited cases where an alien can withdraw, or receives an expedited removal order, or is referred for a credible fear interview.

- Total inspections are presented as a seasonally adjusted data series. These seasonally adjusted inspections decreased 25 percent between August 2001 and October 2001, but have increased 12 percent since then.

*Last Modified 11/14/2002*

This is a printer friendly version of
http://www.ins.usdoj.gov/graphics/aboutins/statistics/msrsep02/SWBORD.HTM

## SOUTHWEST BORDER APPREHENSIONS

The U.S. Border Patrol made 68,263 apprehensions along the southwest border during September 2002, a 15 percent increase when compared to September 2001. Voluntary returns conducted by Border Patrol agents increased by 14 percent from a year ago to 63,614. For fiscal year 2002, apprehensions were down 25 percent and voluntary returns were down 26 percent when compared to fiscal year 2001.

| | Month | | | | Fiscal Year | | |
| Southwest Border | Sep-2002 | Sep-2001 | % Change | | FY 2002 to Date | FY 2001 to Date | % Change |
|---|---|---|---|---|---|---|---|
| **Apprehensions** | 68,263 | 59,276 | 15 | | 929,809 | 1,235,717 | -25 |
| **Voluntary Returns** | 63,614 | 55,907 | 14 | | 884,380 | 1,191,047 | -26 |

Data Source: PAS G-23.8 & G-23.18

### Southwest Border Total Apprehensions



- Normally, apprehensions reach a yearly low in December followed by a strong seasonal increase in January. Seasonal highs tend to be reached in early spring. Apprehensions decrease but remain relatively high through the summer months and then start their autumn decline in September, which continues through the Christmas and New Year holidays.

- Seasonally adjusted apprehensions decreased 65 percent between January 2000 and October 2001. Since reaching their lowest level in October 2001, seasonally adjusted apprehensions have increased 21 percent as of September.

- In FY 2001, Central American apprehensions on the southwest border reached 22,515, a decrease of 577 when compared to the previous year. For fiscal year 2002, southwest border Central American apprehensions reached 21,750, a decrease of 3 percent compared to fiscal year 2001. Of the 21,750 Central Americans apprehended in FY 2002, 41 percent were Honduran, 31 percent were El Salvadoran, 25 percent were Guatemalan, and 2 percent were Nicaraguan.

*Last Modified 11/14/2002*

This is a printer friendly version of
http://www.ins.usdoj.gov/graphics/aboutins/statistics/msrsep02/REMOVAL.HTM

## REMOVALS

Total removals for September increased 5 percent compared to the same month a year before. In September 2002, INS removed 11,314 aliens from the United States, 5,025 of these aliens were criminals.

| | Month | | | Fiscal Year | | | |
|---|---|---|---|---|---|---|---|
| | Sep-2002 * | Sep-2001 | % Change | FY 2002 to Date | FY 2001 to Date | % Change | F |
| Deportable | 3,260 | 3,117 | 5 | 44,824 | 46,038 | -3 | |
| Inadmissible | 8,054 | 7,695 | 5 | 101,116 | 131,278 | -23 | |
| Total Removals | 11,314 | 10,812 | 5 | 145,940 | 177,316 | -18 | |
| Criminal Removals | 5,025 | 5,272 | -5 | 69,580 | 71,871 | -3 | |
| Non-criminal Removals | 6,289 | 5,540 | 14 | 76,360 | 105,445 | -28 | |

Data Source: HQSTA DACS Monthly Extract

\* - Current Monthly Data are Preliminary.



Removals by Type

- The current month's statistics are preliminary. Historically there have been significant upward revisions in the statistics for three months after the initial reporting period. The August statistic for total removals has increased 7 percent (889 removals) since the preliminary number was released last month.

- Preliminary data indicate that total removals in fiscal year 2002 decreased 18 percent compared to fiscal year 2001. In fiscal year 2002, expedited removals decreased 52 percent compared to fiscal year 2001. Other types of removals increased 4 percent comparing FY 2002 to FY 2001. Non-expedited removals were 77 percent of total removals. In fiscal year 2000 non-expedited removals were 54 percent of total removals; in fiscal year 2001 they were 60 percent of total removals.

- Preliminary data indicate that removals of criminal aliens (including expedited) decreased 3 percent in fiscal year 2002. Non-expedited criminal removals decreased 1 percent.

*Last Modified 11/14/2002*